# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

——————————————————————— x
: 
In re:                                         :         **Chapter 11**
                                               :
**MAGIC BRANDS, LLC, et al.,**[1]              :         **Case No. 10-11310 (BLS)**
                                               :
             **Debtors.**                      :         **(Joint Administration Requested)**
                                               :
——————————————————————— x

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED FINANCING, (B) UTILIZE CASH COLLATERAL, (C) GRANT PRIMING LIENS, PRIORITY LIENS, AND SUPERPRIORITY CLAIMS TO DIP LENDERS, AND (D) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF

Magic Brands, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, respectfully represent:

### Fed. R. Bankr. P. 4001 Concise Statement[2]

1.      By this motion and for the reasons set forth below, pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Fed. R. Bankr. P. 2002, 4001, and 9014, and Del. Bankr. L.R. 4001-2, the Debtors respectfully request entry of (a) an interim order substantially in the form attached hereto as Exhibit A (the "Interim Order") (i) authorizing the Debtors to (A) obtain postpetition senior secured financing,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Magic Brands, LLC ("Magic") (8989), Fuddruckers, Inc. ("Fuddruckers") (8267), Atlantic Restaurant Ventures, Inc. ("Atlantic") (9769), King Cannon, Inc. ("King Cannon") (8671), and KCI, LLC ("KCI") (9281). The address for all of the Debtors is 5700 Mopac Expressway, Suite C300, Austin, Texas 78749.

[2] Unless otherwise indicated, capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the DIP Agreement (as defined below).

(B) utilize cash collateral, (C) grant priming liens, priority liens, and superpriority claims to the DIP Lenders (as defined below), and (D) grant adequate protection to the Prepetition Secured Parties (as defined below), (ii) scheduling a hearing to consider the relief requested herein on a final basis (the "Final Hearing"), and (iii) granting related relief; and (b) an order granting the relief requested herein on a final basis (the "Final Order," and together with the Interim Order, the "DIP Orders").[3]

2.     Pending the Final Hearing and entry of the Final Order, the Debtors respectfully request that the DIP Facility (as defined below) be approved on an interim basis pursuant to the terms of the Superpriority Priming Senior Secured Debtor-In-Possession Credit Agreement, in substantially the form attached hereto as Exhibit B (the "DIP Agreement"). Pursuant to Fed. R. Bankr. P. 4001 and Del. Bankr. L.R. 4001-2, the following are the material provisions of the DIP Agreement and/or the Interim Order:[4]

| **Borrowers**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Magic Brands, LLC, Fuddruckers, Inc., Atlantic Restaurant Ventures, Inc., King Cannon, Inc. and KCI, LLC (collectively the "DIP Borrowers") |
|---|---|
| **Guarantors**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | R. Wes, Inc., Fuddruckers of Howard County, LLC, 8725 Metcalf II, Inc. Fuddruckers of White Marsh, LLC, A R V I of Pikesville, Inc., A.R.I.V. – Rockville, Inc. (collectively, the "DIP Guarantors," together with the DIP Borrowers, the "DIP Obligors"). The DIP Guarantors are not Debtors. |

---

[3] The Debtors will provide a proposed Final Order to the Court, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), landlords, lienholders, taxing authorities, thirty largest creditors and parties appearing in these cases upon appropriate notice in advance of the Final Hearing.

[4] The summaries and descriptions of the terms and conditions of the DIP Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Agreement and the Interim Order. In the event that there is a conflict between this motion and the DIP Agreement or the Interim Order, the DIP Agreement or the Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **Administrative Agent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Wells Fargo Capital Finance, Inc. (the "<u>DIP Agent</u>") |
| **DIP Lenders**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Wells Fargo Capital Finance, Inc. and other banks, financial institutions or other entities that become signatories to the DIP Agreement, if any (collectively, the "<u>DIP Lenders</u>") |
| **Commitment**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br>*Del. Bankr. L.R. 4001-2(a)(ii)* | A senior secured revolving loan facility of $13,780,500 and which includes a letter of credit sub-facility of $500,000 (collectively, the "<u>DIP Loans</u>" or the "<u>DIP Facility</u>"). (Interim Order ¶ 2; DIP Agreement §2.1) |
| **Term**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br>*Del. Bankr. L.R. 4001-2(a)(ii)* | Unless accelerated as a result of an Event of Default, the earlier of (a) August 21, 2010, (b) the date the Revolver Commitment is permanently reduced to zero, (c) the date of the termination of the Revolver Commitment, (d) thirty five (35) days after entry of the Interim Order if the Final Order has not been entered by the Court on or before such date, (e) the closing date of any sale of all or substantially all of the assets of the Debtors pursuant section 363 of the Bankruptcy Code that has been approved by an order of the Court, and (f) the effective date of a Plan of Reorganization that has been confirmed by order of the Court. (DIP Agreement §3.3) |
| **Use of DIP Facility**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Facility shall be used in accordance with the 13-Week Budget to fund working capital and general corporate purposes, the administration and prosecution of the chapter 11 cases, adequate protection payments, and related transaction costs, fees and expenses associated with the DIP Facility. The outstanding letters of credit issued under the Prepetition Credit Facility (as defined below) shall be deemed to be letters of credit issued and outstanding under the DIP Agreement. (Interim Order ¶ 9; DIP Agreement §6.14) |
| **Roll up**<br>*Fed. R. Bankr. P. 4001(c)(1)(B) and Del. Bankr. L.R. 4001-2(a)(i)(A)* | After entry of the Interim Order and until entry of the Final Order, Collections shall be applied to the Prepetition Revolver and upon entry of a Final Order the Prepetition Revolver shall be paid in full with advances under the DIP Facility. (Interim Order ¶ 9(a); DIP Agreement §2.1) |
| **Entities with Interests in Cash Collateral**<br>*Fed. R. Bankr. P. 4001(b)(1)(B)(i)* | Prepetition Senior Agent on behalf of the Prepetition Secured Lenders (collectively, the "<u>Prepetition Secured Parties</u>"). (Interim Order ¶9) |
| **Use of Cash Collateral; Material Terms**<br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii) and (iii) Del. Bankr. L.R.* | The Debtors are authorized to use cash collateral of the Prepetition Secured Parties in accordance with the Budget (as defined below). (Interim Order ¶8) |

