IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
                                        :
In re:                                  :        Chapter 11
                                        :
MAGIC BRANDS, LLC, et al.,              :        Case No. 10-11310 (BLS)
                                        :
                                        :        (Joint Administration Requested)
                        Debtors.¹       :
                                        :
-----------------------------------------------------x
```

## MOTION FOR ORDER AUTHORIZING DEBTORS TO MAINTAIN, RENEW, CANCEL OR REPLACE EXISTING INSURANCE PROGRAMS AND PAY ALL PREMIUMS, FEES AND INSURANCE PREMIUM FINANCING OBLIGATIONS IN CONNECTION THEREWITH

Magic Brands, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby move for entry of an order, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors to maintain, renew, cancel or replace, in their reasonable business judgment, their existing insurance programs and pay all premiums, fees and insurance premium financing obligations in connection therewith. In support of this Motion, the Debtors rely on and incorporate by reference the *Declaration of Gregor Grant in Support of Chapter 11 Petitions and First Day Pleadings* (the "Grant Declaration")[2],

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Magic Brands, LLC ("Magic") (8989); Fuddruckers, Inc. ("Fuddruckers") (8267), Atlantic Restaurant Ventures, Inc. ("Atlantic") (9769), King Cannon, Inc. ("King Cannon") (8671), and KCI, LLC ("KCI") (9281). The address for all of the Debtors is 5700 Mopac Expressway, Suite C300, Austin, Texas 78749.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Grant Declaration.

filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully

represent as follows:

## Jurisdiction

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§

1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a) and

363(b) of the Bankruptcy Code.

## Background

2.      On the date of this Motion (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  Contemporaneously with the filing of

this Motion, the Debtors filed a motion seeking joint administration of the Chapter 11 Cases pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      The Debtors continue to operate their business and manage their properties as debtors

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner

or statutory committee has been appointed in the Debtors' cases.

4.      The Debtors own, operate and franchise fast casual dining establishments under

the concepts of Fuddruckers™ and Koo Koo Roo™.  As of the Petition Date, the Debtors

operate approximately 98 corporate owned locations and have 135 franchised locations located

in 33 states and the District of Columbia, with additional franchised locations in Canada and

Puerto Rico.  Fuddruckers, a leader in the fast casual restaurant segment, has a long established

reputation for high quality, upscale hamburgers that are grilled fresh-to-order.  Koo Koo Roo

restaurants offer a variety of healthy chicken dishes.

5.      Prior to the Petition Date and continuing post-petition, the Debtors have been

closing unprofitable corporate-owned locations in an effort to return the company to positive

cash flow and earnings have been negative. The Debtors commenced these Chapter 11 Cases to

complete their restructuring and position the business for a sale that should maximize value for

creditors and other constituents. The contemplated sale of substantially all of the Debtors' assets

should allow the Debtors to emerge quickly from bankruptcy as a stronger and healthier

enterprise, saving over 1,500 jobs in the process and generating a meaningful recovery for

creditors. Additional information regarding the Debtors' business, capital structure and the

circumstances leading up to these chapter 11 filings is contained in the Grant Declaration.

## Relief Requested

6.      In connection with the operation of their businesses, the Debtors maintain (i)

workers' compensation programs (the "Workers' Compensation Programs") and (ii) various

liability, property and other insurance programs and policies (the "Liability and Property

Insurance Programs," and together with the Workers' Compensation Programs, the "Insurance

Programs") through several different insurance carriers (the "Insurance Carriers").

7.      The Insurance Programs are essential to the preservation of the Debtors'

businesses, properties and assets, and in many cases the coverage is required by various

regulations, laws and contracts that govern the conduct of the Debtors' business.

