IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re:                                                         :   Chapter 11
                                                               :
                                                               :   Case No. 10-11310 (BLS)
MAGIC BRANDS, LLC, *et al.*,                                   :
                                                               :   (Jointly Administered)
                        Debtors.[1]                            :
                                                               :   Re: Docket Nos. 21 & 173
---------------------------------------------------------------x

**DEBTORS' RESPONSE TO OBJECTION OF FIDELITY NEWPORT HOLDINGS, LLC AND AMERICAN BLUE RIBBON HOLDINGS, LLC TO DEBTORS' MOTION FOR ORDERS (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (II) APPROVING CERTAIN BIDDING PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) SCHEDULING AN AUCTION AND SALE HEARING AND (V) APPROVING SUCH SALE**

Magic Brands, LLC and its debtor affiliates (collectively, the "Debtors") hereby respond to the *Objection of Fidelity Newport Holdings, LLC and American Blue Ribbon Holdings, LLC to the Debtors' Motion for Orders (I) Approving Bidding Procedures for the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing and (V) Approving Such Sale* (Docket No. 173) (the "ABR Objection"). In support of this Response, the Debtors rely on the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Magic Brands, LLC ("Magic") (8989); Fuddruckers, Inc ("Fuddruckers") (8267), Atlantic Restaurant Ventures, Inc ("Atlantic") (9769), King Cannon, Inc ("King Cannon") (8671), and KCI, LLC ("KCI") (9281) The address for all of the Debtors is 5700 Mopac Expressway, Suite C300, Austin, Texas 78749.

Declaration of Rod Guinn filed herewith. In further support of this Response, the Debtors state as follows:

**Introduction**

1. The Debtors ran a fair and robust stalking horse bid process for more than two months prior to the filing of these Chapter 11 cases. Based on a slanted -- and in at least one important respect, untrue -- version of the events, American Blue Ribbon Holdings, LLC ("ABR") seeks to upset the Debtors' selection of Tavistock Ventures, LLC ("Tavistock") as the stalking horse bidder, a move that, if successful, will threaten the very integrity of the stalking horse process and create uncertainty in every bankruptcy case that employs that process.

2. The Debtors used their reasonable business judgment in selecting Tavistock as the stalking horse bidder after providing all prospective bidders, including ABR, a reasonable opportunity to submit their highest and best offer in an open and fair stalking horse process. The selection of Tavistock as a stalking horse bidder already has preserved and enhanced the value of the Debtors' estates, and it continues to do so. There is simply no basis to disturb that selection now. Even assuming that ABR has standing to challenge the Debtors' selection of a stalking horse -- a very tenuous argument at best -- there is no harm to having ABR and others await the next stage of the sale process to submit their best qualifying bids and compete in an auction. The greater harm lies in permitting any prospective bidder to challenge the Debtors' business judgment in selecting a stalking horse bidder. The Court should be wary of creating such a precedent and accordingly, should overrule the objection.

2

RLF1 3571390v.1

## Factual Background

### A. Summary of the Debtors' Prepetition Marketing Efforts

3. On or about February 4, 2010, the Debtors retained FocalPoint Securities, LLC ("FocalPoint") as their investment bankers to assist the Debtors in their efforts to locate a new investor and/or market and sell substantially all of the Debtors' assets as a going concern.

4. Around February 18, 2010, FocalPoint began contacting potential investors. In total, FocalPoint contacted approximately 72 potential bidders and sent approximately 58 of these potential bidders a short summary of the transaction called a "teaser," and a form of non-disclosure agreement ("NDA") to be executed in order to gain access to confidential due diligence materials. Approximately 41 potential investors expressed interest in learning more about the potential opportunity in purchasing the Fuddruckers/Koo Koo Roo businesses by executing a NDA. Those parties received a copy of the Debtors' confidential information memorandum, which describes the Debtors' historical operations, management's strategic plan and pro forma projections (the "CIM"). In addition, those parties obtained access to an electronic data room (the "Data Room") established by FocalPoint, containing due diligence materials.

