# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MAGIC BRANDS LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-11310 (BLS)<br>(Jointly Administered)<br><br>Re: Docket Entry No. 21<br><br>Objection Deadline: May 14, 2010 at 12:00 p.m.<br>(extended as to the Committee by consent)<br>Hearing Date: May 17, 2010 at 9:00 a.m. |

## LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MAGIC BRANDS LLC, ET AL. TO DEBTORS' MOTION FOR ORDERS (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (II) APPROVING CERTAIN BIDDING PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) SCHEDULING AN AUCTION AND SALE HEARING, AND (V) APPROVING SUCH SALE

The Official Committee of Unsecured Creditors (the "Committee") of Magic Brands LLC., et al., the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed counsel, Kelley Drye & Warren LLP and Klehr Harrison Harvey Branzburg LLP,[2] hereby files this limited objection (the "Limited Objection") to the Debtors' Motion For Orders (I) Approving Bidding Procedures For The Sale Of Assets Free And Clear Of All Liens, Claims, Interests And Encumbrances Pursuant To Section 363 Of The Bankruptcy Code, (II) Approving Certain Bidding Protections, (III) Approving The Form And Manner Of Notice Of The Sale And Assumption And Assignment of Executory Contracts And Unexpired Leases, (IV) Scheduling An Auction And Sale Hearing, And (V) Approving

---

[1] The Debtors in these cases are: Magic Brands, LLC, Fuddruckers, Inc., Atlantic Restaurant Ventures, Inc., King Cannon, Inc., and KCI, LLC.

[2] Applications to retain Kelley Drye & Warren LLP and Klehr Harrison Harvey Branzburg LLP as counsel to the Committee are being completed and will be filed with the Court in the near term.

Such Sale (the "Sale Motion").[3] In support of this Limited Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. On the Petition Date (as defined below), the Debtors filed the Sale Motion seeking approval of an expedited sale to sell substantially all of their assets. In that regard, prior to Petition Date, the Debtors entered into an asset purchase agreement with Tavistock Ventures, Inc. ("Tavistock") pursuant to which the Debtors seek approval, among other things, to deem Tavistock the stalking horse bidder. The asset purchase agreement contains a break-up fee and expense reimbursement provision that would, if approved, reduce the consideration received by the Debtors' estates by $1.4 million (the "Break-Up Fee").

2. Under Third Circuit precedent, the Break-Up Fee may only be approved if it is a valid administrative expense under section 503(b) of the Bankruptcy Code – it must be an actual and necessary cost that preserves the value of the Debtors' assets. Here, payment of the Break-Up Fee is not necessary to preserve the value of the Debtors' assets and should not be approved by the Court because the Debtors received a virtually identical bid from Fidelity Newport Holdings, LLC, and its wholly owned subsidiary American Blue Ribbon Holdings, LLC (collectively, "ABRH"). The ABRH bid is different from the Tavistock bid in two ways: First, the ABRH bid increases the guaranteed purchase price by $1 million. Second, the ABRH bid does not require the payment of the Break-Up Fee. Due to the ABRH bid, the Break-Up Fee is not necessary to preserve the value of the Debtors' assets.

3. The Committee is not opposed to Tavistock serving as the stalking horse bidder, and the Committee is not yet taking a position on which bid is higher or otherwise better; rather, the Committee is opposed to the approval of the Break-Up Fee.

---

[3] Docket Entry No. 21.

## STATEMENT OF FACTS

### A. General Background

4. On April 21, 2010 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5. Since the Petition Date, the Debtors have continued in possession of their properties and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. On May 3, 2010, the United States Trustee appointed U.S. Foodservice, Inc., Pepsi-Cola North America, White Marsh General Partnership, P & D Realty Company LLC, and Marcelo and Berna Montalvan to the Committee.[4] On the same date, the Committee selected Kelley Drye & Warren LLP to serve as lead counsel to the Committee, and, thereafter, selected Klehr Harrison Harvey Branzburg LLP as local counsel.

### B. The Proposed Sale Of The Debtors' Assets

7. On April 22, 2010, the Debtor filed the Sale Motion, pursuant to which the Debtors seek authority to sell substantially all of their assets to either Tavistock, as the stalking horse bidder, or the highest or best otherwise best bidder, as determined at an auction.

