UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                     .      Case No. 10-11310(BLS)
                           .
                           .
MAGIC BRANDS, LLC,         .
                           .      824 North Market Street
                           .      Wilmington, DE 19801
                           .
           Debtor.         .      May 17, 2010
. . . . . . . . . . . . ..         9:16 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:            Richards, Layton & Finger, P.A.
                           By:  DANIEL J. DeFRANCESCHI, ESQ.
                                DREW G. SLOAN, ESQ.
                                JULIE A. FINOCCHIARO, ESQ.
                           One Rodney Square
                           920 North King Street
                           Wilmington, DE 19801

                           Goulston & Storrs
                           By:  DOUGLAS B. ROSNER, ESQ.
                                CHRISTINE D. LYNCH, ESQ.
                                VANESSA V. PECK, ESQ.
                                PETER BILOWZ, ESQ.
                           400 Atlantic Avenue
                           Boston, MA 02110-3333


Audio Operator:            Theresa Pullan


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Contd'):

```
For ABRH:                Office of the United States Trustee
                         By:  JOSEPH J. McMAHON, JR., ESQ.
                         844 King Street
                         Suite 2207
                         Wilmington, DE 19801

                         Paul, Weiss, Rifkind, Wharton &
                           Garrison, LLP
                         By:  JONATHAN T. KOEVARY, ESQ.
                              ANDREW N. ROSENBERG, ESQ.
                         1285 Avenue of the Americas
                         New York, NY 10019-6064

                         Pepper Hamilton, LLP
                         By:  DAVID M. FOURNIER, ESQ.
                         Hercules Plaza
                         Suite 5100
                         1313 Market Street
                         Wilmington, DE 19899-1709

For the Committee:       Kelley Drye & Warren, LLP
                         By:  JAMES S. CARR, ESQ.
                              ERIC R. WILSON, ESQ.
                         101 Park Avenue
                         New York, NY 10178-0002

                         Klehr Harrison Harvey Branzburg, LLP
                         By:  DOMENIC E. PACITTI, ESQ.
                         919 Market Street
                         Suite 1000
                         Wilmington, DE 19801-3062

For Spirit Funding LLC:  Lewis and Roca, LLP
                         By:  SUSAN M. FREEMAN, ESQ.
                         40 North Central Avenue
                         Suite 1900
                         Phoenix, AZ 85004

                         Morris James, LLP
                         By:  BRETT D. FALLON, ESQ.
                         500 Delaware Avenue
                         Suite 1500
                         Wilmington, DE 19801-1494
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Contd'):

For Wells Fargo Capital     Paul, Hastings, Janofsky & Walker, LLP
Finance:                    By:  JESSE H. AUSTIN, III, ESQ.
                                 CASSIE COPPAGE, ESQ.
                            600 Peachtree Street, N.E.
                            24th Floor
                            Atlanta, GA 30308

                            Duane Morris, LLP
                            By:  RICHARD W. RILEY, ESQ.
                            Suite 1200
                            1100 North Market Street
                            Wilmington, DE 19801-1246

For VA Power, et al.:       Stevens & Lee
                            By:  MARIA APRILE SAWCZUK, ESQ.
                            1105 North Market Street
                            7th Floor
                            Wilmington, DE 19801

For Tavistock:              Pachulski Stang Ziehl & Jones, LLP
                            By:  BRUCE GROHSGAL, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE 19801

                            Michelson Law Group
                            By:  RANDY MICHELSON, ESQ.
                            150 Spear Street
                            Suite 1600
                            San Francisco, CA 94105

For Microsoft:             Brown Stone Nimeroff, LLC
                            By:  JAMI NIMEROFF, ESQ.
                            Two Commerce Square
                            2001 Market Street
                            Suite 3420
                            Philadelphia, PA 19103-7042

TELEPHONIC APPEARANCES:

For Interested Party,       Wells Fargo
Blair Mertens:              By:  BLAIR MERTENS, ESQ.

For Interested Party,       Wells Faro
Stefan Sigurdson:           By:  STEFAN SIGURDSON, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd':

| | |
|---|---|
| For Spirit Funding: | Lewis and Roca, LLP<br>By:  ROB M. CHARLES, ESQ.<br>40 North Central Avenue<br>Suite 1900<br>Phoenix, AZ 85004 |
| For Franchise Group: | Orrick, Herrington & Sutcliffe, LLP<br>By:  FREDERICK D. HOLDEN, JR., ESQ.<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105-2669 |
| For Westfield, LLC: | LeClairRyan, LLP<br>By:  ILAN MARKUS, ESQ.<br>545 Long Wharf Drive<br>Ninth Floor<br>New Haven, CT 06511 |
| For Fuddruckers Independent Franchisee Association: | Zarco Einhorn Salkowski & Brito, P.A.<br>By:  ROBERT ZARCO, ESQ.<br>Bank of America Tower<br>100 S.E. 2nd Street<br>27th Floor<br>Miami, FL 33131 |

---

**I N D E X**

|                                              |      | **PAGE** |
| -------------------------------------------- | ---- | -------- |
| **WITNESS**                                  |      |          |
| JOHN CLARK                                    |      |          |
| Cross Examination by Mr. Zarco               |      | 39       |

| **EXHIBITS**              | **ID.** | **EVD.** |
| ------------------------- | ------- | -------- |
| G-1    Fuddruckers' privacy policy | 87 | 88 |

1           COURT CLERK:  All rise.

2           THE COURT:  Please be seated.  Ready to proceed?

3  Good morning.

4           MR. ROSNER:  Good morning, Your Honor.  Douglas

5  Rosner for the debtors and debtors-in-possession, and with me

6  is Chris Lynch, also my partner at Goulston & Storrs, and two

7  of our colleagues, Peter Bilowz and Vanessa Peck, as well as

8  some folks from Richards Layton for the debtors and

9  debtors-in-possession.

10          THE COURT:  Okay.

11          MR. ROSNER:  Your Honor, we have a lot on today, so

12 what we propose to do is go basically in the order of the

13 second amended agenda which has been provided to the Court.

14 And then there'll be certain things that are uncontested.

15 There are certain things where there might be some discreet

16 issues to talk about.  There are a couple of things that we're

17 going to ask to move to the end, and the -- I think the matters

18 towards the end would be primarily the bid procedures, the

19 Spirit motion, Sitrick and Focal Point.

20          THE COURT:  Okay.

21          MR. ROSNER:  So, we'd like to start with Agenda

22 Item 1 which is approval of the debtor-in-possession financing.

23 This is final approval.

24          THE COURT:  Okay.

25          MR. ROSNER:  It has already been approved on an

1 interim basis.  Your Honor, not to take too much of your time,

2 but I'll just highlight really what the major changes are to

3 the debtor-in-possession financing, changes made since the

4 entry of the interim order.  The primary change, from an

5 operational point of view, is that the budget has been updated

6 to reflect actuals and then it goes out for a 13-week period.

7          And the main changes there is that the first few

8 weeks of the case were more positive than we had initially

9 forecasted when we first filed, primarily because the vendor

10 community responded, I think, very rationally and reasonably to

11 the filing, and we were able to continue generally ordinary

12 course terms with many of the vendors.  Some are on cash on

13 delivery, but we did not face issues like critical vendor

14 issues and things like that, that commonly happen in these

15 cases.

16          So, that improved the cash position enough so that it

17 gave us a little -- gave the debtors more headroom over the

18 course of the next 60 days.  What it doesn't change, however,

19 is the incremental increase in the revolver if the case goes on

20 into early July.

21          And so, the -- in discussions with the committee --

22 and you'll hear more about this during the day -- in

23 discussions with the committee it became apparent that once we

24 get into early July the debtors begin to borrow and we're no

25 longer below the level where we were on the petition date as

1 far as the outstanding revolver amount.

2          THE COURT:  Okay.

3          MR. ROSNER:  And so every dollar borrowed is a dollar

4 less for the general unsecured, so it does have an impact.

5          The second major change deals with the carve outs in

6 Paragraph 5.  And I'm not -- I believe the Court has a redline

7 version.

8          THE COURT:  I do.

9          MR. ROSNER:  The -- at the -- since entry of the

10 interim order, as you know a committee was formed on May 3rd,

11 and Kelley Drye and FTI are the advisors to the unsecured

12 creditors committee.

13          THE COURT:  Mr. Carr, it's good to see you again.

14          MR. CARR:  Good to see you, Your Honor.

15          MR. ROSNER:  The committees immediately stepped in.

16 We've obviously -- the debtors' professionals, as well as the

17 committee professionals have obviously spent a lot of time.  We

18 have brought the committee of professionals up to speed.  They

19 stepped in.  They started negotiating directly with the lenders

20 and requested certain changes that the debtors also agreed

21 with.

22          The change to the carve out would add -- would be as

23 follows.  That the carve out would now include accrued but

24 unpaid professional fees as of the earlier of the commencement

25 of the remedies notice period or the closing of the sale up to

1  the budged amount.  And then in addition to that there would be

2  $550,000 for post-remedies professional fees and an additional

3  700,000 for the investment banker as part of the contemplated

4  sale.

5          THE COURT:  So, if the music stops all accrued --

6          MR. ROSNER:  Accrued but unpaid is captured up to the

7  budgeted amount.

8          THE COURT:  Okay.

9          MR. ROSNER:  So, the big issue there was, from an

10  operational point of view does it still give us enough -- does

11  it still give the debtors enough headroom as far as

12  availability?

13          THE COURT:  Sure.

14          MR. ROSNER:  Because the lenders correctly wanted to

15  reserve as professional fees accrued.  After working through

16  the numbers we came up with the budget that did work that did

17  provide the availability headroom that the debtors needed.

18          THE COURT:  Okay.

19          MR. ROSNER:  And once that was recognized the debtors

20  were able to agree to these changes.  In addition, there's a

21  funding -- an escrow funding mechanism that would be triggered

22  by a remedies notice event or a closing of a sale where the

23  proceeds are not sufficient to cover the administrative

24  expenses or -- and the professional fees.

25          THE COURT:  Okay.

1              MR. ROSNER:  The next major change is in the

2   investigation rights provisions in Paragraph 6.  And there the

3   committee requested a number of changes with respect to their

4   rights to investigate the lenders' prepetition claims, and if

5   appropriate bring -- take appropriate action.

6              The committee would have until July 6, 2010 in order

7   to -- would be the investigation termination date in order to

8   object to the claim or bring some type of avoidance action or

9   adversarial -- adversary proceeding.  The committee is also

10  given standing in Paragraph 6 to commence challenges on behalf

11  of the estate.  What was taken out of 6 and will now be put

12  back in is the right of other parties in interest to object to

13  the secured parties' claims.  That was in the interim order.

14  It was taken out of Paragraph 6.

15             The Office of the U.S. Trustee raised this point, and

16  after discussions this morning the debtors, the committee and

17  the lenders agree that it should go back in.  So, after this

18  morning's hearing or during one of the breaks we are going to

19  write in where parties in interest should go back in.

20             THE COURT:  Sure.

21             MR. ROSNER:  What the parties also agreed to,

22  however, is that parties in interest generally would not have

23  standing.  They would still have to come to the Court and

24  request standing if they want to do something other than object

25  to the claim.

1          THE COURT:  Right.  Okay.  I understand.

2          MR. ROSNER:  The final debtor-in-possession order --

3 financing order contemplates, it was contemplated throughout

4 this case, and that is a full roll up of the revolver piece,

5 not the term loan piece.  However, the committee did request

6 and the lenders agreed to an amendment to the DIP loan that

7 would change the waterfall.  The original waterfall on sales of

8 discrete assets was that the proceeds would be applied first to

9 the prepetition term loan and then to the post-petition

10 financing.  That's now been reversed, so proceeds apply to

11 post-petition financing first, for obvious reasons.

12          THE COURT:  Sure.

13          MR. ROSNER:  So, those are -- oh, the last change

14 deals with access to collateral in Paragraph 13, landlord

15 liens.  There's been additional language at the bottom that

16 makes it clear that the debtor-in-possession agents' rights are

17 limited to those granted under applicable non-bankruptcy law or

18 consented to by landlord.

19          THE COURT:  Okay.

20          MR. ROSNER:  So, I believe those highlight the major

21 changes, and I invite committee counsel or lenders' counsel to

22 supplement that.

23          THE COURT:  Okay.  Mr. Pacitti, good morning.

24          MR. PACITTI:  Good morning, Your Honor.  Domenic

25 Pacitti of Klehr Harrison Harvey Branzburg, proposed co-counsel

1  for the official committee of unsecured creditors.  Your Honor,

2  I'm here with James Carr and Eric Wilson of Kelley Drye &

3  Warren.

4          THE COURT:  Gentlemen.

5          MR. PACITTI:  They're our co-proposed co-counsel, as

6  well.  Pro hacs were signed by Your Honor last week.

7          THE COURT:  Okay.

8          MR. PACITTI:  Also in the courtroom today is Steven

9  Simms of FTI.  They are our proposed financial advisors to the

10 official committee.  Mr. Wilson will address the DIP issues

11 today, Your Honor.

12          THE COURT:  Okay.  That sounds fine.

13          MR. ROSNER:  Thank you.

14          MR. WILSON:  Good morning, Your Honor.  Eric Wilson

15 of Kelley Drye & Warren for the official committee of unsecured

16 creditors.

17         Your Honor, Mr. Rosner's comments accurately reflect

18 the progress that was made with respect to the financing.

19 The only thing I would add is that another change that was made

20 at the request of the committee was to reconcile the milestones

21 under the financing so that they ran concurrently with the bid

22 procedures, and we've been able to modify that schedule such

23 that it is consistent with those procedures with one exception,

24 the proposed closing date of the transaction with the ultimate

25 stalking horse.

1          I think the agreement is that we will attempt to have
2  the closing of the 363 sale concurrent with the closing date
3  that's currently required under the DIP, which is July 9th.
4  It's currently proposed under the Tavistock bid to be July
5  15th, so that's sort of the only outstanding issue.
6          THE COURT:  Okay.
7          MR. WILSON:  Thank you.
8          THE COURT:  Very good.  Thank you.
9          MR. AUSTIN:  Good morning, Your Honor.  Jess Austin
10 from Paul Hastings on behalf of Wells Fargo Finance.
11          The statements made by debtor's counsel is correct
12 relative to the lenders' accommodations of the request.  I did
13 want to advise the Court that at this point we've already filed
14 a proof of claim on behalf of Wells Fargo as the agent, and
15 I've already provided copies of all of the documents, the
16 evidence in the claim to the committee.  So, we've been working
17 through that, and from that standpoint, if any other party in
18 interest now wants to look at the claim it's on record.
19          The -- I also did want to note what the committee's
20 council noted is that one additional amendment that's included
21 in the amendment to the DIP credit agreement was to modify the
22 milestones.  So, the amendment does two things; it modified the
23 waterfall as described and it modified the milestones.
24          With respect to the comment about the July 9th date
25 versus the 15th, it's my understanding there was going to be a

1 modification to the APA to match up to July 9th.  If whatever

2 becomes the outside date would be the outside date relative to

3 the closing of the 363 sale.  Thank you.

4           THE COURT:  Thank you, Mr. Austin.

5           MR. ROSNER:  So, Your Honor, to clarify in the

6 milestones, and I just spoke briefly with Tavistock's counsel,

7 it's an outside date of July 9th, so we're not in default of

8 the debtor-in-possession financing.

9           THE COURT:  Sure.

10           MR. ROSNER:  It's my understanding from the current

11 proposed stalking horse that they would prefer to close earlier

12 than July 9th, but they understand that it's an outside date,

13 is that correct?

14           THE COURT:  Good morning.

15           MS. MICHELSON:  Good morning, Your Honor.  Randy

16 Michelson for Tavistock Ventures, Inc.  That is correct.

17           THE COURT:  Very good.  Thank you.

18           MR. ROSNER:  So, Your Honor, the debtors would ask

19 that the Court enter the final order, as modified and filed

20 with the Court yesterday evening, with the additional

21 modification that we'll make today regarding the investigative

22 rights of parties in interest.

23           THE COURT:  Okay.  Does anyone else wish to be heard

24 regarding the financing?

25                     (No audible response)

1          THE COURT:  Okay.  I am prepared to approve it.  And

2 I believe based upon the record before me it's abundantly clear

3 there has been substantial productive dialogue and negotiation

4 between the newly appointed official committee, as well as the

5 lenders and the debtors.  And I'm satisfied that the

6 modifications that have been negotiated and consensually

7 achieved are appropriate and warranted.  And I am otherwise

8 satisfied that the debtors have carried their burden under

9 Bankruptcy Code Sections 363 and 364, as well as Bankruptcy

10 Rule 4001 for the purposes of entry of a final order approving

11 the financing.

12          I would also express my appreciation to counsel for

13 the debtors for sending over the blackline yesterday.  It's

14 actually helpful to get.  I understand that this is always a

15 work in progress.  We'll often start the hearing with this, but

16 to get it last night actually gave me a pretty decent sense of

17 (indiscernible).

18          MR. ROSNER:  Thank you, Your Honor.

19          THE COURT:  So, I appreciate that.  Okay.  Do you

20 have a clean form of order?

21          MR. ROSNER:  Well, we still have to make the --

22          THE COURT:  Oh, you still -- right.

23          MR. ROSNER:  Yes.  So, we'll submit that, Your

24 Honor, after the hearing or after the break.

25          THE COURT:  Very well.  I'll look for the order, but

1    based upon the record before me the order will be entered.

2    Okay.

3                MR. ROSNER:  Do you want orders as we go through each

4    item, or do you want them --

5                THE COURT:  Why don't we -- probably as we go through

6    each item --

7                MR. ROSNER:  Okay.

8                THE COURT:  -- so that we know anything that has been

9    submitted under certificate of no objection either has been

10   signed or is being signed.  So --

11               MR. ROSNER:  Okay.  So, you can remind me of that as

12   we go through because I may --

13               THE COURT:  Yes, that's fine.

14               MR. ROSNER:  Okay.  Too many pages.

15               The next item, Your Honor, on the agenda is the

16   motion for expedited order establishing procedures for sale of

17   de minimis assets.

18               THE COURT:  Right.

19               MR. ROSNER:  It was approved on an interim basis

20   subject to various notice requirements, et cetera.  The only

21   objection has been withdrawn, and those are Dockets 94 and 181.

22               THE COURT:  I saw that.

23               MR. ROSNER:  And, Your Honor, I have a -- both a

24   redlined and a clean of the order.  The redline are just very

25   minor nit changes.

1          THE COURT:  I just need the clean then.

2          MR. ROSNER:  Okay.

3          THE COURT:  Thank you.  Does anyone else wish to be

4  heard regarding the de minimis asset sale motion?

5                    (No audible response)

6          THE COURT:  Okay.  I'm satisfied that the application

7  should be granted.  The record in the case is certainly

8  sufficient to support the relief requested.  Okay.

9          MR. ROSNER:  Your Honor, the next item is the motion

10 for authority for continued use of existing cash management

11 systems.  Your Honor, this motion was also approved on an

12 interim basis at the first-day hearing.  There have been no

13 objections to this motion, and we have worked out, I believe,

14 all of the concerns raised by the U.S. Trustee prior to the

15 first-day hearing, as well as the 345 language.

16         THE COURT:  Okay.  Does anyone else wish to be heard

17 regarding cash management?  Okay.

18         MR. ROSNER:  I will -- let me just -- Your Honor, I

19 will present a redline of this as well, Your Honor, or --

20         THE COURT:  You already have.

21         MR. ROSNER:  -- Mr. Sloan will submit a redline to

22 the order.  The changes are mostly to --

23         THE COURT:  I can see the changes.

24         MR. ROSNER:  Yes.  To go from the interim to the

25 final.

1          THE COURT:  Okay.  That's fine.  Based upon the

2 record before me the debtors have carried their burden and the

3 application will be granted on a final basis.  Okay.

4          The next matter.

5          MR. ROSNER:  The next matter, Your Honor, is the

6 debtor's motion for an order authorizing nunc pro tunc

7 rejection of certain unexpired leases of non-residential real

8 property and abandonment of the personal property therein.

9 This again would be the personal property that wasn't sold

10 under the interim asset disposition motion.

11          Your Honor, there have been no objections to the

12 lease rejection motion or to the nunc pro tunc request.

13 The -- with respect to the ones that are being -- the leases

14 being rejected as of the petition date, they were surrendered

15 and vacated prior to the petition date.  With respect to the

16 ones that are -- we're asking for nunc pro tunc to April 30th,

17 those were also surrendered and vacated as of April 30th.

18          THE COURT:  Very good.

19          UNIDENTIFIED ATTORNEY:  There's a CNO on it, this one

20 and the next one, so you don't --

21          THE COURT:  Oh.

22          MR. ROSNER:  Oh.  There's a CNO on it?

23          THE COURT:  A CNO --

24          MR. ROSNER:  Okay.

25          THE COURT:  All right.  I'll look for that and, Mr.

1  DeFranceschi, as usual, if you don't see it on the docket by,

2  say, tomorrow, give us a call and we'll track it down, but I

3  believe it's on my desk.

4         MR. ROSNER:  Okay.  Your Honor, Item 5 also has a

5  certificate of no objection, and that's the rejection

6  procedures that will apply to these cases, so --

7         THE COURT:  Very good.  That's fine.  Then we'll go

8  ahead and I'll look for that.