| | |
|---|---|
| *4001-2(a)(ii)* | |
| **Interim Financing**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | Revolver Commitment under the DIP Facility shall be made available upon entry of the Interim Order and satisfaction or waiver of certain other conditions to closing set forth in the DIP Agreement; provided, that the Debtors shall be permitted to use on an interim basis only those amounts that are consistent with the Budget (as defined below) and the DIP Agreement, in the aggregate amount of approximately $4,000,000, plus the amount of Collections applied to the Prepetition Revolver Advances. (Interim Order ¶¶ 2, DIP Agreement § 2.1) |
| **Amortization** | None. |
| **Interest Rates**[5]<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | All DIP Loans shall be Base Rate Loans. (DIP Agreement §2.6)<br><br>Base Rate Loans: Base Rate + 6% per annum. (DIP Agreement §2.6(a))<br><br>Base Rate: The greater of (a) four percent (4.00%) per annum and (b) the rate of interest announced, from time to time, within Wells Fargo Bank, N.A. at its principal office in San Francisco as its "prime rate"<br><br>Default Rate: Applicable rate + 2.00% per annum. If an Event of Default occurs and is continuing under the DIP Facility, each Loan at the end of the Interest Period then in effect for such LIBOR Loan. (DIP Agreement §2.6(c)) |
| **Fees**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | Closing Fee: of $70,000 payable $35,000 on the Closing date and $35,000 on the date of entry of the Final Order. (DIP Agreement §2.11(a))<br><br>Commitment Fee: 0.50% per annum on the average daily amount of the unused Revolving Commitments. (DIP Agreement §2.11(b))<br><br>Letter of Credit Fee: Base Rate + 6% per annum on the average aggregate daily amount available to be drawn under the Letters of Credit. (DIP Agreement §2.6(b)) |
| **Budget**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | A thirteen week cash flow forecast (updated on a monthly basis), which shall include actual cash receipts and disbursements (reported on a weekly basis). (DIP Agreement |

---

[5] Under the prepetition Credit Facility, the Debtors currently pay interest at a rate of approximately 10%.

| | |
|---|---|
| *Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | §6.); Borrower is required to operate in accordance with the Budget subject to permitted variances as set forth in section 6.19 of the DIP Agreement. (DIP Agreement §6.19) |
| **Other Covenants** | Compliance with affirmative and negative covenants as are customary for debtor in possession financing, including: (a) delivery of monthly and quarterly financial statements; (b) limitation on liens, indebtedness, investments, loans, acquisitions, sales, and affiliate transactions and (c) achievement of milestones related to the sale of substantially all of the Debtors' assets. (DIP Agreement §§ 5.1–5.23; 6.1–6.21) |
| **Liens and Priorities**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(i)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(i)(D) and (G),*<br>*4001-2(a)(ii)* | The DIP Loans shall be afforded certain liens and claims, including priming liens, priority liens, and superpriority claims, on property of the estate, as described in more detail in ¶ 36 below. (Interim Order ¶¶3-5 DIP Agreement § 2.16) |
| **Carve-Out** | (i) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6); (ii) subject to the terms and conditions of this Order, the allowed and unpaid reasonable fees and expenses of attorneys and financial advisors (other than FocalPoint) employed pursuant to sections 327 and 1103 of the Bankruptcy Code by the Debtors or any official committee of unsecured creditors (if appointed) up to a maximum aggregate amount of $550,000, and (iii) $700,000 on account of the transaction fee as set forth in that certain engagement letter of FocalPoint Partners LLC dated as of February 3, 2010 (items (i), (ii), and (iii), collectively, the "Maximum Carve-Out Amount"). (Interim Order ¶ 5; DIP Agreement §2.16(c)) |
| **Waiver of Rights**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(viii) and (x)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(i)(B) and (C)* | Upon entry of the Final Order, the Debtors waive certain rights and causes of actions against the Prepetition Agents (as defined below) and the Prepetition Secured Lenders, and the time within which any non-Debtor party in interest or statutory committee (a "Committee") may challenge the obligations to, or liens of, the Prepetition Agents and the Prepetition Secured Lenders (any such challenge, a "Challenge") will be limited to the later of (i) sixty (60) days from the date of appointment of a Committee, if brought by the Committee, and (ii) seventy-five (75) days from the date of entry of the Interim Order, if brought by any non-Debtor party other than the Committee. The Interim and Final Orders also will prohibit the assertion of all other claims under section 506(c) of the Bankruptcy Code against the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders.(Interim Order ¶¶ D, 7, and 11, DIP Agreement §2.16 ) |