8.      For some of the Insurance Programs, it is not economically advantageous for the

Debtors to pay premiums on an annualized basis. Accordingly, from time to time, in the

ordinary course of their business, the Debtors finance premiums with respect to these Insurance

Programs. Prior to the Petition Date, the Debtors financed certain insurance premiums pursuant

to a Commercial Premium Finance Agreement and Disclosure Statement (the "Premium Finance

Agreement") with First Insurance Funding Corporation ("First Insurance"), through its insurance

3

broker, Wortham Insurance and Risk Management ("Wortham").  As of the Petition Date, the

Debtors were current under the Premium Finance Agreement.

9.      Attached hereto as Exhibit A is a list of the Debtors' Insurance Programs,

identifying, among other things, the Insurance Carrier, the type of coverage, deductibles and

limits, the coverage period and the aggregate annual premiums due thereunder.[3]  Insurance

Programs covered under the Premium Finance Agreement are as indicated on Exhibit A.

10.     By this Motion, the Debtors request entry of an order of this Court, pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code, authorizing, but not directing, the Debtors to

(i) continue their Insurance Programs on an uninterrupted basis in accordance with the same

practices and procedures as were in effect prior to the Petition Date, and to renew or cancel such

Insurance Programs or seek new insurance coverage as the Debtors, their reasonable business

judgment, deem necessary, appropriate or desirable, without the need to seek leave of Court, and

(ii) pay, in their sole discretion, all undisputed premiums, finance payments, administrative fees,

and broker fees necessary to maintain the insurance coverage provided under the Insurance

Programs, regardless of whether they relate to the period before the Petition Date (collectively,

the "Insurance Obligations").

11.     The Debtors also request, as a precaution, that the Court authorize and direct the

Debtors' banks, at the Debtors' instruction, to receive, honor, process, and pay, to the extent of

funds on deposit, any and all checks or electronic fund transfers relating to the Insurance

Obligations that may not have been honored prior to the Petition Date.

---

[3]      In addition to the Insurance Programs listed on Exhibit A, the Debtors maintain other insurance policies
and programs with respect to employee benefits, including health, dental, disability and life insurance  These
programs and policies are addressed in a separate motion filed concurrently herewith pertaining to the Debtors'
maintenance of employee wage and benefit policies and programs.

## Workers' Compensation Programs

12.    The laws of the various states in which the Debtors operate require the Debtors to maintain a workers' compensation program to provide their employees with compensation for injuries arising from or related to their employment with the Debtors.

13.    The Debtors maintain workers' compensation coverage through a third party insurance program provided by The Chubb Corporation ("Chubb") for all of their employees, other than those located in Texas (the "Chubb Workers' Compensation Program"). Under the Chubb Workers' Compensation Program, the Debtors are obligated to pay an annual premium that is calculated based on the Debtors' projected payroll. For the current policy term of July 1, 2009 through June 30, 2010, the Debtors are paying an estimated annual premium of approximately $185,000.

14.    Chubb performs an audit of the Debtors' actual payroll at the conclusion of each policy year. If the Debtors' actual payroll exceeds amounts used to calculate the estimated premium, the Debtors are required to pay an additional true-up premium to Chubb. If actual payroll is less, the Debtors will receive a refund from Chubb for the difference. In addition, to the extent that prepetition workers' compensation claims are not paid by the Debtors, Chubb will pay them and accrue a claim against the Debtors for the amounts paid within the Debtors' deductible. Accordingly, at some point after the Petition Date, Chubb may have a claim for additional premiums relating to the prepetition period due to the audit or the payment of any prepetition workers' compensation claims not paid by the Debtors. In either case, Chubb's claims are secured by a letter of credit in the amount of $2,575,000 (the "Letter of Credit"). The Letter of Credit is backed by cash collateral deposited with the issuing bank by the Debtors' indirect 100% equity holder.

15.    In connection with the Chubb Workers' Compensation Program, non-Texas employees seeking reimbursement for work-related injuries and illness file their claims with a third party claims administrator, Gallagher Bassett Services, Inc. ("Gallagher Bassett"), who in turn forwards processed claims on to the Debtors for payment up to a deductible of $250,000 per occurrence. The Debtors also pay claims handling fees to Gallagher Bassett which aggregate approximately $111,000 annually.