5. FocalPoint received nine (9) indications of interest ("IOI") in acquiring the Debtors' assets. Initially, eight of the nine IOI's reflected a proposed purchase price that the Debtors' management, in consultation with FocalPoint, believed was an acceptable starting point, and those parties were offered the opportunity to meet with the Debtors' management. Eight management presentations (in person and on the phone) were ultimately given to potential purchasers on March 24, 30, and 31 and April 1 and 6. Management presentations were

3

scheduled during a specific block of time in order to maximize the time management could spend with each bidder, while minimizing disruption to the business.

6. On April 5, 2010, FocalPoint circulated a form of asset purchase agreement ("APA") to parties that had submitted IOIs to use as a starting point for making definitive stalking horse offers. The Debtors' management had determined that the timing of a chapter 11 filing needed to be around April 19-21 because the Debtors' management believed that it was important that the selection of a stalking horse bidder and chapter 11 filing occur in advance of the Fuddruckers Franchise Convention from April 25 to 28, 2010, and therefore April 14 was established, and announced to the bidders, as the deadline for submitting binding offers. Two parties submitted a marked up form of APA by the April 14 bid deadline: Tavistock and ABR. Shortly before the commencement of their Chapter 11 cases, the Debtors executed the asset purchase agreement with Tavistock.

**B. American Blue Ribbon**

7. During a telephone call with Rod Guinn from FocalPoint on February 18, 2010, ABR first expressed an interest in acquiring the Debtors' business. As it did with other potential bidders, FocalPoint sent a teaser and form of NDA to ABR. ABR demanded a number of material revisions to the form of NDA that were unacceptable to the Debtors. By far, ABR's demands with respect to the specific terms and conditions of the NDA were substantially greater and negotiations more intense and prolonged than those with the other potential bidders. Negotiations did not conclude until ABR's execution of a NDA on March 11, 2010 – nearly four (4) weeks after ABR received the original form of NDA.

8. Following ABR's execution of the NDA, FocalPoint provided ABR with a copy of the Debtors' CIM and granted ABR access to the Data Room. FocalPoint also sent a letter to

4

ABR which described the guidelines for prospective bidders to submit a non-binding, detailed indication of interest as a stalking horse bidder for the acquisition of substantially all the assets of the Debtors. The letter provided in relevant part that "upon receipt of an IOI that is deemed to be acceptable, meetings will be arranged with management." During a telephone call between Rod Guinn of FocalPoint and Hazem Ouf, the CEO of ABR at or around the time that ABR executed the NDA, Mr. Guinn specifically asked Mr. Ouf whether ABR would want to meet with the Debtors' senior management at the appropriate time, to which Mr. Ouf responded that ABR was not interested in hearing or discussing management's views or business strategies.

9. ABR submitted its IOI on March 26, 2010, two days after the IOI deadline announced to all bidders. ABR's IOI was deemed unacceptable by the Debtors' management because it was well below the purchase price threshold set by eight other potential bidders who submitted IOIs and contained a financing contingency. On March 31, 2010, a week after the IOI deadline, ABR submitted a revised IOI, which reflected an increase in the proposed purchase price to an acceptable level and deleted the financing contingency. The Debtors' management agreed to allow ABR to continue to participate in the process notwithstanding the fact that it had no obligation to do so.

10. After ABR's submission of the revised IOI on March 31, Mr. Ouf requested an opportunity to meet with management. By that time, management presentations had already been given to six potential bidders and had already been scheduled with the other two potential bidders. The schedules of senior management could not accommodate another in person management presentation. FocalPoint attempted to work with ABR on several occasions to try to schedule telephone calls with management. On April 8, 2010, Mr. Ouf was asked to provide FocalPoint with his preference as to whom he wanted to speak with and when. ABR did not

5

respond to FocalPoint's request concerning calls with senior management until April 13, 2010, on the eve of the bid deadline.

11.     On April 14, 2010, ABR submitted a bid for substantially all of the assets of the Debtors in the form of a marked up APA, containing numerous material changes to the original form provided by FocalPoint, including substantial additional representations and warranties. Tavistock submitted its bid in the form of a marked up APA, which contained significantly fewer changes to the original form. ABR offered $40 million subject to an undefined purchase price adjustment and bid protections in the form of a break-up fee (3%), expense reimbursement of $500,000 and minimum overbid of $2 million, for a total overbid amount of 9.25% of the proposed purchase price ($3.7 million). Tavistock offered $35 million without any purchase price adjustment and subject to a break-up fee of 3.5%, no expense reimbursement and a minimum overbid of $250,000 for total overbid amount of 4% of the purchase price.