8. In February 2010, the Debtors retained FocalPoint Securities, LLC ("FocalPoint"), as their investment bankers to locate a new investor and/or market and sell substantially all of the Debtors' assets as a going concern. *See* Sale Motion at ¶ 8. By late March, FocalPoint had received nine serious indications of interest to be the stalking horse bidder. Ultimately, the Debtors selected Tavistock as the stalking horse and the parties entered into an asset purchase agreement (the "APA"), a copy of which was attached to the Sale Motion as Exhibit B. *See* Sale Motion at ¶¶ 11-12.

---

[4] Docket Entry No. 145.

3

DEL1 75066-1

9.  Pursuant to the APA, Tavistock has offered to purchase substantially all of the Debtors' assets, including: (i) 15 parcels of owned real property on which Fuddruckers restaurants are located; (ii) the leases of the Debtors' corporate offices in Austin, Texas and North Andover, Massachusetts; (iii) 52 leased restaurants; (iv) inventory related to purchased assets; (v) accounts receivable related to purchased assets; (vi) furniture and equipment related to purchased assets; (vii) all intellectual property, including all of the Debtors' franchise rights for the Debtors' 135 franchised locations; (viii) all permits; and (ix) register cash. *See* APA at § 2.2.

10.  Of the 52 leased restaurant locations to be acquired by Tavistock, seven locations are subject to a lease (the "Spirit Lease") between the Debtors and Spirit Master Funding, LLC ("Spirit"). The purchase price under the APA is $40 million if those seven Spirit locations (the "Remaining Spirit Locations") are included as part of the sale, and $31 million if they are not.[5]

### C.  The Proposed Break-Up Fee and Expense Reimbursement

11.  Section 7.4 of the APA contains the proposed Break-Up Fee of 3.5% of the "Asset Price" as defined in Section 3.1(a) of the APA. As discussed above, the Asset Price fluctuates depending on whether the Remaining Spirit Locations are included in the sale transaction. If the Remaining Spirit Locations are included, the Asset Price is $40,000,000, and the Break-Up Fee is $1.4 million. If the Remaining Spirit Locations are excluded, the Asset Price is $31,000,000, and the Break-Up Fee is $1.085 million.[6]

12.  The Debtors state that the Break-Up Fee "is a necessary inducement for the Stalking Horse Bidder to submit its bid subject to higher and better offers and is a necessary

---

[5] On May 13, 2010, the Committee filed an objection (Docket Entry No. 225) to the Debtors' motion to approve a proposed amendment to the Spirit Lease (Docket Entry No. 125).

[6] Since the Committee believes the Court will sever the Spirit Lease, for the remainder of the Limited Objection, the Committee refers to the Break-Up Fee as $1.4 million, with the understanding that it could be $1.085 million if the Remaining Spirit Locations are not included in the sale of the Debtors' assets.

4

condition to closing the Sale." *See* Sale Motion at ¶ 28. The Debtors argue that approval of the Break-Up Fee is appropriate under the Third Circuit precedent of *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) and *In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010). *See* Sale Motion at ¶¶ 29-33.

### D. The ABRH Objection and Bid

13. On May 7, 2010, ABRH objected to the Sale Motion (the "ABRH Objection")[7], stating that ABRH is willing to serve as the stalking horse on virtually the exact same terms as Tavistock, but with two important differences. First, ABRH's bid increases the purchase price by $1 million – with and without the Remaining Spirit Locations. Second, ABRH will serve as the stalking horse without the Break-Up Fee. *See* ABRH Objection at ¶ 1. An executed asset purchase agreement and blackline against the APA are attached to the ABRH Objection as Exhibits A-1 and A-2.

## ARGUMENT

### A. The Break-Up Fee Should Not Be Approved

14. The Debtors' primary obligation in bankruptcy is to maximize the value of their assets for the benefit of their estates and creditors. In certain circumstances, the Court may approve a debtor's request to pay a break-up fee where such expense is properly paid under section 503(b) of the Bankruptcy Code. This is not such a case.

15. Here, Tavistock and ABRH both are willing to serve as the stalking horse and guarantee a minimum purchase price at an auction. Both bidders use the same asset purchase agreement and the bids are virtually identical. However, ABRH's bid does not require payment of the Break-Up Fee. Given these facts, the Court should find that the Break-Up Fee is

---

[7] Docket Entry No. 173.

not necessary to preserve the value of the Debtors' assets, and should not approve the Break-Up Fee.