9         MR. ROSNER:  Okay.

10         THE COURT:  Agenda Item Number 6.

11         MR. ROSNER:  Item 6, near and dear, is the debtor's

12  application to employ Goulston & Storrs as counsel to the

13  debtors and debtors-in-possession.  Your Honor, we filed our

14  original affidavit, and then at the request of the U.S.

15  Trustee's Office did a supplemental conflict search of

16  prospective purchasers as submitted written expressions of

17  intent prior to the petition date or as of the supplemental

18  filing.

19         THE COURT:  Sure.

20         MR. ROSNER:  Your Honor, the -- we also provided

21  additional detail on fees and retainers that were paid prior to

22  the petition date in the supplemental affidavit --

23         THE COURT:  I saw the affidavit.

24         MR. ROSNER:  -- in addition to the detail that was

25  provided in the original.

1          THE COURT:  Okay.

2          MR. ROSNER:  We also agreed to modify the order to

3 make it clear that our hourly rates are subject to Section 330,

4 at the request of the U.S. Trustee's Office, and I believe that

5 resolved all of the concerns, or informally raised by that

6 office.

7          THE COURT:  Okay.  Mr. McMahon, anything to add, sir?

8          MR. McMAHON:  Nothing, Your Honor.

9          THE COURT:  Very good.  Good morning, sir.

10          MR. McMAHON:  Good morning.

11          THE COURT:  Okay.  That's fine.  Item Number 7.

12          MR. ROSNER:  Your Honor, Item Number 7, the

13 application to employ Focal Point.  We would like to kick over

14 to the end of the hearing after the break, the U.S. -- just so

15 you know, the U.S. Trustee raised some concerns on the

16 supplemental affidavit that was filed, as well as the 330 --

17 I'm sorry -- the modified 330 review that we're requesting.

18          THE COURT:  Okay.

19          MR. ROSNER:  So, we're asking that that go to the

20 end.

21          THE COURT:  That sounds fine.

22          MR. ROSNER:  Your Honor, the next application is

23 Number 8 which is the application of the debtors for an order

24 authorizing the retention of CRG Partners Group.  Your Honor,

25 also there's been no objection filed here.  There was a

1  supplemental affidavit filed at the request of the U.S. Trustee

2  regarding both fees paid prepetition, as well as additional

3  conflicts checks.  And that order also provides for a 330

4  review of the hourly rates.  And I believe that would resolve

5  the Trustee's concerns with respect to CRG.

6          THE COURT:  Okay.  Does anyone else wish to be heard

7  regarding the CRG application?

8          MR. ROSNER:  Oh, the -- actually the other item in

9  the supplemental affidavit was more clarity on how the retainer

10 gets applied.

11         THE COURT:  Okay.  I did see the supplemental

12 affidavit.  All right.  Very good.  Does anyone else wish to be

13 heard?

14              (No audible response)

15         THE COURT:  Okay.  I will enter the order based upon

16 the resolution of the concerns expressed by the U.S. Trustee.

17 Okay.

18         MR. ROSNER:  Your Honor, the next item is Number 9,

19 Sitrick.  We're asking that that be put to the end, as well.  I

20 don't think it's a substantive issue.  It's more we just need

21 to sit down with Mr. McMahon and go through the prepetition fee

22 payments because there's a question on whether the math works.

23         THE COURT:  Okay.  That's fine.

24         MR. ROSNER:  Is that right?

25         UNIDENTIFIED ATTORNEY:  Yes.

1          MR. ROSNER:  The next matter, Your Honor, is the

2     debtor's application to employ and retain Richards, Layton &

3     Finger as our co-counsel in these cases.  There have been no

4     objections.  Mr. DeFranceschi filed a supplemental affidavit,

5     as did the other professionals, regarding the additional

6     conflicts checks, as well as prepetition payments.

7          THE COURT:  Okay.

8          MR. ROSNER:  And the order was also revised at the

9     request of the U.S. Trustee to provide for a 330 review.

10         THE COURT:  Very good.  All right.  That sounds fine.

11    The application will be approved.

12         MR. ROSNER:  Okay.  Your Honor, Item 11, the motion

13    to establish interim monthly compensation procedures is the

14    subject of a certificate of no objection that was filed.

15         THE COURT:  Okay.  That'll be entered -- that order

16    will be entered.

17         MR. ROSNER:  Your Honor, the next item is a motion

18    for authority to retain and pay professionals utilized by the

19    debtors in the ordinary course of business.  There were no

20    formal objections filed, however, the U.S. Trustee did approach

21    us informally and ask that we conform the order and affidavit

22    to a form used in the Vion case, which we did.  We exchanged

23    drafts, and I believe the proposed form of order and affidavit

24    is acceptable to the U.S. Trustee.

25         THE COURT:  Okay.  Mr. McMahon, what exactly is

1  the -- it's not my case, is it?

2          MR. McMAHON:  Was it Judge Carey or --

3          UNIDENTIFIED ATTORNEY:  Judge Sontchi.

4          MR. McMAHON:  Judge Sontchi.

5          THE COURT:  Sontchi?  He'll sign anything.

6                      (Laughter)

7          MR. McMAHON:  Actually, it's --

8          UNIDENTIFIED ATTORNEY:  As long as it's not opposed,

9  Your Honor.

10         MR. McMAHON:  We won't tell him that's how you

11 adopted his order.

12         THE COURT:  That's fine.  Is there a change to the

13 traditional practice?  Is there a particular issue with the

14 retention?  We do this a fair amount.  Is this just a different

15 reporting requirement?  Mr. McMahon?

16         MR. McMAHON:  Your Honor, good morning.  Joseph

17 McMahon for the acting United States Trustee.

18         In terms of changes, there are changes to the

19 proposed form of affidavit to tighten it up, things like

20 prepetition payment history --

21         THE COURT:  Sure.

22         MR. McMAHON:  -- waiver of prepetition claim for

23 non-attorney professionals and those that do not represent the

24 debtor -- I'm sorry.  So, that's it for the affidavit.

25         With respect to the form of order, there's a

1 change -- we had a discussion with the debtors about certain of

2 the professionals who we have marked general liability on the

3 Exhibit A.  The automatic stay's in place.  We don't anticipate

4 them doing much work, so we reduced their cap from $35,000 a

5 head to ten.

6          THE COURT:  Okay.

7          MR. McMAHON:  And it kind of created a two-tier

8 structure where certain of them got the benefit of the greater

9 cap and the others are operating under tighter strictures.

10 That's it.

11          THE COURT:  Okay.  All right.  That sounds fine.

12          MR. ROSNER:  And, Your Honor, there are also, I

13 think, further disclosures on -- even though they're not

14 subject to the disinterestedness standard, except there are

15 further disclosure requirements for non-lawyer ordinary course

16 professionals who might be.

17          THE COURT:  Okay.  I've had a chance to review the

18 blackline and I think I understand the changes and I will

19 approve the ordinary course professionals' application.

20          MR. ROSNER:  Thank you, Your Honor.

21          The next application is the application -- this is

22 Number 13 -- of the debtors for an order authorizing the

23 retention and employment of Wiley Rein, a special franchise

24 counsel to the debtors, nunc pro tunc.

25          Your Honor, there have been no formal objections

1 filed to this, however, the U.S. Trustee did informally raise

2 certain concerns and make comments.  A supplemental affidavit

3 was filed with the additional conflict check.  The other

4 additional language put into the order was to make it clear

5 that Wiley Rein will not be providing bankruptcy services, that

6 these are franchise services.

7          There are also going to be litigation counsel in the

8 contested matter before this Court on June 2nd with respect to

9 the Minnesota properties, and there will be franchise issues

10 coming up with respect to the sale, as well, as the sale

11 contemplates the assumption and assignment of franchise

12 arrangements.

13          THE COURT:  Okay.

14          MR. ROSNER:  And their hourly rates are also subject

15 to 330 review.

16          THE COURT:  Very good.

17          MR. ROSNER:  And I believe those are the major

18 changes that were made to their retention order.

19          THE COURT:  Okay.  That sounds fine.  I'm prepared to

20 approve it.  Do you have a clean copy of the order?  Thank you.

21          Okay.  The next matter.

22          MR. ROSNER:  Okay.  The next matter is Matter 14.

23 Your Honor, this matter, although everything has now been

24 resolved among the creditors committee, the debtors and the

25 U.S. Trustee, given the heightened scrutiny under 503 I believe

1  this matter does warrant some proffer so that you can make the

2  necessary findings.  And these findings were also requested as

3  part of the resolution.

4       In order to make it clear that this case -- that to

5  the extent the key employee incentive plan is approved in this

6  case, that doesn't mean it gets -- it's generally applicable to

7  every other case.  So, Your Honor, last night we filed with the

8  Court -- or maybe it was earlier than last night -- we filed

9  with the Court the modified key employee incentive plan which

10  we are requesting approval of today.

11       THE COURT:  I have it.  I received it last night.

12       MR. ROSNER:  Your Honor, the modified plan is a

13  response to the concerns that were raised by the United States

14  Trustee's Office, as well as the unsecured creditors committee.

15  And although before the debtors believed that the plan

16  satisfied Section 503(c)(3), we think even more so now it

17  satisfies the standards under that section, as well as Section

18  363(b).  Before I go into the proffers I'd just like to review

19  the changes.

20       THE COURT:  Sure.

21       MR. ROSNER:  And the initial change -- the -- I guess

22  the most significant change was a change to the economics which

23  are attached as Exhibit A to the modified plan.

24       THE COURT:  I have it.

25       MR. ROSNER:  And in those -- and the economics change

1  as follows.  Before the transaction value was based more on a

2  gross transaction value.  We've now changed the definition of

3  transaction value to deduct what would be paid to Spirit under

4  a Spirit modification fee if that -- if the -- if that amended

5  lease is conditionally assumed and then actually assigned.

6          THE COURT:  Okay.

7          MR. ROSNER:  In addition, we've deducted the -- any

8  breakup fee or expense reimbursement that might be paid to an

9  unsuccessful bidder.  In addition, the plan was modified to

10 make it clear that litigation-type excluded assets are not

11 included in transaction value.  And those are spelled out in

12 the definition in 3M.

13         Lastly, the -- in order to make it clear that this is

14 an incentive plan and not a retention plan we added a floor.

15 And so, the -- there's no bonus, there is no entitlement to a

16 bonus under this plan if the transaction value is less than

17 30.3 million.

18         Now, the Court is -- before the Court today are a

19 number of pleadings that go to the gross transaction value less

20 excluded asset adjustments and things like that.  But, you're

21 seeing numbers like 31 million, 32 million without Spirit.

22 You're seeing numbers 40 million, 41 million with Spirit.

23         THE COURT:  Right.

24         MR. ROSNER:  So, to translate that into this -- to

25 use sort of those figures for this chart so you understand it

1 better, the first band of 25 percent is between 31 and $35.9
2 million in gross value.

3                THE COURT:  Right.

4                MR. ROSNER:  So, if for some -- if the Court does not
5 approve the conditional assumption of the Spirit agreement and
6 we're left and we're not able -- and severability is no longer
7 an issue and we're not able to assume and assign the lease as
8 agreed to in the Spirit motion, then you're looking at that
9 band, that 25 percent band --

10                THE COURT:  Okay.

11                MR. ROSNER:  -- at the current point based on current
12 offers.  We also eliminated the 35 percent band and stretched
13 out that 25 percent band to go all the way up to the 50 percent
14 level.  The 50 percent level, as far as gross value, is around
15 30 -- over 35.9 million to 42.6 million.

16                So, where the offers stand today is approximate -- is
17 within that 50 percent band.  Then, given the momentum of the
18 sale process, knock on wood, we will move into the next band
19 which is the gross of 42.6 to 45.8 as part of an auction
20 process, and maybe even higher into the 100 percent band, et
21 cetera.  And when we start to reach those numbers, there's
22 obviously real benefit to the estate, there's real benefit to
23 the unsecured creditors.  So, those were the major changes to
24 the modified agreement.

25                Now, Section 503 requires a few things.  And first I

1 want to make it clear that this is not a retention bonus.  At

2 no time did the board -- the board of managers or the board of

3 directors of Fuddruckers and Magic -- consider approving a

4 retention bonus.  And one of the board members, John Clark, is

5 essentially disinterested because he is not one of the employee

6 participants in the plan.

7             THE COURT:  Okay.

8             MR. ROSNER:  And having worked very closely with him

9 I want to assure the Court that this was not intended to be a

10 retention plan.  And Mr. Clark is here today, and he would

11 testify, and I would ask that I be granted the opportunity to

12 make a proffer that he would testify, if asked, to the matters

13 raised in the key employee incentive plan as follows.  And he

14 would also be available for cross examination on these matters,

15 if any party wishes to do so.  He would testify that he's a

16 director of Fuddruckers, Inc. and a manager of K.C.I, LLC which

17 is the manager of Magic.

18             He would testify that the board of managers and the

19 board of directors voted to approve the key employee plan as

20 initially requested on April 15th.  He would further testify

21 that the board, acting primarily through Mr. Clark, considered

22 the advice of counsel and the debtor's investment bankers in

23 formulating the terms of the key employee incentive plan

24 initially filed with the Court and later modified to reflect

25 the concerns raised by the official committee of unsecured

creditors and the United States Trustee's Office.

The board, again acting primarily through Mr. Clark, reviewed, with counsel, incentive plans approved and other Chapter 11 cases in fashioning the plan terms for the debtor's key employees in these cases.  Mr. Clark would testify that the board has authorized a modified keep that he believes is structured to incentivize key employees to obtain the highest and best bids through the proposed sale process, including to maintain the debtor's operational performance and encourage prospective bidders to participate.

From the outset of incentive plan discussions the board considered whether the keep is necessary to incentivize key employees, and concluded that it was, given the challenges prevented by these Chapter 11 cases and the expectations as to value to be achieved in a sale.

Mr. Clark would further testify that with respect to the Tier II employees the board recognized that they needed to be incentivized to perform beyond the scope of their typical duties.  Such extraordinary tasks included promptly responding to potential buyers' due diligence requests, dealing with personnel issues related to the bankruptcy cases, managing franchisee relationships in light of the financial situation, implementing the orderly closure of underperforming locations, and meeting the impact of those closures on the debtor's remaining portfolio.

1       Mr. Clark would testify that all plan participants

2   are critical to the sale process.  That the services that they

3   have performed in the months leading up to the petition date

4   and their continued services post-petition are above and beyond

5   the scope of their typical day-to-day duties, and Mr. Clark

6   believes that the plan participants should be compensated for

7   their increase in duties and responsibilities.

8       Mr. Clark would testify that the board believes that

9   continued heightened performance of the plan participants to be

10  essential to maximizing value and attracting additional bidders

11  in the sale process.  He would further testify that there is no

12  assurance that any of the plan participants will be employed by

13  the ultimately successful bidder.

14      He would testify that because of the structure of the

15  keep he believes that the plan participants are nonetheless

16  incentivized to increase value of the debtor's business for the

17  benefit of all constituents rather than to try to steer the

18  sale process in the direction of a bidder that would more

19  likely offer them future employment.

20      Mr. Clark would further testify that he thinks the

21  final keep, as modified, fairly balances the need to

22  incentivize plan participants to continue to perform

23  extraordinary services with the offsetting cost to the estate,

24  and further that he was very mindful of this balance in

25  considering potential incentive bonus structures, realizing

1  that each dollar to the plan participants was a dollar less for

2  the debtor's unsecured creditors.  And that concludes what

3  would be the proffer of Mr. Clark, a board member.

4         THE COURT:  Does anyone wish to cross examine Mr.

5  Clark?

6                    (No audible response)

7         THE COURT:  Very well.  I'll accept the proffer.

8         MR. ROSNER:  Your Honor, I have an additional proffer

9  of Peter Large, the -- oh.

10        THE COURT:  Mr. Zarco.

11        MR. ZARCO:  I would like to cross examine Mr. Clark.

12        THE COURT:  Do you having a pending objection to the

13  motion?

14        MR. ZARCO:  To this particular motion?

15        THE COURT:  Yes.  Let me clarify.  Come on up.  My

16  point is, I understand that there are issues that are of

17  significance to you, and my point in asking was that if there

18  is testimony or if the debtor needs to put on testimony to

19  address those issues that are sort of later on in the hearing

20  that are of particular interest to you, then that's fine.

21  You'll have that opportunity.

22        This is the discreet issue of the incentive comp, and

23  so if you wish to cross him on the incentive program you're

24  welcome to do so, but the first question I would have is, do

25  you have an objection to the program?

1          MR. ZARCO:  If you're asking me right now, I just

2   want to know what it is that the members of this board have

3   done, or the managers that are going to be getting this key

4   incentive money have done that is beyond the scope of their

5   regular duties as officers or the managers of the company.

6          I mean, to say, Your Honor, that there's going to be

7   compensation because of them having to deal with franchisee

8   relations and other operations of the company I would think

9   that based on their position they would do the ordinary course.

10  If they're going to get paid additional money for that I think

11  the creditors, the debtor's estate and everybody should be

12  entitled to understand what is it that is being done that is

13  beyond the scope of their employment at a level that they're

14  currently in.  And I think we're entitled to know that.  I'm

15  not here to disrupt, you know, the hearing, Your Honor.

16         THE COURT:  No, no, no.  I'm not asking if you're

17  disrupting anything.  I have a lot of paper in front of me.

18  Have you filed an objection to the program?

19         MR. ZARCO:  I don't believe we have.

20         THE COURT:  Okay.  Here's what I want to do.  I will

21  afford you the opportunity because it's been moving quickly and

22  there's been a substantial resolution among parties, but it got

23  filed over the weekend, so I'm going to give you that

24  opportunity, okay?  But, it is limited to the discreet issues

25  that are connected to the incentive program.  And if you wish

1  to cross examine you may cross examine.

2          Let me ask Mr. Rosner a question, though.  Obviously,

3  you said at the outset we've got a lot of stuff that we are

4  doing, so I'm really at your pleasure.  If you would like

5  there's a request to cross and -- which means that I think what

6  you had assumed was going to be an uncontested piece was -- is

7  now contested.  I'm happy to continue moving through because I

8  expect that the cross actually probably won't be very long if

9  the issues are limited to what Mr. Zarco identified.  Zarco,

10 right?

11         MR. ZARCO:  Yes, Zarco.

12         THE COURT:  Mr. Zarco.  Then I'm happy to proceed

13 that way.  If you want to push this further then we can do

14 that, but frankly we're right in the middle of this, so we may

15 as well proceed that way.

16         MR. ROSNER:  Your Honor, we might as well proceed,

17 and I think we should also proceed with the proffer of Peter

18 Large which also goes to this issue.  And to highlight that,

19 Mr. Clark's proffer also covered this issue as well as the

20 things that go beyond their call of duty that are impacted or

21 created --

22         THE COURT:  I understand.

23         MR. ROSNER:  -- by the bankruptcy.  I'd also -- I'm

24 not sure who Mr. Zarco is representing today, and I'm not --

25 and he didn't -- there were no objections filed, so I do

1  question whether he has proper standing or to oppose it now,

2  the day of the hearing.  There were changes made to the plan,

3  but they were all changes that improved the plan as far as the

4  estate's concerned.

5          THE COURT:  I understand.  Why don't you proceed with

6  the second proffer.

7          MR. ROSNER:  The next proffer is the proffer of Peter

8  Large, and he is also here today in court.  And if called to

9  testify Mr. Large would testify truthfully and competently as

10  follows.  And he is available for cross examinations on matters

11  raised in his proffer that relate to the key employee incentive

12  plan.

13          Mr. Large is the chief executive officer of

14  Fuddruckers, Inc. and Magic Brands, LLC.  In that capacity he

15  focuses on the strategy for the debtor's business and the

16  accountability of all senior management for their respective

17  areas of operation.

18          Mr. Large would testify that the employees, subject

19  to the key employee incentive plan, have been working

20  diligently since early February 2010 to petition the debtors

21  for a sale in a manner that will maximize value for all of the

22  debtor's constituents.

23          Mr. Large would testify that while the plan

24  participants have been compensated for their typical respective

25  duties as employees of the debtors, the services they have

1 performed have been, and continue to be, above and beyond what

2 they are compensated for in their respective job descriptions.

3          Mr. Large would testify that none of the plan

4 participants hold any equity in the debtors and do not

5 otherwise personally benefit from their efforts to maximize

6 value, other than the possibility of future employment with a

7 successful bidder.

8          Mr. Large would testify that in January 2010 when the

9 debtor's sole indirect shareholder decided not to provide

10 additional money to fund the continued restructuring of the

11 business and ongoing operational losses it would've been the

12 path of least resistence to simply shut down operations or hand

13 the keys over to the secured lenders, but that the plan

14 participants, instead, have worked to substantially improve the

15 outcome for the debtor's estates and unsecured creditors.

16          Mr. Large would further testify that despite the fact

17 that the keep was not officially approved by the board of

18 directors until April 15th, the plan participants were

19 initially promised an incentive bonus in February and were told

20 that any such bonus would be based on values obtained in a

21 going concern sale of the debtor's business, and that he

22 believes the plan participants perform their extraordinary

23 services partially in reliance thereon.

24          Mr. Large would testify that the plan participants

25 continued to perform services post-petition.  He believes in

1 large part because of the incentive and sense of appreciation

2 provided under the keep.