RLF1 3563219v.1

| | |
|---|---|
| **Determination of Validity, Enforceability, Priority, or Amount of a Prepetition Claim or Any Lien Securing the Claim** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* <br> *Del. Bankr. L.R. 4001-2(a)(i)(B)* | Except to the extent that a Challenge is timely commenced and results in a final and non-appealable order of the Court disallowing the Prepetition Indebtedness or invalidating the Prepetition Liens (as defined in the Interim Order) in whole or in part, the Prepetition Indebtedness shall constitute allowed, secured claims for all purposes in the cases and any subsequent proceedings under the Bankruptcy Code, and the Prepetition Liens shall be deemed legal, valid, and binding (Interim Order ¶6) |
| **Adequate Protection for Prepetition Secured Parties** <br> *Fed. R. Bankr. P. 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii)* | Adequate protection for the Prepetition Secured Parties includes, replacement liens and superpriority claims, to the extent of diminution in value of their collateral, and payment of accrued and unpaid interest and reasonable fees and expenses of the Prepetition Secured Parties (including fees and expenses of legal and financial professionals). (Interim Order ¶¶ 9 and 10) |
| **Events of Default** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* <br> *Del. Bankr. L.R. 4001-2(a)(ii)* | The DIP Agreement contains certain Events of Default, including events related to the Cases, including amount others (a) the bringing of a motion by any Loan Party, or the entry of an order or ruling (which has not been withdrawn, dismissed or reversed); (i) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (ii) to use cash collateral of the Lender Group under Section 363(c) of the Bankruptcy Code without the prior written consent of Agent and the Required Lenders; or (iii) any other action or actions adverse to any member of the Lender Group or their rights and remedies hereunder or their interest in the Collateral; (b) the filing of any plan of reorganization or disclosure statement to which Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims; (c) the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the obligations, (d) the entry of an order amending, supplementing, staying, vacating, or otherwise modifying the Loan Documents, the Interim Order or the Final Order without the written consent of Agent or any Loan Party filing a motion for reconsideration with respect to the Interim Order or the Final Order; (e) after entry of the Final Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against Agent, any Lender or any of the Collateral or against the Pre-Petition Agent, any Pre-Petition Lender or any Collateral; (f) the sale without Agent's and the Required Lenders' consent, of all or |

| | |
|---|---|
| | substantially all of the assets of the Loan Parties through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations and termination of the Lenders' Commitments; (g) the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; (h) the entry of an order in any of the Chapter 11 Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to Agent, on behalf of the Lender Group; and (i) termination of the exclusive period for Loan Parties to file a plan of reorganization in the Chapter 11 Cases; or (DIP Agreement Article §§ 7.1-7.15) |
| **Waiver or Modification of the Automatic Stay** *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | Subject to five days' written notice to the Debtors, after an Event of Default, the automatic stay shall be terminated (solely with respect to the DIP Facility) to permit the exercise of remedies by the DIP Agent and the DIP Lenders. (Interim Order ¶¶14; DIP Agreement §8.1) |
| **Waiver or Modification of Applicability of Nonbankruptcy Law Relating to the Perfection or Enforceability of a Lien** *Fed. R. Bankr. P. 4001(c)(1)(B)(vii)* | All liens granted for the benefit of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, shall be valid, enforceable, non-avoidable, and perfected, effective as of the date of entry of the Interim Order, and no further action shall be required to effect such perfection. (Interim Order ¶¶4, 12 ) |
| **Indemnification** *Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Obligors agree to certain indemnities as described in ¶ 31 below (Interim Order ¶ 2; DIP Agreement §10.3) |
| **Conditions to Borrowing** *Fed. R. Bankr. P. 4001(c)(1)(B)* *Del. Bankr. L.R. 4001-2(a)(ii)* | Customary borrowing conditions, including: (a) entry of the Interim Order or Final Order, as the case may be, (b) absence of any administrative claim that is senior to, or pari passu with, the superpriority claim of the DIP Agent and the DIP Lenders (other than claims secured by Permitted Prior Liens, or the Carve-Out), (c) absence of any Default or Event of Default, (d) representations and warranties contained in the DIP Agreement are true and correct, and (e) extension of credit is consistent with the Budget (as defined below). (DIP Agreement §§ 3.1, 3.2) |
| **Liens on Causes of Action Under Chapter 5 and Proceeds Thereof** *Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | The DIP Agent shall not be granted liens on Avoidance Actions (as defined below) |

| *Del. Bankr. L.R.* | |
| *4001-2(a)(i)(D)* | |

## Jurisdiction

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein is section 105(a) of the Bankruptcy Code.

## Background

4.      On the date hereof (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

5.      Contemporaneously with the filing of this Motion, the Debtors filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, creditors' committee, or other official committee has been appointed in the Debtors' Chapter 11 Cases.

7.      In support of this Motion, the Debtors rely on the *Declaration of Gregor Grant in Support of Chapter 11 Petitions of First Day Pleadings* (the "Grant Declaration").