16.    For their Texas Employees, the Debtors maintain a workers' compensation program (the "Texas Workers' Compensation Program," insured through the Combined Group Insurance Services, Inc. ("Combined Group"). The Debtors pay an estimated premium, which like the Chubb Workers' Compensation Program is based on the number of employees (in this case, in Texas) and is subject to audit and adjustment.

17.    In connection with the Texas Workers' Compensation Program, Texas employees seeking reimbursement for work-related injuries and illness file their claims with a third party claims administrator, Anchor Claims Management ("Anchor"), who in turn forwards processed claims on to the Debtors for payment up to a deductible of $100,000 per occurrence. The claims handling fees to Anchor are included in the Debtors' premium to the Combined Group, which aggregates approximately $32,000 annually.

18.    The Debtors seek authority, but not direction, to pay all premiums, administrative fees and broker fees arising under their Workers' Compensation Programs, in their sole discretion, as they come due in the ordinary course of business. The Debtors estimate that as of the Petition Date, accrued but unpaid administrative and claims handling fees owed to Gallagher Bassett and Anchor Claims Management aggregate approximately $100,000. Although the Debtors believe that, as of the Petition Date, they are current with respect to obligations for

6

premiums arising under the Workers' Compensation Programs, out of the abundance of caution
the Debtors seek authority, but not direction, to pay all undisputed premiums arising before or
after the Petition Date, as they come due in the ordinary course of business.

**Liability and Property Insurance Programs**

19.     As listed on Exhibit A, the Debtors' Liability and Property Insurance Programs
provide insurance coverage for liabilities relating to, among other things, general commercial
claims, property damage, automobile damage, directors' and officers' liability, and various other
property-related and general liabilities. Continuation of these policies is essential to the ongoing
operation of the Debtors' business.

20.     The Debtors are required to pay premiums under the Liability and Property
Insurance Programs based upon fixed rates established by the applicable Insurance Carrier. As
discussed above, some of these premiums are financed through First Insurance. The annual
premiums for the Debtors' Liability and Property Insurance Programs, including the finance
payments to First Insurance, aggregate approximately $650,000. The Debtors are current in
payment of the premiums. As of the Petition Date, the remaining balance of premiums for the
Liability and Property Insurance Programs is approximately $125,000. The Debtors seek
authority, but not direction, to pay all undisputed premiums and broker fees, relating to the
Liability and Property Insurance Programs, arising before or after the Petition Date, as they come
due in the ordinary course of business. Claims of one of the Debtors' Insurance Carriers under
the Liability and Property Insurance Programs, Liberty Mutual, are secured by a letter of credit
in the amount of $240,000, backed by cash collateral deposited with the issuing bank by the
Debtors' indirect 100% equity holder, and an additional $15,000 held in escrow.

## Basis for Relief

21.    Pursuant to section 363(b) of the Bankruptcy Code, a debtor may, in the exercise

of its sound business judgment and after notice and a hearing, use property of the estate outside

of the ordinary course of business. 11 U.S.C. § 363(b). The Debtors submit that the use of estate

funds for payment of the Insurance Obligations is permitted by section 363(b) of the Bankruptcy

Code as necessary costs of preserving the estate.

22.    Furthermore, to supplement these explicit powers, section 105(a) of the

Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary

or appropriate to carry out the provisions of this title." Id. § 105(a). A bankruptcy court's use of

its equitable powers to "authorize the payment of pre-petition debt when such payment is needed

to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc.,

98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under 11 U.S.C. § 105, the court can permit pre-

plan payment of a pre-petition obligation when essential to the continued operation of the

debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98

B.R. at 177).