12.     On April 15, 2010, FocalPoint and counsel for the Debtors had a conference call with the Debtors' senior management to review and discuss the bids submitted by ABR and Tavistock. The Debtors' primary concerns with ABR's APA included, among others, ABR's purchase price adjustment (Tavistock's bid contained no purchase price adjustment), the total overbid amount (which was significantly higher than Tavistock's proposed overbid amount), the number of required seller representations and warranties which were not limited to materiality, and ABR's intentions with respect to the Debtors' unexpired leases. The primary deficiency with Tavistock's offer was the proposed lower purchase price.

13.     After the April 15 call, FocalPoint reached out to representatives of both Tavistock and ABR to discuss management's concerns and provide both with the opportunity to improve their respective bids. No one made any promises that ABR would be selected as the

stalking horse (and the Debtors' board of directors never authorized any such selection), and it was made clear to ABR that its form of agreement remained a concern.

14. On April 16, 2010, FocalPoint had several discussions with ABR about their offer (including an "all hands" call with counsel to the Debtors and ABR). At the conclusion of those discussions, no resolution had been reached on several material issues: ABR refused to abandon its concept of an unquantified purchase price adjustment; ABR offered only to reduce its overbid amount by $1 million, still leaving a significant minimum overbid amount; ABR also stated that it would "consider" which seller representations and warranties would be limited by materiality. Given the history of protracted negotiations with ABR on the form of NDA and the substantial markup of the form of APA, the Debtors and their professionals had doubts about being able to negotiate an acceptable agreement in the few remaining days before the Debtors' Chapter 11 filing, which was planned for the week of April 19, 2010.

15. On April 17, 2010, Tavistock increased the cash purchase price of its bid to $40 million and the Debtors selected Tavistock as its stalking horse bidder. The reasons for that choice were clear: the price was the same as ABR's; Tavistock's APA, unlike ABR's, did not have a purchase price adjustment, the bid protections were reasonable and substantially better than ABR's; the issues on the definitive document were narrower; and the absence of a difficult negotiation experience on the NDA.

16. FocalPoint notified ABR of the Debtors' selection of Tavistock as the stalking horse bidder and encouraged ABR to participate later in the auction. Since the Debtors' Chapter 11 filing on April 21, 2010, the Debtors have continued to respond promptly to ABR's requests for information.

## Argument

### A. The Debtors Ran a Fair and Robust Marketing and Stalking Horse Process That Maximized the Value of the Debtors' Estates.

17. As described in the accompanying Declaration of Rod Guinn and summarized above, the Debtors ran a fair and robust prepetition marketing and stalking horse process that involved ABR, Tavistock and several other bidders, ultimately culminating in the Debtors' selection of Tavistock as the stalking horse bidder. Contrary to the suggestion that the Debtors "cut off" ABR from the process, the Debtors, through FocalPoint, embraced ABR in that process, considering ABR's bids despite being untimely, encouraging revised bids when the initial bid fell short, and promptly responding to ABR's numerous requests for information. ABR had more than a reasonable opportunity to submit its highest and best bid to become the stalking horse bidder within the established time constraints.

18. The Debtors' marketing and stalking horse process also maximized the value of the Debtors' estates by locking in prepetition the highest and best bid for the Debtors' business. In consultation with FocalPoint, the Debtors' Board of Directors concluded that Tavistock, not ABR, should be the stalking horse bidder for the following reasons: (a) Tavistock's proposed purchase price was the same as ABR's, but not subject to any adjustment, (b) the proposed form of APA that Tavistock submitted on April 14 contained changes to the Debtors' form that were much more reasonable than ABR's proposed changes; (c) the proposed bid protections were reasonable and customary and a relatively small price for the Debtors to pay in exchange for having a guaranteed buyer at an auction; and (d) confidence that the Debtors and Tavistock would reach agreement on a definitive form of APA in the tight timeframe remaining before the Chapter 11 filing.