16. A break-up fee may only be approved if such expense is properly allowed under section 503(b) of the Bankruptcy Code as necessary to preserve the value of a debtor's assets. *O'Brien*, 181 F.3d at 535; *Reliant Energy*, 594 F.3d at 206. In this regard, an analysis of *O'Brien* and *Reliant Energy* is instructive.

17. In *O'Brien*, the bankruptcy court was asked to approve a break-up fee for the stalking horse bidder, Calpine Corporation. *O'Brien*, 181 F.3d at 529-30. The bankruptcy court refused to approve the break-up fee prior to the auction, believing that it would chill or complicate bidding. The bankruptcy court reserved final decision, allowing Calpine to seek payment of the break-up fee after the auction. *Id.* When Calpine was the unsuccessful bidder, it sought payment of the break-up fee. Calpine's request was denied because the bankruptcy court found that payment of the break-up fee was not necessary to preserve the value of the debtor's assets. *Id.* at 530. In affirming the ruling of the bankruptcy court, the Third Circuit made clear that even if the purpose of a break-up fee is permissible, it must still be necessary to preserve the value of the debtor's estate to be awarded, stating:

> [E]ven if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose. For example, in some cases a potential purchaser will bid whether or not break-up fees are offered. ... In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.

*Id.* at 535.

18. In *Reliant Energy*, the Third Circuit followed *O'Brien* and affirmed the denial of a break-up fee of approximately 3%, which the bankruptcy court believed would chill bidding and was not necessary to preserve the value of the debtor's assets. *Reliant Energy*, 594 F.3d at 203-204. In that case, the Third Circuit highlighted that the bidder, Kelson Channelview

6

LLC, made its bid without assurance that it would receive a break-up fee, as approval of the stalking horse bid was expressly conditioned on approval by the bankruptcy court. The Third Circuit concluded: "there is no escape from the fact that Kelson *did* make its bid without the assurance of a break-up fee, and this fact destroys Kelson's argument that the fee was needed to induce it to bid." *Id.* at 207 (emphasis in original). Further, even though Kelson could have (and subsequently did) walk away from its bid, the Third Circuit held that the bankruptcy court did not err in denying the break-up fee based on (i) evidence in the record that another bidder would submit a superior bid, (ii) the binding language of the asset purchase agreement, and (iii) the logical belief that Kelson would not abandon a fully negotiated agreement if no other bidder materialized. *Id.* at 208.

19. Applying *O'Brien* and *Reliant Energy* to this case, the Court should not approve the Break-Up Fee because it is not necessary to preserve the value of the Debtors' assets and it is excessive. Indeed, approving the Break-Up Fee will not preserve the value of the Debtors' assets, it will only decrease the value of those assets by $1.4 million.

20. Since ABRH submitted a bid without the Break-Up Fee, there is no reason for 1.4 million to be paid to Tavistock, if another party is the successful bidder at the auction. The $1.4 million should be used to satisfy the claims of the Debtors' creditors, particularly in a case where the Debtors believe that unsecured creditors could receive little or no recovery. *See* Declaration of Gregor Grant in Support of Chapter 11 Petitions and First Day Pleadings (the "Grant Declaration")[8] at ¶ 21.

21. In the Sale Motion, the Debtors discuss the following nine factors analyzed by the bankruptcy court when it considered and ultimately denied the break-up fee in *O'Brien*:

---

[8] Docket Entry No. 15.

7

(1) Is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation?

(2) Does the fee hamper, rather than encourage bidding?

(3) Is the amount of the fee unreasonable relative to the proposed purchase price?

(4) Did the unsuccessful bidder place the estate property in a sales configuration mode to attract other bidders to the auction?

(5) Did the request for a break-up fee serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders?

(6) Does the fee requested correlate with a maximization of value to the debtor's estate?

(7) Are the principal secured creditors and the official creditors committee supportive of the concession?

(8) Were safeguards beneficial to the debtor's estate available?

(9) Was there a substantial adverse impact on unsecured creditors, where such creditors are in opposition to the break-up fee?

*O'Brien*, 181 F.3d at 536.

22. While the Third Circuit did not adopt these nine factors as the definitive test when considering the enforceability of break-up fees, an analysis of these factors is useful to determine whether the record supports the Debtors' allegation that the Break-Up Fee is necessary to preserve the value of their assets. As set forth below, an analysis of these factors weighs against approval of the Break-Up Fee. This is particularly true, where, as here, ABRH is willing to serve as the stalking horse bidder without the Break-Up Fee. Indeed, at most, only one of the *O'Brien* factors supports approval of the Break-Up Fee.