3        Mr. Large would testify that the plan participants

4 are divided into two tiers.  He would testify that Tier I

5 employees are the officers of the debtors that have been and

6 continue to be the most active and instrumental in making the

7 strategic decisions that led to a three to four-fold increase

8 in projected EBITDA and the offers that we are now seeing

9 today.

10        Since the petition date the Tier I employees have

11 continued to push performance to confirm the bona fides of the

12 proforma forecast on which the bids are being made.  In

13 addition to their typical day-to-day duties of managing the

14 debtor's business the Tier I employees have participated in

15 management interviews with prospective buyers, responded to

16 numerous due diligence requests, have worked diligently to

17 respond to the concerns of vendors, landlords, utility

18 companies, franchisees and personnel related to the Chapter 11

19 filing.

20        And he would further testify that in connection with

21 the Chapter 11 cases, that these senior officers are also

22 appearing in court, testifying in furtherance of certain

23 motions and other actions taken for the benefit of the estate.

24 Mr. Large would further testify that in his view a direct

25 effect of this heightened performance has been a more

1  competitive bidding process that this Court is witnessing.

2          Mr. Large would testify that the Tier II employees,

3  while not always in direct contact with potential purchasers,

4  were critical to the maintenance of business operations in the

5  months leading up to the petition date and that their continued

6  heightened performances, post-petition, are essential to

7  preserving and even adding value to the debtor's business.

8          Post-petition, the Tier II employees like the Tier I

9  employees, in addition to their typical day-to-day duties have

10 been involved in responding to due diligence requests in

11 dealing with personnel and operational issues related to the

12 bankruptcy, including the orderly closure of locations,

13 marketing efforts to reduce the impact of the bankruptcy,

14 vendor and franchisee relations, all of which have been

15 directly impacted by the Chapter 11 filings.  And that would

16 conclude the proffer of Mr. Large.

17         THE COURT:  Okay.  Does anyone wish to cross examine?

18 We'll start with the first witness.  Swear the witness, please.

19         UNIDENTIFIED ATTORNEY:  Can I have one minute, Your

20 Honor?

21         THE COURT:  Sure.

22         UNIDENTIFIED ATTORNEY:  Your Honor, the only paper

23 that the witness has is a copy of the plan.

24         THE COURT:  Very good.

25         COURT CLERK:  Please state your name for the record

1  and spell your last.

2           MR. CLARK:  My name is John Clark.

3           COURT CLERK:  Would you please spell your last name,

4  please?

5           MR. CLARK:  C-l-a-r-k.

6              JOHN CLARK, DEBTOR'S WITNESS, SWORN

7                      CROSS EXAMINATION

8  BY MR. ZARCO:

9  Q    Good morning, Mr. Clark.

10  A    Good morning.

11  Q    My name is Robert Zarco and I'm the attorney for FIFA, the

12  Fuddruckers Independent Franchisee Association.  I just have

13  some very brief questions, sir.  According to the proffer from

14  your counsel --

15           MR. ROSNER:  Your Honor, just if I -- the debtors

16  just have a quick statement to make.  FIFA, Inc., we don't

17  understand has any claim against the estate as an entity.  And

18  so, we just wanted to put that on the record, Your Honor, as

19  part of our question as to standing.

20           THE COURT:  So noted.  The issue is reserved.

21           MR. ZARCO:  Your Honor, for the record, FIFA

22  represents the interests of 90 franchisees out of 120 in the

23  system, over 75 percent.  I think that based on the fact that

24  one of the considerations of this Court --

25           THE COURT:  I didn't ask.

1            MR. ZARCO:  Oh, I'm sorry.

2            THE COURT:  He did.

3            MR. ZARCO:  Okay.

4  BY MR. ZARCO:

5  Q    Mr. Clark, based on the proffer from your counsel, he

6  indicated that one of the reasons for the key employee

7  incentive plan is based on the fact that these officers, either

8  the Tier I or the Tier II employees, were generating services

9  that were beyond the scope of their job duties, isn't that

10 correct, sir?

11 A    Yes.

12 Q    And could you please tell me what it is that were the

13 services that were rendered by these individual employees in

14 each of the tiers that you consider to be beyond the scope of

15 their job duties?

16 A    I think if I take the Tier II first, in that tier we have

17 people who do a normal management job within the company.  What

18 is being required additionally from them is to deal with, if

19 they are operational, the closures of the branches that we have

20 closed, the HR problems that arise when you close a branch.

21 We've had to deal with the problems of creditors, et cetera,

22 who are looking to our financial team to provide the

23 information that they require.

24            In addition, we've had to present to the people who

25 are interested in buying the business, and that has caused an

1  enormous amount of work both in the financial administration

2  side of the business.  Tier I, we have a situation that when

3  the major shareholder made the decision that he was not going

4  to further any further investment into the business we had the

5  situation where the business could have closed overnight.

6          At that time the senior management decided that they

7  would stay on and attempt to get the best value for the

8  business in order to satisfy, as best they could, the claims of

9  the creditors and all the other interested parties in the

10 business.  To that end they affronted all the presentations to

11 the prospective purchasers, and that has involved a great deal

12 of additional work on their behalf.

13         We go through this process, which is the Chapter 11

14 process, which is a lot of effort that is required from your

15 management.  It is very substantial.  And on that basis I felt

16 as the independent director in this case that there had to be a

17 balance struck between the requirements of the creditors and

18 the requirements of the management in order to maximize the

19 value for creditors.  And I believe that we had, within the

20 original keep, a very sensible situation.  The trustee and the

21 creditor's committee had views that we took into account and,

22 in many cases, they were very fair views.  And in my view, the

23 amended final keep is a balance between the requirements to

24 keep your management incentivized to maximize the value and the

25 interest of the creditors.

1 Q    Thank you, Mr. Clark.  Let's talk about Tier II first as

2 that was the order of -- that you testified on.  With regard to

3 the closing of stores, isn't it a fact, sir, that management

4 that is currently in place that you seek to incentivize has

5 been with this company for a period of about three years, is

6 that correct?

7 A    No.

8 Q    The management that you seek to incentivize has been with

9 the company how long?

10 A    I'm sorry.  I haven't got my list of the people involved,

11 but we have -- the majority in Tier II have been there, at

12 least, two years.

13 Q    All right.  And with regard to the management that's been

14 there for Tier I, how long have they been there?

15 A    Tier I you have -- two have been there since 2007 and the

16 remainder have been in -- appointed within the last year as

17 near as --

18 Q    Now, with regard to the individuals in Tier II, you

19 indicated that one of the additional work that they undertook

20 was the operational efforts of closing down stores and dealing

21 with HR issues surrounding that, isn't that correct, sir?

22 A    (No verbal response).

23 Q    It -- in fact, during the last two or three years, there

24 have been a significant number of Fuddruckers stores closing

25 down, isn't that correct?

1  A    No.

2  Q    Well, my understanding, sir, there's been over 20 or 30

3  Fuddruckers stores closing throughout the country in the last

4  two or three years, you --

5  A    You might well be right.  The thing is that the -- I'm

6  sorry, I don't have those figures --

7        THE COURT:  I'm sorry, sir.  Can you get a little

8  closer to the microphone --

9        THE WITNESS:  Oh, sorry.

10        THE COURT:  -- so we can pick you up?

11  A    I don't have those figures with me.

12  Q    But, you are aware that there were --

13  A    Oh, absolutely.

14  Q    Okay.  And during the time -- during the ordinary course

15  of the operation of the Fuddruckers' business, this management

16  that you were seeking to incentivize now for handling the

17  operational aspects of closing down the store and the HR issues

18  that emanate from that were, in fact, doing that precise kind

19  of work prior to this bankruptcy petition, isn't that correct?

20  A    They would have done that as a small part of their

21  business.  I'm not saying that we are actually trying to

22  recompense the management purely for the closure of businesses

23  and the HR related issues that came round them.  It is part and

24  parcel of the whole transaction under a Chapter 11 where you do

25  have additional pressure in order to close a substantial number

1  of branches by the 30th of April in this case.

2  Q    So, the reality is that this management that is seeking to

3  be incentivized to undertake the operational aspects of closing

4  down stores and handling the HR problems that arise from that

5  were precisely doing that kind of work as part of their normal

6  compensation that they were getting paid for during the last

7  two or three years, isn't that a true statement?

8  A    No, because the heightened activity that took place

9  immediately after we went into the Chapter 11 procedures was

10  substantially enhanced on what had been a trickle of closures

11  over the period.

12  Q    So, you're -- so, the basis for the incentivized

13  compensation is based on the fact that there were more stores

14  being closed as part of the bankruptcy, than prior to the

15  bankruptcy, is that correct?

16  A    There is more closures.  There are more requirements on

17  the management to do other things that -- under Chapter 11 that

18  were not there in the normal course of business.

19  Q    And, sir, in order for them to carry out this work during

20  this time period, the time allotted for that work replaces

21  other duties and responsibilities that they would have done

22  during that same time, isn't that correct?

23  A    No.  The company still has to run its business and the

24  normal running of the business carries on with the same amount

25  of time spent on that.  There is an additional requirement to

1 cover the closure of the substantial number of operations

2 during this period which is over and above their normal course

3 of duty.

4 Q    So, are you saying to this Court that, in fact, these

5 particular employees are working many more hours than they

6 ordinarily would have worked before?

7 A    Absolutely.

8 Q    With regard to the particular individuals that you

9 indicated should be compensated, have you undertaken any kind

10 of time assessment to determine how many more hours they're

11 getting paid?

12 A    I have not.

13 Q    Okay.  Do you know, in fact, with regard to each of the

14 individuals, how much more time each one of them is spending on

15 a daily basis or on a weekly basis that, in your view, entitles

16 them to additional compensation?

17 A    I am looking at the requirements that we have placed on

18 them, and they have had substantial extra requirements placed

19 on them.  I can't quantify it in the number of hours per day or

20 the number of hours per week, but it's a substantial increase.

21 And it is not only, you know, we're focusing on the closure of

22 these particular branches which is fine.  You're highlighting

23 that section --

24 Q    These individuals -- I'm sorry, were you finished?

25 A    No.

1  Q    Please continue.

2  A    You are highlighting that particular section, but we do

3  have other requirements that are being put onto them.  We have

4  had a due diligence process that has required an enormous

5  amount of input, mainly from the Tier I, but also from the Tier

6  II.

7  Q    Sir, my question really is very simple, sitting here

8  today, do you have any particular knowledge as to how many more

9  hours per day or per week are being undertaken --

10            MR. ROSNER:  Your Honor, asked and answered.

11            THE COURT:  These are asked and answered.  Let's move

12  on.

13  Q    Okay.  Now, sir, with regard to dealing with creditors,

14  isn't it correct that, prior to this bankruptcy during the time

15  that other stores were being shut down, that these same

16  individuals were dealing in creditors arising out of that

17  relationship of stores that were previously closed?

18  A    No.

19  Q    So, the creditor issue that you're talking about now that

20  deals with the closure of such stores was not an issue that

21  existed before?

22  A    No.

23  Q    What new creditor issues are you discussing that -- I'm

24  sorry.  What new creditor issues are you referring to when you

25  say that there are new creditor issues now that have arisen

1  that did not exist before as it relates to the operational

2  aspect of the business?

3  A    Chapter 11.

4  Q    And aren't the Chapter 11 creditors, sir, the same

5  creditors that existed that were operating and working with the

6  company during the relationship that they had?

7  A    I'm sorry.  I don't --

8  Q    Yes, these Chapter 11 creditors are creditors that are

9  coming before the Court to get compensated for services,

10  supplies or some kind of vendor relationship that existed prior

11  to the bankruptcy, correct?

12  A    Can I just put this point --

13  Q    No, just answer my question.

14  A    I am hopefully.  The vendor relationships prior to Chapter

15  11 were in the normal course of business.  If we closed or

16  closed down an operation prior to the Chapter 11 situation,

17  they were paid in the normal course of business.  There were no

18  creditor relationships or creditor problems that were there at

19  the time of a normal closure.  Under Chapter 11, we've had to

20  have the situation where we have had all the correct -- or a

21  vast number of creditors making -- looking at the company to

22  provide information of how they're going to get paid.

23  Q    And you're saying that the creditors that were dealing

24  with Fuddruckers prior to the bankruptcy were not making any

25  inquiries to this company as to how they were going to get

1  paid, that was not an important item for them?

2  A    No.

3  Q    So, this is all new to the bankruptcy?

4  A    I think it created a totally different position as far as

5  the creditors are concerned.

6  Q    So, your position today is that dealing with the creditors

7  here in the bankruptcy is a completely different animal in

8  terms of any consideration that the Fuddruckers Corporation had

9  vis-a-vis these same creditors that were owed all this money

10 prior to the bankruptcy?

11 A    I'm sorry, owed all this money.  I don't follow --

12 Q    Yes, the --

13 A    -- we're operating under very normal terms with all our

14 creditors.  There's not a question that we were controlling the

15 way we were dealing with our creditors.  I find that the

16 creditor situation's totally different under the Chapter 11

17 situation.  It wasn't the normal course of business as operated

18 by Fuddruckers.

19 Q    So, with regard to Tier I, you indicated, as I heard from

20 the proffer, that the -- these were officers of the company,

21 correct?

22 A    Yes.

23 Q    And these were the same officers that were running this

24 company for the last three years?

25 A    No.

1  Q    Approximately two to three years?

2  A    We have a two to three years for two, another two were

3  within the last year and one was in -- effectively began at the

4  end of December last year.

5  Q    And during the time that these same officers were running

6  the company, the company's financial position got substantially

7  worse, isn't that correct?

8  A    The company's position did get substantially worse only

9  because the major shareholder, who was a person who was backing

10  the company during the last two years, decided that he would no

11  longer further back the company.

12  Q    So --

13  A    It was not a question that the financial position of the

14  business changed over and above in the normal course of

15  business.  And we've had a recession and that was one of the

16  factors that has changed the operation of the business.

17  Q    When you indicate that the major shareholder was no longer

18  backing the financial condition of the company means that

19  during the company's operational deficit period, the

20  shareholder was putting in capital in order to deal with and

21  cover the deficit, correct, the operational deficit?

22  A    No -- well, I think operational deficit is a big word in

23  this case.  There were cash flow shortages.

24  Q    In fact, the cash flow shortages emanated from the

25  operations of the company's business as opposed to the

1 operations stemming from the franchisee's business, isn't that

2 true?

3 A    There is a balance to be struck.  The factor is that the

4 managed house business -- managed business as you called it,

5 was in decline during the period of the recession.  We also saw

6 a decline in the franchise business during that period, as

7 well.

8 Q    In fact, sir, if you look at the revenues of the company

9 generated from franchisee royalty of which the franchisor was

10 not operating or running the particular stores, there were

11 about $7 million in revenue, correct, do you remember that?

12            MR. ROSNER:  Your Honor, I object --

13            THE COURT:  This is beyond the scope --

14            MR. ROSNER:  -- I'm not sure where this is going.

15            THE COURT:  -- yes, this is -- I don't know where

16 you're going.  This is well beyond the scope of the direct.

17            MR. ZARCO:  The --

18            THE COURT:  To the extent --

19            MR. ZARCO:  Your Honor, if I may --

20            THE COURT:  Hang on.  Sometimes I find this is

21 helpful.  I sit as the trier of fact.  To the extent that

22 you're trying -- to that you are asking and establishing a

23 point that the job description and responsibilities of the

24 people that are subject to the plan you're alleging are

25 essentially unchanged --

1          MR. ZARCO:  One of them.

2          THE COURT:  -- I get it.  I get it.

3          MR. ZARCO:  No, but that's not what I'm trying to get

4   here.  If I can proffer where I'm going to go, maybe I can --

5   we can shortcut it.  Very simply, Your Honor, these -- our

6   position is that these same people that are being incentivized

7   to do the work they should have been doing and -- which is

8   reflected by the fact that the operational aspects of the

9   corporate stores were operating at a substantial deficit.  And

10  it was only because of the net income being provided to this

11  company by the franchisee's side of the equation which was a

12  net profit of $5 million on the franchisee's side which this

13  company generated very, very little support and service to, as

14  compared to what these same managers that were operating these

15  corporate stores lose $3 million on over $120 million of sales.

16  The only reason this company had a net positive EBITDA is

17  because of the franchisee's side of the equation.

18          We were generating, from the franchisee's side, $5

19  million.  They were losing $3 million on over $120 million in

20  sales and those operational sides of the corporate balance

21  sheet, Your Honor, was operated by the same people that are now

22  being incentivized to go ahead and keep the company afloat

23  doing the same work that they were supposed to be doing before.

24  And to the extent that they're doing different work, it's going

25  to be in lieu of the time they were spending, or were supposed

1 to be spending, on something else.  There's no evidence here

2 from this individual that these people are spending more time.

3 They're doing the same thing and getting paid for it.

4        So, what happens is because the asset purchase

5 agreement that is the subject of this bankruptcy deals with the

6 stalking horse adopting and retaining the same management team,

7 we're now setting up a situation where the creditors and the

8 debtor's estate are going to subsidize a management team that

9 put this company in the position that it's in.  That's

10 outrageous.

11        If you were telling me, Your Honor --

12        THE COURT:  This is a heck of a proffer you have

13 going on.

14                    (Laughter)

15        THE COURT:  Why don't we move on?  I understand your

16 point.  I don't think you're going to get there with this

17 witness.

18        MR. ZARCO:  Okay.

19        THE COURT:  I think you're beyond the scope and if

20 you felt this strongly about it, you should have filed an

21 objection.  Let's move on.

22 BY MR. ZARCO:

23 Q    Okay.  With regard to the -- to the Tier I employees, Mr.

24 Clark, could you please tell me what you -- well, briefly, is

25 your answer the same with regard to the description of what the

1 Tier I employees are going to be doing now going forward and

2 that they did that was beyond the scope of their job duties or

3 is it different for the Tier I employees?

4 A    I'm sorry.  I don't follow your question.

5 Q    Okay.  You testified as to the Tier II employees that

6 were going to be involved in the closure of more stores, that

7 they had HR problems to deal with, that they had to deal with

8 creditors and that they were, you know, having discussions with

9 potential buyers, remember that?

10 A    Oh, yes.

11 Q    So, my question to you is with regard to Tier I employees,

12 what role are they having that is different and is considered

13 an extraordinary service beyond the scope of their ordinary

14 duties?

15 A    They are, in fact, the reason why you have a situation

16 where you have very many people interested in buying this

17 company.  They have been formatting the policy going forward of

18 a strong viable company and put this to the people who are

19 interested in buying the company.  And to the extent, that is

20 well beyond their normal business.

21 Q    So, it's your view that management that's in place and has

22 been in place for the last two or three years, the fact that

23 they are now positioning the company in a way that makes the

24 company look more valuable or present itself as being more

25 valuable is something that is extraordinary effort and beyond

1 the scope of upper level management in a corporation of this

2 type, that's your testimony?

3 A    Yes, I think in the circumstances, you have an enormous

4 amount of effort that is going into --

5 Q    Could you please tell me as a proffer, what is the

6 extraordinary or beyond the scope of their duty relationships

7 that the Tier I officers have undertaken or are undertaking

8 with franchisees that were not supposed to be undertaken

9 before?

10 A    We have to keep in close touch with them.  We've had to

11 explain to them what the situation under Chapter 11 is

12 affecting them.  We have had to field all the -- or they have

13 had to field, not we.  They have had to field all the questions

14 and information that are coming down from the franchise

15 community.  We've had to explain to them how we are involving

16 the franchise community in any possible sale of the business,

17 et cetera, et cetera.

18 Q    So, is it a fact that the franchisee community was not

19 advised about this bankruptcy until your company put out a

20 press release, isn't that correct?

21 A    That's right, yes.

22 Q    And you say that put -- that having the franchisees which

23 are an integral part of this company learn for the first time

24 about their franchisor filing bankruptcy is keeping them

25 informed of the process of the bankruptcy?

1          MR. ROSNER:  Your Honor, I would object.  And -- I

2 mean, or -- unless maybe that's one of the other reasons why

3 these people are entitled to a bonus because they had to manage

4 the company under very stressful situations leading up to the

5 bankruptcy in order to tee up the very successful sale process

6 while only including those significant --

7          THE COURT:  This is an objection?

8                    (Laughter)

9          MR. ROSNER:  Yes.

10          THE COURT:  Your objection is matching his proffer.

11          MR. ROSNER:  So, it's now asked and answered, Your

12 Honor.

13          THE COURT:  It is.  Thank you, sir.  You may step

14 down.

15          MR. ZARCO:  Thank you.

16          THE COURT:  All right.  I'd like to hear from the

17 official committee.

18          MR. WILSON:  Good afternoon, Your Honor.  Eric Wilson

19 for the creditor's committee.  Your Honor, the settlement that

20 was presented to Your Honor over the weekend really represents

21 a cumulative effort with FTI Focal Point and the management of

22 the company to rationalize the incentive program such that it

23 was directly tied to the net value to the estate that would be

24 realized as a result of their efforts in the form of enhanced

25 offer.  As Mr. Rosner discussed at the outset, the way we

1  accomplished that was to take the benchmark, as well as the

2  aggregate transaction value, and to restyle them in a way that

3  clearly and directly incentivized current management to

4  maximize the value of the estate.