## Prepetition Secured Indebtedness

8.      Fuddruckers, King Cannon, KCI and Magic Brands (the "Prepetition Borrowers") and Wells Fargo Capital Finance , Inc. (formerly known as Wells Fargo Foothill, Inc.), as the arranger and administrative agent ("WFCF" or the "Prepetition Agent") for the

8

prepetition lenders (the "Prepetition Lenders"[6], and with the Prepetition Agent, the "Prepetition Secured Parties") are parties to that certain Credit Agreement, dated as of December 1, 2006 (as amended from time to time, the "Prepetition Credit Agreement"; and together with all other agreements , documents notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Loan Documents"). The purpose of the Credit Agreement was to refinance an existing credit facility with J.P. Morgan Chase Bank. The Prepetition Credit Agreement provided for a credit facility consisting of (i) a term loan in the original principal amount of $16,000,000 (the "Prepetition Term Loan"), and (ii) a revolving credit facility in the maximum aggregate amount of $10,000,000 (the "Prepetition Revolver"). The Prepetition Borrowers' obligations under the Prepetition Loan Documents (the "Prepetition Senior Indebtedness") were set to mature on November 30, 2011.

9.     The Prepetition Senior Indebtedness was guaranteed pursuant to a certain General Continuing Guaranty dated as of December 1, 2006 (the "Prepetition Guaranty") by certain of their subsidiaries, namely, Atlantic Restaurant Ventures, Inc. ("Atlantic"), R. Wes, Inc., Fuddruckers of Howard County, LLC, 8725 Metcalf II, Inc., Fuddruckers of White Marsh, LLC., A R V I of Pikesville, Inc., A.R.I.V. –Rockville, Inc. (collectively, the "Prepetition Guarantors" and with the Prepetition Borrowers, the "Company")[7].

10.     Pursuant to the terms of that certain Security Agreement, dated as of December 1, 2006 (the "Prepetition Security Agreement"), among each of the Prepetition Borrowers, the Prepetition Guarantors and the Prepetition Agent, the Prepetition Senior Indebtedness is secured by liens (the "Prepetition Liens") on substantially all of the personal

---

[6] Although the Prepetition Credit Agreement contemplates that that might be a syndicate of lenders, WFCF was the sole lender and agent under the Prepetition Credit Agreement.

[7] Of the Prepetition Guarantors, only Atlantic is a Debtor in the Chapter 11 Cases.

property assets of the Prepetition Borrowers and the Prepetition Guarantors (the "Personal Property Prepetition Collateral"), and mortgages on all real property owned by Fuddruckers (the "Mortgaged Real Estate" and together with the Personal Property Prepetition Collateral, and with the Mortgaged Real Estate the "Prepetition Collateral"). The Prepetition Liens in favor of the Prepetition Agent are senior to all other liens in the Prepetition Collateral or than certain permitted liens.

11.     As of the Petition Date, the Prepetition Senior Indebtedness was approximately $23.5 million.

### Prepetition Events Related to the Prepetition Credit Agreement

12.     In the fall of 2009, the Prepetition Borrowers anticipated that it would not be in compliance with certain financial covenants under the Prepetition Credit Agreement. Accordingly, in an effort to provide themselves time to explore viable options for a financial restructuring, the Prepetition Borrowers sought waivers of such covenants from the Prepetition Secured Parties. On October 27, 2009, the Prepetition Borrowers and the Prepetition Secured Parties entered into a certain Waiver, Forbearance and Amendment Number Four to Credit Agreement (the "Waiver Agreement"), pursuant to which the Prepetition Secured Lenders agreed, among other things, to waive violations of certain financial covenants under the Credit Facility, subject to the condition subsequent that the Debtors' indirect controlling shareholder make significant equity infusions in the Prepetition Borrowers. Two of those infusions were made in the Fall of 2009 on or before March 31, 2010.

13.     However, in January 2010, the Prepetition Borrowers learned that further equity infusion would not be forthcoming and informed the Prepetition Secured Parties of the same. The Prepetition Borrowers and the Prepetition Secured Parties then negotiated and entered into an Amendment Number Five to the Credit Agreement dated as of March 4, 2010 (the

10

"Forbearance Agreement"), pursuant to which the Prepetition Secured Parties, among other things, agreed to continue financing, provide an over-advance facility, and to forbear from the exercise of remedies for until April 12, 2010 (the "Forbearance Period"). During the Forbearance Period, the Prepetition Borrowers, with the cooperation of Prepetition Secured Parties and with the assistance of their investment banker and financial advisor FocalPoint Partners LLC, ("FocalPoint") commenced a process to find a stalking horse bidder to acquire substantially all of the Debtors' assets in Chapter 11, and continue their ongoing restructuring efforts to maximize the Debtors' going concern value.

14.     Additionally, the Debtors and FocalPoint determined that postpetition financing and the use of cash collateral would be necessary to enable the Debtors to continue their business operations in the ordinary course and preserve the going concern value of their assets though a going-concern sale process.

### Relief Requested

15.     By this motion and for the reasons set forth below, pursuant to sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Fed. R. Bankr. P. 2002, 4001, and 9014, and Del. Bankr. L.R. 4001-2, the Debtors respectfully request that the Court (a) authorize the Debtors, on an interim basis pending the Final Hearing and entry of the Final Order, to (i) obtain postpetition senior secured financing up to an aggregate principal amount of $13,780,500 ; provided that, during such interim period the Debtors shall be permitted to use only approximately $4,000,000 of such amount, plus the amount of Collections applied to the Prepetition Revolver Advances, consistent with the Budget (as defined below) and the DIP Agreement, (ii) utilize cash collateral, (iii) grant priming liens, priority liens, and superpriority claims to the DIP Agent and the DIP Lenders, and (iv) grant adequate protection to the Prepetition Secured Parties, (b) authorize the Debtors, on a final basis, to (i) obtain postpetition

senior secured financing up to an aggregate principal amount of $13,780,500 , (ii) utilize cash collateral, (iii) grant priming liens, priority liens, and superpriority claims to the DIP Agent and the DIP Lenders, and (iv) provide adequate protection to the Prepetition Secured Parties, (c) schedule the Final Hearing, and (d) grant related relief, in each case, on the terms and subject to the conditions described herein and set forth in the DIP Orders and the DIP Agreement.