23.    In a long line of well-established cases, federal courts consistently have permitted

postpetition payment of prepetition obligations where necessary to preserve or enhance the value

of a debtor's estate for the benefit of all creditors. See, e.g., Miltenberger v. Logansport, C. &

S.W. Ry. Co., 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to

reorganization permitted to prevent "stoppage of the continuance of such [crucial] business

relations"); Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment

of prepetition claims beyond railroad reorganization cases); Mich. Bureau of Workers' Disability

Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-86 (S.D.N.Y. 1987)

8

(approving lower Court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

24.     The "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. See In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that a Court may authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); In re Boston & Me. Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation). The doctrine is frequently invoked early in a chapter 11 case, particularly in connection with the payment of prepetition claims. The Court in In re Structurelite Plastics Corp. indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (quoting Chateaugay Corp., 80 B.R. at 287). The court stated that "a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932. The rationale for the doctrine of necessity rule is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor." Ionosphere Clubs, 98 B.R. at 176. Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

25.     This Court has granted the same or similar relief in other large chapter 11 cases.

See, e.g., In re Buffet Holdings, Inc., Case No. 08-10141 (Bankr. D. Del. Jan. 23, 2008) (Walrath,

J.); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (Bankr. D. Del. June 13,

2007) (Walsh, J.);  In re Radnor Holdings Corp., Case No. 06-10894 (Bankr. D. Del. Aug. 23,

2006) (Wash, J.); In re Russell-Stanley Holdings, Inc., Case No. 05-12339 (Bankr. D. Del. Aug.

22, 2005) (Walsh, J.); In re Chart Indus., Inc., Case No. 03-12114 (Bankr. D. Del. July, 10, 2003)

(Venters, J.); In re SLI, Inc., Case No. 02-12608 (Bankr. D. Del. Oct. 7, 2002) (Walrath, J.).

26.     The nature of the Debtors' businesses and the extent of their operations make it

essential for the Debtors to maintain their Insurance Programs on an uninterrupted basis. If the

Debtors fail to pay any premiums and related fees under any of the Insurance Programs, then the

Insurance Carriers may seek to terminate the existing Insurance Programs, or they may decline to

renew their insurance policies when they expire in a couple of months. If the Insurance

Programs lapse without renewal, the Debtors could be exposed to substantial liability for

personal and/or property damages to the detriment of all parties in interest. Further, section

1112(b)(4)(c) of the Bankruptcy Code provides that "failure to maintain appropriate insurance

that poses a risk to the estate or to the public," is "cause" for mandatory conversion or dismissal

of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(c). The Debtors would also be in default under

their real property leases – one of their most significant assets – which require that the Debtors

maintain adequate insurance coverage. Furthermore, if the Debtors' Insurance Programs lapsed,

the Debtors would be required to obtain replacement policies on an expedited basis. The

Debtors' Insurance Programs are the result of a competitive bidding process and replacing such

programs and policies on short notice would result in significant cost to the estates.

RLF1 3563153v 1

27.    The continuation of the Insurance Programs, on an uninterrupted basis, and the

payment of all undisputed prepetition and postpetition Insurance Obligations arising under the

Insurance Programs are essential to preserve the Debtors' businesses and preserve the value of

the Debtors' estates for all creditors.

**Sufficient Cause Exists for the Court to Authorize**
**the Debtors to Maintain Financing Agreements**

28.    Section 364 provides, in relevant part, "[i]f the [debtor] is unable to obtain

unsecured credit . . . , the court, after notice and a hearing, may authorize the obtaining of

[secured] credit or the incurring of [secured] debt . . ." 11 U.S.C. § 364(c). In short, section 364

authorizes a debtor, in the exercise of its business judgment, to incur secured debt if the debtor

has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates.

See, e.g., In re Budget Group, Inc., Case No. 02-12152, 2002 Bankr. LEXIS 1050 (Bankr. D. Del.