8

19. Having provided ABR with a reasonable opportunity to submit its best bid, the Debtors had no obligation to continue to negotiate with ABR. Management was concerned about being able to get a signed definitive APA with ABR within the timeframe of the Chapter 11 filing – a legitimate concern that was based on ABR's track record in negotiating the NDA and its extensive mark-up of the APA. The Debtors' management exercised reasonable business judgment in selecting Tavistock and calling an end to a fair prepetition stalking horse process only days before the Debtors' planned Chapter 11 filing and the Fuddruckers Franchise Convention.

20. ABR will have its opportunity to submit the highest and best bid for the Debtors' business in connection with an established auction process. That time, however, is not now. Based on the facts and circumstances presented, the Debtors' business judgment that Tavistock, and not ABR, submitted the highest and best stalking horse bid should not be second-guessed.[2]

**B.  Permitting Prospective Bidders to Challenge the Debtors' Selection of a Stalking Horse Will Undermine the Integrity of the Prepetition Marketing and Stalking Horse Process.**

21. Permitting prospective bidders to challenge freely a debtor's selection of a stalking horse bidder undermines the integrity and certainty of an established prepetition marketing and stalking horse process. ABR would have the Court believe that this is a simple matter of the Court choosing one stalking horse bidder over another. At stake, however, is ensuring the integrity of the sales process. Here, ABR's challenge, if successful, could very well

---

[2] The business judgment rule shields a debtor's management from judicial second-guessing. Johns-Manville Corp., 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985))

9

chill the bidding by causing Tavistock to abandon its efforts to acquire the Debtors' business. This would be a terrible result for the estates and their creditors.

22. Moreover, sanctioning ABR's tactics will have a chilling effect on bankruptcy sales in general by sending a very clear message to every potential stalking horse bidder contemplating making a binding, irrevocable prepetition offer to purchase a debtor's business: don't do it. A stalking horse bidder has the reasonable expectation that its bid, once selected by a debtor's management, will remain exclusive until such time as a defined auction process unfolds in bankruptcy. As consideration for that exclusivity, the stalking horse remains bound to purchase the debtor's assets even if no other bidder comes forward. The stalking horse bid serves a critical role in bankruptcy, giving a debtor certainty that it has a guaranteed offer at an acceptable price whether or not there is competition once the debtor enters into the uncertain world of bankruptcy. To be clear, the Debtors here would not have filed for Chapter 11 protection without a stalking horse.

23. ABR for whatever reason has chosen to pursue a course that will diminish and devalue the critical role of the stalking horse and subject the stalking horse selection process, normally reserved to a debtor's business judgment, to judicial second-guessing. Because ABR's challenge simply goes too far in undermining the integrity and certainty of a valuable and critical prepetition sales process, this Court should overrule the objection.

## C. The Combined Break-Up Fee and Expense Reimbursement Is Actually Necessary to Preserve the Value of the Estate.

24. The Third Circuit has said that the benefit of a break-up fee required to satisfy section 503(b) of the Bankruptcy Code can be found "if assurance of a break-up fee promote[s] more competitive bidding such as by inducing a bid that otherwise would not have been made."

10

In re O'Brien Env't Energy, Inc., 181 F.3d 527, 535-37 (3d Cir. 1999). The combined break-up fee and expense reimbursement proposed here satisfies the O'Brien standard.[3]

25. As set forth in the Debtors' sale motion, the assurance of a combined break-up and expense reimbursement was necessary to lock up Tavistock's highest and best offer and is a condition to Tavistock's obligations under the APA.[4] The Debtors' Board of Directors, in consultation with their professionals, also concluded that the bid protections would not dissuade other interested parties from bidding at an auction or otherwise serve to chill the bidding for the Debtors' assets in any way.

26. The fact that a definitive agreement with Tavistock on the purchase of the Debtors' assets was achieved prior to the Fuddruckers Franchise Convention already has preserved and enhanced the going concern value of the Debtors' business and estates, both by encouraging bidding and by benefitting the Debtors in their relations with both their employees and their franchisees. It is noteworthy that ABR also insisted prepetition on a break-up fee, expense reimbursement and minimum overbid amount aggregating 9.25% of its proposed purchase price, and despite the Debtors' requests at the time, agreed to make only token changes to its bid protections that if accepted, would have certainly chilled any competitive bidding. It is disingenuous for ABR to now argue that the break-up fee and expense reimbursement was unnecessary to attract a stalking horse bid merely because those protections no longer serve ABR's self-interest.