23. First, based on ABRH's allegations, it appears that the Debtors' prepetition marketing process was incomplete. The Committee has had insufficient time to fully investigate the Debtors' prepetition marketing efforts, and currently cannot say whether the negotiations leading to the APA were tainted. However, based on the allegations in the ABRH Objection, the Debtors' alleged refusal to meet with ABRH and sudden termination of

8

negotiations with ABRH are questionable. This factor cannot be said to support approval of the Break-Up Fee.

24.     Second, the Break-Up Fee will hamper bidding because it will require an unreasonably high initial overbid of $1.65 million, $1.4 million of which will provide no benefit to the Debtors' estates or creditors. Since the Break-Up Fee will unfairly advantage Tavistock, this factor clearly weighs against approval of the Break-Up Fee.

25.     Third, a break-up fee of $1.4 million, 3.5% of the purchase price, is unreasonable relative to the proposed purchase price. The majority of cases permitting break-up fees have only allowed fees that do not exceed one to two percent of the proposed purchase price.[9] This is particularly important where, as here, the Debtors believe that unsecured creditors could receive little or no recovery in these cases. *See* Grant Declaration at ¶ 21. Indeed, with ABRH willing to serve as stalking horse with no Break-Up Fee, the Committee believes that any break-up fee is excessive. This factor weighs against approval of the Break-Up Fee.

26.     Fourth, Tavistock did not initiate the sale process or place the Debtors' assets in a sale configuration mode. The Debtors' management, with the assistance of FocalPoint, determined that a sale of the Debtors' assets was necessary, and independently solicited bids for their assets. Tavistock did not initiate this sale process, and should not receive a windfall for being one of several bidders willing to participate in an auction for the Debtors' assets. This factor weighs against approval of the Break-Up Fee.

---

[9] *See, e.g., In re Integrated Resources, Inc.*, 135 B.R. 746, 752-53 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650, 662-63 (S.D.N.Y. 1992) (1.0% breakup fee permitted *only after* the court prompted the parties to reduce the requested breakup fee from 1.59%); *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 578-79 (11th Cir. 1988); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (1.11% breakup fee of $500,000 permitted on $45,000,000 merger price); *In re 995 Fifth Avenue Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (0.68% breakup fee of $500,000 permitted on $73,000,000 bid for sale of asset).

9

DEL1 75066-1

27. Fifth, the Committee acknowledges the argument that the Break-Up Fee induced Tavistock to submit its bid, could retain Tavistock as a potentially successful bidder, and established the bid standard in the APA. However, based on ABRH's claims that it was in simultaneous negotiations with the Debtors, combined with ABRH's willingness to serve as stalking horse without the Break-Up Fee, it can also be argued that the Break-Up Fee did not establish a minimum bid or attract other bidders. Based on the allegations made in the ABRH Objection, ABRH may have submitted a bid prepetition without a break-up fee. As such, this factor can weigh for or against approval of the Break-Up Fee.

28. Sixth, the Break-Up Fee does not correlate with maximizing the value of the Debtors' assets. The Break-Up Fee does precisely the opposite, ensuring that the Debtors' assets are worth $1.4 million less if anyone other than Tavistock is the successful bidder. This factor weighs against approval of the Break-Up Fee.

29. Seventh, the Committee opposes the Break-Up Fee. The Break-Up Fee will only reduce the recovery to unsecured creditors because the Break-Up Fee is excessive and unnecessary in light of the ABRH bid.[10] This factor weighs against approval of the Break-Up Fee.

30. Eighth, there are other safeguards available that are beneficial to the Debtors' estates, namely, the ABRH bid. This alternative safeguard weighs against – and completely obviates – the need for the Break-Up Fee.

31. Ninth, there will be a substantial adverse impact on the unsecured creditors who oppose the Break-Up Fee because $1.4 million that should be available to pay their claims will be paid to Tavistock. This factor weighs against approval of the Break-Up Fee.

---

[10] Because the Debtors' secured creditors will be paid in full, their support or opposition to the Break-Up Fee is irrelevant.