5          And we did that by eliminating proceeds that would

6  not inure to the benefit of the state in the form of funds that

7  would go to Spirit in the event that our arguments regarding

8  the severability of that lease are unsuccessful.  It improved

9  by way of reduction in the calculation of that number for

10 litigation proceeds that arguably wouldn't be tied to

11 management's efforts to enhance the value of the transaction.

12 And there was one other way that it was enhanced and I believe

13 that is -- right.  And another way was to reduce the claims

14 that might be asserted by the beneficiaries of this program on

15 a dollar-for-dollar basis from the general unsecured creditor

16 pool.

17         So, net-net, and it was the same process that was

18 undertaken with Focal Point is that the way the program is

19 currently styled truly takes into consideration the efforts

20 that will be expended by these employees that directly benefit

21 creditors of the estate.  And that, again, was the result of

22 extensive negotiations and information and exchange that took

23 place among the creditor's committee as professionals, the

24 debtor and Focal Point over the last week to ten days.

25         THE COURT:  Okay.  Thank you.

1        MR. WILSON:   Thank you.

2        MR. ROSNER:   Your Honor, Douglas Rosner, again, for

3  the debtors and debtors in possession.   Your Honor, I think

4  you've now heard, both through proffers and cross examination,

5  that the pre-bankruptcy planning process in the Chapter 11

6  process does add, by multiples, the workload and stress levels

7  and strategic planning that needs to take place in order to

8  make this work.   And as proffered by Mr. Large, I mean, he's

9  made it clear what the value add is here.

10        In January, we -- the company was looking at trailing

11  12 month EBITDA in the low twos.   Had the company just sold at

12  that point in time, Wells Fargo would not have been paid in

13  full and creditors would have received nothing.   And, so in the

14  three month period, we've converted it into a multiple of $8

15  million pro forma EBITDA and that's what bidders are bidding

16  on.   And they -- and the company's officers, the Tier I and

17  Tier II employees are a large part of that contributed value

18  and that value is benefitting the unsecured creditors.   And in

19  many respects, that value benefits the franchisees even though

20  certain franchisees may not recognize it.

21        So, Your Honor, we would ask that for the reasons

22  stated on the record that the modified key employee incentive

23  plan be approved.

24        THE COURT:   All right.   I will approve the

25  application as it's been modified and revised between and among

1  the parties.  As a threshold matter consistent with, I think,

2  most of my colleagues, certainly Judge Walsh, I ascribe

3  significance in particular to the position of the official

4  committee of unsecured creditors when considering incentive

5  programs.

6          In addition, I'm satisfied that based upon the record

7  before me, that the debtors have carried their burden under

8  Bankruptcy Code Section 503(c)(3) and that this is, in fact, a

9  -- an incentive program that is reasonably and appropriately

10  calculated and tailored to encourage and incentivize the

11  debtor's existing management, both Tier I and Tier II, to

12  maximize the prospects for a meaningful return for all

13  creditors in the case.

14          In so ruling, to the extent that there is an

15  objection by FIFA, I will overrule that objection.  I have had

16  the opportunity to consider it and I also have heard the

17  testimony live and proffered from the two witnesses today.  And

18  suffice it to say that I am satisfied that the record does

19  reflect that there are substantial additional responsibilities

20  that are being thrust upon the existing management and the

21  circumstances are, within this Court's experience, such that it

22  is both prudent and reasonable and consistent with this Court's

23  practice in other cases to properly incentivize management to

24  encourage them to maximize their -- again, to maximize their

25  prospect for a successful reorganization.

1          So, based upon the record before me, I will overrule

2  any objection extant.  And based upon the resolution that's

3  been achieved between the other parties, particularly the

4  estate fiduciaries, I will approve and authorize the relief

5  requested.  Very good.  Okay.

6          MR. ROSNER:  Thank you, Your Honor.  Your Honor, the

7  next matter is Matter 15, the Spirit motion, and that, we're

8  moving to a post-break period.

9          THE COURT:  Okay.

10          MR. ROSNER:  Number 16 is the utility motion.

11          THE COURT:  Right.

12          MR. ROSNER:  Your Honor, my colleague, Vanessa Peck,

13  will present that.

14          THE COURT:  Okay.  Ms. Peck?

15          MS. PECK:  Good morning, Your Honor, Vanessa Peck on

16  behalf of the debtors and debtors in possession.  As you know,

17  we -- among the first stay motions that were filed was our

18  motion to establish and approve adequate assurance procedures

19  to satisfy utility companies.  Two objection were filed.  One

20  was filed by Integrys Energy Services.  The other was filed by

21  a group of nine utility companies.  Last week we negotiated

22  with the -- with counsel to those objecting utility companies

23  and I'm happy to report that we reached an agreement in

24  principle with everyone.  It has yet to be signed up, but the

25  companies have been carved out of the order that was submitted

1 to court last night, the revised final order, and we would ask

2 that it be entered.

3          THE COURT:  Very good.  It's a clean copy?  That's

4 fine.  Ms. Sawczuk?

5          MS. SAWCZUK:  Good morning, Your Honor.  Maria

6 Sawczuk on behalf of the nine utilities that are listed on the

7 objection that we filed.  Your Honor, counsel is correct.

8 We've agreed to -- additionally, we've agreed to extend the 30

9 day period under Section 366© to the next hearing date to allow

10 us to get to a final resolution on this matter.  But, we have

11 come to an agreement in principle.

12          THE COURT:  Very good.

13          MS. SAWCZUK:  And, Your Honor, this is the only other

14 matter I have, so if I may be excused?

15          THE COURT:  Have a good day.

16          MS. SAWCZUK:  Thank you.

17          MR. ROSNER:  Your Honor, the last item on the list is

18 the bidding procedures piece of the sale motion.  What we would

19 ask now is that we take a -- I'm not going to say a brief

20 recess, but a short recess because there are a lot of moving

21 pieces here.

22          THE COURT:  Okay.  That's fine.  I'm happy to give

23 you that opportunity.  Why don't we do this?  How about, at a

24 minimum, 30 minutes.  And what I'd like is -- again, I'm not

25 trying to rush you right now.  We can talk about what my

1 availability is later today, but I have a particularly

2 complicated hearing at 11:30.  So, at a minimum, I'd think I'd

3 like you to come back and at least tell me where you are and

4 what issues you see coming forward and maybe then I can have a

5 handle on it, get a sense and, if appropriate, then I can give

6 you at least my thoughts on how we move the ball forward going

7 from here.  But, does that sound reasonable?

8          MR. ROSNER:  That does, Your Honor.  Thank you.

9          THE COURT:  What do we have -- what exactly -- we

10 have the -- we skipped over a couple things.  We've got the

11 sale.

12          MR. ROSNER:  The Focal Point's retention which is a

13 disclosure issue and a 330 review issue.

14          THE COURT:  Right.

15          MR. ROSNER:  We have Sitric which I'm hoping is just

16 simple math.  We have the Spirit conditional assumption motion

17 and the committee has requested -- in addition to objecting to

18 the motion, they've requested a short period of additional time

19 to brief and maybe take some discovery.  And we have the bid

20 procedures motion which has a lot of very interesting issues as

21 this Court is aware.

22          THE COURT:  Okay.

23          MR. ROSNER:  I believe those are the four matters

24 that are still left.

25          THE COURT:  Okay.  Why don't we do this?  We'll break

1 and we will reconvene at 11 o'clock, again, presumably for a

2 status report and then we'll talk about scheduling and

3 mechanics.  All right?

4          MR. ROSNER:  Thank Your Honor.  Can we leave things

5 here?

6          THE COURT:  You can leave things there --

7          MR. ROSNER:  Okay.

8          THE COURT:  -- but, at 11:30, you will need to

9 clear --

10          MR. ROSNER:  Yes, I understand.

11          THE COURT:  -- that stuff out.  Although you can

12 leave -- I see you have a lot of boxes and other stuff, so you

13 can leave stuff stacked up.  All right.  We'll stand in recess.

14 Thank you, counsel.

15          MR. ROSNER:  Thank Your Honor.

16                    (Recess)

17          COURT CLERK:  All rise.

18          THE COURT:  Please be seated.  Mr. Rosner?

19          MR. ROSNER:  Thank Your Honor.  Douglas Rosner for

20 the debtors and debtors in possession.  So, we've -- we

21 resolved with the Office of the U.S. Trustee, the Focal Point

22 and Sitric.

23          THE COURT:  Okay.

24          MR. ROSNER:  So, the Focal Point application -- and

25 we'll have to revise the order and submit it later.  But, in

1  general, what it does is it follows a structure in the -- as I

2  understand it, the Tribune Company case and I don't know which

3  Judge that was, so --

4          THE COURT:  That's all right.

5          MR. ROSNER:  Okay.

6          THE COURT:  I already spoke with Judge Sontchi this

7  morning.  He's forgiven me.

8          MR. ROSNER:  We include a -- we include a finding of

9  reasonableness under 328 subject to the terms of the order with

10 respect to the rights of the U.S. Trustee.

11         THE COURT:  Okay.

12         MR. ROSNER:  The U.S. Trustee would then have 330,

13 331 review -- objection review rights.

14         THE COURT:  Okay.

15         MR. ROSNER:  And then there's some language after

16 that to make it clear that nothing in the order prejudices the

17 U.S. Trustee.

18         THE COURT:  Sure.

19         MR. ROSNER:  In -- and as I understand it, the U.S.

20 Trustee is no longer moving forward with its opposition to the

21 disinterestedness disclosures and the Focal Point affidavit.

22         THE COURT:  Okay.  Mr. McMahon?  Sure.

23         MR. McMAHON:  Joseph McMahon for the acting United

24 State Trustee.  That is correct.  Although I want to just

25 confirm one thing on the record.  In Paragraph 7 of Focal

1  Point's supplemental declaration, there's a disclosure with

2  respect to the work that Mr. Guinn individually did for the

3  debtors' board prepetition.  This reference to him waiving his

4  claims and rights with respect to compensation under

5  prepetition engagement letters as such.  My understanding is

6  that the waiver -- it was confirmed for me over the weekend,

7  will be of all claims that could be asserted, i.e., there may

8  be trailing indemnification rights of the like under that

9  engagement letter.  I just want to make that clear for the

10 record and ask Focal Point to confirm that.

11             MR. ROSNER:  Yes, Your Honor.  On behalf of the

12 debtors, we do confirm that.  Mr. Guinn is in the courtroom

13 and, for the record, he confirms what the U.S. Trustee said.

14             THE COURT:  Very good.

15             MR. ROSNER:  And it's our understanding, there was no

16 written engagement letter or written indemnity rights or of

17 that sort.

18             THE COURT:  Okay.  I understand.

19             MR. ROSNER:  The next retention application that we

20 put over to now is --

21             THE COURT:  -- Sitric.

22             MR. ROSNER:  -- Sitric.  And the problem there was in

23 their supplemental affidavit, they included an exhibit where

24 the math just didn't add up.

25             THE COURT:  Okay.

1          MR. ROSNER:  They ended up at the petition at the

2     time of the filing with a $24 retainer.  That was what was

3     left, but the math didn't get there because they forgot a

4     $50,000 piece of the retainer.

5          So, they are going to correct that and we are going

6     to file a supplement to the supplement.  And then followed by a

7     certificate of no objection and ask for entry of the order.

8     And that order will also have 330 review rights on the hourly.

9          THE COURT: All right.  That sounds fine.  That's an

10    easy fix.

11         MR. ROSNER:  As -- so that leads to, I guess, the

12    real meat --

13         THE COURT:  Right.

14         MR. ROSNER:  -- of today.  The Spirit -- the motion

15    to conditionally assume Spirit and the bid procedures motion,

16    neither of which are resolved yet.  We don't expect resolution

17    of the Spirit issues and we would ask that that be heard in the

18    afternoon after a break.

19         THE COURT:  Okay.

20         MR. ROSNER:  And my partner, Chris Lynch, will tell

21    you where we are in the bid procedures.

22         THE COURT:  Okay.  Ms. Lynch?

23         MR. LYNCH:  Good morning, Your Honor.  Christine

24    Lynch on behalf of the debtors and debtors in possession.  I

25    want to give you a status report on the open issues with

1  respect to the bid procedures.

2          THE COURT:  Sure.

3          MS. LYNCH:  We believe that most, if not all, of the

4  issues on the bid and option procedures, themselves, have been

5  resolved.  So, the primary open issue is the requested bid

6  protections for Tavistock.  We believe that, with some

7  additional time which will allow parties to continue to have

8  ongoing conversations, it might be possible to reach a

9  resolution with, at least, some of the constituencies on that

10 issue.  So, we would ask for a short break and maybe after your

11 next hearing --

12         THE COURT:  Okay.

13         MS. LYNCH:  -- we could reconvene.

14         THE COURT:  Mr. Carr, did you have something to add?

15         MR. CARR:  Yes, Your Honor.  Thank you.  For the

16 record, Jim Carr of Kelly, Drye and Warren on behalf of the

17 committee.  Your Honor, Ms. Lynch is correct in that we have

18 achieved a consensus in connection with the -- substantially

19 all of the issues in connection with the sale motion and, that

20 is, we've reached agreement in connection with the bid

21 procedures, auction procedures and the deadlines established in

22 the motion.  The one issue that is still outstanding is the

23 appropriateness of the request for a breakup fee in light of

24 the Third Circuit rulings in O'Brien and Reliant.

25         THE COURT:  And I assume, am I correct, the question

1 about the appropriateness is given the existence of the

2 American Blue Ribbon offer --

3          MR. CARR:  That is correct, Your Honor.

4          THE COURT:  -- or proposal that's out there and that

5 -- the whole back and forth there?

6          MR. CARR:  Yes, Your Honor.

7          THE COURT:  Okay.  I understand.

8          MR. CARR:  American Blue Ribbon, in fact, as Your

9 Honor knows from the objection and bid that was filed last

10 Thursday, American Blue Ribbon came in and indicated that it

11 would submit that they would add a breakup fee and, in fact,

12 submit a bid that was a million dollars higher.  And that's an

13 important point, Your Honor.  The committee's not attacking

14 Tavistock in connection with being the stalking horse bidder.

15 All we're doing, Your Honor, is we'd like Your Honor to rule in

16 connection with the appropriateness of the breakup fee.

17          THE COURT:  All right.  The -- I want to be clear

18 before anybody feels the obligation to come on up.  We will

19 deal with this.  We'll talk about scheduling in a moment.  The

20 reason for my question was just to make sure that I understood

21 there -- I understand there's a lot of back and forth and a lot

22 of negotiations and I'm pleased to hear that there's been some

23 progress.  I just -- when you were reserving the one issue, I

24 wanted to make sure that I understood precisely what the

25 current issue is and now I do.

1          MR. CARR:  Thank you.

2          THE COURT:  With respect to timing, as I said, I have

3    an 11:30 hearing that I'm having difficulty handicapping.  It

4    is now 20 after 11.  Do you want to try for 1:30?  Well, the

5    reason that I ask, Mr. Rosner, is because I have scheduling

6    conflicts this evening that require me to leave by about 4:45.

7          MR. ROSNER:  Then 1:30 it is, Your Honor.

8          THE COURT:  Okay.  All right.  So, we'll reconvene at

9    1:30 and we'll go from there.  Stand in recess.  Thank you,

10   very much, counsel.

11         UNIDENTIFIED ATTORNEY:  Thank you, Judge.

12                         (Recess)

13         THE COURT:  Please be seated.  Ms. Lynch, where do we

14   stand?

15         MS. LYNCH:  Good afternoon, Your Honor.  Thank you

16   for allowing us to have a break.  Let's start with the easy

17   stuff first.  We do have a DIP order and an order approving the

18   Focal Point retention that are ready to be submitted.

19         THE COURT:  Okay.  All right.  Mr. Zarco?

20         MR. ZARCO:  Not this one, Your Honor.

21         THE COURT:  Okay.  Okay.  Give me just a moment to

22   take a look at the black lines.

23                         (Pause)

24         THE COURT:  And the final DIP financing order?  All

25   right.  As noted, I've previously ruled on both of these.  I

1  will sign them and will have them on the docket today.

2          MS. LYNCH:  Thank you, Your Honor.

3          THE COURT:  Okay.  Next matter.

4          MS. LYNCH:  Your Honor, the debtors are prepared to

5  move forward with our bid procedures motion.

6          THE COURT:  Okay.

7          MS. LYNCH:  Your Honor, on April 22nd, 2010, the day

8  after the petition date, the debtors filed a motion to sell

9  substantially all of their assets to an entity called Tavistock

10 Ventures, Inc., subject to higher and better offers and, of

11 course, approval of the Court.  By that motion, the debtors

12 also seek approval of certain procedures to govern the bidding

13 for substantially all of the debtor's assets and approval of

14 certain bidding protections for Tavistock.

15          I'd first like to describe briefly for Your Honor,

16 some of the terms of the stalking horse deal.  The proposed

17 stalking horse transaction establishes two separate purchase

18 price floors, 40 million in cash if the debtors are able to

19 assume and assign to Tavistock certain leases subject to a

20 master lease with Spirit Master Funding, LLC, and a $31 million

21 floor if the debtors are unable to assume and assign those

22 leases.  Included among the assets to be sold are the

23 Fuddruckers and Koo Koo Roo brands, the debtors own real

24 estate, rights under leases and contracts and furnitures,

25 fixtures and equipment.

1        In addition, Tavistock has agreed to offer employment

2   to substantially all restaurant level employees for locations

3   that its acquiring and to hire corporate level employees for a

4   period of, at least, six months.

5                THE COURT:  Okay.

6                MS. LYNCH:  Your Honor, Tavistock was selected as the

7   stalking horse after an extensive marketing process conducted

8   by the debtor's investment bankers, Focal Point Securities,

9   LLC.  The marketing and stalking horse selection process is

10  described in detail in the declaration of Rod Guinn of Focal

11  Point which was submitted with our response on Friday.  And, in

12  addition, if the Court will permit, I would like to proffer the

13  testimony of Alex Stevenson of Focal Point in support of the

14  debtor's sale motion.

15               THE COURT:  I'll take that, but I would like to hear

16  -- I don't normally take openings, but I would like to know

17  what the current state of play is across the board.  It seems

18  like it had -- I think it was Mr. Carr who advised that most of

19  the issues had boiled down to the competing bidder question.

20  So, I mean, if that's what we're talking about, then I think

21  I'd like to know and be a little bit informed by people before

22  we move forward.

23               MR. LYNCH:  So, Your Honor, at this point, we are

24  going forward with our motion seeking approval of a breakup fee

25  of 3.5 percent and a minimum overbid amount in addition to that

1 of $250,000.  There has been no agreement reached between the

2 committee and the debtors and Tavistock.

3              THE COURT:  Okay.  I'll hear from -- I think I'd like

4 to hear from Mr. Carr first.

5              MR. CARR:  Yes, Your Honor.

6              THE COURT:  And, again, this is by way of really

7 opening and background to give me a little bit of guidance.

8              MR. CARR:  Thank you, Your Honor.

9              THE COURT:  Okay.

10              MR. CARR:  In connection with the sale motion, Your

11 Honor, we have reached agreement on all the issues, but one.

12              THE COURT:  Right.

13              MR. CARR:  And that issue is the appropriateness of

14 the breakup fee.  And it's important before we get into

15 arguments, legal and factual, in connection with the

16 appropriateness of the breakup fee to understand what's not

17 happening today.  The committee is not opposing Tavistock as

18 the stalking horse bidder.  So, there's no need to decide or

19 assess that issue.  Moreover, the committee is not rendering an

20 opinion as to which bid is higher or otherwise better.

21              As I indicated earlier, also, Your Honor, we've

22 reached agreement in connection with the auction procedures and

23 the bid procedures.

24              THE COURT:  And the time line, as well, right?

25              MR. CARR:  And the time line, as well.  So, what

1  we're specifically focusing on is the appropriateness of the

2  breakup fee in light of Third Circuit precedent and whether or

3  not, in this situation, with the facts as presented to Your

4  Honor, a breakup fee is appropriate.  And that would be the

5  issue, Your Honor, that we are prepared to put forward.

6        THE COURT:  I understand.  Let me make one point, so

7  that the record is clear.  I realize that the committee is not

8  the only objector --

9        MR. CARR:  That's correct.

10        THE COURT:  -- and that there are other issues and

11  other parties that may be opposing the merits or the elements

12  of the bid procedures and I'll hear from all parties as it

13  relates to it.  I just wanted to understand where the issues

14  stood between the debtor and -- let me ask, does anyone else

15  have an extant objection before we get going?  Mr. Zarco,

16  briefly.

17        MR. ZARCO:  Very briefly, Your Honor.  Your Honor, I

18  just want to make sure the record is clear.  While I understand

19  the creditors' position and the debtors' with regard to that

20  all aspects have been agreed upon except the breakup fee and

21  the expense, that is not the position of FIFA.

22        THE COURT:  Right.

23        MR. ZARCO:  And at the appropriate time, I would like

24  to explain to the Court why it is that we have an issue with

25  the timing of the procedure as it pertains to the adequate

1 assurance element of it.

2         THE COURT:  Okay.  That sounds fine.  And I want it

3 to be clear, and I appreciate you affording me the opportunity

4 to do so.  There are a number of objections that are out there

5 and I'm just trying to manage where we're going with the

6 hearing.