## Debtors' Proposed DIP Facility

### A. Efforts to Obtain DIP Financing

16.    Given the relatively short duration of the Forbearance Agreement, the Debtors focused their efforts on restructuring operations to improve earnings and maximize going concern value in a sale and soliciting stalking horse offer.

17.    Concurrently, the Company discussed the possibility of obtaining debtor in possession financing with the Prepetition Secured Parties and analyzed, with assistance of FocalPoint the prospects for alternative debtor in possession financing.  Give the prospects of a chapter 11, the fact that the Debtors' assets were significantly leveraged and the uncertainty that the sale process would achieve a purchase price sufficient to satisfy the Prepetition Senior Indebtedness in full, the Debtors, in consultation with their advisors, concluded that the prudent and most costs effective course would be to obtain debtor in possession financing from the Prepetition Secured Parties.

18.    The Debtors, with the assistance of FocalPoint, obtained a commitment for postpetition financing from the Prepetition Senior Agent (which is embodied in the DIP Agreement submitted to the Court for approval pursuant to this motion).  In addition, FocalPoint contacted up to four potential lenders and was not able to find a lender interested in pursuing a debtor in possession financing arrangement on similar or better terms than those being offered by the DIP Agent.

RLF1 3563219v.1

19. It bears noting that, because the Debtors' obligations to the Prepetition Secured Parties are secured by substantially all of the Debtors' assets, the Debtors had only two potential options with respect to the prospect of obtaining postpetition financing from a lender or lender group other than the Prepetition Secured Parties: (a) find a lender willing to extend postpetition financing junior to that of the Prepetition Secured Parties, or (b) obtain postpetition financing that primed the liens of the Prepetition Secured Parties without such parties' consent. Given the Debtors' current leverage and the Debtors' imminent liquidity needs, the Debtors and FocalPoint concluded that any proposal for postpetition financing (other than the proposal of the Prepetition Senior Agent) in all likelihood would have contemplated a non-consensual priming lien on substantially all of the Debtors' assets, and thus would not have contemplated (x) unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, (y) credit secured by liens junior to the Prepetition Secured Parties' liens, or (z) credit secured by liens equal to the Prepetition Secured Parties' liens. The Debtors concluded that this would not be a cost-effective (and likely unsuccessful) approach, especially given the favorable terms being offered by the DIP Agent.

20. Accordingly, the Debtors, in the sound exercise of their business judgment, ultimately concluded that the DIP Facility proposed by the DIP Lenders, which is premised upon a consensual priming of the Prepetition Secured Parties' liens and thus avoids the need for a lengthy and uncertain priming dispute, is the best postpetition financing option available to the Debtors.

**B.     Implementation of the DIP Agreement**

21. The Debtors, the DIP Lenders, and the DIP Agent engaged in extensive, good faith, arm's length negotiations with respect to the terms and conditions of the postpetition

financing. The result of these negotiations is the proposed DIP Facility, including the form of the DIP Agreement.

22.     The Debtors have provided a budget to the DIP Agent a true copy of which is attached hereto as Exhibit C, which forecasts projected cash flow for the thirteen-week period following the Commencement Date, and which budget has been approved in form and substance by the DIP Agent (as subsequently amended, modified, and updated from time to time in accordance with the DIP Agreement, the "Budget").

23.     As reflected in the Budget, the total amount of DIP Facility proceeds required by the DIP Borrowers prior to the anticipated entry of the Final Order during the week of May 10, 2010 (the "Interim Period") is approximately $4 million plus the amount of Collections applied to the Prepetition Revolver Advances amount  (the "Interim Amount") and the DIP Agent and the DIP Lenders require that during the Interim Period only up to the sum of $4 million, plus the amount of the reduction of the Prepetition Revolver Advances, subject to the Budget (subject to the Permitted Variance[8]), is to be made available upon entry of the Interim Order until entry of the Final Order.

24.     Absent the ability to use the Interim Amount pending entry of the Final Order, the Debtors will not have sufficient cash on hand to enable them to satisfy their postpetition obligations as they come due.  Accordingly, access to these funds on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors' estates by ensuring that the Debtors have sufficient liquidity to continue their business operations uninterrupted

---

[8] Disbursements are consistent with the Budget if they are within the Permitted Variance.  See DIP Agreement § 6.19.

during the period prior to entry of the Final Order, to fund the administration and prosecution of these cases.

25. Furthermore, as evidenced by the Budget, the DIP Facility is appropriately sized given the Debtors' projected liquidity needs during these cases. The Debtors believe that the Budget is feasible and will provide the Debtors with sufficient liquidity to operate during the sale process without the accrual of unpaid administrative expenses.