Aug, 1, 2002) (court authorized funding of acquisition of property on a secured basis where

acquired property was necessary to maintain operations and debtors could not obtain such

funding on an unsecured basis); In re Mastercraft Interiors, Ltd., Case Nos. 06-12769, 06-12770,

2006 WL 4595946, at *4 (Bankr. D. Md. Aug. 10, 2006) (authorizing the debtor's purchase of

secured financing because the debtor's financing needs were "immediate and critical" to the

success of the proceedings and the debtor was unable to obtain unsecured credit); In re Ames

Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts

"permit debtors-in-possession to exercise their basic business judgment consistent with their

fiduciary duties"); see also 3 COLLIER ON BANKRUPTCY ¶ 364.03, at 364-7 (15th ed. Rev. 1999).

Further, section 364(c) does not impose a duty on the debtor to request unsecured credit from

every potential lender before seeking secured credit. See In re Snowshoe Co., Inc., 789 F.2d

1085, 1088 (4th Cir. 1986).

29.     Generally, lenders are unwilling to finance insurance premiums on an unsecured basis. Here, the Premium Finance Agreement provides financing at an interest rate that is considerably less than the Debtors' other financing sources and, therefore, is justified under section 364(c). Moreover, the financing of the insurance policies helps the Debtors manage their cash flow. If the Debtors are unable to continue making payments on the Premium Finance Agreement, under the terms thereof, First Insurance may be permitted to terminate the applicable insurance policies. The Debtors then would be required to obtain replacement insurance on an expedited basis. If the Debtors were required to obtain replacement insurance and to pay a lump sum premium for such insurance policy in advance, this payment likely would be greater than what the Debtors currently pay. Even if the First Insurance was not permitted to terminate the insurance policies, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies. Accordingly, the Debtors believe that they have articulated a valid business justification for maintaining the Premium Finance Agreement.

30.     In view of the importance of maintaining insurance coverage throughout the entire duration of the Chapter 11 Cases with respect to their business activities and preserving their liquidity by financing certain insurance premiums, the Debtors believe it is in the best interests of their estates to authorize the Debtors to honor their obligations under the Premium Finance Agreement.

## Reservation of Rights

31.     To the extent any Insurance Program or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court authorizes the payments

described above, such payments should not be deemed to constitute an assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code. The Debtors are in the process of reviewing these matters and reserve all of their rights under the Bankruptcy Code with respect thereto. Moreover, authorization to pay all amounts on account of the Insurance Obligations shall not affect the Debtors' right to contest the amount or validity of these obligations.

32.     In furtherance of the relief requested herein, the Debtors request that the Court authorize and direct the Debtors' banks to receive, honor, process, and pay, to the extent of funds on deposit, any and all checks or electronic transfers requested or to be requested by the Debtors relating to the Insurance Obligations, including those checks or electronic transfers that have not cleared the banks as of the Petition Date, without the need for further Court approval.

<h3 align="center">The Debtors Have Satisfied Bankruptcy Rule 6003(b)</h3>

33.     Bankruptcy Rule 6003(b) provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Petition Date. Fed. R. Bankr. P. 6003(b). As described herein and in the Grant Declaration, continuation of the Insurance Programs is essential to the Debtors' business operations. The failure to maintain the Insurance Programs would have immediate and detrimental consequences to the Debtors' business operations and would decrease value to the detriment and prejudice of all stakeholders. Accordingly, the Debtors submit that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and, therefore, Bankruptcy Rule 6003(b) is satisfied.

**Waiver of Bankruptcy Rules 6004(a) and (h)**

34.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen day stay imposed by Bankruptcy Rule 6004(h) to the extent applicable.  The immediate payment of Insurance Obligations is essential to prevent irreparable damage to the Debtors' operations and going concern value and thus, ample cause exists to justify waiver of the notice requirements and stay pursuant to Bankruptcy Rule 6004(a) and (h).