---

[3] A more thorough discussion of O'Brien is contained in the Debtors' sale motion, to which the Court and other parties are respectfully referred.
[4] This is unlike the facts in In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir 2010) where the proposed break-up fee was not a condition to the stalking horse bidder's obligations under the purchase agreement

11

27. In addition to locking up a bid prepetition, the Debtors' selection of Tavistock as the stalking horse, to state the obvious, has served as the catalyst for ABR's submission of an offer that is a substantial improvement on the terms ABR was willing to agree to prepetition. Without a doubt, the true purpose of a stalking horse bid has been fulfilled already at a very early stage in the process: providing a platform for other bidders and attracting competition.

### D. ABR Does Not Have Standing To Challenge the Debtors' Selection of a Stalking Horse Bidder.

28. ABR does not have standing to challenge the Debtors' selection of a stalking horse bidder. In general, an unsuccessful bidder does not have standing to challenge a sale. In re Colony Hill Assoc., 111 F.3d 269, 273 (2d Cir. 1997) (a non-creditor, whose only connection with a bankruptcy case is that the party was an unsuccessful bidder at a bankruptcy sale, lacks standing to challenge the right of other bidders to consummate the sale); In re Quanalyze Oil & Gas Corp., 250 B.R. 83, 88-89 (Bankr. W.D. Tex. 2000) (competing bidder normally lacks standing to even challenge a sale, much less seek reconsideration of an order approving sale.). However, some courts have recognized an exception to this general rule and have conferred standing on an unsuccessful bidders where the "intrinsic fairness" of the sale has been challenged, thus implicating a good faith purchaser finding. See, e.g., In re Paolo Gucci, 126 F.3d 380, 388 (2d Cir. 1997) ("[A]n unsuccessful bidder challenging the intrinsic fairness of the sale has standing to appeal an order directing that sale."); Colony Hill, 111 F.3d at 274 (unsuccessful bidder had standing to allege that purchaser's actions destroyed the "intrinsic fairness" of a bankruptcy sale so that it was not a good faith purchaser); Dick's Clothing & Sporting Goods, Inc. v. Phar-Mor, Inc., 212 B.R. 283, 289 (N.D. Ohio 1997) (unsuccessful bidder had standing to

12

challenge a sale order, but only insofar as the bidder alleged that the sale was not made in good faith).[5]

29.     The ABR Objection is neither an objection by a bidder who lost a bankruptcy auction nor a challenge to a proposed sale or the good faith status of a proposed purchaser. ABR's sole objection is that it was not selected as the Debtors' *stalking horse bidder* entering into an auction process. ABR has not been shut out from participating in a competitive auction or deprived of the opportunity to make a higher or better offer and acquire the Debtors' assets. To the contrary, the Debtors welcome ABR's participation in a competitive auction which can only inure to the benefit of the Debtors' estates and creditors. Because the Debtors' selection of Tavistock as the stalking horse bidder does not foreclose the ability of ABR, or any bidder for that matter, to bid on the Debtors' business at auction, ABR does not have standing.

---

[5]     The rationale underlying the standing exception is succinctly explained in the Seventh Circuit's pre-Bankruptcy Code decision in In re Harwald Company:

> Courts... properly entertain suits challenging the equity of a bankruptcy sale transaction, on the assumption that sales tinged by fraud, mistake or unfairness would generally result in an accepted bid below that which might have been expected in a fair, free market situation. Thus, when an unsuccessful bidder attacks a bankruptcy sale on equitable grounds related to the intrinsic structure of the sale, he brings himself within the zone of interests which the Bankruptcy Act seeks to protect and to regulate.

497 F.2d 443, 444-45 (7th Cir. 1974).

## Conclusion

For the foregoing reasons, the Debtors respectfully request that the Court overrule the ABR Objection in its entirety.

Dated: May 14, 2010
      Wilmington, Delaware

Respectfully submitted,

/s/

Daniel J. DeFranceschi (DE No. 2732)
Drew G. Sloan (DE No. 5069)
Julie A. Finocchiaro (DE No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Douglas B. Rosner
Christine D. Lynch
Peter D. Bilowz
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
Telephone: (617) 482-1776
Facsimile: (617) 574-4112

*Proposed Counsel for Debtors and Debtors in Possession*