32. Based on the foregoing, the *O'Brien* factors weigh heavily against approval of the Break-Up Fee. Importantly, with ABRH willing to serve as the stalking horse without the Break-Up Fee, only one of the nine factors arguably supports approval of the Break-Up Fee. The only party that will benefit from the Break-Up Fee is Tavistock, which will receive a windfall, if the Break-Up Fee is approved, at the expense of the Debtors' unsecured creditors.

## CONSENSUAL RESOLUTION OF OTHER ISSUES

33. The Committee and Debtors consensually resolved certain other issues with the proposed bidding procedures and bidding procedures order. Revised versions of those documents will be submitted to the Court prior to or at the hearing on the Sale Motion.

## RESERVATION OF RIGHTS

34. The Committee hereby reserves its rights to raise further objections to the Sale Motion, including without limitation all objections related to the auction and actual sale or assignment of the Debtors' assets.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court deny the Break-Up Fee and grant such other and further relief as the Court deems just and proper.

Dated: May 14, 2010
Wilmington, Delaware

KLEHR HARRISON HARVEY BRANZBURG LLP

By: /s/ *signature*
Domenic E. Pacitti (DE Bar No. 3989)
Margaret M. Manning (DE Bar No. 4183)
919 Market Street
Suite 1000
Wilmington, Delaware 19801-3062
Tel: (302) 426-1189
Fax: (302) 426-9193

and

11

KELLEY DRYE & WARREN LLP
James S. Carr (N.Y. Bar No. JC-1603)
Eric R. Wilson (N.Y. Bar No. EW-4320)
Dana P. Kane (N.Y. Bar No. DK-3909)
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

*Proposed Counsel to the Official Committee of Unsecured Creditors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MAGIC BRANDS LLC, et al.,[1] | ) | Case No. 10-11310 (BLS) |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) |  |

## CERTIFICATE OF SERVICE

I, Domenic E. Pacitti, Esq. of Klehr Harrison Harvey Branzburg LLP, hereby certify that on this 14th day of May 2010, I served a copy of the **Limited Objection of the Official Committee of Unsecured Creditors of Magic Brands LLC, et al. to Debtors' Motion for Orders (I) Approving Bidding Procedures for the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing, and (V) Approving Such Sale** upon the parties listed on the attached Service List via First Class mail.

                                                                                 */s/ Domenic E. Pacitti*
                                                                                 Domenic E. Pacitti, Esquire (DE Bar No. 3989)

---

[1] The Debtors in these cases are: Magic Brands, LLC, Fuddruckers, Inc., Atlantic Restaurant Ventures, Inc., King Cannon, Inc., and KCI, LLC.

# SERVICE LIST

Daniel J. DeFranceschi
Drew G. Sloan
Julie A. Finocchiaro
Richards Layton & Finger P.A.
920 N King St
Wilmington, DE 19801

Douglas B. Rosner
Christine D. Lynch
Goulston & Storrs P.C.
400 Atlantic Ave
Boston, MA 02110-3333

Jesse H. Austin III
Paul Hastings Janofsky& Walker LLP
600 Peachtree St NE Ste 2400
Atlanta, GA 30308

Richard W. Riley
Duane Morris LLP
1100 N Market St Ste 1200
Wilmington, DE 19801

Joseph J. McMahon, Jr., Esquire
Office of the United States Trustee
Delaware
844 King St Ste 2207Lockbox 35
Wilmington, DE 19899-0035

David M Fournier
Pepper Hamilton LLP
1313 Market St Hercules Plaza Ste 5100
PO Box 1709
Wilmington, DE 19801

Randy Michelson
Michelson Law Group
150 Spear St
San Francisco, CA 94105

Sachin Lele
Richard Morey
DLA Piper LLP
203 N LaSalle St Ste 1900
Chicago, IL 60601

Bruce Grohsgal
Pachulski Stang Ziehl & Jones LLP
919 N Market St 17st FlPO Box 8705
Wilmington, DE 19801

Pauline K. Morgan
Joseph M. Barry
Young Conaway Stargatt & Taylor LLP
1000 West St., 17th Fl
Wilmington, DE 19801

Andrew N. Rosenberg
Jonathan Koevary
Paul Weiss Rifkind Wharton & Garrison LLP
185 Ave of the Americas
New York, NY 10019

Brett D. Fallon
Carl N. Kunz, III
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899-2306

Rob Charles
Lewis and Roca LLP
One South Church Avenue, Suite 700
Tucson, Arizona 85701-1611