7         MR. ZARCO:  That's fine.  I just want to make sure

8 I'm heard, because the relationship here is a little atypical

9 based on the fact that it's a franchisor/franchisee

10 relationship as opposed to a landlord transaction.

11         THE COURT:  I understand.

12         MR. ZARCO:  Thank you, Your Honor.

13         THE COURT:  Okay.  Mr. Rosenberg?

14         MR. ROSENBERG:  Good afternoon, Your Honor.  Andrew

15 Rosenberg, Paul, Weiss, Rifkind, Wharton and Garrison for ABRH

16 and Fidelity Newport Holdings, LLC.  It's actually the first

17 time I've been before Your Honor.

18         THE COURT:  Welcome.

19         MR. ROSENBERG:  Thank you.  Our objection generally

20 speaks for itself.  We have with us today if necessary by way

21 of proffer and also available for cross examination, Mr. Hazem

22 Ouf, the CEO.  We also have a director, Ryan Langdon of

23 Newport.  And maybe it makes sense to just, if it will help

24 sort of frame the argument a little bit just to give you two

25 minutes of where we are.

1          THE COURT:  Okay.

2          MR. ROSENBERG:  Which is that without getting into a

3  he said/she said, which I think is probably irrelevant, because

4  I think what matters is where we are today, we were actively

5  involved in the bidding process prepetition.

6          THE COURT:  I believe your colleague was here at the

7  first day hearing.

8          MR. ROSENBERG:  Yes.  I think you had described him

9  as poisoning the well.

10          THE COURT:  There is a function to everything we do,

11  isn't there.

12          MR. ROSENBERG:  I said he was spicing or sweetening,

13  but same general idea.  But we are now here today doing

14  something more than poisoning, spicing or sweetening.  We have

15  submitted a signed asset purchase agreement with a purchase

16  price one million dollars higher than the Tavistock bid.  It

17  contains no breakup fee, no expense reimbursement.  It is

18  otherwise the same and most simply we're willing to do, to pay

19  more and do it for free.

20          We have corporate authority, we had a board meeting

21  on May 4th in which this transaction was authorized.  We are

22  also prepared to wire funds tomorrow for the full amount of the

23  deposit.  Rumor has it there may be an issue that comes up as

24  to why we don't have a deposit today.  The answer is, you know,

25  I generally do not bring a sack of money or a cashier's check

1  and carry it around with me.  If somebody had asked, quite

2  frankly, we probably would have brought one, but we're prepared

3  to do a wire tomorrow.

4       And by way of background, ABRH is a substantial

5  company in and of itself with 266 restaurants, but it's owned

6  by Newport, which is a well-established hedge fund, and

7  Fidelity National, which is a Fortune 500 company that I

8  believe it could take judicial notice in the papers Blackstone

9  offered to purchase the other day for $15 billion.  So I am

10 confident having spoken to both of them that there will be no

11 problem wiring that money tomorrow.

12      And that's the, I think, the background and I would

13 probably want to put a little legal argument in after the

14 Creditors' Committee, but thought it would be helpful to

15 establish where we're at at the outset.

16      THE COURT:  Okay.  Thank you.  Ms. Dempsey?  Oh, I'm

17 sorry.  Yes, ma'am?

18      MS. MICHAELSON:  Your Honor, Randy Michaelson on --

19      THE COURT:  I'm sorry.

20      MS. MICHAELSON:  -- behalf of Tavistock Ventures,

21 Inc.  My job is to un-poison the well, Your Honor.  Tavistock

22 has already delivered value by virtue of its stalking horse bid

23 and they are prepared to put on proffered evidence and

24 testimony to establish that the debtor has already received

25 value by virtue of the stalking horse bid and that the breakup

1  fee should be approved as negotiated and as agreed to by the

2  debtor.

3            THE COURT:  Okay, I understand.  Thank you.  Ms.

4  Dempsey?

5            MS. LYNCH:  Ms. Lynch.

6            THE COURT:  I'm sorry.  Ms. Lynch.   There's a

7  Christine Dempsey who regularly appears in my court.

8            MS. LYNCH:  That's fine, Your Honor.

9            THE COURT:  My apologies.

10           MS. LYNCH:  Even though we have history, it's okay.

11           THE COURT:  Sorry.  Let me ask you a question.  Does

12  the debtor dispute American Blue Ribbon's position?

13           MS. LYNCH:  Your Honor, the debtor disputes the

14  allegations that ABR has made that the debtor ran an unfair

15  process.

16           THE COURT:  Well, right.  I guess does the debtor

17  dispute that we are where we are?

18           MS. LYNCH:  The debtor does not dispute that we

19  currently have a stalking horse bidder that we'd like --

20           THE COURT:  You have a high class problem.

21           MS. LYNCH:  -- yes, we do, Your Honor.  Look, I mean

22  we had a bird in the hand, we're not so sure that we have two

23  in the bush though.  Okay?  So we have Mr. -- I'm sorry --

24  Rosenberg --

25           MR. ROSENBERG:  Mr. Dempsey.

1                     (Laughter)

2            THE COURT:  We'll blame everything on Mr. Dempsey.  I

3 am sorry about that.

4            MS. LYNCH:  No problem.  Advising the Court that his

5 client is prepared to submit a deposit tomorrow.  We don't have

6 any evidence of that.  We have his word.  Fine, maybe his word

7 is good, but we haven't seen any actual documentation that they

8 have the funds available.

9            We also haven't received any proof or evidence that

10 they have the funds to close, which is something we would

11 require under our bid procedures for any bidder to be a

12 qualified bidder.  And he did indicate that there was a board

13 meeting during which corporate authority was given to make this

14 bid.  That was a question to our mind actually --

15            THE COURT:  Sure.

16            MS. LYNCH:  -- because we had understood that it

17 wasn't entirely clear whether there was corporate authority for

18 the American Blue Ribbon entity to move forward.

19            So there are some questions in our mind.  Do we think

20 that they're locked and loaded?  No.  And that's why we don't

21 think the are a real substitute stalking horse bid.

22            THE COURT:  Okay.  Here's what I'd like to do.  I

23 actually have a teleconference I'm going to take for just a

24 moment, it's a discovery dispute, and  we'll reconvene in

25 probably about ten minutes.  But here's -- this is probably not

1   going to be a surprise to you, you've all done this before,

2   this is the difficulty that I face.  And again, I'm being a

3   little bit flip with you in telling you that this is a high

4   class problem, but it is.  But there is a standard imposed by

5   the Third Circuit under O'Brien, I think recently refined or

6   affirmed or articulated in Reliant and everybody's cited it to

7   me, and I've read the decision.  That I need to find that the

8   breakup fee in this case is necessary to preserve the estate,

9   the 503(b) standard.  And it is -- I've encountered this before

10  and it is difficult for the Court to make that finding if it

11  can be confident that frankly another bidder of equal stature

12  and sort of of equal certainty is present and available.  And

13  the only way to put it is that the, frankly, that the breakup

14  fee is not necessary to ensure that there's, you know, robust

15  bidding, or the other benefits, which I think are important,

16  and I really believe they are important, that go with the

17  stalking horse, the structure that's provided by a stalking

18  horse, the fact that there is an APA that people need to look

19  at.

20          And also, one issue that doesn't get discussed, but I

21  think is of tremendous value, perhaps the greatest value that

22  comes from the stalking horse bid in the usually compressed

23  time lines that Bankruptcy Courts impose is the confidence it

24  conveys to a bidding market place that this guy or this woman

25  or this player is willing to put their money up.  And so, even

1 though I'm only going to have a couple days to get in and do my

2 due diligence, I start with the wind at my back.  I have

3 confidence that they wouldn't do this deal if it was a dog.

4          So it is -- I don't accept the proposition that the

5 approval of the breakup fee is necessary or essential to

6 maintain the integrity of the system.  I think that this is a

7 risk that a stalking horse runs until it obtains the approval

8 that somebody may actually come in.  It doesn't usually happen,

9 but we've seen it.  The first time that I can actually recall

10 it was in this -- I think in this courtroom in front of Judge

11 Walrath in the Top Flight case, I think, where something

12 basically along those lines happened.  And I had it happen a

13 month ago in a case called Atrium.  Now that ultimately

14 settled, but the same -- were you in there -- yes, that was a

15 zoo.

16          But my point is this.  I'm not telling you anything

17 you don't know.  But it is a difficult proposition for me to

18 approve a breakup fee.  Even though I am fully cognizant of the

19 value that's already been conferred upon the debtor and upon

20 the process by the stalking horse.  But I don't think that

21 approval of breakup fees in the O'Brien standard is sort of a

22 retrospective.  I'm paying you for what you've done.  It's

23 frankly, I'm incentivizing you, because it's necessary and

24 because there are lots of benefits that accrue from that, some

25 of which I've just identified.

1          So I wanted at least share with you those concerns.

2  This is not unplowed ground and I have not heard any evidence

3  and I'm prepared to, within the time frame that we have, and I

4  will also hear the other elements and any other issues that

5  anybody has with the sale process on the merits in due course.

6  But I need about five minutes and then we'll reconvene.  We

7  stand in recess.

8          MS. LYNCH:  Thank you, Your Honor.

9                         (Recess)

10          THE COURT:  Please be seated.  Ready to proceed?

11          MS. LYNCH:  Well, Your Honor, that brief recess was

12  spent productively.  I'm happy to report that Tavistock has

13  agreed to reduce its combined breakup fee and reimbursement to

14  $400,000.  And the Committee is in agreement with this as I

15  understand.  The minimum initial overbid for a bid to be a

16  qualified bid would be a million dollars over the stalking

17  horse prices.  And again, it's my understanding that the

18  Committee finds that acceptable as well.

19          THE COURT:  All right.  And that would be designed

20  then to capture -- the minimum overbid would capture the

21  proposed $400,000 breakup fee and basically another increment

22  on top of that to make it worth the extra --

23          MS. LYNCH:  Worth our while to go forward --

24          THE COURT:  I understand.

25          MS. LYNCH:  -- with the expense of a process.

1            THE COURT:  Okay, I understand.  How do they feel

2   about it?

3            MS. LYNCH:  Your Honor, I would submit that it

4   doesn't matter how they feel, because they don't have standing

5   --

6            THE COURT:  I know.

7            MS. LYNCH:  -- to object.  So that's our position.

8            THE COURT:  I understand.  Okay.  Mr. Rosenberg?  Or,

9   actually, Mr. Carr.

10            MR. CARR:  Thank you, Your Honor.  Ms. Lynch did

11   accurately reflect the Committee's position and it saves me the

12   trouble of having to go through the Atrium transcript, Your

13   Honor.  Just a couple of points.  The $400,000 breakup

14   fee/expense reimbursement comes from the fact that we do

15   believe that Tavistock added some value to this process and

16   that we'd like to reimburse Tavistock for that effort.  And

17   we've also agreed that the $400,000 does not have to be

18   documented, Your Honor.

19            THE COURT:  So this is a breakup fee or an expense

20   reimbursement?

21            MR. CARR:  It's a combination.

22            THE COURT:  Okay, and we're not going to break it out

23   one way or the other?

24            MR. CARR:  That's correct.

25            THE COURT:  Okay.  I think I understand.

1          MR. CARR:  Thank you.

2          THE COURT:  Mr. Rosenberg?

3          MR. ROSENBERG:  Ms. Lynch is about to try to make the

4   same standing argument that I made with your firm four years

5   about representing Top Flight against Adidas and was

6   unsuccessful.

7          THE COURT:  That had to be --

8          MR. ROSENBERG:  Six years?

9          THE COURT:  -- seven?

10          MR. ROSENBERG:  Seven years.   Sometime in the

11   distant past we made the argument that is scrawled down on that

12   piece of paper unsuccessfully.  By way of bad luck, Your Honor,

13   I also represented Calpine 13 years ago.  So I'm quite familiar

14   with this issue and the difficulty of that position.

15          Your Honor, obviously we're not thrilled, but we do

16   see that all the economic stakeholders in this case have

17   (indiscernible).  Quite frankly, only Your Honor knows this,

18   but if we press this objection, I still think under the legal

19   standard that it's unclear how you could pay somebody more to

20   get less and have that pass 503(b), but we're willing to stand

21   down on that, because what we really need, Your Honor, is

22   information.  And that's, you know, one of the main reasons we

23   wanted to be stalking horse was not so much for the, you know,

24   obviously reducing the bid protections makes bidding easier in

25   terms of financing, but in order for us to consider bidding

1  higher, this information that we need, you know, for whatever

2  reason, good or bad, we are clearly, you know, the red-headed

3  stepchild in terms of bidder here and not the favorite son.

4                    (Laughter)

5            THE COURT:  Where are you going with this?

6            MR. ROSENBERG:  Where I'm going is -- not to

7  disparage the red-headed stepchild --

8            UNIDENTIFIED SPEAKER:  Bad choice of words.

9            MR. ROSENBERG:  Exactly, exactly.  Looking up, let

10  the transcript reflect His Honor's curious look back.  What we

11  really do need, Your Honor, though, in order to not press our

12  objection, need some commitment from the debtor is the

13  diligence necessary which hopefully would benefit this estate

14  if we get that information, you know, hopefully we'd be

15  potentially in a position to bid higher if we resubmit our bid

16  prior to the auction.

17            And specifically, we need I think a diligence date

18  within the next ten days and then a subsequent diligence date

19  within the ten days after that.  We do have a -- you know, the

20  data room obviously has some information, but there's a

21  considerably a lot more information that we need.  We're

22  obviously a real bidder were here, we've gone to a lot of

23  trouble, and what we need is a commitment from the debtor that

24  they will try to accommodate us on some meeting dates and also,

25  you know, work in good faith with us to fill out the diligence

1 punch list.

2          THE COURT:  Okay, thank you.

3          MS. LYNCH:  Your Honor, of course we will cooperate

4 with American Blue Ribbon.  To my knowledge, all of their

5 diligence requests to date have been responded to with one

6 exception, and that is the request for a meeting with

7 management.  The only reason why that hasn't occurred is due to

8 -- well, initially American Blue Ribbon saying they didn't want

9 a meeting with management and by the time that they finally

10 told us that they did want a meeting, it was too late in the

11 process to schedule an in person meeting with senior

12 management.  But of course the debtor will cooperate and

13 attempt to schedule a management meeting with American Blue

14 Ribbon.

15          THE COURT:  Okay, I understand.

16          MS. LYNCH:  We welcome them to the process, Your

17 Honor.

18          THE COURT:  Sure.

19          MS. LYNCH:  We'd like to keep them involved.

20          THE COURT:  We'll deal with questions of due

21 diligence and those issues at the conclusion of the hearing to

22 the extent we need to.  But, okay, I think I understand then

23 where we are with the mechanics of the bidding procedures as

24 well as the resolution of the issues relating to the expense

25 reimbursement/breakup fee.

1          I think I'd like to know, I know that there is a

2  remaining and extant F-I-F-A, FIFA objection, are there other

3  objections that remain extant or have all the other objections

4  been resolved?  I guess there were submissions and objections.

5          MS. LYNCH:  Yes, Your Honor, there were five

6  objections that were filed by the applicable objection

7  deadlines.  There's an objection by Microsoft which we viewed

8  as a premature objection on adequate assurance grounds.  That

9  is more properly made by the objection deadline for the sale

10  itself, which will be established by Your Honor today

11  hopefully.

12          THE COURT:  Okay.

13          MS. LYNCH:  There was an objection filed by Macerich

14  and it's my understanding that we've resolved all of Macerich's

15  issues pertaining to the bid procedures and auction procedures.

16          There was an objection by FIFA or FIFA which we

17  understand, although we had hoped to have resolved all the

18  issues on the bid procedures, there seems to be one

19  outstanding.  An objection by American Blue Ribbon and an

20  objection by the Committee on the breakup fee.

21          THE COURT:  Right.  And the Committee objection has

22  been resolved.

23          MS. LYNCH:  All of the Committee's informal

24  objections on the actual bid procedures --

25          THE COURT:  Right.

1          MS. LYNCH:  -- and auction procedures have been

2    resolved.  We have a black line of the bid procedures' order

3    and bid procedures that reflects the modifications that we made

4    at the request of the Committee.

5          THE COURT:  All right.   Well, before we move forward

6    then, I think I'd like to hear from Mr. Austin.

7          MR. AUSTIN:  One point for the record, Your Honor.

8          THE COURT:  Yes, sir.

9          MR. AUSTIN:  On behalf of Wells Fargo Capital

10   Finance, we do support the entry of the order of the bid

11   procedures.  The motion that sought approval of the bid

12   procedures also had attached to it, however, a form of a sale

13   order, and at least it's a form of the order we want the record

14   to reflect, we are not signed off on the form of that order at

15   this point.  We'll address that at the, if we have to, at the

16   objections for the sale procedures --

17          THE COURT:  Sure.

18          MR. AUSTIN:  -- on a limited objection basis.

19          THE COURT:  That sounds fine.  I understand.  Those

20   rights are reserved.

21          MS. LYNCH:  Your Honor, I was reminded of one other

22   informal objection that we received that we were able to

23   resolve.  Your Honor, the U.S. Trustee raised some concerns

24   about the potential sale or transfer of personally identifiable

25   information collected and maintained by Koo Koo Roo and

1  Fuddruckers.  We shared the privacy policies with the United

2  States Trustee and discussed the issues with the United States

3  Trustee and we proposed a resolution which we understand is

4  acceptable to the United States Trustee.  It's as follows:  The

5  debtors agree that they are not selling and will not sell

6  personally identifiable information collected and maintained by

7  Koo Koo Roo.  And the debtors are proposing to sell to

8  Tavistock or the successful bidder personally identifiable

9  information collected and maintained by Fuddruckers, but under

10  the bidding procedures as revised, each bidder to be a

11  qualified bidder must agree to be bound by the Fuddruckers'

12  privacy policy.  Tavistock has already agreed to be bound by

13  the Fuddruckers' privacy policy.

14          THE COURT:  Okay, I understand.  Mr. McMahon?

15          MR. McMAHON:  In connection with that, Your Honor,

16  I'd like to hand up a copy of the Fuddruckers' privacy policy

17  marked as Government 1.

18          THE COURT:  Very good.

19          MR. McMAHON:  I assume there's no objection.

20          THE COURT:  Any objection?

21          MS. LYNCH:  No.

22          THE COURT:  All right, thank you.  All right, that's

23  admitted, and I do appreciate, Mr. McMahon, your office's focus

24  on this issue.  I've raised it a number of times in different

25  cases.  We've actually had a couple cases with consumer privacy

1  ombudsman and I just think it's helpful to deal with these

2  issues right out, right from the get-go, because otherwise I've

3  had a couple instances where it was raised fairly well along in

4  the process and it creates a full-blown emergency, or it can.

5  So this is admitted and then part of the record in the hearing

6  and I believe I understand the resolution achieved on this

7  issue between your office and the debtors.   Okay?   I believe

8  then that leaves us with FIFA and Mr. Zarco?

9           MR. ZARCO:   Thank you, Your Honor.

10          THE COURT:   Yes, sir.

11          MR. ZARCO:   Very briefly.   Your Honor, in light of

12  the fact that FIFA represents and is comprised of 90

13  restaurants out of the 120 which are owned by about 35

14  individuals, these franchises, according to the schedules,

15  apparently are going to be assumed and assigned.   Because one

16  of the standards that has to be satisfied here with regard to

17  which is the bid that will ultimately be accepted, the Court

18  has to look at which is the highest and best offer, and highest

19  typically deals with the financial terms while best goes way

20  beyond that.

21          THE COURT:   Sure.

22          MR. ZARCO:   Typically in a bankruptcy scenario, you

23  have situations with landlords, you have creditors, it's simply

24  a dollars and cents kind of transaction.   Unfortunately here in

25  the franchise world, it's a horse of a different color.   You

1   have a very interdependent relationship that lasts a period of

2   20 years.  There's a lot of responsibilities that this

3   assignee, the potential buyer of this company's going to have

4   that go way beyond whether or not they could simply show a

5   strong balance sheet.

6          Our concern as franchisees is not necessarily how

7   much money's coming into the company, but how is that money

8   going to be used.  If in fact the money's going to be used only

9   to support corporate operations to the detriment of the

10  franchisees, which are the lifeblood of this company, as I

11  stated before, Your Honor, it is the revenue that is derived

12  from the franchisees' operations that in fact has kept this

13  company alive.  The franchisees' income, like I said, was $5

14  million.  Their corporate operations were netting a $3 million

15  deficit, which is the reason why there's a $2 million EBITDA.

16  It's because of the franchisees.

17         Before the franchisees can properly object with

18  regard to whether or not there's adequate assurance of future

19  performance, it is very important that we be provided with the

20  due diligence information.  Not only to the extent to the

21  company's capitalization, their cash position, things of that

22  sort, but also what is their management structure?  What is the

23  experience that they have in running a franchise business?

24  What infrastructure is in place to provide the appropriate

25  level of service, support and assistance to the franchisee

1  group.  What is their ability to satisfy Federal Trade

2  Commission requirements?  What's their standard on disclosures?

3  Who is going to be responsible for dealing with the full

4  compliance necessary in the law?