## C. Liens and Claims

26. Pursuant to the DIP Orders, all loans and obligations under the DIP Facility shall:

a) Pursuant to section 364(c)(1) of the Bankruptcy Code, constitute superpriority claims against each of the Debtors, with priority over any and all administrative expenses, diminution claims, all claims of any kind asserted by the Prepetition Secured Parties arising under the Interim Order or the Final Order, and all other claims against the Debtors, subject only to the Carve-Out; and

b) Pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, be secured by a perfected first priority lien on all existing and after-acquired real and personal, tangible and intangible, property of the Debtors' respective estates, and shall prime and be senior in all respects to the Prepetition Liens (subject to the paydown of such Prepetition Liens as set forth in the DIP Agreement) and Replacement Liens, subject only to the Carve-Out, permitted prior liens and offset rights. The DIP Facility Liens shall not attach to causes of action arising under chapter 5 of the Bankruptcy Code and all proceeds thereof except for actions under section 549 to the extent any such causes action seek avoidance of transfers of assets otherwise constituting Collateral under the Prepetition Credit Agreement or the DIP Credit Agreement (the "Avoidance Actions");

27. The liens securing the DIP Facility shall be valid, perfected, enforceable, and effective as of the date of entry of the Interim Order without any further action by the DIP Obligors, the DIP Agent, or the DIP Lenders and without necessity of the execution by the DIP Obligors of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

RLF1 3563219v.1

### D. Provisions to be Highlighted Pursuant to Del. Bankr. L.R. 4001-2

28.     The Debtors believe that the following provisions of the DIP Agreement and/or the Interim Order must be highlighted pursuant to Del. Bankr. L.R. 4001-2:[9]

a)      **Binding the Estate to Validity, Perfection, or Amount of Secured Debt.** Although certain stipulations by the DIP Obligors set forth in the Interim Order relate to the validity, amount and perfection of the Prepetition Indebtedness and the Prepetition Liens, the Interim Order reserves the rights of non-Debtor parties in interest, including any statutory committee, to initiate a Challenge with respect thereto by the later of (i) sixty (60) days from the date of appointment of a Committee, and (ii) seventy-five (75) days from the date of entry of the Interim Order. (Interim Order ¶ 6); and

b)      **Waiver of Section 506(c) Surcharge.** The Debtors waive the ability to surcharge against the DIP Collateral and the Prepetition Collateral (each as defined in the Interim Order) without the prior written consent of the DIP Agent. (DIP Agreement § 2.16; Interim Order ¶ 7).

### E. Events of Default

29.     The DIP Agreement contains customary events of default for loan agreements of this type. Such events of default include, but are not limited to, the following:

a)      Failure to pay principal (no cure) or interest or fees (three-day cure) when due;

b)      Cross-default to payment defaults by the DIP Obligors, or any of their subsidiaries, on principal aggregating at least $100,000 (other than any failure, default or breach resulting solely from or caused by the filing of these cases);

c)      Breach of any negative covenant, any financial covenant, or the use of proceeds covenant;

d)      Breach of any other covenant or other related loan or collateral document (ten-day cure);

e)      Material inaccuracy of any representation or warranty when made;

---

[9] Additional extraordinary provisions not specifically covered by Del. Bankr. L.R. 4001-2 are highlighted in the Concise Statement provided at the outset of the motion.

f)     Entry of an order granting relief from the automatic stay to permit foreclosure on any assets of the DIP Obligors which have a value in excess of $100,000;

g)     Entry of an order appointing a trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers under section 1106 of the Bankruptcy Code;

h)     Entry of an order confirming, or submission by the Debtors of, a plan of reorganization that does not provide for (i) payment in full of the DIP Facility before the effective date of such plan, or (ii) conversion of the DIP Facility to an exit financing facility;

i)     Entry of an order granting any superpriority claim (other than the Carve-Out and any claims secured by Permitted Prior Liens) that is equal or senior to the DIP Agent's superpriority claim;

j)     Entry of an order granting, or permitting the grant, of liens on the Collateral other than as permitted by the DIP Agreement and the related documents, including the DIP Orders;

k)     Any DIP Obligor files any action, suit, or other proceeding challenging (i) the validity, perfection, or priority of any liens securing the Credit Facility, (ii) the validity or enforceability of any of the Credit Documents (as defined in the Credit Facility), or (iii) asserting any avoidance claim against, or seeking to recover money damages from, any agent or lender under the Credit Facility or DIP Facility;

l)     Conversion of any of the cases to a case under chapter 7 of the Bankruptcy Code;

m)     Failure by the Court to enter the Final Order within thirty-five days after entry of the Interim Order; and

n)     Any DIP Obligor fails to comply with any material term, provision, or condition of the Interim Order or the Final Order.

## F.     Remedies

30.     Following the provision by the DIP Agent to the Debtors of five days' written notice of an Event of Default under the DIP Facility (with a copy of such notice to be provided to counsel to the Debtors, counsel to any statutory committee appointed in the chapter 11 cases, and the U.S. Trustee, without further order of, or application to, the Court, all amounts owed to the DIP Agent and the DIP Lenders under the DIP Agreement, the Interim Order, or the

Final Order (as applicable), shall be immediately due and payable, and the DIP Agent and the DIP Lenders shall have the rights and remedies provided in the DIP Agreement, the Interim Order, or the Final Order (as applicable).

### G. Indemnification

31.     The DIP Borrowers agree to indemnify the DIP Agent, the DIP Lenders, and their respective affiliates, officers, partners, directors, trustees, investment advisors, employees, and agents from liabilities relating to or arising out of, among other things, the DIP Agreement or any environmental claims or hazardous materials activity arising from any action by the DIP Borrower or its subsidiaries. The indemnity does not extend to liabilities caused by or resulting from the willful misconduct or gross negligence of the indemnified parties.