**Notice**

35.     Notice of this Motion shall be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Wells Fargo Capital Finance, Inc.; (iii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; and (iv) the Insurance Providers.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Del. Bankr. L.R. 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

**No Prior Request**

36.     No prior application or request for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as <u>Exhibit B</u>, granting the relief requested in the Motion

and such other further relief as may be just and proper.

Dated:  April 21, 2010                        Respectfully submitted,
         Wilmington, Delaware

_____

Daniel J. DeFranceschi (DE No. 2732)
Drew G. Sloan (DE No. 5069)
Julie A. Finocchiaro (DE No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

                    -and-

Douglas B. Rosner, Esq.
Christine D. Lynch, Esq.
Peter D. Bilowz, Esq.
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
Tel:     (617) 482-1776
Fax:     (617) 574-4112

*Proposed Counsel for Debtors and Debtors in
Possession*

## EXHIBIT A

**(Debtors Insurance Programs)**

## Debtors' Insurance Programs

| Insurance Carrier | Coverage | Deductible/Limits | Coverage Period | Premiums | Financed Y/N |
|---|---|---|---|---|---|
| Liberty Mutual | Property (incl. $5MM earthquake) | $25,000/$136MM<br>Hurricane: 2% TIV or $100K minimum<br>$50K for Harris County, TX | 7/1/2009-7/1/2010<br>(expires at 12:01 AM on 7/1/2010) | $184,933 | N |
| Empire/Princeton | Excess Earthquake | 5% TIV or $100K minimum / $15MM | 7/1/2009-7/1/2010 | $75,632 | Y |
| Fireman's Fund | Umbrella | No Additional Deductible/$50MM | 7/1/2009-7/1/2010 | $86,410 | Y |
| AIG | D&O/Employment Practices Liability | D&O Deductible $25K<br>EPL Deductible $100K<br>Shared Limit $3MM | 7/1/2009-7/1/2010 | $90,744 | Y |
| Chubb | Internat'l Liability | No Deductible<br>WC: $1 MM<br>GL: $2 MM<br>Auto: $1 MM | 7/1/2009-7/1/2010 | $2,000 | Y |
| Travelers | Flood (4 locations) | $1000 Deductible per location<br>Limits are $500K<br>Bldg/$200k to $335K for FF&E | 7/1/2009-7/1/2010 | $4,700 | N |

| Insurance Carrier | Coverage | Deductible/Limits | Coverage Period | Premiums | Financed Y/N |
|---|---|---|---|---|---|
| Chubb | General Liability | $250,000/ $750K per event, $1.75 MM Aggregate | 7/1/2009-7/1/2010 | $184,048 | N |
| Chubb | Automobile | $1000/$1MM | 7/1/2009-7/1/2010 | $10,715 | N |
| Chartis ( AIG) | Crime | 20K/$1MM | 11/23/2009 - 7/1/2010 | $6,444 | N |
| Chubb | Worker's Compensation (except Texas) | $250,000/ $1MM per occurrence | 7/1/2009-7/1/2010 | $185,708 | N |
| Combined Group | Texas Non Subscription | 100K/$5MM per occurrence $50MM Aggregate Limit | 7/1/2009 -7/1/2010 | $31,998 | N |

**EXHIBIT B**

**(Proposed Order)**

RLF1 3563153v 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
                              :     Chapter 11

In re:                       :

                             :     Case No. 10-11310 (BLS)

MAGIC BRANDS, LLC, *et al.,*     :

                             :     (Joint Administration Requested)

                             :

               Debtors.[1]     :     Re: Docket No. _____

                             :
-------------------------------------------------------x

**ORDER AUTHORIZING DEBTORS TO MAINTAIN, RENEW,
CANCEL OR REPLACE EXISTING INSURANCE PROGRAMS
AND PAY ALL PREMIUMS, FEES AND INSURANCE PREMIUM
<u>FINANCING OBLIGATIONS IN CONNECTION THEREWITH</u>**

Upon the Motion[2] of Magic Brands, LLC and its debtor affiliates, as debtors and debtors

in possession in the above-captioned Chapter 11 Cases (collectively, the "<u>Debtors</u>"), seeking

entry of an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code authorizing, but

not directing, the Debtors (i) to maintain, renew, cancel or replace their workers' compensation

programs and their liability and property insurance programs, (ii) to pay certain prepetition

obligations in respect thereof, on an uninterrupted basis, necessary to maintain their insurance

coverage, including the payment of all undisputed premiums, administrative fees and broker

fees, whether relating to the period prior to or after the commencement of these Chapter 11