5        There are so many, many issues.  And what I'm

6  concerned is that based on the information set forth in the

7  bidding procedures, while talking to the debtor, they have

8  indicated that Tavistock would be willing to provide us with

9  due diligence information shortly, and hopefully that will

10  help, I am confident there's going to be other issues

11  non-financial that will go to the element of, is it the best

12  offer even though it may not necessary be the highest or it may

13  be the highest.

14        So this is something that has me very concerned.

15  Because frankly what could happen is the day of the auction we

16  could get a higher bidder, and then we're going to have a two

17  or three-day window in which to assess this best offer element.

18  And I don't think that within two or three days, and I know you

19  run a very different schedule here, and I understand the

20  constraints of the Court, but understanding that the

21  franchisees are the lifeblood of this company, it has been the

22  only reason why the company has lasted as long as it has.  And

23  as a result, I need to understand what it is that we can be

24  done -- what is it that can be done so that the franchisees can

25  obtain the due diligence as to the non-financial terms.

1        Management structure.  One of the concerns we have is that

2   apparently the existing management is going to stay in, I

3   understand, for a period of six months.  Your Honor, it is that

4   management that has put this company in the position it's in.

5   The franchisees, it's a hornet's nest out there right now with

6   this management taking over this company.  This is a big issue

7   that this Court has to consider.  Because the creditors may be

8   benefitting short term, but long term, the future relationship

9   with this company for any and all creditors or people who have

10  contracts that are assumed and then assigned and are going to

11  be in bed with this company that we believe and we have

12  demonstrated and have put on the record, we have no confidence

13  in management, none.

14        And that's the reason why we think that in order for

15  us to be able to lodge a proper and fair objection that would

16  benefit the bankruptcy estate, that would benefit the creditors

17  and that would benefit anyone that's doing business with the

18  company and would benefit all parties in interest of which we,

19  as franchisee, are going to have our contracts assumed and

20  assigned, are parties in interest.  And we have the right to

21  state our objections.

22        So all I'm asking the Court is, to please in

23  approving this bidding procedure, to understand that there has

24  to be a mechanism that the FIFA, the franchisee can get the

25  answers to these questions.  Because if certain management

1 issues are addressed, it can go a long way with regard to the

2 extent of our objections, if any.

3         THE COURT:  I understand.  Okay.  Thank you.

4         MS. LYNCH:  Your Honor, a couple things.  A little

5 perspective.  The franchise royalties comprise about five to

6 $7 million annually out of annual revenues of about

7 $150 million.  Mr. Zarco has overstated his position a bit,

8 with all due respect.

9         Another question that we have is, who is FIFA?  FIFA

10 is not a counter party to any executory contract that the

11 debtors have.  We understand that a notice of appearance has

12 been filed on behalf of FIFA that we don't believe complies

13 with 2019 and we're going to make a request under 2019 for the

14 information required.

15         Obviously counter-parties to executory contracts and

16 leases are entitled to adequate assurance information.  We have

17 agreed that we would provide it to counter parties upon their

18 signing a reasonable confidentiality agreement, but we're going

19 to give it to the actual individual parties who are signing the

20 confidentiality agreement.  We have no obligation to give it to

21 FIFA.

22         Also, adequate assurance under a franchise agreement,

23 you know, I don't want to get into arguments prematurely on

24 adequate assurance, but it really just is the ability to comply

25 with the terms of the franchise agreement.  So I don't think

1 the burden is as high as Mr. Zarco is arguing at this stage.

2          THE COURT:  Okay, I think I understand.

3          MR. ZARCO:  Your Honor, can I respond?

4          THE COURT:  Briefly.

5          MR. ZARCO:  I want to make sure the record is clear.

6 Your Honor, I did not overstate at all the numbers.  There is a

7 big difference between gross revenues and EBITDA and the gross

8 revenues generated from the franchisee was seven million.

9 There was only $2 million of expense undertaken to generate the

10 seven million in revenue, giving a net income profit of

11 $5 million on the franchisee side.  On the corporate side you

12 have $120 million on gross revenues, which after all their

13 effort netted at $3 million loss.  So she's talking revenue,

14 I'm talking profit.

15          And secondly, for the debtor as a franchisor to say

16 that the obligations under franchisor/franchisee relationship

17 are not that much, is the reason why we have a hornet's nest.

18 Because there's a document that's 35 pages long with respective

19 obligations that goes way beyond the payment of a royalty and

20 advertising fee.  There's a whole slew of obligations that must

21 be taken that cannot be rendered by just anybody.  And whoever

22 buys this company has to be able to show, in order to satisfy

23 the highest and best offer, that best constitutes the

24 non-financial terms.  Because otherwise if you start losing

25 these franchisees and they start closing down because of the

1  lack of service, support and assistance of the franchisor, I

2  don't know what these companies are buying.  Because the only

3  source of the revenue, and the only benefit these creditors are

4  going to get is if this franchise association and the

5  franchisees survive.

6          So to totally undermine the extent of the

7  relationship and with the brush of a hand say there's not that

8  many responsibilities, underscores the lack of knowledge and

9  underscores the attitude that this franchisor has had to the

10 franchisees, which is the reason why they're here.  Thank you.

11         THE COURT:  Thank you.

12         MS. LYNCH:  Your Honor, just so the record is clear.

13 I think Mr. Zarco is putting words in my mouth.  I did not

14 intend to minimize the debtors' obligations under the franchise

15 agreements, and the adequate assurance that will be provided by

16 any successful bidder is an -- the ability to comply with those

17 obligations.  So I didn't intend to minimize whatever

18 obligations the debtors have under the franchise agreements.

19         It's also important for the Court to remember that

20 there is a franchisee on the Creditors' Committee.  So the

21 interest of franchisees are represented through the Creditors'

22 Committee.

23         THE COURT:  Okay.  Let me ask you a question.  What

24 is the current schedule for the sale time line?

25         MS. LYNCH:  So, Your Honor, our current proposed

1 schedule is a bid deadline of June 14th at four p.m., an

2 auction date of June 17th, probably in the morning sometime,

3 nine or ten, and we're requesting a sale hearing on June 21st

4 or as soon thereafter as the Court's schedule permits.  We

5 believe that the schedule is reasonable and it will provide for

6 a full opportunity to continue to market the assets while

7 recognizing that there's a need to sell this business as

8 quickly as possible before there's any damage to the brand.

9 And we understand that the constituencies in this case, the

10 Committee, the U.S. Trustee, the secured lender have no

11 objection to that proposed schedule.

12        Oh, one clarification, Your Honor.  The outside

13 closing deadline under the asset purchase agreement is

14 currently July 15th.  We were asked by the Committee if

15 Tavistock would be willing to move that date so it's identical

16 to the DIP financing agreement milestone of July 9th and

17 Tavistock is willing to do that.  So now the outside closing

18 date under the asset purchase agreement will be July 9th.

19        THE COURT:  Okay, I understand.  Mr. Carr?

20        MR. CARR:  Just very briefly, Your Honor.

21        THE COURT:  Sure.

22        MR. CARR:  Having been in Mr. Zarco's position

23 numerous times and objecting to expedited sale procedures.

24 When representing counter-parties, whether a landlord or

25 franchisee or a counter-party to a contract, the issue is

1  always adequate assurance of future performance and when am I

2  going to get that information.  In this schedule, Your Honor,

3  we were cognizant of that.  That's why we had the auction set

4  for June 17th and the sale hearing set for June 21st.  So the

5  minute we know who the winning bidder is, adequate assurance

6  information will be sent immediately to the appropriate parties

7  so that you have a couple of days to assess the adequate

8  assurance information.  Unlike most situations where you have a

9  sale hearing, you have an auction and then a sale hearing

10 usually a day after the auction.  So we do believe that this

11 provides adequate time.  But most importantly, the reason why

12 the schedule is the way it is is because at some point the cash

13 runs out.

14          THE COURT:  I understand.

15          MR. CARR:  Thank you.

16          THE COURT:  Anyone else?

17               (No audible response)

18          THE COURT:  Okay.  Yes, ma'am.

19          MS. MICHAELSON:  Your Honor, Ms. Lynch is correct --

20 Randy Michaelson for Tavistock Ventures Inc.  Ms. Lynch is

21 correct that Tavistock has agreed to move up the outside

22 closing date to July 9th.  I just wanted to flag for the Court

23 a concern that was raised this afternoon in hearing ABR's

24 counsel's comments about due diligence materials.  Tavistock

25 has been able to get all the materials promptly that it needed

1  from the debtor.  The debtor has been extremely cooperative.

2  The debtor has set up a virtual data room, provided materials

3  which enabled Tavistock to make its offer nearly a month ago.

4  Those same materials also enabled ABR to make an offer nearly a

5  month ago and to increase its bid just a week or so ago.

6          My concern is that we not be in a position down the

7  road in keeping with this schedule where ABR is going to show

8  up and say, Your Honor, we didn't get enough information in

9  order to compete fairly at the bidding.  And given where we've

10 been today I think that's a legitimate concern and I want to

11 make sure that the Court is aware that we are concerned about

12 it, we have every reason to believe that the debtor will

13 provide information as quickly as it can to ABR and we

14 encourage the debtor to do that.  But we do not want to be back

15 here on the 11th or the tenth or the ninth with ABR arguing

16 that there's not enough information for us to make a bid in any

17 form other than the two bids that we've already made.

18         THE COURT:  I understand.  All right, thank you.

19 Okay, here's what we're going to do.  There's, I think, a broad

20 consensus with respect to the bidding procedures and the

21 mechanics of the process, including the time line and for that

22 I express my appreciation to all of the parties for what I'm

23 confident was a pretty extensive negotiation.  There is a

24 modification in the terms of the breakup fee/expense

25 reimbursement.  It's been reduced to now $400,000, which is

1  well within any percentage range that this Court would

2  typically have approved and I'm prepared to approve it.

3       Mr. Rosenberg's been kind enough to not put me

4  through the hypothetical or philosophical discussion about

5  whether or not it's doable under O'Brien, but I'm confident it

6  would have been somehow, but I'm pleased to not have to go

7  there.

8       The mechanics of the sale process as they've been

9  described and negotiated between the parties are certainly

10 acceptable to the Court, particularly given the resolution and

11 agreement that's been achieved.  I'm satisfied that the time

12 line that's been identified, while it is tight, is nevertheless

13 consistent with what this Court has proved on other occasions

14 and is sufficient to afford an opportunity for active and

15 robust bidding, and I think the events of leading up to today

16 and today give me a measure of confidence that there is real

17 interest in the marketplace, hopefully beyond the two parties

18 that are here, but at a minimum they're at least two interested

19 parties and that makes for an auction.

20      Two points.  With respect to the sale process, the

21 solicitation process and the due diligence process, one of the

22 luxuries that we have in this court is experienced counsel,

23 professionals who know how to do cases and do sales.  And the

24 debtors don't need me to tell them that one of the ways that

25 they can make sure that they can move successfully through with

1  this case on the time line and game plan that they've

2  identified is to ensure that parties who want information have

3  information.  If there are issues with respect to the

4  sufficiency of the cooperation, I would hope and expect the

5  parties would be able to meet up and resolve those issues, but

6  if not, I'm available.  My practice, as I think most of you

7  know, is that I do not encourage motion practice when it

8  relates to discovery and I see due diligence as being basically

9  discovery process.

10       I would encourage you to get me on the phone, but I

11  will expect that the parties will have had substantial

12  negotiations beforehand.  And that applies not only to American

13  Blue Ribbon, but to any other party that shows interest and is

14  interested in coming in and conducting due diligence hopefully

15  with the interest of making a bid.

16       With respect to the issues that have been raised by

17  FIFA, all I can do is offer several observations.  The first is

18  that I have heard from the debtors with respect to the standing

19  issue and I make no finding with respect to standing.  I have

20  counsels' representations today that I will accept at face

21  value that there are a number of parties that they represent.

22  I'm not sure that that gives rise to standing or not, but

23  clearly the franchisees are a material constituency here.  They

24  have a seat on the official committee and I expect that they

25  will have a great deal of skin in the game when it comes to

1  this process.

2         But I don't believe I'm in a position to say that

3  open and robust access should be afforded to FIFA, to the due

4  diligence room or to potential bidders, which is sort of where

5  I see Mr. Zarco's comments going, because I simply don't know

6  enough right now.  But again, my initial observation to

7  debtors' counsel is, I think, consistent here which is that the

8  more information is broadly shared, the less likelihood there

9  is that the Court would be concerned that the context of a sale

10 hearing, with whether or not the process has been open and

11 fairly run.  So I will leave it at that, and again, I will

12 expect that the parties will have an opportunity to have

13 discussions and I know that we have litigation already on the

14 calendar with respect to Mr. Zarco's clients coming up in early

15 June, right?

16         MR. ZARCO:  June 2nd.

17         MS. LYNCH:  June 2nd.

18         MR. ZARCO:  Argument.

19         THE COURT:  June 2nd?  Okay.  But I believe that

20 subject to my observations, I'm satisfied that the debtors have

21 carried their burden under the wealth of Third Circuit law that

22 we have for approval of a bid procedures and bid protections,

23 however they're cast, and that the proposed time line and

24 mechanics that the debtor has identified are appropriate, are

25 warranted and I am prepared to approve them.

1          Do we need to revise the form of order and we'll look

2   for that under certification?

3          MS. LYNCH:  Yes, we do, Your Honor.  We'll submit

4   that under certification.

5          THE COURT:  Okay.  That sounds find.  I'll look for

6   that order.

7          MS. LYNCH:  Oh, Your Honor, may we have a hearing

8   date and time?

9          THE COURT:  Oh, yes.

10          MS. LYNCH:  And an objection deadline as well, Your

11  Honor, which we propose to be the same as the bid deadline of

12  June 14th?

13          THE COURT:  Okay.  We'll talk about the objection

14  deadline for a moment.  Let's go with June 22nd at 9:30 a.m.

15          MS. LYNCH:  Okay.

16          THE COURT:  With respect to the objection deadline,

17  obviously that date of the 14th is an objection deadline for

18  objections that are not predicated upon the identity of the

19  actual winning bidder and parties' rights are reserved to file

20  objections subsequent to the auction once everybody knows who

21  the winning bidder is.  But I think that the mechanics are such

22  that if there's parties that have either reservations of rights

23  or objections to the process overall, that frankly the process

24  that will benefit from objections, and if the 14th is the date

25  you want, I think that would be fine, especially when you're

1   going in then to the auction with knowledge that there are

2   parties that are objecting.  Usually those objections are cast

3   as you're trying to sell something you don't own or you can't

4   transfer my assets.  And again, it's helpful to go into the

5   auction process, I think, knowing that at least those parties

6   are out there.

7           MS. LYNCH:  We propose that all objections other than

8   objections to adequate assurance of a successful bidder other

9   than the stalking horse bidder be due on the 14th.  Any

10  objections to adequate assurance for a successful bidder other

11  than Tavistock, we're fine if parties have up until the sale

12  hearing to provide us with those objections.  But, you know, if

13  the Court would prefer to have the deadline be maybe the day

14  before to give Your Honor some time to review them.

15          THE COURT:  Yes, I'm certainly prepared to be

16  flexible about the process, but I think that both I and the

17  debtors need to know.  So I would say four p.m. on the 21st.

18          MS. LYNCH:  Okay.  Your Honor, one other date we need

19  fixed by the sale procedures order, and that's the deadline for

20  the debtors to serve the cure notice, which we propose to be no

21  later than this Friday, the 21st of June.

22          THE COURT:  Okay, that sounds fine.  The 21st of May.

23          MS. LYNCH:  Sorry.  That's what I meant.  Thank you.

24          THE COURT:  That's fine.  All right, I'll look for

25  that order under certification of counsel.

1           MS. LYNCH:  Thank you, Your Honor.

2           MR. ROSENBERG:  Your Honor, may I be excused?

3           THE COURT:  Certainly.  Actually, why don't we do

4  this.  We have the Spirit issue coming up in a moment, right?

5  Why don't we take a five-minute break and then we'll reconvene.

6  Stand in recess.

7                        (Recess)

8           THE COURT:  Please be seated.  Mr. Rosner?

9           MR. ROSNER:  Good afternoon, Your Honor.  Douglas

10  Rosner on behalf of the debtors and debtors in possession.  I'm

11  just losing my grip on the glass here.  Your Honor, the last

12  item on today's agenda is the motion to conditionally approve

13  or authorize the conditional assumption of the Spirit master

14  lease as amended.  Very quickly, Your Honor, and I know the

15  Court has read the papers, but very quickly, we're asking you

16  to approve a master lease that as of the petition date covered

17  22 locations, and as modified would cover seven locations plus

18  one that is subject to a sublease called Sandy, Utah, and that

19  sublease, the sub-lessor's interest in the sublease would be

20  assigned to Spirit, so it would become a direct lease between

21  Spirit and the Sandy, Utah tenant.

22           THE COURT:  Okay.

23           MR. ROSNER:  The Sandy, Utah tenant did not file an

24  objection just so the Court is aware.  So that's not an issue.

25           THE COURT:  Right.

1              MR. ROSNER:  The assumption and assignment of that

2      sublease.  The unsecured creditors committee has filed an

3      objection.  But before I get to that I just want to highlight

4      some of the other important pieces of this amendment.

5              It not only reduces the number of properties, it

6      reduces the rent from 3.25 approximately to 1.03 approximately,

7      it extends the term out, it deletes net worth covenants, it

8      also provides for consideration for those modifications and the

9      consideration included paying the April rent at the time of the

10     execution which, you know, admittedly as the committee pointed

11     out it was right on the -- well the deal was reached on the eve

12     in the wee hours of the morning before we filed and was

13     actually signed up the day but prior to the actual filing.

14             There was also a component to cure unpaid real estate

15     taxes and as Your Honor recalls that came up at the first day

16     hearing and has been deferred over to this hearing.

17             And then there's a lease modification fee.  And the

18     lease modification fee is an amount equal to $750,000 plus 50

19     percent of the, what is defined as transaction value, over 31

20     million.

21             And the 31 million isn't just some random made up

22     number and it is the number that we saw as the low end of what

23     a deal would look like without Spirit and then the value add of

24     doing a deal with Spirit over and above that.

25             Your Honor, today we're not asking you to decide

whether the debtor's interpretation of the law, the facts, and
how this Court would ultimately decide some very complicated
severability issues, we're not asking you to decide
severability today.

What we're asking you to do is to authorize the
conditional assumption of the master lease as amended.  And the
standard there is not whether one party would win over another
party, the standard there is reasonable business judgment.

Now the committee raises a number of objections and
one of their objections is this should be a settlement or treat
it as a settlement under 9019.

I mean we're not necessarily settling a claim, we're
amending a lease in order to facilitate the creation of value
as far as continued operations of the business.

It's not uncommon that debtors and landlords modify
leases as part of a restructuring or reorganization in order to
maximize value, reduce costs or for whatever other reason.

In this case it does both.  It reduces cost and
significantly increases value.

But whether you look at this as a conditional
assumption or look at this as a settlement, the standards are
generally the same and the Court doesn't have to decide again
whether we're right or wrong as far as whether we think we
could have litigated this from day one and won.

And the committee argued this in their objection that

1  if you treat this as a settlement there are certain factors

2  that have to be met and the relevant factors here are

3  probability of success, complexity which includes costs and

4  risks and the delay, and then the paramount interest of

5  creditors.

6           That's not that different than reasonable business

7  judgment because all three of those --

8           THE COURT:  There's an argument actually that in

9  fairness there's an argument that the 9019 standard is actually

10 lower than the 365 standard.  I mean there's no 365 case law

11 that says all you need to do is go to the lowest point on the

12 range of reasonableness and that's the phrase that always gets

13 quoted in these.

14          MR. ROSNER:  Right.  I understand that.

15          THE COURT:  So I mean while there are more factors

16 articulated, I think 9019 is really an exceedingly deferential

17 standard to the debtors.

18          MR. ROSNER:  Well within reasonable business

19 judgment.

20          THE COURT:  I don't know.

21          MR. ROSNER:  But it's sort of --

22          THE COURT:  We're all --

23          MR. ROSNER:  Yeah, it's a little bit of semantics in

24 a way.

25          THE COURT:  Yes.

1          MR. ROSNER:  Because what you'll hear today if we get

2     that far, you know, our proffer is that the senior management

3     considered all of the things that a Court would consider in

4     deciding whether this is a settlement that should be approved

5     in deciding whether to do this deal.

6          THE COURT:  Let me ask you though -- I know it's in

7     the papers but I want to make sure that I understand -- what is

8     the -- in response to the committee's objection, what is the

9     urgency I guess of needing to move forward today with a

10    conditional assumption where normally we would have this out

11    there as something that would be assumed and assigned in the

12    context of a sale motion.  So I want to make sure that I

13    understand precisely where we are with that.

14         MR. ROSNER:  Your Honor, the urgency is twofold.  One

15    is right in the amendment itself is it says that conditional

16    assumption must be approved by the bankruptcy court no later

17    than or within 30 days after the petition date.  So the 30 days

18    runs this Friday.

19         So what happens if that doesn't happen?  The

20    amendment goes on to say that in the event a condition is not

21    satisfied then they have the right to essentially declare a

22    termination event and there's a five day period.

23         This is a termination event we obviously could not

24    cure unilaterally if the Court doesn't approve today.