### Use of Cash Collateral and Adequate Protection

32.     Certain amounts of cash, cash equivalents, and other amounts on deposit or maintained in the Debtors' bank accounts constitute proceeds which, to the extent subject to valid and perfected liens, are the cash collateral of the Prepetition Secured Parties, subject to the security interests of such parties in accordance with section 552(b) of the Bankruptcy Code (collectively, the "Cash Collateral").

33.     The Debtors have been informed that the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Budget (and any permitted variances), subject to the grant of adequate protection in the form of Replacement Liens and payment of interest as it occurs, and the other terms and conditions set forth in the Interim Order.

34.     To the extent that their interests in the Collateral constitute valid and perfected security interests and liens as of the Commencement Date, the Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate

protection of their interests in the Collateral to the extent of any diminution in the value of such Collateral from and after the Commencement Date. The Prepetition Secured Parties are also entitled to acquire protection under Section 364 on account of the primary DIP Facility Liens being granted under the DIP Agreement and Interim Order. As adequate protection for any such diminution in value, the Prepetition Secured Parties shall be granted (a) liens on the Collateral (the "Replacement Liens"), subject only to (i) liens granted in favor of the DIP Agent and the DIP Lenders, (ii) the investigation rights provided to the Committee and other parties in interest, (iii) Permitted Prior Liens, and (iv) the Carve-Out, (b) a superpriority claim, subject only to (i) the superpriority claims granted in favor of the DIP Agent and the DIP Lenders and (ii) the Carve-Out and any claim secured by Permitted Prior Liens, and (c) payment of reasonable fees and expenses incurred by the Prepetition Senior Agent and the Prepetition Secured Lenders under the Credit Facility (including reasonable fees and expenses of legal and financial professionals).

35. The Replacement Liens shall be valid, perfected, enforceable, and effective as of the date of entry of the Interim Order without any further action by the Prepetition Senior Agent or the Prepetition Secured Parties, and without the need for execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

### The DIP Facility Should Be Authorized

36. Approval of the DIP Facility and the use of Cash Collateral will enable the Debtors to fund their current and ongoing operating expenses, including postpetition wages and salaries, utilities, taxes, and vendor costs. Absent the requisite financing, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their businesses, their going concern value, and ultimately, their ability to successfully bridge to a sale. Because the Debtors'

available and projected Cash Collateral is insufficient to fund these critical expenditures, the credit provided under the DIP Facility is essential to maximizing the value of the Debtors' estates for the benefit of all stakeholders. Further, the availability of credit under the DIP Facility will instill much needed confidence in the Debtors' employees, vendors, and customers, thereby greatly enhancing the likelihood that the Debtors will continue to receive the support of their key constituents throughout the pendency of these chapter 11 cases. Accordingly, the timely approval of the relief requested herein is imperative.

37. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (x) the debtor is unable to obtain such credit otherwise and (y) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

38. The Debtors have been unable to obtain adequate financing without granting priming liens pursuant to section 364(d) of the Bankruptcy Code. Despite their efforts, the Debtors did not find a lender or group of lenders, within the timeframe necessitated by the Debtors' liquidity needs, willing to extend (a) unsecured credit pursuant to section 364(a) or (b) of the Bankruptcy Code, allowable under section 503(b)(1) as an administrative expense or (b)

20

credit in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code. Similarly, the Debtors' efforts to procure postpetition financing or other financial accommodations from any other prospective lender or group of lenders on terms and conditions more favorable than the proposed DIP Facility, and within the necessary timeframe, proved unsuccessful. Accordingly, the Debtors propose to obtain the financing set forth in the DIP Agreement by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), and (d) of the Bankruptcy Code.

39. Having determined that postpetition financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility with the DIP Agent and the DIP Lenders extensively and at arm's length. So long as a debtor's business judgment does not run afoul of the letter and spirit of the Bankruptcy Code, courts grant a debtor considerable discretion with respect to postpetition financing. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In Farmland Industries, Inc., 294 B.R. 855, 881-84 (Bankr. W.D. Mo. 2003); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

40. A debtor is not required to seek alternative financing from every possible lender in order to satisfy the requirements of section 364(d) of the Bankruptcy Code. In re 495 Central Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). Rather, a debtor need only

RLF1 3563219v.1

demonstrate sufficient efforts to obtain financing from other sources without the granting of senior liens. Snowshoe, 789 F.2d at 1088 (the debtor demonstrated that credit could not be obtained without the granting of a senior lien, in part by providing evidence that efforts to obtain financing from other financial institutions in the geographic area had proven unsuccessful).

41.    The efforts of the Debtors and FocalPoint notwithstanding, the Debtors were unable to procure the requisite postpetition financing within the Debtors' expedited timeframe absent the granting of superpriority claims and priming liens. Substantially all of the Debtors' assets are encumbered, and despite these limitations, the Debtors have successfully negotiated postpetition financing on the best terms available. The circumstances of these chapter 11 cases necessitate postpetition financing under sections 364(c) and (d) of the Bankruptcy Code. Further, although the DIP Agent and the DIP Lenders, as part of the Final Order, are requiring that the entire prepetition revolver be rolled up into the DIP Facility, the DIP Agent is not seeking the same relief from the Prepetition Term Loan. In light of the foregoing reasons, the DIP Facility reflects the exercise of the Debtors' sound business judgment.