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, are: Magic Brands, LLC ("<u>Magic</u>") (8989); Fuddruckers, Inc. ("<u>Fuddruckers</u>") (8267); Atlantic Restaurant
Ventures, Inc. ("<u>Atlantic</u>") (9769), King Cannon, Inc. ("<u>King Cannon</u>") (8671), and KCI, LLC ("<u>KCI</u>") (9281)
The address for all of the Debtors is 5700 Mopac Expressway, Suite C300, Austin, Texas 78749

[2]      Unless otherwise defined, all capitalized terms herein shall have the meaning ascribed to them in the
*Motion for an Order Authorizing Debtors to Maintain, Renew, Cancel or Replace Existing Insurance Programs and
Pay All Premiums, Fees and Insurance Premium Financing Obligations in Connection Therewith* (the "<u>Motion</u>")

Cases, and (iii) to continue their financing arrangement for certain insurance premiums and make payments in connection therewith, all as more fully described in the Motion; the Court having jurisdiction to consider the Motion and the relief requested therein; consideration of the Motion and the relief requested being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this Court; due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; a hearing having been held to consider the relief requested in the Motion (the "Hearing"); upon the record of the Hearing and the information set forth in the Grant Declaration; the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby:

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are hereby authorized and empowered to maintain their Insurance Policies without interruption, on the same basis, and in accordance with the same practices and procedures that were in effect prior to the Petition Date; and it is further

ORDERED that the Debtors are hereby authorized, but not directed, to pay the Insurance Obligations necessary to maintain their Insurance Programs currently in effect, including making scheduled payments under the Premium Finance Agreement in the Debtors' ordinary course of business; and it is further

ORDERED that the Debtors are authorized to renew or cancel their existing insurance policies and enter into new policies in the ordinary course of business, including making any ordinary course payments in connection therewith; and it is further

2

ORDERED that nothing in this Order or the Motion shall be construed as prejudicing the rights of the Debtors to dispute or contest the amount of or basis for any obligations in connection with or relating to the Debtor's Insurance Programs; and it is further

ORDERED that, notwithstanding anything to the contrary contained herein, (a) any payment made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any order approving debtor-in-possession financing (a "DIP Order"), and (b) any claim for which payment is authorized pursuant to this Order that is treated as an administrative expense of the Debtors' estates shall be and is subject and subordinate to any and all claims, liens, security interests and priorities granted to the DIP Lenders and the DIP Agent (as defined in the DIP Order) as adequate protection for the use of their cash collateral pursuant to, in accordance with and subject to the terms of the applicable DIP Order, and payment on any such claim shall be subject to any and all restrictions on payments in the DIP Order and any other order of the Court authorizing the Debtors' use of cash collateral; and it is further

ORDERED that nothing in this Order or the Motion shall be construed as an assumption by the Debtors of any insurance policy, contract or agreement, including, but not limited to, the Premium Finance Agreement, pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that Bankruptcy Rule 6003(b) has been satisfied; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(a) are waived; and it is further

ORDERED that notwithstanding any applicability of Bankruptcy Rules 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

GSDOCS\1965068 9
RLF1 3563153v 1

ORDERED that the Debtors are authorized to take such actions as are necessary to implement and effectuate the terms of this Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated:  April _____, 2010
        Wilmington, Delaware

_____

THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

GSDOCS\1965068 9
RLF1 3563153v 1