25         THE COURT:  Right.

1          MR. ROSNER:  So there would be this five day

2  termination event.

3          I will say that in response to the objection and the

4  request and the objection for additional time, Spirit did say

5  that they would reserve the right to declare that termination

6  event if it doesn't get approved within the 30 day period.

7          In addition the Court should understand that there

8  are a lot of moving pieces to this amendment and there is a lot

9  of quid pro quo and part of the quid pro quo was we did not --

10  the estate did not want to assume the master lease before a

11  closing of the sale where we were certain that it was going to

12  be assigned.

13          And I know the committee criticizes that decision,

14  but the conditional nature of the assumption is really for the

15  benefit of the estate.  And if anyone has a complaint about it

16  it's really the landlord because the landlord is getting

17  conditional assumption but, you know, what does the landlord

18  get from that because we could still go ahead later and reject

19  the lease if nobody wants it as modified.

20          So the quid pro quo for that was we would get

21  approval up front because the landlord would be receiving

22  reduced rent, reduced from what the landlord would have

23  received had we just litigated this from day one.

24          And the other important piece is that had we

25  litigated from day one without knowing the outcome, not only

1  would we be paying the higher rent but we would have a serious

2  risk of losing and then where would we be on the eve of a sale

3  having lost the litigation and they would be holding all the

4  cards?

5          And so to avoid that situation we needed -- the

6  uncertainly as we were going into the filing we needed to use

7  that as our leverage including our business leverage of

8  threatening to reject the entire lease.

9          And what's interesting is that the threat of

10 severability was less effective than the threat of rejecting

11 the entire lease because there there's a real business in

12 economic impact for both of us and we would have both shot

13 ourselves in the head and for no one's benefit.

14         So to answer your question as to why we need it done

15 today, it's to avoid a termination event, it's to satisfy what

16 we think are our contractual obligations in exchange for

17 getting the rent relief that we got right up front, and that

18 the debtors believe that this is a deal that's in the best

19 interest of the estate when compared with what -- on the

20 petition date what we saw as the alternative.

21         And as stated in the papers and we're prepared to

22 make proffers and everything else today, that the alternative

23 as of the petition date was possibly eliminating any

24 distribution of unsecured creditors because these seven stores,

25 as the proffers would show, are seven of the most profitable

1   locations as far as the corporate owned restaurant locations.

2          And so when you're looking at a could million dollars

3   of EBITDA walk out the door, multiply that by four or five,

4   you're talking real money and that money is the only money that

5   would be available for unsecured creditors.

6          The other piece that the Court should understand is

7   that the goal here at all times during the negotiations and

8   even today is to create an opportunity for a meaningful

9   dividend.

10          So as the Court heard today we have two interested

11   bidders.  We don't know if there will be more come auction

12   time, but this opportunity to create a dividend and receive a

13   dividend for unsecured creditors can only go up.

14          And so if the deal were not approved, then we have

15   the situation where we're going back down and we're starting at

16   zero again.  And it would take a lot to get to the point where

17   we're back at a 15, 20 percent dividend.

18          So in a nutshell those are the types of arguments

19   that we would make and we're prepared to proffer and I think --

20   I'm not sure whether you want me to go on with that or have --

21          THE COURT:  No.

22          MR. ROSNER:  Okay.

23          THE COURT:  I think I'd like to hear from the

24   committee and then we'll figure out how we'll proceed.  Mr.

25   Carr?

1        MR. CARR:  Thank you, Your Honor.  For the record Jim

2   Carr of Kelley, Drye & Warren on behalf of the committee.

3        Your Honor, I spent about ten hours looking into

4   Bankruptcy Code for conditional assumption.  I looked at 365,

5   read it several times, couldn't find it.  Went to other

6   sections of the Code, couldn't find it.

7        I finally did what a self-respecting attorney would

8   do is I called Mr. Rosner and I said, gee, I can't find this

9   concept of conditional assumption somewhere in the Bankruptcy

10  Code, can you help me out?

11       THE COURT:  It's a Delaware thing.

12       MR. CARR:  And he said I made it up and I said okay.

13       MR. ROSNER:  No, that is not what I said.

14       MR. CARR:  He used it in another case.

15       MR. ROSNER:  Your Honor, I said when I was at

16  Sonnenschein we did it in Central Hardware.  St. Louis.

17       MR. CARR:  Not in Delaware.

18       MR. ROSNER:  Not in Delaware.

19       THE COURT:  Venue was transferred.  Spirit, Central,

20  and Witty (phonetic).

21       MR. ROSNER:  Say that again?

22       THE COURT:  Venue in the Central Hardware case was

23  transferred.

24       MR. ROSNER:  Handy Andy, right?  I think that was

25  Handy Andy.  That was the Chapter 22 piece of it.  Not my

1  responsibility.  I was already at Goulston & Storrs.

2          THE COURT:  This has been quite the trip down memory

3  lane.

4          MR. ROSNER:  Yes, I know.

5          THE COURT:  Okay.  I apologize.

6          MR. CARR:  In any event we make several arguments.

7  One is that this is premature for today and I'll explain why.

8          We also argue that the issue of severability should

9  be addressed by Your Honor and addressed on an expedited basis.

10 That's another issue.

11         The final issue we raise is that a non debt apparent

12 of the debtors is getting released from an unconditional

13 guarantee and we're not sure why and it appears that no

14 consideration was provided for that guarantee.

15         And as I'm reading the motion everything made sense

16 in connection with the proposed amendment then all of a sudden

17 it's oh by the way we're going to release a non debt apparent

18 guarantee and we're not exactly sure why.

19         So those are the three concerns that we have in

20 connection with this motion.

21         THE COURT:  Well let's talk about the immediate issue

22 raised by Mr. Rosner and that was the question of timing and

23 the prospect that there will be a termination that gets called

24 and the consequences of the loss of whatever deal that's been

25 cut.

1          MR. CARR:  Yeah and that's a good question, Your

2     Honor, you said why now.

3          THE COURT:  Yes.

4          MR. CARR:  It's simple.  It's because the landlord

5     right now believes it has the leverage and it wanted it now so

6     they can do it very quickly without having any opposition.

7          Because what we believe as the committee when we

8     looked into this issue for the few hours that we had to look

9     into the issue, and we submitted I think a 28 or 32 page brief,

10    we believe that there are a number of problems with this

11    motion.

12         And if the landlord has the right to walk, which I

13    don't believe the landlord does.  You still have an executory

14    contract, okay, you still have a real property lease.  If the

15    debtor walks from this amendment, the debtor still has

16    obligations -- I'm sorry -- the landlord still has obligations

17    -- I'm always used to representing the landlord so I'm just by

18    habit saying the debtor -- the landlord still has obligations

19    under 365.

20         Debtor or the landlord can't walk away from those

21    obligations.  The landlord's still bound.

22         So we're saying, what we're really talking about

23    here, Your Honor, is we're saving perhaps the administrative

24    rent on what we call the removed properties.

25         THE COURT:  Right.

1          MR. CARR:  Those 15 properties that have been vacant

2  since prior to the petition date.  That rent, Your Honor, I

3  submit by the time we get to a resolution of the issue of

4  severability would be about $300,000, give or take a few

5  thousand dollars.          That pales in comparison to the

6  consideration being provided to Spirit.  That's why primarily

7  we don't need it now.

8          So let's talk for a second about premature.  We just

9  had today, Your Honor, an auction scheduled that has been

10  blessed by the Court.  We don't know yet what leases a

11  potential bidder wants or a potential bidder doesn't want.

12          I can tell you from talking to American Blue Ribbon

13  they haven't paid much attention to the remove leases, the 15

14  what they call the remove leases, they haven't paid that much

15  attention to the remaining seven leases.

16          The reason for that is they had to submit the exact

17  identical bid --

18          THE COURT:  Right.

19          MR. CARR:  -- that was submitted by Tavistock.  Now

20  that American Blue Ribbon has some opportunity to conduct due

21  diligence, you notice in the bids you have two numbers, you

22  have without --

23          THE COURT:  With and without.

24          MR. CARR:  -- and with.  That gap may be narrowed so

25  that it may make sense to the debtor if Your Honor doesn't find

1 that these leases are severable to reject given the

2 consideration that's being provided to Spirit.

3          Let's look at the consideration because it's

4 unconscionable.  I mean I had to read this several times to

5 make sure I understood the consideration that was being

6 provided.

7          A $750,000 payment as a lease modification fee.

8 Okay.  Maybe in and of itself that sounds reasonable to me.

9 But in addition you have an additional lease modification fee

10 equal to an uncapped 50 percent of the transactional value --

11 that's a defined term -- of the sale of the debtor's assets in

12 excess of $31 million.

13          Based on the American Blue Ribbon bid just on this

14 component alone Spirit gets $5 million and it could go up.

15          Assuming American Blue Ribbon is the highest and

16 otherwise best bid, that number could go up because it's

17 transactional value.  Transactional value under the proposed

18 amendment includes more than simply cash.  So I'm just looking

19 at a minimum number.

20          If we have spirited bidding, which I believe we will,

21 that $5 million is going to go up significantly.

22          You then have the third component, $571,000 to cover

23 alleged cure costs for rent in April and unpaid property taxes.

24 Notwithstanding the fact that the cure costs are going to some

25 of the stores that have been returned to the debtor -- to the

1  landlord.  I'll get it right eventually by the end of this

2  hearing.

3          THE COURT:  That's all right.

4          MR. CARR:  You also have all rights and title and

5  interest to the furniture, fixture, and equipment at the 14

6  properties being returned to Spirit being returned immediately.

7  Today.

8          There are a couple of things by the way that can't be

9  undone.  Once these payments are done if you look at the order,

10 we're done with this issue forever in this case.

11         For example we can't ever argue severability because

12 in the order once Your Honor -- if Your Honor signs the form of

13 the order that was presented to the Court, we can -- no one can

14 argue severability.  Period.  It's a done issue.

15         That payment can't be recovered even if someone turns

16 around and says we don't want any of the --

17         THE COURT:  Those sites.

18         MR. CARR:  -- Spirit leases.  You also have an

19 assignment of a sublease that the debtors entered into in 2005

20 with Casual Beef Concepts as the sublessee for property that's

21 located in Sandy, Utah.  That sublease and about $140,000 in

22 annual base rent is being given to Spirit.

23         You have a continued base rental obligation of about

24 $1 million, a little over $1 million to the assumed seven

25 remaining properties and also you have the ability to mitigate

1  damages and relet the 14 removed properties today if Your Honor

2  approves this.

3       So what's happening is you're going to have the

4  benefits of rejection and the benefits of assumption even

5  though we have this partial assumption happening today that

6  can't be looked at.

7       Why now?  Because the landlord has the leverage right

8  now, because the landlord said right now.  In fact, Your Honor,

9  if you look at the master lease, the debtor is not even

10 required or obligated to argue, he's not allowed to argue

11 severability.  Debtors gave up that right in the master lease.

12      Well you know what, Your Honor?  The committee didn't

13 give up that right and the committee is here today arguing that

14 this is inappropriate under 365.  First of all conceptually

15 there is no concept of conditional assumption.  I think in

16 reality what this is is this is really a settlement.

17      But if we proceed under 365 or if we proceed under

18 Bankruptcy Rule 9019, we want the opportunity to come in to

19 court and explain why it's not in the debtor's best business

20 judgment and/or why it's not in the best interest of the entire

21 estate.

22      And we set forth those reasons because we weren't

23 sure exactly what was going to happen today, but we set forth

24 those reasons in our papers and that was without having the

25 benefit of any discovery.  This was just information that we

1   obtained from the moment the committee was formed to the time

2   -- to the objection deadline in connection with this motion.

3        Some of the things -- so we have a bid process that's

4   being set up now.  What we're doing is we are not permitting

5   any bidders to make an informed decision on whether or not they

6   want all of the Spirit leases or properties or none of the

7   Spirit properties.  It's going to be done.

8        We also know that the benefits of assumption and the

9   benefits of rejection are being done today.  It's another

10  reason why not now.

11       And again I go back to Spirit's still obligated under

12  365.  Spirit can't and, you know, maybe Spirit will come in and

13  make a motion to vacate the automatic stay, but for right now

14  Spirit is obligated.

15       That's why, Your Honor, it's premature to decide --

16  to make this decision today.

17       Just a couple other points in connection with the

18  conditional assumption order.  As I indicated, the payments,

19  the $570,000 payment will be ratified today.  Within five days

20  of entry of the conditional assumption order the debtor is

21  going to pay approximately $300,000 in property taxes.

22       We don't even know if under 365(d)(3) in this

23  jurisdiction in light of the Montgomery Ward decision is that

24  appropriate now or not appropriate now?

25       We also believe that some of the property taxes

1 relate to properties that are on the removed properties.  Not

2 100 percent sure of that, but we believed the property taxes

3 relate to some of the removed properties.  Why would a debtor

4 pay property taxes for a lease that's going to be rejected and

5 returned and in fact was abandoned and returned, arguably

6 returned to the debtor pre-bankruptcy?  Makes no sense.

7        These are some of the reasons also why the business

8 judgment test is just not being satisfied in connection with

9 this motion.

10        So turning now also to the consideration that's being

11 provided to Spirit.  I tried to find out where did the 50

12 percent of the upside come from?  There's no rational basis.

13 It's not related to Spirit's potential damages or damage claim.

14        What it was, Your Honor, it was simply Spirit

15 believed it has the leverage and it utilized that leverage.  So

16 they in essence forced the debtor to say we want 50 percent

17 from 31 million to 40 million, okay, but now we also know that

18 the bid at least has gone up to 41 million.  That's where

19 Spirit gets the $5 million.

20        But then Spirit has the chutzpah to say we want 50

21 percent above that when in fact there are other assets that are

22 being bid out there.  It's not just the Spirit leases.  So

23 Spirit is saying all these other assets.

24        The bid above 41 million has nothing to do with these

25 other assets, it only has to do with the fact of the Spirit

1 leases.

2        Such a settlement is clearly unconscionable and

3 certainly doesn't satisfy the business judgment standard or in

4 the best interest of this estate.

5        So, you know, I don't -- unless Your Honor wants I

6 don't think I need to go through the objection and the

7 standards and the case law and the objection.

8        We set forth a significant number of cases but we

9 would like the following.  We would like an expedited hearing

10 on the issue of severability.  We would like the issue of

11 severability to be determined prior to the bid deadline so that

12 we have a clear message to send to the community which is

13 interested in bidding on these assets, what you can bid for,

14 what you can't bid for.

15        The way it's now set up at a minimum is we know that

16 two bidders have indicated a bid with the seven Spirit

17 properties and without the seven Spirit properties.  Maybe all

18 the other bidders follow along the same lines.

19        But what we'd also like to send a message to the

20 community is let's have this issue resolved.  We believe, Your

21 Honor, that the leases are in fact severable, we've argued this

22 issue before to other judges in this jurisdiction.

23        Notwithstanding Judge Walrath's decision in <u>Buffets</u>

24 <u>Holding</u> which I think is clearly -- is going to be clearly

25 distinguishable here, you have to look to state law is what

1  we've learned.  We believe Arizona law applies although it's

2  not 100 percent clear but we'll get clarity on that soon.

3         But almost like any other state law you look at the

4  contract itself, you look at the intent of the parties, and you

5  look at the actions.

6         A couple of facts that Spirit cannot undo and that is

7  certain properties that were comprised of the master lease,

8  they were already apportioned in the history of the

9  relationship of these parties.

10         You had leases, properties being taken out and being

11  sold to the debtors and then you had a reapportionment of the

12  quote annual base rent.

13         So you have history where these specific parties have

14  severed properties from the master lease, have continued the

15  relationship.

16         And we point out a number of other provisions in the

17  Spirit lease that argues or lends credibility to severability

18  and certainly there are some that don't.

19         This is a master lease.  The debtors don't have the

20  right to challenge that it's a master lease.  Annual base rent

21  shall be paid and we're not going to apportion among the

22  properties but you know what we can apportion because we've

23  already done it.

24         And interestingly the purchase price was such that it

25  was reduced and consistent with the reduction, consistent with

1 the purchase price the rent was reduced, the annual base rent

2 was reduced.

3      I think when you see the evidence it's going to be

4 clear that the intent of the parties and the conduct of the

5 parties is such that you can sever the Spirit lease.

6      Finally, Your Honor, in order to get there.  We have

7 discovery, informal discovery that's ready to go.  We would

8 like Your Honor's --

9      THE COURT:  Let me ask one question before we get to

10 that.

11      MR. CARR:  Yes.

12      THE COURT:  What I think I'm going to hear from Mr.

13 Rosner is, and probably from Mr. Austin as well, is that you're

14 rolling the dice or you're asking me to roll the dice on

15 whether or not they're going to terminate or walk.  And I know

16 we've got the 365 issue and what rights they may have in that

17 respect.

18      But I mean I think that's going to be the biggest

19 piece of his argument and my first question was why do we need

20 to deal with this now?

21      I mean I've read your objection and I do understand

22 the issues and I mean I'm obviously not prepared to conduct a

23 hearing on severability now.  But we've had a couple of them

24 before.

25      How do you respond to that?

1          MR. CARR:  How do I respond?  I'll ask a rhetorical

2    question in return.  What are we rolling the dice?  What are we

3    losing and what are we getting?

4          On the one hand what are we losing?  Probably

5    $300,000 of administrative rent.  Maybe the estate has to pay

6    administrative rent on the closed locations, okay, that's what

7    possibly we're losing.

8          Compare that to what we're losing, what the estate is

9    losing, what the unsecured creditors are losing.  And you

10   understand this is a thin margin case.

11         THE COURT:  I understand.

12         MR. CARR:  Unsecured creditors are getting anywhere

13   from zero to perhaps 15 percent distribution.

14         What we're losing, Your Honor, is also the ability --

15   for example $275,000 was paid on the eve of bankruptcy for

16   closed locations.  We're losing the right to recover, to void

17   and recover that payment.  So out of 300,000 we may be able to

18   get 270,000 back in connection with the preference payment.

19         But what we're also losing is if it's approved we're

20   losing a minimum of about $6 million of consideration when you

21   add it all up, the five million lease modification fee and all

22   the other components, we're losing $6 million on the one side

23   that otherwise would go to unsecured creditors as opposed to

24   $300,000 administrative expense.

25         And I don't want to give up the right to go after the

1 landlord for preference because ultimately if it's not approved

2 or it's rejected, we have rejection damage claims, we have

3 mitigation issues, we have claims issues, we have preference

4 issues, we have a number of issues that we can deal with and

5 address with the landlord if and when appropriate.

6      So I say take a look at those two factors.  I don't

7 think we're losing much if the landlord walks today.  In fact,

8 Your Honor, I would be shocked if the landlord walks today.

9 This is a tremendously sweet deal for the landlord.  Why?

10 Because the landlord right now has leverage.

11      What we're trying to do as a committee is to balance

12 the playing field.

13      THE COURT:  Okay.  I think I understand.

14      MR. CARR:  And just finally in connection with the

15 request is -- expedited hearing is that assuming the Court has

16 availability we'd like to have a hearing on that issue prior to

17 the bid deadline of the 14th of June and we'd also like

18 authority to send out expedited informal discovery requests

19 today.

20      And, you know, we submit, Your Honor, that it's not

21 an inconvenience because this was all done on an expedited

22 basis to begin with so we're not creating the exigency

23 circumstances that exist here.  We're working within those

24 circumstances.

25      And just finally is again the argument that makes no

1   sense in connection with this motion is Fuddruckers

2   International's release of the guarantee and at a minimum that

3   should be stayed for another day.

4           THE COURT:  Okay.

5           MR. CARR:  Thank you.

6           THE COURT:  Thank you.  Mr. Austin?

7           MR. AUSTIN:  Thank you, Your Honor.  For the record

8   I'm Jess Austin on behalf of Wells Fargo Capital Finance.

9           I think this Court asked a very focused question

10  which is what would this be lost and that I think the Court

11  made the reference, various analogies have been floating today,

12  is that the committee wants to roll the dice.

13          And from Wells Fargo's perspective it is not prepared

14  to finance effectively what we see as the committee's crap

15  shoot relative to its issues on the Spirit transaction.

16          The committee has spoken about Spirit having leverage

17  with this debtor and admittedly it did.  But I want to advise

18  the Court, and I think the debtor would make a proffer if we

19  got into evidentiary testimony presentation, that Wells Fargo's

20  willingness to finance this debtor, Wells Fargo's willingness

21  to provide the DIP loan to go through the sale process, was

22  strongly influenced by -- and the structure of the financing

23  was strongly influenced by the fact that the debtor was able to

24  negotiate a transaction with Spirit albeit it may well be

25  perceived to be rich, but it is a transaction which brought

1  value out of the box to this debtor that gave the clear

2  appearance of recovery to unsecured creditors, something which

3  I believe this Court is well familiar with.

4         And in most retail cases and most restaurant cases,

5  to come in with a 363 sale on the first day and to be able to

6  say we're going to be something more than we believe

7  administratively insolvent or to cover just the administrative

8  costs that we actually have a distribution to unsecureds is not

9  what one would say is the usual circumstances.