42.    The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.[10]

---

[10] The provisions highlighted pursuant to Del. Bankr. L.R. 4001-2 were negotiated thoroughly and were required both by the DIP Lenders for the availability of the DIP Facility and the Prepetition Secured Parties for their consent to use Cash Collateral. Therefore, the inclusion of such provisions is justified by the facts and circumstances of these cases.

RLF1 3563219v.1

**The Use of Cash Collateral Should Be Approved and
the Proposed Adequate Protection Should Be Authorized**

43.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral if "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  In addition to the DIP Facility, the Debtors require the use of Cash Collateral in order to ensure they have the liquidity necessary to fund their day-to-day business operations.  Absent authority to use Cash Collateral, the Debtors' liquidity needs will not be satisfied, jeopardizing the Debtors' ability to continue business operations and the success of these chapter 11 cases.  Thus, the use of Cash Collateral is imperative to the preservation of the Debtors' going concern value and to ensure the ultimate success of the Debtors' efforts to reorganize.

44.     The Prepetition Secured Parties have consented to the use of Cash Collateral on the terms set forth herein and in the Interim Order, and their interests in the Cash Collateral are adequately protected as described herein.  Accordingly, the Debtors' request to use Cash Collateral in the operation of their businesses and the administration of these chapter 11 cases should be approved.

45.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by the trustee, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of the relief. 11 U.S.C. § 361.  Adequate protection is an elastic concept, and accordingly, what constitutes adequate protection must be decided on a case-by-case basis. See

23

MBank Dallas v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987); Martin v. U.S. (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985). The focus of the inquiry is whether a secured creditor is protected from diminution in the value of its interest in the collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy") (internal citations omitted).

46. In consideration for the adequate protection proposed herein, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral and entry into the DIP Facility. The Replacement Liens, superpriority claim, cash payments, and other protections afforded the Prepetition Secured Parties provide ample protection against any diminution in the value of their interests in the Collateral. Accordingly, the adequate protection proposed herein is fair, reasonable, and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

### The Automatic Stay Should Be Modified on a Limited Basis

47. The relief requested herein contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to (a) permit the DIP Borrowers to grant the security interests, liens, and superpriority claims described above with respect to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as the case may be, and to perform such acts as may be reasonably requested to assure the perfection and priority of such security interests and liens, (b) permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and continuance of an Event of Default and after five days' written notice thereof, the rights and remedies provided in the DIP Agreement, the Interim Order, and the Final Order, as applicable, and (c) implement the terms of the proposed DIP Orders. In the Debtors' business judgment, the stay modification requested herein is fair and reasonable under the circumstances.

RLF1 3563219v.1

## Interim Approval Should Be Granted

48.     Fed. R. Bankr. P. 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a hearing to consider the relief requested on a final basis.

49.     Pursuant to Fed. R. Bankr. P. 4001(b) and (c), the Debtors respectfully request that the Court conduct an emergency preliminary hearing on this Motion and (a) approve the DIP Facility on an interim basis, (b) authorize the Debtors to use Cash Collateral and, consistent with the Budget and the DIP Agreement, use up to $4 million of the DIP Facility on an interim basis, pending the Final Hearing and entry of the Final Order, in order to finance the Debtors' ongoing business operations and avoid immediate and irreparable harm to the Debtors, their estates and creditors, and all parties in interest, and (c) schedule the Final Hearing.

50.     The Debtors lack the funds necessary to continue their business operations, and thus, have an urgent and immediate need for liquidity. Absent authorization to use Cash Collateral and obtain credit under the DIP Facility, on an interim basis pending the Final Hearing, the Debtors will suffer immediate and irreparable harm, as the Debtors will be unable to satisfy their postpetition obligations as they come due, to the detriment of their estates and creditors, and all parties in interest. Accordingly, the interim relief requested herein is vital to preserving the Debtors' going concern value and ensuring the Debtors a meaningful opportunity for a successful reorganization.

RLF1 3563219v.1

## Waiver of Fed. R. Bankr. P. 6004(a) and (h)

51.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Fed. R. Bankr. P. 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Fed. R. Bankr. P. 6004(h).

## Notice

52.     No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases. Pursuant to Del. Bankr. L.R. 9013-1(m), notice of the "first-day" hearing to consider this motion is being provided to (i) the U.S. Trustee, (ii) the holders of the thirty largest unsecured claims against the Debtors on a consolidated basis, (iii) counsel to Wells Fargo Capital Finance, Inc., as administrative agent for the Debtors' Prepetition Secured Parties and prospective DIP Agent, and (iv) the Internal Revenue Service. Following the hearing, a copy of this motion and any order entered with respect hereto will be served on (a) the foregoing parties, and (b) landlords, holders of Permitted Prior Liens on record, state taxing authorities and all parties having filed requests for notices in these chapter 11 cases. Due to the urgency of the circumstances and the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

## No Prior Motion

53.     No prior motion for the relief requested herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: April 21, 2010
      Wilmington, Delaware

Daniel J. DeFranceschi (DE No. 2732)
Drew G. Sloan (DE No. 5069)
Julie A. Finocchiaro (DE No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Douglas B. Rosner, Esq.
Christine D. Lynch, Esq.
Mary Ellen Welch Rogers, Esq.
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, Massachusetts 02110-3333
Tel: (617) 482-1776
Fax: (617) 574-4112

*Proposed Counsel for Debtors and
Debtors in Possession*