10        And Wells Fargo was strongly pushing that position

11 because but for a transaction ultimately with Spirit, I daresay

12 we were prepared at that point to simply present a bare bones

13 financing where Wells Fargo would have been a stalking horse

14 bidder itself.

15        What would be lost if this Spirit transaction is not

16 ultimately approved?  Well first off you lose $9 million.  The

17 difference between the gross purchase price offered by

18 Tavistock with the Spirit transaction at 40 and a transaction

19 gross purchase price without it, 31 million.  It's already set

20 that said, okay, if I've got the Spirit deal I'll bid this,

21 I'll bid A at 40, if I don't have the Spirit deal I'm bidding

22 at 31.  So out of the box you're losing $9 million.

23        You're losing the benefits of the deal itself which

24 are baked into the budget.  If you don't have the benefits that

25 Mr. Rosner outlined relative to reduced rent on other stores,

1  admittedly there's some payments that go out, but if you don't

2  have that benefit, we're going to have to rework the budget.

3          I can't tell you standing here today whether if

4  there's increased rent as we go through this litigation process

5  that the budget works.

6          And if we do go through the litigation process I

7  don't think the budget's going to work based on what's been

8  allocated relative to professional fees.

9          What will be lost?  Probable recovery to unsecured

10  creditors because the starting point is not 40, it's not 41

11  million, it's dropping back to 31 million.

12          So you've got to climb the hill again to even get up

13  to the point of whether or not there is going to ultimately be

14  recovery.

15          What's also finally lost is the support of Wells

16  Fargo for opening the financing through the process.  And this

17  may need to then say do we have to go back and review the fact

18  that our standing silent effectively on the keep was premised

19  on ultimately the overall package that's being presented?  Do

20  we need to go back and look at some of the other things that

21  have been -- certainly revisit the budget, we've got to tighten

22  it up.

23          The point on this, Your Honor, is I recognize some of

24  the issues that are being presented by the committee.  And when

25  you look at the fact you do indeed have a master lease and you

1  do indeed have all of these leases under that one master lease.

2         The fact that leases can move out because debtor

3  purchases them and what have you and you adjust the rent, that

4  may well be an indicia that you can sever but that certainly is

5  not going to be the be all and end all because I've seen plenty

6  of master leases.  I think there's been evidence that can be

7  presented that says properties change all the time.

8         But the point we really have here is that with this

9  package, and it basically came to this Court, it came to Wells

10 Fargo, it came to the creditor constituencies as a package, you

11 have a sale process with Tavistock being the leading bidder

12 that set its bid as saying I will pay $40 million if I have the

13 Spirit transaction which was being negotiated in tandem with

14 the APA pre-bankruptcy.

15        So we would certainly strongly support the debtor's

16 request today to make sure the benefits of the Tavistock --

17 excuse me -- the Spirit transaction is not lost, while this

18 committee would (indiscernible) like to go and say we may want

19 to do all these things, those things tend to cost a lot of

20 money and in the process we may ultimately have a lessor that

21 says I'm not going to play in that ball game.  I'm going to

22 take my properties and I'm going to go home because that's not

23 the deal I cut and you guys can then deal with all the other

24 properties at a reduced purchase price.

25        We certainly support the debtor's request to seek

1  approval as it's asked today.  Thank you.

2             THE COURT:  Okay.  Mr. Fallon?

3             MR. ROSNER:  Well I'll let you go first.

4             MR. FALLON:  Good afternoon, Your Honor.  Brett

5  Fallon from Spirit Master Funding, LLC.  I have with me today

6  Susan Freeman a partner at Louis & Roca.  We've moved her

7  admission pro hac vice.  Your Honor has entered the order.

8             THE COURT:  Very good.

9             MR. FALLON:  Thank you.

10            MS. FREEMAN:  Good afternoon, Your Honor.

11            THE COURT:  Ms. Freeman.

12            MS. FREEMAN:  Susan Freeman for Spirit.  We have a

13  master lease and it covers 22 properties.  And when the debtor

14  came to us pre-petition and asked us to restructure that lease

15  because it was talking to buyers and buyers only wanted seven

16  stores and it didn't want all 22 stores, bring us current and

17  we'll talk to you.

18            Bring us current and let's talk about sharing in some

19  of the upside that is brought into this estate by virtue of our

20  being willing to reduce this, to restructure this and we'll

21  talk to you.

22            And we did ultimately reach an agreement.  It was

23  signed within an hour of the bankruptcy petition filing.  It

24  was hard fought and a difficult negotiation.

25            We got a lot less than we had asked to in this and we

1 are significantly damaged in this regard.  Our loss of rent is

2 about two million, over $2 million, $2,078,000 a year in rent

3 and another $412,000 in property taxes that the debtor is right

4 now obligated to pay us and that's per year for the next seven

5 years.  That's $17.5 million.  You can apply cap rates and you

6 kind of come down and we figure we're at least in the $12

7 million range of actual damages.

8        Sure, we might be able to release these properties,

9 the Ohio properties, the ones that have been closed that the

10 debtor is continuing to pay rent on because it recognizes and

11 it has for many, many years that this is a single lease and

12 they've got to pay no matter whether they're operating or not.

13        They've been trying to sell those since June of 2007

14 and haven't found anybody willing to come in and take over and

15 operate those properties.

16        You know well maybe if we operate the properties,

17 maybe if we're able to find new tenants, you know, we're still

18 talking about damages that are in the $9 million range.

19        And so we know that we have actual and real damages

20 that are here.  And as a result we need to -- we did negotiate

21 hard, we wanted more, we wanted a higher amount of rent.  Well

22 this is the only amount that the buyers are willing to accept

23 going forward.

24        And then so we talked about sharing in the upside and

25 giving a flat dollar amount and how can we negotiate back and

1 forth and it did not start at 50 percent and we had higher

2 numbers up front and, you know, we ended up with this amount.

3      And now the committee is coming in and trying to

4 renegotiate it, you know, that's what committees do.  But this

5 is the debtor's business judgment.  It would be the debtor's

6 business judgment whether it's 9019 or whether it is this

7 today.

8      We asked for a cure before we went forward.  We ended

9 up not getting a complete cure because the taxes still haven't

10 been paid.  But that was part of our deal for even

11 renegotiating this at all.

12      We also agreed that if you go ahead and ask for

13 immediate decision on assumption and get the order within 30

14 days then we're not going to be getting the full rent on the

15 entire lease on an administrative basis that we would otherwise

16 be entitled to.

17      You know, yes, there's an ability to reject the

18 entire lease, but the quid pro quo of that is while you're

19 deciding whether to assume or reject we're entitled to a full

20 amount of rent on the entire lease going forward and that's

21 about $175,000 per month for those -- it's 273 per month for

22 all of the properties and even if you don't include part of it,

23 you're still talking about 175 or so and that's for May, June,

24 maybe July, maybe depending upon how long this thing lasts and

25 how long it takes to close.

1          The only way that the committee's analysis makes
2  sense is if you assume that in fact you can sever out this
3  lease and that they are able to reject only portions of it.  We
4  think that's just frankly not the case and certainly the
5  debtor's business judgment is to go forward and agree with us
6  that it takes a negotiation to get out of a portion of the
7  lease.

8          The debtor certainly hedged in the filing of its
9  papers, but we really believe that the case law is pretty
10 strong in this.  You certainly have the <u>Buffets Holdings</u> case
11 which is here in this Bankruptcy Court and it is right on point
12 and it deals with exactly this kind of a situation just two
13 years ago and the Court said, no, the parties' intent if you
14 look at this contract is not to have multiple contracts, but a
15 single contract.

16         And here we have a very clear intent that's spelled
17 out in Paragraph 3 of the lease.  In <u>Buffets</u> the Court said
18 even though the parties allocated the rent out in their
19 contract, it still is intended to be a single contract --

20         THE COURT:  Well --

21         MS. FREEMAN:  -- and here it wasn't allocated.

22         THE COURT:  -- well again I'm not conducting a
23 severability hearing here although I'm certainly familiar with
24 the <u>Buffets Holdings</u> case by Judge Walrath.

25         And one of the things I believe if I remember

1  correctly, and I haven't looked at it recently so you may be

2  ahead of me on this, but the lease structure there and master

3  lease structure was arranged really part and parcel of a fairly

4  complex and integrated financing structure.

5          So I mean I make no comment about whether that

6  applies here but I mean I've dealt with the <u>Buffets</u> question

7  before and, you know, if I have to I'll deal with it again.

8          MS. FREEMAN:  And this was a huge transaction, it was

9  22 stores that came in.  Well I guess originally it was 24.

10  There was a short term option period for an option to go ahead

11  and buy properties and two of them they were able to find

12  buyers for and able to buy them.

13          While the Court's familiar with <u>Buffets Holdings</u> you

14  may not be familiar with Arizona law and since the contract

15  provides for Arizona law to cover, let me point out that there

16  are four Arizona cases.

17          Three of them the Court found non-severable, only one

18  found severable.  And the point I would particularly make is in

19  the most recent case, the 2009 holding in <u>Moussa</u> (phonetic),

20  the Court -- our Court of Appeals set a very high standard

21  which was that the contract may only be severed if the contract

22  terms "clearly show the parties intended it to be severable."

23  The burden is really upon them to come forward.

24          THE COURT:  I understand.

25          MS. FREEMAN:  And the only case in which there was a

**J&J COURT TRANSCRIBERS, INC.**

1  severability found was where there was an -- there were

2  separate extension agreements of an initial contract and the

3  Court said those extension agreements supported separate times

4  and for completely separate amounts could be severed out.

5          So I mean I can go through our lease --

6          THE COURT:  No.

7          MS. FREEMAN:  -- the provisions back it up.

8          THE COURT:  No.  And this is sort of all by way of

9  opening.

10          MS. FREEMAN:  Sure.

11          THE COURT:  But I think I understand your position.

12          MS. FREEMAN:  Okay.

13          THE COURT:  Thank you.  Mr. Fournier?

14          MR. FOURNIER:  Good afternoon, Your Honor.  David

15  Fournier on behalf of Fuddruckers International, the non-debtor

16  parent referenced earlier.

17          Your Honor, with respect to the guarantee I think

18  that this is probably the first time I've heard a creditors

19  committee stand up and argue for a deal to be modified to

20  increase the unsecured debt that the company would be left

21  with.

22          Your Honor, I suspect that what you're going to hear

23  from the debtor is that their rationale for eliminating the

24  guarantee is to eliminate the possibility of their existing

25  through the back door what they are trying to eliminate through

1  the front door which is the 502(b)(6) claim.

2          The landlord Fuddruckers International as a guarantor

3  is just that, it's not the primary obligor.  And I suspect the

4  debtor is trying to eliminate the possibility for a subrogation

5  claim which would exist if we were pursued for payment to that

6  claim and ultimately we were to pay it.

7          In all events, Your Honor, I would simply want to

8  note for the record that Fuddruckers International's

9  willingness to sign on to the sixth amendment was predicated on

10 the existence of the release of guarantee provisions and if the

11 deal were modified to eliminate those provisions that would be

12 an alternate amendment if you will that our client has not

13 consented to.

14          THE COURT:  Okay.

15          MR. FOURNIER:  Thank you.

16          THE COURT:  Mr. Rosner, briefly.

17          MR. ROSNER:  So you've heard --

18          THE COURT:  -- a lot.

19          MR. ROSNER:  I guess -- a lot -- on your question of

20 whether we should go forward today and there's a lot more

21 because I think we need to proffer.

22          But just so the Court understands one thing and it's

23 been raised by the committee, it's been raised by the lender.

24 I mean maybe this hurts my argument to go forward today but I

25 don't think so.

1          And that is -- I mean this is as I said before there

2     are a lot of moving pieces in this amendment and we gave up a

3     lot, we got a lot.

4          We're not, as with any negotiation, everyone didn't

5     come out all happy.  We came out with something that gave the

6     creditors an opportunity to recover something right off the

7     bat.

8          But one of the things we didn't give up is that if

9     there is a termination event we did not give up the fact that

10    we would have to revert back to full rent.  That's something we

11    fought hard on because of administrative solvency concerns and

12    because at the time and even now there's not a huge amount of

13    headroom, you know, as far as our DIP financing.

14         So but so the real question here is if we don't go

15    forward today and get this approved is whether the whole deal

16    that gives the unsecured creditors an opportunity to get a

17    meaningful dividend that will grow through the sale process

18    goes away because what will happen is if a termination event is

19    triggered then -- and the committee is not successful with

20    respect to severability then we have nothing to sell.

21         And so we're back to -- we're going to have a

22    situation where we're selling 31 locations -- I'm mean I'm

23    sorry -- we're selling for 31 million or $32 million and we're

24    borderline administratively solvent or insolvent depending on

25    how much in litigation fees and attorneys and professionals are

1  used up in this case on a lot of various issues.

2          And it's not a successful outcome which, you know,

3  which the debtors teed up on day one.  So that's what's at

4  issue here and it's a lot and we're paying a lot for it.

5          I mean I'm not going to deny that this is -- there's

6  significant consideration being paid to modify a master lease

7  where we concluded, where the debtors concluded there was a

8  sufficient uncertainty as to severability that it wasn't worth

9  rolling the dice.

10          And so and again we're prepared today with proffers,

11 we're prepared with witnesses, we're prepared with the numbers

12 to demonstrate to the Court that there is a real benefit to

13 approving this deal even though there's a real cost too.

14          But, you know, at the same time, you know, I mean

15 that -- so that goes to I think your focus question.

16          THE COURT:  It does.  No, I think I've heard enough.

17 Here's what I want to do.  First, there is a threshold question

18 or issue or concern that's raised by the committee and frankly

19 that I raised perhaps at the beginning of this exercise about

20 procedurally where we are and Mr. Carr was a little bit flip

21 about whether or not the concept of a contingent assumption or

22 a conditional assumption is in the Code.

23          I mean I don't fault the debtor for -- but it looks

24 to me like a settlement.  But I'm also not going to stand on

25 ceremony or allow procedure to subvert the sustenance.

1          What the debtor wants to do I think is certainly

2    disclosed in the motion, whether I call it a settlement or a

3    conditional assumption, there are a bunch of different pieces

4    to it.

5          There's been no secret in this case about the

6    significance of the relationship with Spirit and so I think I

7    understand the transaction.

8          I am today not prepared to roll the dice that the

9    debtor has asked.  And what I have is I'm actually going to

10   adjourn this hearing to Friday morning and I'm doing that for a

11   couple of reasons and I'll share them with you.

12         It may be that this is a fool's errand and if so then

13   it's my fault.  But I think I understand the deal.  I've had an

14   opportunity last night frankly to read the committee opposition

15   and I've gone back and looked at the deal to make sure that I

16   understand it.

17         But the committee has raised concerns about basically

18   whether or not they've had an ample opportunity to get their

19   arms around this transaction.  They've asked to conduct

20   discovery, there's severability.  I'm not conducting a

21   severability hearing on Friday in case anybody is wondering.

22   All right.

23         This hearing on your motion is being adjourned to

24   Friday, okay?  If I am satisfied with the committee's

25   objection, then on Friday it may be that I deny the motion and,

1   you know, I'll schedule a severability hearing.  That question

2   would have to get answered.  If I'm satisfied that the debtors

3   have carried their burden then the motion may be approved.

4            But I'm not in a position I think today to answer

5   that as I said because of at least some of the scheduling

6   issues that I have.

7            The second thing is this and it's a sensitivity that

8   I have to the position of the committee and frankly to I think

9   all parties.

10           This has been a significant day in the very short

11  life of this case.  Okay.  You've got bid procedures.  We know

12  where we're going and we know who we're going with and we've

13  got an idea of the way that that process will play itself out.

14           I'm under no illusions of where the debtor's or I'm

15  sorry the committee's attentions have been focused leading up

16  to this.

17           The DIP financing and cash collateral issues have

18  been successfully negotiated and resolved and for that I

19  commend the parties.

20           And I know that they've submitted a substantial

21  objection on this issue and I have not been on all of the calls

22  but I got to think that it was the financing and the bid

23  procedures were the two first priorities.

24           I mean and I know that they were also working on

25  this, I've seen the work product.  But you know where you are

1  right now and I'm going to give you four more days to

2  essentially try to convince the committee of the rightness of

3  your position.

4         Because there's really two things and I -- that's a

5  little bit flip, but really when I look at the committee

6  objection and listen to Mr. Carr he doesn't buy it.  He doesn't

7  think you've cut a good deal and he's more than welcome, and

8  the committee is more than welcome to continue to prosecute

9  that objection on Friday.

10         Or in the context of the overall case knowing where

11  you stand right now, knowing where you are with your financing

12  and with the schedule for the time line of the sale process, it

13  may be that the committee can get its arms around it or at

14  least that some of the issues may be streamlined.

15         In addition the committee's asked for some

16  information and I would hope that they'd be able to get --

17  again it's not a severability fight, but I would hope that

18  they'd be able to get some of the information.

19         There's been some back and forth about information.

20  I make no comment about that today but and I know you folks

21  have your hands full.

22         But that's why I want to adjourn it today.  And I

23  believe and I'm going to ask Spirit to confirm my

24  understanding, but I believe that there will not be violence

25  done then to the debtor's options or optionality, if that's a

1  word, if we manage to deal with this issue by Friday.

2         That doesn't mean necessarily that I fully accepted

3  the proposition that it's got to happen by Friday.  I think I

4  understand the committee's position today on that issue and

5  we'll deal with it.

6         But I would like to know that there will not be as a

7  result of my bouncing this from today to Friday a termination

8  that would preclude me from considering the proposed

9  conditional assumption or a settlement on the merits.  Ms.

10  Freeman?

11         MS. FREEMAN:  Your Honor, we're not allowed to assert

12  a termination event unless the order is not entered by Friday

13  so having a hearing on Friday morning is fine.  There's no way

14  under this document that we would be able to do something.

15         I can also say however that we've received no

16  informal or formal discovery requests as something as wanted as

17  Spirit --

18         THE COURT:  I would give them your card.  Okay.  But

19  that's the main reason that I want to adjourn this is because

20  I'm hopeful the parties' schedules will permit them to do this

21  on Friday.

22         And the main concern that I have is looking at this

23  that I'm not certain, and no one's raised this directly, but

24  I'm not certain that the committee has had a full opportunity

25  to really put this front and center.  They've had a lot on

1 their plate from the moment of their appointment and, you know,

2 this is where we are now.

3         But I think that that's where I'd like to leave this

4 and again I would invite the parties if there's a question

5 about the mechanics of getting up to Friday, then you should

6 feel free to get me on the phone in advance of that.

7         But otherwise what I'd like to do is again move the

8 hearing on your motion to Friday, all right?

9         MR. ROSNER:  I'm not going to quarrel with that, Your

10 Honor.

11         THE COURT:  Okay.

12         MR. ROSNER:  Thank you.

13         UNIDENTIFIED SPEAKER:  What time, Your Honor?

14         THE COURT:  Oh, can we do 9:15?  I realize that's

15 early but I've got things scheduled throughout that day.

16         MR. ROSNER:  That's fine, Your Honor.

17         THE COURT:  Okay.

18         MR. ROSNER:  Could I just check with our witnesses?

19         THE COURT:  Yes.

20         MR. ROSNER:  Thank you.  Your Honor, Friday 9:15 is

21 fine.

22         THE COURT:  Okay.  One last point speaking of

23 witnesses.  I would ask as a courtesy, this is something I

24 don't often ask, but I'd ask the parties to coordinate as best

25 they can so that there is a consensus about if we're going

1 forward with witnesses on a contested basis that you know who

2 they are because if there is somebody that is not -- doesn't

3 need to come, I don't want them to have to come.

4        So again I just ask that the lines of communication

5 remain open and we'll try to manage that process.

6        MR. ROSNER:  Thank you, Your Honor.

7        THE COURT:  All right.  Mr. Rosner, do we have

8 anything further today?  I think I've got at least --

9        MR. ROSNER:  I think we actually got through 17 of

10 17.

11        THE COURT:  Okay.  And then I think I still have one

12 order coming over on your certification, right?  Is it two?

13        UNIDENTIFIED SPEAKER:  Yes, the bid proceedings

14 order.

15        THE COURT:  All right.  I'll look for both of them.

16        MR. ROSNER:  To Sitrick and bid procedures, Your

17 Honor.

18        THE COURT:  All right.  I'll look for both of those

19 under certification.  We'll stand in recess.  Thank you very

20 much counsel.

21

22                    *  *  *  *  *

23

24

25

144

**C E R T I F I C A T I O N**

1

2       We, KATHLEEN BETZ, AMY L. RENTNER, RITA BERGEN, and

3  JANET D. PERSONS, court approved transcribers, certify that the

4  foregoing is a correct transcript from the official electronic

5  sound recording of the proceedings in the above-entitled

6  matter, and to the best of our ability.

7

8  /s/ Kathleen Betz

9  KATHLEEN BETZ

10

11  /s/ Amy L. Rentner

12  AMY L. RENTNER

13

14  /s/ Rita Bergen

15  RITA BERGEN

16

17  /s/ Janet D. Persons

18  JANET D. PERSONS

19

20  J&J COURT TRANSCRIBERS, INC.          DATE:  May 19, 2010

21

22

23

24

25