UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .
IN RE:                        .        Chapter 11
                              .
Magic Brands, LLC, et al.,    .
                              .
                              .
     Debtors.                 .    Bankruptcy #10-11310 (BLS)
```
.......................................................

Wilmington, DE
June 22, 2010
9:30 a.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For The Debtors:                Daniel DeFranceschi, Esq.
                                Richards Layton & Finger, PA
                                One Rodney Square
                                920 North King St.
                                Wilmington, DE, 19801

                                Douglas Rosner, Esq.
                                Goulston & Storrs, P.C.
                                400 Atlantic Ave.
                                Boston, MA 02110

                                Christine Lynch, Esq.
                                Goulston & Storrs, P.C.
                                400 Atlantic Ave.
                                Boston, MA 02110

                                Peter Bilowz, Esq.
                                Goulston & Storrs, P.C.
                                400 Atlantic Ave.
                                Boston, MA 02110

2

```
For the Official Committee:     Eric Wilson, Esq.
of Unsecured Creditors          Kelley Drye & Warren, LLP
                                101 Park Ave.
                                New York, NY 10178

                                Dana Kane, Esq.
                                Kelley Drye & Warren, LLP
                                101 Park Ave.
                                New York, NY 10178

                                Domenic Pacitti, Esq.
                                Klehr Harrison Harvey
                                Branzburg, LLP
                                919 Market St.-Ste. 1000
                                Wilmington, DE 19801

For Franchisees:                Kevin G. Collins, Esq.
                                Bifferato, LLC
                                800 N. King St.
                                Wilmington, DE 19899

                                Robert Zarco, Esq.
                                Zarco Einhorn Salkowski
                                & Brito, P.A.
                                100 S.E. 2nd St., 27th Fl.
                                Miami, FL 33131

                                Robert Einhorn, Esq.
                                Zarco Einhorn Salkowski
                                & Brito, P.A.
                                100 S.E. 2nd St., 27th Fl.
                                Miami, FL 33131

For Wells Fargo Capital:        Leslie Plaskon, Esq.
Management                      Paul Hastings Janofsky
                                & Walker, LLP
                                Park Ave. Tower
                                75 E. 55th St.-1st Fl.
                                New York, NY 10022

                                Richard Riley, Esq.
                                Duane Morris, LLP
                                1100 N. Market St.-Ste. 1200
                                Wilmington, DE 19801
```

```
For Westfield, LLC &:          Patricia P. McGonigle, Esq.
Mission Valley Shopping        Seitz Van Ogtrop & Green
                               222 Delaware Ave.
                               Wilmington, DE 19801

For Tavistock Ventures, LLC:   Randy Michelson, Esq.
                               Michelson Law Group
                               150 Spear St.-Ste. 1600
                               San Francisco, CA

                               Bruce Grohsgal, Esq.
                               Pachulski Stang Ziehl & Jones
                               919 N. Market st.-17th Fl.
                               Wilmington, DE 19899

For The U.S. Food Service:     Mark Minuti, Esq.
                               Saul Ewing, LLP
                               222 Delaware Ave.-Ste. 1200
                               Wilmington, DE 19801

For Microsoft:                 Jamie B. Nimeroff, Esq.
                               Brown Stone Nimeroff, LLC
                               1818 Market St.-Ste. 2300
                               Philadelphia, PA

For RTI:                       Kathy Miller, Esq.
                               Smith Katzenstein & Furlow
                               The Corporate Plaza
                               800 Delaware Ave.
                               Wilmington, DE 19899

For The Macerich Company &:    Leslie C. Heilman, Esq.
Cousins Properties, Inc.       Ballard Spahr, LLP
                               919 N. Market St.-12 th Fl.
                               Wilmington, DE 19801

For                            Theodore J. Tacconelli, Esq.
                               Ferry Joseph & Pearce, PA
                               824 Market St.-Ste. 1000
                               Wilmington, DE 19899

For Spirit Funding:            Brett D. Fallon, Esq.
                               Morris James, LLP
                               500 Delaware Ave.-Ste. 1500
                               Wilmington, DE 19801
```

For Luby's, Inc.:                    Ann Cordo, Esq.
                                     Morris Nichols Arsht & Tunnell
                                     1201 N. Market St.-18th Fl.
                                     Wilmington, DE 19899

                                     Gregory Werkheiser, Esq.
                                     Morris Nichols Arsht & Tunnell
                                     1201 N. Market St.-18th Fl.
                                     Wilmington, DE 19899

(Via Telephone)

For The City of Grapevine:           Eboney Cobb, Esq.
                                     Perdue Brandon Fielder Collins
                                     & Mott, LLP
                                     4025 Woodland Park Blvd.
                                     Ste. 300
                                     Arlington, TX 76013

For Westfield, LLC and               Niclas A. Ferland, Esq.
Mission Valley Shoppingtown           LeClairRyan, LLP
                                     545 Long Wharf Dr., 9th Fl.
                                     New Haven, CT 06514

For County of Williamson:            Peter Michael Reed, Esq.
                                     McCreary Veselka Bragg
                                     & Allen, P.C.
                                     700 Jeffrey Way-Ste. 100
                                     Round Rock, TX 78665

Audio Operator:                      Theresa Pullan

Transcribing Firm:                   Writer's Cramp, Inc.
                                     6 Norton Rd.
                                     Monmouth Jct., NJ 08852
                                     732-329-0191

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

5

## Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Debtor:** | | | | | |
| Mr. Gray | 45 | 66 | 84 | 86 | 87 |
| Mr. Stevenson | 89 | 99 | 102 | 103 | |

**MOTIONS:**

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| D-1 | Luby's Opening Bid | 52 | 68 |
| D-2 | Bid For Minnesota Sites | 52 | 68 |
| D-3 | Credit Facility Commitment | 55 | 68 |
| D-4 | Not Identified | 94 | |

THE COURT: Finding

1            THE CLERK:  All rise.

2            THE COURT:  Please be seated.  Good morning, Guys.

3      (Laughter)

4            MR. DEFRANCESCHI:  Let's make a deal, Judge.

5            THE COURT:  I'm okay with that.  Ms. --

6            MS. LEACH:  Good morning, Your Honor.  Your Honor,

7   we're here before you today requesting approval of the sale of

8   substantially all of the Debtors' assets to Luby's, Inc., free

9   and clear of liens, claims, interests and encumbrances.  Luby's

10  was the winning bidder at an auction which took place last

11  Thursday, June 17th at Richards, Layton's office, pursuant to

12  the Bidding Procedures Order entered by this Court on May 18th,

13  2010.  There were three qualified bidders who participated in

14  the auction, Tavistock Ventures, Fidelity National Holdings,

15  LLC, and Luby's, Inc.

16        Your Honor, the auction was an unbelievable success.  It

17  yielded substantially more than anyone anticipated.  We're

18  pleased to report that Luby's' bid, if consummated, is

19  projected to pay Unsecured Creditors as much a 100 cents on the

20  dollar.  This is an incredible result, given that the projected

21  dividend resulting from Tavistock's stalking horse bid was

22  projected to be around 15 cents on the dollar.

23            THE COURT:  I recall.

24            MS. LEACH:  So Your Honor, just a lit bit of color,

25  the bidding at the auction began with an opening bid of Luby's

1    of 42.6 million, with 200,000 of what we're calling contingent

2    consideration, which I'll explain later.  And it ended nine

3    hours later with Luby's being declared the highest and best

4    bidder, with a bid of 61 million, plus an additional 2.45

5    million if it does not take assignment of the Debtors' contract

6    with Pepsi and 200,00 of contingent consideration, payable in

7    the event the Debtors are able to deliver two locations in

8    Minnesota currently operated by an entity owned by Mr. Ralph

9    Flannery.

10          THE COURT:  Okay.

11          MS. LEACH:  So without getting into too much detail,

12   I'll mention a couple of key provisions of the Asset Purchase

13   Agreement, included -- which, by the way, is not yet final.

14          THE COURT:  Okay.

15          MS. LEACH:  Included among the assets being sold are

16   the Fuddruckers and Koo Koo Roo brands, the Debtors' owned real

17   estate, rights under leases and contracts, and furniture,

18   fixtures and equipment.  Luby's has agreed to offer employment

19   to substantially all restaurant level employees for locations

20   being acquired.  As mentioned, as part of the consideration for

21   the sale, in the even that Luby's does not assume the Pepsi

22   contract at the closing, Luby's must pay the estate 2.45

23   million.  Luby's will take assignment of a minimum of -- we

24   think it's 28 leases, but we're still working out the details

25   on that.

1        And regarding the Minnesota locations, the Debtors have

2   agreed to prosecute the action to evict the Flannery entity

3   from the two Minnesota locations under the reasonable direction

4   of Luby's.  Luby's agrees to cooperate in the litigation,

5   including making available documents and employees as needed.

6   They will also reimburse the Debtor for attorneys fees and

7   related litigation expenses and for any obligations incurred by

8   the Debtors under the Minnesota leases.  If the Debtors are

9   able to obtain possession of the Minnesota locations, Luby's

10  must pay the estate $200,000 and will have the right to

11  designate the assignee of the Minnesota leases, which could

12  include Luby's itself or a third party, until the expiration of

13  the Debtors' Section 365(d)(4) period.

14       Your Honor, Tavistock had the second highest bid, valued

15  by the Debtors and the Committee at 61,550,000.  Pursuant to

16  the terms of the bid procedures, Tavistock's offer remains open

17  until the earlier of the closing with Luby's and 60 days after

18  the entry of the Sale Order.  So in the event the Debtors do

19  not close with Luby's within 60 days after entry of the Sale

20  Order, Tavistock must close with the Debtors on the terms and

21  conditions in the stalking horse Asset Purchase Agreement with

22  such modifications as the parties agreed to at the auction.  We

23  also know that -- note that pursuant to the Bid Procedures

24  Order, following a closing of Luby's, Tavistock will receive

25  $400,000 as a breakup fee and expense reimbursement.

```
 1        Your Honor, a few more details.  Prior to the auction,
 2   Luby's posted a non-refundable deposit of 4,320,000 and appears
 3   ready and willing to close the transaction.  We note that the
 4   transaction value potentially triggers the requirement to file
 5   disclosures under Hart-Scott-Rodino, and to accommodate that
 6   possibility, which we never expected in a million years, Your
 7   Honor, but the threshold is --
 8        THE COURT:  This actually triggers an HSR issue?
 9        MS. LEACH:  It's possible, because the threshold
10   under HSR is 63.4, I believe, and the full value of the
11   consideration, which would be paid if Luby's not does not take
12   assignment of the contract, is 63.45, so, yes.
13        (Laughter)
14        MS. LEACH:  I note for the record the Judge is
15   raising his eyebrows.  Yes, I know, we just slid right under
16   it, so there's the possibility we need to do that filing.  And
17   at this point, we would have a hard deadline to do that filing
18   of next Wednesday, I believe.  And -- next Wednesday?
19        UNIDENTIFIED SPEAKER:  June 30th, I believe, was the
20   date.
21        MS. LEACH:  And then we would -- that would start the
22   15 day waiting period under the Bankruptcy Code.  So to
23   accommodate this possibility, the parties have agreed to close
24   on July 26th, and consequently, Wells Fargo has agreed to
25   extend the DIP milestone for the sale closing from July 9th to
```

1  July 26th.

2      As the Court is aware, both Wells Fargo and the Creditors

3  Committee have been intimately involved in the sale process,

4  consulted at every step along the way, and support the approval

5  of the sale to Luby's.  So -- and Your Honor, the vigorous

6  bidding at the auction, which we had multiple rounds of bidding

7  over the nine hours, as you might imagine, demonstrates that

8  Luby's is a good faith purchaser entitled to the protections of

9  Section 363(m) and the proposed order will include such a

10  finding.  Mr. Werkheiser, who represents Luby's, will also be

11  making a proffer in good faith at the appropriate time.  So

12  Your Honor --

13          THE COURT:  Why don't we talk about the objections

14  then, for a moment?

15          MS. LEACH:  Yep.  So Your Honor, I'm going to address

16  a couple of objections and then will hand it off to my

17  colleagues.  Should we talk about Tavistock's objection?

18          THE COURT:  We might.

19          MS. LEACH:  Which came in at the eleventh hour, I

20  note.

21          THE COURT:  I've reviewed it.

22          MS. LEACH:  So Tavistock appears to raise two points;

23  one, they question whether Luby's was a qualified bidder under

24  the bid procedures, and two, they insinuate that -- {clears

25  throat} excuse me -- a conversation between a representative of

1   Luby's and a representation of Fidelity National, which was

2   within the view other attendees at the auction, somehow tainted

3   the process.

4       So to respond to the first point, Your Honor, whether

5   Luby's was a qualified bidder, Your Honor, on June 14th, which

6   was the bid deadline, we received Luby's' bid on time in

7   compliance with the bid procedures.  We reviewed the

8   documentation that they submitted that demonstrated that they

9   would have the financial wherewithal to consummate a

10  transaction at their bid number, and their information that

11  would demonstrate they could provide adequate assurance of

12  future performance under contracts and leases.  We consulted

13  with the Committee and Wells Fargo and collectively determined

14  that the bid was a qualified bid.  So we've advised Tavistock

15  as much, and the bid procedures are clear, Your Honor.  The

16  Debtors, in consultation with the Committee and the lender,

17  determine whether a bid satisfies the requirements to be a

18  qualified bid under the bid procedures.

19      Secondly, the conversation that apparently transpired

20  between two bidders, Your Honor, at the beginning of the

21  auction, I did announce the rules of the auction, one of which

22  was bidders were not allowed to communicate with one another.

23  I understand, and you'll hear more about this, that this

24  conversation was along the lines of pleasantries:  We're done,

25  congratulations, good luck.  Nothing more than that.  So I have

1  no other information than that.,  And it's important to note

2  that during the auction, Tavistock never once raised an

3  objection.  They never objected that the Luby's bid was not a

4  qualified bid, they never brought to my attention or said on

5  the record that they were concerned about a conversation

6  between two bidders.  They just sat there and continued to bid.

7  So I understand that they're disappointed, they were really

8  looking forward to acquiring the company, but they weren't the

9  prevailing bidder at the auction.

10         THE COURT:  All right, let's talk about some of the

11 other objections.  And the objectors will all have an

12 opportunity, I just need to understand the status of the issues

13 that are pending before me today.

14         MS. LEACH:  Sure.  So --

15         MR. ROSNER:  (Indiscern.).

16         MS. LEACH:  Yeah.  Mr. Rosner is going to address the

17 franchisee objection, Your Honor.

18         THE COURT:  Okay.  Mr. Rosner?

19         MR. ROSNER:  Your Honor, Douglas Rosner for the

20 Debtors and Debtors-In-Possession.  In conversations before the

21 hearing with Mr. Zarco, the franchisees filed what essentially

22 are two objections; there's a cure objection, there's an

23 adequate assurance objection.

24         THE COURT:  Right.

25         MR. ROSNER:  The estate, with the consent of the

1   Committee, has agreed to reserve 2.75 million in what we feel

2   is the unlikely event -- obviously Mr. Zarco might feel

3   differently -- that the franchisees would be successful in

4   prosecuting the cure objection, the 2.75 --

5          THE COURT:  That's the issue or is that -- is that

6   separate from the Pepsi issue?

7          MR. ROSNER:  It's part of the Pepsi --

8          THE COURT:  Okay.

9          MR. ROSNER:   The cure objection is a Pepsi marketing

10  fund --

11         THE COURT:  Right, okay, I've read the objection, I

12  just wanted to make sure I understood (indiscern.).  Mr. Zarco,

13  good morning.

14         MR. ROSNER:  The -- all parties obviously reserve all

15  of their rights, all of their objections, all of their claims,

16  everything else, and the reserve amount does not reflect an

17  admission on the part of the estate as to liability.  We do

18  need to discuss a schedule as far as discovery schedule and

19  evidentiary hearing schedule, so maybe during -- if there's a

20  short break we can have that discussion and --

21         THE COURT:  Sure.

22         MR. ROSNER:  -- and ask the Court, you know, what

23  dates might work for the Court.

24         THE COURT:  Okay.

25         MR. ROSNER:  And then as far as the adequate

1    assurance objection, it's my understanding that they no longer

2    oppose the sale.

3              THE COURT:  Mr. Zarco, good morning.

4              MR. ZARCO:  Good morning, Your Honor.  I will be very

5    brief today.  The franchisee group withdraws all of its

6    objections with regard to the adequate assurance concerns, and

7    we approve whole-heartedly the sale to Luby's.

8              THE COURT:  Very good.

9              MR. ZARCO:  (Indiscern.).

10             UNIDENTIFIED SPEAKER:  It was a little over four

11   minutes, but that's --

12             MR. ZARCO:  And it might be the first time I'll ever

13   hear those words, so I will be ordering the transcript.

14             THE COURT:  Frame it.

15             MR. ZARCO:  I just want to make sure, for the record,

16   that 2.75 is a global number that will include the Pepsi issue,

17   the advertising issue, so that if for some reason the Pepsi

18   issue comes in a little shorter but the advertising is more,

19   it's a global pool of money for all of the claims.  I just want

20   to make sure we're very clear on that.

21             MR. ROSNER:  Yeah, that's our understanding.

22             MR. ZARCO:  All right.

23             THE COURT:  Let me ask, is that intended to be a cap

24   as well or is it --

25             MR. ZARCO:  No, it's a minimum.

1            MR. ROSNER:  I mean, it's --

2      (Laughter)

3            MR. ROSNER:  I mean, if you ask me honestly, the cap

4  is zero because it's -- but if --

5            THE COURT:  No, but --

6            MR. ROSNER:  If it's not --

7            THE COURT:  No, but you get my point --

8            MR. ROSNER:  It's not a cap, it's a reserve.

9            THE COURT:  All right --

10            MR. ROSNER:  So in -- it's also unlikely that the

11  estate will be making distributions before you decide the issue

12  as well.

13            THE COURT:  Sure.  No, that's fine, but I do believe

14  -- I have actually this issue coming up at 10:30 about what a

15  slug of money was intended for, so I'm hoping to avoid that

16  issue you folks --

17            UNIDENTIFIED SPEAKER:  (Indiscern.).

18            THE COURT:  So --

19            MR. ROSNER:  To make the record clear, if for some

20  unlikely reason we're still litigating the cure objections and

21  the Liquidating Trustee or the Plan Trustee is trying to make a

22  distribution to Creditors, then we may have to have some type

23  of estimation hearing --

24            THE COURT:  No.

25            MR. ROSNER:  -- but I just don't -- I see that as so

1    unlikely.

2              THE COURT:  Yes, my point was not about the mechanics

3    of it, but rather -- I understood it as a reserve, and the

4    reserve is so that there is no uncertainty about some funds

5    being there, but, I mean, these are, by definition,

6    unliquidated amounts that are vigorously disputed between the

7    parties, and if the matter is litigated and I came in at a

8    number that's higher than that, I just want to be sure that,

9    you know, the 2.75 is not a cap.  And if I come in lower or if

10   it comes in at zero, as you suggested, then we understand how

11   it plays out.  But it was important, at least to me, to

12   understand that, and I think it's been clarified, and Mr.

13   Zarco's also clarified, and I think you've confirmed, that this

14   applies to the range of the issues or claims that have been

15   identified.  And again, so it's those for -- it's that money

16   for those various claims, it's not broken out into each

17   separate part, is that fair?

18             MR. ROSNER:  Correct.

19             MR. ZARCO:  Correct.

20             THE COURT:  That's fair?  Okay, I understand.

21             MR. ZARCO:  Thank you, Judge.

22             MR. ROSNER:  Thank you.

23             THE COURT:  All right, thank you.

24             MR. BILOWZ:  Good morning, Your Honor, Peter Bilowz

25   on behalf of the Debtors, I just wanted to run through the rest

1    of the objections.

2              THE COURT:  Okay.

3              MR. BILOWZ:  I understand time is short so I'll try

4    to run through those quickly.  And I'm just going to follow the

5    sequence of the agenda that was filed this morning.  The first

6    objection was a limited objection by Sprint Solutions, that was

7    a cure objection, Your Honor.  The parties have agreed to

8    continue that matter to the hearing on August 25th.  As I'll

9    mention with respect to any of the undisputed or unresolved

10   cures, the amounts claimed will be reserved, and that reserve

11   will be reflected in a new Exhibit C to the Sale Order.

12             The next objection, which was by S&B Partnership, we've

13   agreed with the proposed cure that they asserted in their

14   objection.  We've reflected that in an updated cure schedule

15   that was filed along with the revised Sale Order this morning,

16   so that will reflect the number that S&B asserted as the amount

17   that is going to be paid as a cure if that contract is assumed

18   and assigned.

19             The next objection is an objection filed by Rockville Pike

20   Properties.  We've resolved that as well, and the amount that

21   was asserted by Rockville is agreed to by the Debtors and it is

22   reflected in the updated cure schedule.

23             Number 4, which is the cure objection by Restaurant

24   Technologies, I believe that's resolved, but I think maybe the

25   email I got from counsel to Restaurant Technologies was a

1  little (indiscern.) maybe you could clarify what it -- I think

2  it's resolved, but --

3          MS. MILLER:  Good morning, Your Honor, Kathy Miller

4  on behalf of RTI.  With the cure part, the Debtor has agreed, I

5  believe, to reserve the amount in our objection?

6          UNIDENTIFIED SPEAKER:  Correct.

7          MS. MILLER:  Okay.  The other issue is, we're told

8  that the buyer has not yet determined whether or not they want

9  to assume this contract, and obviously they just won the bid

10  and they need some time, we understand that.  The issue for us

11  is we have equipment in the stores in over 100 locations.  They

12  are fryer equipment and cleaning oil.

13          THE COURT:  Sure.

14          MS. MILLER:  So if they reject it, we need time --

15  like 30 days, but I don't think we have that -- to be able to

16  get the equipment out before the closing.  So we need some sort

17  of notice so we can send people out and get our equipment back

18  if they are going to reject.

19          THE COURT:  That -- I mean, that sound primarily like

20  a business issue.  Is that something the parties can work

21  through?  Mr. Werkheiser, good morning.

22          NR. WERKHEISER:  Good morning, Your Honor, Gregory

23  Werkheiser, Morris, Nichols, Arsht & Tunnell, for Luby's, Inc.,

24  your proposed purchaser today.  Your Honor, let me just note we

25  are very pleased to have the opportunity to be here today and

1    to participate in this transaction.  I think you heard earlier

2    from Ms. Lynch as she was summarizing some of the terms in the

3    agreement that we do, at this point, contemplate a closing in

4    the latter part of July.  And I think perhaps the solution

5    here, given our timing, is of course once we get through today,

6    we are going to be reaching out to all of the various contract

7    and lease parties to begin discussions with them over what

8    contracts would and would not be taken.  We are sensitive that

9    there are parties that are in a position where they have to

10   either have premises vacated or remove -- have equipment

11   removed and we will have those discussion promptly.  Worst case

12   scenario, I understand, Your Honor, we're back in front of the

13   Court on July 14th, which is well in advance of our

14   contemplated closing date, and if we couldn't work something

15   out on the timing of the return of equipment or rejection

16   before then, I think we could probably take up that narrow

17   issue at that time.

18            THE COURT:  Okay, that sounds fine.

19            MS. MILLER:  Thank you, Your Honor.

20            THE COURT:  I understand.

21            MR. BILOWZ:  Okay, thank you for resolving that.  The

22   next objection is -- was an objection by Ecolab, it was another

23   cure objection.  We've agreed to continue that hearing to

24   August 25th, and again, that amount will be reserved as

25   reflected in the new Exhibit C to the Sale Order.

1      Microsoft's objection, I just spoke with counsel, and

2   maybe counsel will be able to clarify whether it's fully

3   resolved, but that's, again, another cure objection which we've

4   agree with the amount.  We've updated the cure schedule to

5   reflect that.  We believe it fully resolves Microsoft's

6   objection, although as I understand it, they want to know

7   whether or not the purchaser is going to assume it.  That we

8   won't know until the closing date, but --

9           THE COURT:  Okay, Ms. Nimeroff.

10          MR. BILOWZ:  -- I can let counsel step forward to

11   address that.

12          MS. NIMEROFF:  Thank you.  Good morning, Your Honor,

13   Jamie Nimeroff for Microsoft.  Your Honor, the issue is, I

14   think, just a little slightly different from Microsoft's

15   perspective.  They are a licensor of intellectual property, and

16   as is their position in every case, if the license agreement

17   does not get assumed and assigned to the purchaser, there can't

18   be any unintended transfer of the software or the -- in effect

19   --

20          THE COURT:  Sure.

21          MS. NIMEROFF:  -- the software or intellectual

22   property that has not been associated with the license.  So we

23   understand that there's been an agreement on the cure amount,

24   and that's great, and if the purchaser wants to take it, we

25   have no objection to Luby's and we're with that.  I just need

1   to make sure that there's no, again, language that would

2   accomplish a transfer of the software in the event that the

3   license agreement is not ultimately --

4            THE COURT:  Is rejected.

5            MS. NIMEROFF:  -- assumed and assigned.

6            THE COURT:  Okay, I understand.

7            MS. NIMEROFF:  So I need to -- and I apologize, Your

8   Honor, I didn't get a chance to review this this morning, and I

9   will certainly do that.

10           THE COURT:  That's fine, I understand.

11           MS. NIMEROFF:  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           NR. WERKHEISER:  Your Honor, for the record again,

14  Gregory Werkheiser, and that is consistent with our discussions

15  with Microsoft.  We would either take the agreement through

16  assumption and assignment or through perhaps additions to an

17  existing license agreement that would be (indiscern.) with

18  Microsoft, but we are not attempting to effectuate a transfer

19  of their intellectual property other than through the

20  assumption and assignment or otherwise by agreement.

21           THE COURT:  I understand.

22           NR. WERKHEISER:  Thank you.

23           THE COURT:  Thank you.

24           MR. BILOWZ:  Number 7 on page 3 of the agenda, there

25  was an objection by Westfield, LLC and Mission Valley

1   Shoppingtown that's also reflected on the last page of -- or

2   second to last page of the agenda at 21.  They're essentially

3   the same objection, it was an objection on the grounds of

4   adequate future -- adequate assurance of future performance

5   with respect to the stalking horse and then with respect to

6   Luby's.  That objection has been -- the parties have agreed to

7   continue that objection to the next omnibus, which is July

8   14th.  And again, so -- sorry, that's not a cure, so that's

9   really the only matter that's to be determined at that point in

10  time.

11              THE COURT:  Okay.

12              MR. BILOWZ:  Your Honor, #8 and 9 I'm essentially

13  taking together.  These are both objections by Texas Taxing

14  Authorities with respect to liens that they have on property

15  that is being purchased by Luby's.  I've been unable to resolve

16  that with counsel -- or the attorneys to those taxing

17  authorities.  We have, however, proposed language in the Sale

18  Order and it's reflected in the blackline that was submitted to

19  Your Honor this morning that adequately protects the taxing

20  authorities interests.  The language which is contained in

21  paragraph 38 -- and I understand counsel to the taxing

22  authorities may not have seen this yet and we're happy to

23  provide copies -- provides that the liens for the taxes

24  accruing prior to the closing date shall attach to the sale

25  proceeds -- we believe that's what -- all 363(f) requires.  And

1   there'll be adequate money reserved from the sale proceeds to

2   satisfy such liens when and if they are verified.  And

3   certainly it reserves the rights of the Debtors to verify those

4   tax liens and claims.

5          THE COURT:  Well, let me ask a question.

6          MR. BILOWZ:  Yes, Your Honor.

7          THE COURT:  I think I've got counsel for at least

8   some of the Texas lien claimants on the phone, and I'd like to

9   know whether they've had a chance to see that.  I see this

10  language, but I do note that this has been moving fairly

11  quickly.  And I don't say that by way of criticism of anyone.

12  But paragraph 38 does seem intended to be responsive and I'd

13  like to know whether or not counsel has had chance to look at

14  that and --

15         MR. REED:  Your Honor, this is Michael Reed for

16  Williamson County on the phone.  I appreciate being able to

17  participate telephonically, and no, Your Honor, I have not seen

18  that language.

19         THE COURT:  Okay, I -- and I think -- is Ms. Calvo on

20  the phone as well?

21         MS. COBB:  Eboney Cobb for Elizabeth Calvo.

22         THE COURT:  Okay.  And am I correct from my notes

23  that you also represent Texas Taxing Authorities?

24         MS. COBB:  That is correct, Your Honor.

25         THE COURT:  All right, have you had a chance to look

1  at proposed paragraph 38?

2          MS. COBB:  We have not, Your Honor.

3          THE COURT:  Okay.  Is there anyone else for the Texas

4  Taxing Authorities that may be on the phone or otherwise

5  present in the Courtroom?  Okay, here's what I'd like to do.

6  I'm not sure about how to manage the mechanics of it, but I'd

7  like the Debtors to make sure that they see that language.

8  This is -- and folks that are on the phone, this is -- you've

9  been here before, this is not unplowed ground to deal with the

10  Texas Taxing Authority issues in the context of a bankruptcy

11  sale, so hopefully this language will be responsive.  I make no

12  comment about the sufficiency of the language, but I understand

13  the concept behind it, and it's something that certainly has

14  worked in prior cases, so I think counsel needs an opportunity

15  to see that and I'd like -- we'll make that happen, okay?

16          MR. BILOWZ:  How do you propose to resolve it, Your

17  Honor, following the --

18          THE COURT:  I'm going to let you --

19          MR. BILOWZ:  -- in terms of entry.

20          THE COURT:  -- settle it.  I'm going to let you

21  settle it.

22          MR. BILOWZ:  Okay, thank you.  I think we can do

23  that.

24          THE COURT:  Yes, I --

25          MS. LEACH:  Your Honor, we'll email to counsel a copy

1  of the proposed order, and we will follow up with them after

2  the hearing.

3              THE COURT:  Yes, I mean, I don't mean to be flippant.

4  If there remains an issue with this you can give me a call, but

5  this issue comes up in almost any case that has personal and

6  real property sold in the state of Texas, and there's language

7  that's been developed that deals with this.  So you can work it

8  out, and if there remains a problem with it, we can get on the

9  phone.

10             MR. BILOWZ:  All right, thank you, Your Honor.

11             THE COURT:  Okay?  Counsel, does that sound --

12  counsel on the phone, is that satisfactory?

13             MR. REED:  Your Honor, I'd like to ask one question.

14  One of the -- we had been previously offered a set aside, but

15  the problem we were remaining with was that a significant

16  portion of the payment was going to be shifted or transferred

17  to the purchasers, and we were needing lien retention to assure

18  that those would be paid when they're due.  If the Debtors are

19  -- will have the personal liability for the payment of the

20  taxes up to the closing date, and the set aside is intended to

21  address that and the liens are being retained as to the portion

22  of taxes that the purchasers are required to pay, this language

23  should be sufficient.

24             MR. BILOWZ:  And that's what the -- the language I

25  didn't get into the order -- didn't get onto the record was

1   with respect to liens taxing -- taxes accruing after the

2   closing date, such liens shall attach to the property of the

3   purchaser securing such liens is effectively what that language

4   provides.  So I think that that responds to counsel's concern.

5               THE COURT:  Okay.

6               MR. BILOWZ:  And we will send that by email --

7               MR. REED:  As long as we understand that the term

8   accruing is not intended to be a term of art but it refers to

9   such portion of taxes as are allocated to the purchaser's

10  responsibility -- to the purchaser's liability and obligation

11  to pay subsequent to the closing date, that should be fine.

12              THE COURT:  Okay, I understand the concept.  I'll

13  give counsel a chance to try to wordsmith the language, and

14  hopefully that can resolve itself.  And again, to the extent it

15  does not, then you can get me on the phone and we'll work

16  through it, I think, pretty quickly.

17              MR. BILOWZ:  Thank you, Your Honor.  The next up is

18  #10 on the agenda, a limited objection of ADT.  Parties have

19  agreed to continue that hearing to August 25th, but again, the

20  amounts claimed will be reserved from the sale proceeds as

21  reflected in the new Exhibit C.

22              THE COURT:  Okay.

23              MR. BILOWZ:  Pepsi, another cure objection, the same

24  thing, the amount will be reserved from the sale proceeds

25  reflected in the new Exhibit C.

```
 1              THE COURT:  Okay.
 2              MR. BILOWZ:  Macerich, the parties have resolved the
 3  adequate assurance objection.  They've agreed to continue the
 4  hearing with respect to the cure to July 14th, the next
 5  Omnibus, and again, those amounts will be -- asserted by
 6  Macerich will reserved from the sale proceeds --
 7              THE COURT:  Okay --
 8              MR. BILOWZ:  -- as reflected.
 9              THE COURT:  -- Ms. Heilman?
10              MR. BILOWZ:  Uhm --
11              THE COURT:  Hang on, Ms. Heilman, did you wish to
12  address the Court for Macerich?
13              MS. HEILMAN:  Good morning, Your Honor, Leslie
14  Heilman, Ballard Spahr, representing the Macerich Company and
15  Cousins Properties, Incorporated.  Counsel is correct, we have
16  consensually resolved the adequate assurance piece with respect
17  to this matter, and we've agreed to continue the cure
18  objection.  However, I just got an opportunity to review the
19  blackline this morning of the Sale Order, and we did have a
20  continuing sale objection that was left over from our bid
21  procedures that was reserved for the sale, and I don't believe
22  it was any intent of the parties to leave it out and I don't
23  think it's the intent of the parties to preclude year-end
24  adjustments and reconciliations from being the purchaser's
25  responsibility after the sale.  However, the language in the
```

28

1  sale order, on page 18 of the blackline, indicates that the

2  purchaser is only obligated for amounts that have accrued or

3  become due and payable after the closing date, which does not

4  include year-end adjustments, which are not a cure issue, Your

5  Honor.  Those amounts are not in default, they become due upon

6  the end of the year, and they will be billed at that time.

7            THE COURT:  Okay.  Counsel?

8            NR. WERKHEISER:  Your Honor, I'm just going to need a

9  moment with the client --

10            THE COURT:  Sure.  Let me ask one question, actually,

11  while everybody's up.  The expectation -- and I will hear the

12  Tavistock objection in due course, but we're just walking

13  through the objections so I know what the current bid and ask

14  are.  But I received the proposed Form of Order and I assume

15  that there's going to be some -- that's still a work in

16  progress, is that correct?

17            MS. LEACH:  Your Honor, the proposed Form of Order

18  that we filed this morning we believe has been agreed to by the

19  Debtors, Luby's, the Committee and Wells Fargo.  So --

20            THE COURT:  Yes, I guess my point is -- and that's

21  great, but my point is that some of these points, you know, as

22  we just talked to the Texas Taxing Authorities, Ms. Heilman's

23  issue I'm going to hear a substantive response on, but if it's

24  -- if the answer is okay, then that's -- those are changes that

25  would need to be made to the order.

1           MS. LEACH:  Yeah, depending on the outcome of this

2    hearing, we may need to make further changes to the order, and

3    also, Your Honor, the Asset Purchase Agreement, again --

4           THE COURT:  You mentioned that.

5           MS. LEACH:  -- has not yet been finalized.  We expect

6    it will be finalized and signed today.

7           THE COURT:  Okay.  All right, that's fine.  All

8    right, I understand.  Can I get a response to Ms. Heilman's

9    issue, or Mr. Werkheiser, you need a moment on that?

10          NR. WERKHEISER:  Can I just have a moment with the

11    client.

12          THE COURT:  Yes, that's fine, why don't we move on

13    and we can circle back to it.

14          MR. BILOWZ:  Your Honor, just briefly --

15          MR. FERAND:  Excuse me, Your Honor?

16          THE COURT:  Yes.

17          MR. FERLAND:  Niclas Ferland for Mission Valley

18    Shoppingtown and Westfield, LLC.  With respect to the continued

19    objection, what was put on the record is substantially correct.

20    However, there are additional issues that we had raised in our

21    objection that might be categorized more as cure issues, and we

22    wanted to make sure that all of those are reserved for the next

23    Omnibus.

24          THE COURT:  I understand.

25          MR. WILSON:  Your Honor, just briefly, Eric Wilson of

1    Kelley, Drye & Warren for the Creditors Committee.  We do have

2    some minor comments to the Sale Order that we have provided to

3    counsel for the Debtor --

4              THE COURT:  The main point I wanted to make just in

5    that observation was that -- just to confirm that the Sale

6    Order's still being worked on.  Okay.

7              MR. WILSON:  All right, thank you, Your Honor.

8              THE COURT:  All right, thanks, Mr. Wilson.

9              MR. BILOWZ:  The next objection, Your Honor, and I'm

10   skipping over, obviously, the franchisee objection which was

11   resolved.

12             THE COURT:  Sure.

13             MR. BILOWZ:  #14 was an informal response.  We've

14   listed those for Your Honor.  Informal response from Do-Wen,

15   Inc., which I understand is one of the franchisees.

16             THE COURT:  Okay.

17             MR. BILOWZ:  We received this objection requesting

18   additional time to investigate what amounts the Debtors may owe

19   Do-Wen.  We've tried to reach them; been unsuccessful in

20   reaching them.  We really don't understand what the basis of

21   the objection is.  We'd ask the Court overrule it.  I don't

22   know if anyone is -- from Do-Wen is here.

23             THE COURT:  Is anyone here today for Do-Wen?

24             ALL:  (No verbal response).

25             THE COURT:  Okay, I understand.

 1              MR. BILOWZ:  Okay.

 2              THE COURT:  Let's see if -- I guess they're still

 3     working at it, so why don't we move on to the next matter.

 4              MR. BILOWZ:  Another informal response from Integrys.

 5     They have two agreements with the Debtors; those were cures

 6     that they asserted that were incorrect, according to the cure

 7     schedule filed with the Court.  We've reflected that in the

 8     updated cure schedule as agreeing with the cures asserted by

 9     Integrys --

10              THE COURT:  Okay.

11              MR. BILOWZ:  -- with respect to both the gas

12     agreement and the electric agreement.  An informal response was

13     submitted by Pacific Ground Leases, which is one of the

14     landlords.  This was for -- in fact, really not a cure issue.

15     It was property taxes that became due and owing post-petition,

16     and the Debtors have paid that amount, and paid that amount on

17     June 17th.  And so we don't think there is any remaining cure.

18     But we did agree with the number that they had asserted and, as

19     I said, paid that amount.  I don't know if anyone is here from

20     Pacific Ground Leases, or on the phone, but --

21              THE COURT:  Okay, that's fine.

22              MR. BILOWZ:  Okay.  An informal response from the

23     County of Henrico, Virginia.  This was with respect to a 2010

24     tax claim which they say is secured by a lien.  The order, we

25     believe, adequately protects the County of Henrico.  Tax liens,

1   as in any other lien, is going to attach to the sale proceeds,

2   and there will be sufficient amounts reserved to pay those

3   liabilities.  Finally, the informal response from Vega & Cook,

4   LLC.  This is a cure arising out of a class action relating to

5   the issuance of gift cards.  This is, I believe, one of the co-

6   Defendants in that action.  Vega & Cook is the gift card seller

7   for the Debtors.  The parties have consentually resolved it,

8   and we intend to file a motion that will approve a -- seek

9   approval of a related settlement agreement.

10              THE COURT:  Okay.

11              MR. BILOWZ:  There are two -- there are two informal

12   objections that I understand were raised.  I wasn't really

13   aware of --

14              THE COURT:  Actually, why don't we see --

15              MR. BILOWZ:  Yeah, oh, sure.

16              THE COURT:  Why don't we see where these folks are

17   right now.

18              MR. BILOWZ:  Sure.

19              THE COURT:  Ms. Heilman?  Mr. Werkheiser?

20              MR. WERKHEISER:  Your Honor, I'm sorry to be

21   whispering to folks as --

22              THE COURT:  Oh, that's fine.

23              MR. WERKHEISER:  -- you're trying to conduct the

24   hearing.  For the record, again, Gregory Werkheiser.  I

25   believe, in response to Ms. Heilman's concerns, and as to her

1    client, specifically, what we will do is craft some language in

2    the order that reserves their rights on the specific issue that

3    she raised, between now and the hearing on the 14th of July,

4    and we'll use that window, then, to craft something that would

5    be mutually acceptable to both parties to deal with the post-

6    closing adjustments issue, and I understand -- I believe that

7    that is acceptable to her.

8         THE COURT:  Okay.  Ms. Heilman, that works for you?

9         MS. HEILMAN:  That does, Your Honor.  Thank you.

10         THE COURT:  Good, okay.

11         MR. BILOWZ:  The last two, Your Honor, these are not

12    reflected in the agenda.  As I understand it, Spirit Funding

13    and U.S. Foods separately raised informal objections, and this

14    was based on the possibility that a subsidiary of the

15    purchaser, not the purchaser itself, would take assignment of,

16    respectively, the Spirit and the U.S. Foods lease and

17    agreement.  I understand that these objections have been

18    resolved by assurances from counsel of the purchaser that

19    there'll be a parent guarantee in that event, and, in any

20    event, the objections are pushed to the July 14th hearing to

21    make sure that everyone is fine with the form of guarantee if

22    that's what, in fact, happens.

23         THE COURT:  Okay.  Mr. Minuti, good morning, sir.

24         MR. MINUTI:  Good morning, Your Honor.  Your Honor,

25    Mark Minuti from Saul Ewing.  I'm here for U.S. Food Service.

1    Your Honor, the idea is we're gonna continue our adequate

2    assurance objection 'til July 14th.  We're gonna work out a

3    resolution in the interim, hopefully to resolve those issues.

4    If not, we'll be back before you on the 14th, but we're hopeful

5    we can get it resolved.

6               THE COURT:  Very good.

7               MR. MINUTI:  And my client, as I understand it, does

8    want the contract assumed, so --

9               THE COURT:  Okay.

10              MR. MINUTI:  Thank you.

11              THE COURT:  That sounds fine.  Mr. Fallon?

12              MR. FALLON:  Good morning, Your Honor, Brad Fallon

13   for Spirit Master Funding, LLC.  Our understanding is the same

14   as Mr. Minuti's, that they're simply continued.  We worked late

15   last evening and actually into this morning on that issue, and

16   we didn't quite come to a resolution, but I'm pretty confident

17   that we will come to a resolution, so that any order would be

18   subject to our adequate assurance objection.

19              THE COURT:  Okay, I understand.

20              MR. WERKHEISER:  Your Honor, for the record, again,

21   Gregory Werkheiser.  I didn't catch of all counsels'

22   statements, but I understood that they were arising for the

23   U.S. Food Service and Spirit Master lease, and as to those

24   parties, I would confirm that there is -- we've been working

25   through minor adequate assurance issues, and some documentation

1    related to those, and those are the only issues that I believe

2    we still need to address and that we are reserving on until

3    July 14th.

4              THE COURT:  Okay, I understand.  All right, I think

5    I'd like to hear from Tavistock.

6              UNIDENTIFIED SPEAKER:  Your Honor, (indiscern.)

7              MR. WERKHEISER:  Your Honor, and just as to

8    Microsoft, they've asked us to confirm our willingness to

9    include some language in the order that simply makes clear that

10   we are not transferring their license and intellectual property

11   absent of the substantive assignment of their agreement, and,

12   as I stated before, that's how we're proceeding.

13             THE COURT:  I understand.

14             MR. WERKHEISER:  Thank you, Your Honor.

15             THE COURT:  Good morning.

16             MS. MICHELSON:  Good morning, Your Honor.  Randy

17   Michelson appearing on behalf of Tavistock Ventures, Inc.  Your

18   Honor, I feel like I'm staring down at a freight train running

19   down the tracks.  And, to be clear, we're here because we are

20   concerned about the possibility of irregularities in the

21   auction process, and I emphasize possibility.  As the Court

22   knows, in order to make a good faith finding under 363(m),

23   under the Abbott Dairies case, there needs to be a finding that

24   there was integrity in the conduct of the sale.  And we had

25   some questions about that which we raised, but could not get

1    comfortable with, prior to the hearing.  And let me talk about

2    them, and there are two.

3        The first is the question of whether Luby's submitted a

4    qualified bid.  And pursuant to Section 4(i) of the bidding

5    procedures, bidders were required to show that there was

6    readily available funds sufficient to enable the bidder to

7    timely close and to provide adequate assurance.  Now, in

8    Tavistock's -- well, and let me just move on, then I'll

9    reiterate.  In 4(e) of the bidding procedures, there could be

10   no contingency and no condition on any bid that a competing

11   bidder submitted, with one exception, and that exception was

12   the entry of the Court's sale order.  And, specifically, 4(e)

13   said there could be no financing contingency, no due diligence

14   contingency, no contingency, no condition at all.

15       When Tavistock was negotiating its APA as the stalking

16   horse bidder, it was required to provide evidence that it had

17   cash in the bank at the time that it signed the APA.  That was

18   the standard that Tavistock was held to; that was the standard

19   that the Debtor agreed that other bidders would be held to.

20   Luby's, as the Court is aware, is a publicly traded

21   corporation.  Its SEC filings and its press releases show that

22   it is a company that, itself, is in some potential financial

23   distress.  It has closed about 20% of its stores in recent

24   months, and, more specifically, its recent 10Q and 10K show a

25   net loss of 26.4 million for its fiscal year 2009, and

1   additional losses since that time.  Those documents also show

2   that the cash that Luby's had as of May 5th, just last month,

3   was $7.7 million.  This raised a question for Tavistock about

4   whether Luby's met the Court approved bidding requirements of

5   readily available cash.  Now, I'll remind the Court that its --

6   Luby's initial bid was $42.6 million.  There's a big difference

7   between $7.7 million on May 5th, and $42.6 million just last

8   Monday.  We don't know anything more than what we see in the

9   public filings.

10      Based on that concern, I requested of counsel on Saturday

11  that it provide Tavistock with copies of what Luby's submitted

12  last week to show that it complied with the bidding procedures

13  and, in fact, is a qualified bidder.  Specifically, I wanted to

14  see two things:  Luby's' marked up APA, and the evidence

15  required under the bidding procedures to show that Luby's had

16  readily available funds to close a transaction on July 9th,

17  which is the date that Tavistock was required to close.  On

18  Sunday, the Debtors refused to provide the information

19  requested to Tavistock.  This prevented us from determining

20  whether, in fact, it appears that Luby's was a qualified

21  bidder.  And, accordingly, we filed our objection yesterday.

22      Now, there's two issues on that.  The first is, under the

23  bidding procedures, if Luby's does not close, Tavistock, as the

24  second highest bidder, is required to close at its last bid,

25  which was about $59 million.  Now, if Luby's wasn't qualified

1   to bid, then Tavistock bid far too much, perhaps as -- in

2   excess of $9 million more than it otherwise would've had to

3   bid, because the only other bidder dropped out at an amount

4   lower than $50 million, so it's a very significant issue for

5   Tavistock.  And failing to raise to it today would have been

6   seriously detrimental to Tavistock's interests.

7        Second, there's the integrity of the process.

8             THE COURT:  I want to be clear, I regard your

9   objection as timely.

10            MS. MICHELSON:  Thank you, Your Honor.

11            THE COURT:  Okay.  I mean, there was sort of a hint

12  of that at the outset.  I --

13            MS. MICHELSON:  I'm sorry.

14            THE COURT:  I regard the objection as timely.

15            MS. MICHELSON:  You regard the objection as timely,

16  Your Honor?

17            THE COURT:  Their objection as timely.

18            MS. MICHELSON:  Okay.

19            THE COURT:  I'm satisfied.  Look, and I think you're

20  headed down this, and I just wanted -- want to be clear of

21  that.  We do a lot of sales here, and we often have this

22  discussion when we're talking about bid procedures, about how

23  you can do sale objections that are often due before an

24  auction, but there are objectors who object to a sale

25  irrespective of who wins.  You know, there's often a Creditor

1   or a party that says you can't sell my stuff, it's not your

2   stuff, that sort of thing.  And then there are the objections

3   that arise following the auction.  And, frankly, I would prefer

4   to see those objections filed as early or as promptly as

5   possible, simply to give the Court an opportunity.  But the

6   door, frankly, remains open.  If parties allege irregularities

7   or issues with respect to the result of an auction, I want to

8   hear about it.  And parties have done it from the podium, and

9   parties have done it on filings received the morning of the

10  hearing.  So I'm under no illusions about the time pressures

11  that parties are under, and so I just want it to be clear that,

12  you know, I'm not encouraging or rewarding gamesmanship.  I

13  think I can see it -- I can recognize it when I see it.  I

14  don't see that here.  I got an objection; it was blessedly

15  short enough for me to read and understand, and I think the

16  other side had a fair opportunity to do so as well.  So to the

17  extent that there's any back and forth right now about whether

18  or not the objection should be stricken, it won't be stricken.

19          MS. MICHELSON:  Thank you, Your Honor.

20          THE COURT:  I've received it and we'll address it on

21  the merits.

22          MS. MICHELSON:  Thank you.  In light of the Debtors'

23  refusal to provide the information that we sought, which is

24  fairly limited information, and, we thought, information which

25  we were entitled to seek, given our questions, we served

1  discovery this morning under Rule 2004, asking for that

2  information.  If Luby's, in fact, was a qualified bidder,

3  that's the end of the story.  But if it wasn't, the Court needs

4  to know about it, Tavistock needs to know about it, and the

5  parties in interest needs to know about it.  And we'd like the

6  opportunity to do discovery in order to see if that was the

7  case.  Now, the good news here is that, until Ms. Lynch's

8  presentation, I thought the hearing -- the closing was gonna be

9  on July 9th, which was what the sale procedures provided for,

10  but it appears that that's been moved back to July 26th, so

11  there is an opportunity to do some discovery, which I don't

12  think will be fairly -- will be extensive, in order to

13  determine if the bid procedures were, in fact, complied with.

14      The second issue is a violation of the rules that were

15  announced at the outset of the bidding.  There's no dispute

16  that there was a conversation between the two other bidders.  I

17  don't know what happened in that conversation.  I know that it

18  happened at a critical time in the auction, and it raises

19  concerns.  Ms. Lynch said there was no objection at the time

20  the conversation occurred, but, in fact, my client advised

21  Luby's' counsel at the time the conversation was taking place

22  that it was happening in violation of the rules that were

23  announced at the outset of the auction.  Counsel immediately

24  went over to his client and to the other bidder; the

25  conversation ended.  The other bidder left the auction and

1  never reappeared.  At that point, various things transpired.  I

2  don't know whether it was simply an innocent conversation, a

3  congratulatory conversation, a -- you know, I don't know, Your

4  Honor.  But it seems to me that that is a question that needs

5  to be answered, to be sure that the Court could enter a 363(m)

6  finding.

7         Based on that, Your Honor, we'd like the opportunity to do

8  some discovery.  We have the time to do it now that the sale

9  here -- that the closing has been postponed a few weeks, and

10  the Court and the parties then will know what the facts are.

11  We don't intend to interfere with a legitimate sale conducted

12  with integrity.  We do intend to find out what the facts are,

13  should the Court permit us to do so.

14         THE COURT:  I understand, okay.  All right, here's

15  what I want to do.  I actually don't want a response on it

16  right now.  You'll have an opportunity.  There's been a request

17  for discovery, and I'm going to hold that request in abeyance

18  right now, because the Debtor has indicated, and I expect will

19  endeavor to make their case which may be responsive to some of

20  the issues that have been the subject of request for discovery.

21  And if I still have questions or concerns about the integrity

22  or sufficiency of the process, then discovery would issue.  But

23  I think I need to know what the Debtor's case is right now

24  before I decide whether or not there is sufficient record

25  before me to approve the sale, okay?  So I think that -- I

1   mean, I think we've covered a lot of ground.  But, Ms. Lynch,

2   am I correct that the -- this -- the Tavistock objection, I

3   believe, then, is subject to finalizing and changing some of

4   the language in the sale order.  The Tavistock objection is the

5   sole remaining prosecuted objection for purposes of today, is

6   that correct?

7               MS. LYNCH:  Well, I would hope --

8               THE COURT:  There are some informal ones that we can

9   deal with, but I think rights are being reserved, the order is

10  being worked on and some of the other things, but are there

11  other -- have I missed one?  I tried to keep pretty careful

12  notes when we walked through it.

13              MS. LYNCH:  I think the only objection that has not

14  been resolved, adjudicated or continued, is the objection of

15  Tavistock.

16              THE COURT:  Okay.

17              MS. LYNCH:  And we would ask the Court to adjudicate

18  it today.

19       (Background noise)

20              THE COURT:  You know, we're going to try to have that

21  fixed.

22       (Laughter)

23              THE COURT:  It's the glass; there's a little lip on -

24  -

25              MS. LYNCH:  There needs to be a little lip right

1    there.

2            THE COURT:  I know, I know.

3            MS. LYNCH:  Okay.

4            THE COURT:  It's your tax dollar at work.  All right,

5    my apologies to counsel.  All right, I think what we should do,

6    then, is -- I assume you intend to put your case on?

7            MS. LYNCH:  Yes.

8            THE COURT:  Okay, how many witnesses do you have?

9            MS. LYNCH:  We would be putting on a collective case

10   which would go to --

11           THE COURT:  I understand.

12           MS. LYNCH:  -- the integrity of the process in good

13   faith.  Just a minute, Your Honor.  I'm going to consult --

14           THE COURT:  Sure.

15           MS. LYNCH:  -- with counsel to Luby's.

16      (Attorneys confer)

17           MS. LYNCH:  Your Honor, we anticipate putting on

18   three witnesses.

19           THE COURT:  Okay.  Okay, here's what I want to do.  I

20   want to take a break for really just a moment or -- you got

21   something to tell me?

22           MS. LYNCH:  Yeah, I -- my colleague, Mr. Rosner,

23   asked me to clarify with you, would you prefer live testimony,

24   or the testimony to be introduced by proffer?

25           THE COURT:  I would be prepared to entertain a

1    proffer, subject to the objection of any party that wishes to

2    cross and -- but I'll certainly afford a full opportunity for

3    cross examination for anybody.

4              MS. LYNCH:  Of course.

5              THE COURT:  So why don't you take a moment and talk

6    about that.  If anybody wants live direct, that's a right that

7    I would honor.  If anybody's okay to proceed with direct by

8    proffer, we'll go from there and then put the witness on for

9    cross.  And so take a -- we'll take a moment.  I'm going to

10   also just tell the folks for my 10:30 that we'll push them back

11   a little bit, and then we'll reconvene in, literally, just a

12   couple of minutes, okay?  Stand in recess.

13       (Recess)

14             THE CLERK:  All rise.

15             THE COURT:  Please be seated.

16             MS. LYNCH:  Hello, again, Your Honor.

17             THE COURT:  Hello.

18             MS. LYNCH:  We would like to proceed with our direct

19   case on --

20             THE COURT:  Okay.

21             MS. LYNCH:  -- the qualification of Luby's.

22             THE COURT:  Okay.

23             MS. LYNCH:  And we're going to start by Mr.

24   Werkheiser calling a witness.

25             THE COURT:  Okay, Mr. Werkheiser?

1              MR. WERKHEISER:  Good morning, Your Honor.  For the

2    record, Gregory Werkheiser, Morris, Nichols, Arsht & Tunnell.

3    Your Honor, the Debtors and Luby's call, for their first

4    witness, K. Scott Gray.

5              THE COURT:  Okay.  All right, let's swear the

6    witness, please.

7              THE CLERK:  Please stand.  Please place your left

8    hand on the Bible and raise your right hand.  Thank you.  Would

9    you please state your name for the record, spelling your last?

10             MR. GRAY:  Kennedy Scott Gray, G-R-A-Y.

11             KENNEDY SCOTT GRAY, DEBTORS' WITNESS, SWORN

12             THE CLERK:  Thank you, please be seated.

13                         DIRECT EXAMINATION

14   BY MR. WERKHEISER:

15   Q.  Thank you, Mr. Gray.  Mr. Gray, could you just give the

16   Court a little bit of your educational background, please?

17   A.  Certainly.  Good morning, everyone.  I have a undergraduate

18   degree from Lamar University and from Texas University.  I

19   graduated in 1992.  Proceeded -- I was hired by Arthur

20   Andersen; I worked as an external auditor for four years out of

21   the Houston office in the commercial division, and then left

22   Arthur Andersen to join Pappas Restaurants in 1996, and have

23   been associated with this management team since that time.

24   Began to get involved with the Luby's interest as part of the

25   management team in 2001.  Proceeded through working in various

1  areas at Luby's, beginning with internal audit, which is the

2  role I functioned in, including some other -- a financial role

3  at Pappas Restaurants, and then proceeded through to other

4  duties, including financial planning and heading up the finance

5  group, and then at -- as of 2007, was appointed the Chief

6  Financial Officer for Luby's, and I've served in that capacity

7  to the present time.

8  Q.  Thank you, sir.  And do you hold any professional

9  certifications?

10  A.  I do.  I'm a Certified Public Accountant in the Texas State

11  Board of Public Accountancy, and I have since 1998.

12  Q.  Thank you, and, Mr. Gray, could you give the Court some

13  background on who Luby's, Inc. is, please?

14  A.  Yes, Luby's, Inc. was a Texas -- originated in San Antonio,

15  Texas, in 1947.  It's a cafeteria chain that is Texas based,

16  and has been around for a number of years, continuity of

17  service of over 60 years.  Luby's, Inc. is a publicly traded

18  company as of the '80s and is listed on the New York Stock

19  Exchange under the symbol LUB.  The company currently operates

20  96 company owned restaurants, as well as maintains culinary

21  contract services, arrangements with 17 locations, and has a --

22  basically the company is comprised of a majority of land and

23  building wholly owned properties that operate restaurants.

24  There's approximately 68 properties that are land based, and

25  the balance is lease operations.  We employee over 5,000

1  employees, and we continue to look for opportunities to

2  increase shareholder value as a publicly traded company.

3  Q.  Thank you.  And to be clear, did you indicate that there

4  were fee owned properties that lease --

5  A.  Yes.

6  Q.  And how many of those are there?

7  A.  68 and then including, also, on our balance sheet, the

8  company has approximately 19 owned pieces of real estate that

9  are for sale as well.

10 Q.  Thank you.  And what's the relationship between Luby's,

11 Inc. and Pappas Restaurants?

12 A.  Chris and Harris Pappas are -- Christopher J. Pappas is the

13 Chief Executive Officer and Harris J. Pappas is the Chief

14 Operating Officer.  They were brought in as -- to lead the

15 company back in 2001, and they maintain the primary focus on

16 Luby's, but they also have interest in their own company, which

17 they grew from scratch and have several locations.

18 Q.  And did they, at some point in time, make a substantial

19 investment in Luby's?

20 A.  Yes, they did.  They invested $10 million as part of coming

21 on as management in 2001.

22 Q.  Okay, thank you.  Mr. Gray, if I could -- have you seen a

23 copy of the objection that was filed by Tavistock Ventures?

24 A.  Yes, I read it last night.

25 Q.  You're aware that it questions Luby's' financial

1  performance for the 2009 fiscal year and --

2  A.   Correct.

3  Q.   -- a portion of 2010?  And did Luby's, in fact, experience

4  some losses during that period?

5  A.   Yes, the company recorded some book losses, primarily

6  comprised of asset impairments.

7  Q.   And why did that occur?

8  A.   The company's plan to close some under-performing stores.

9  Q.   And did the company experience any losses due to the

10  performance of the restaurant industry, generally?

11  A.   Absolutely.  The restaurant industry overall has

12  experienced a significant decline in its four-year history of

13  tracking results.  It's been -- it impacted our company as

14  well.

15  Q.   And how has Luby's responded to that?

16  A.   Luby's has responded by looking at the under-performing

17  stores, taking the position of retrenchment, operating

18  basically with the operations with limited required capital

19  expenditures in order to improve its cash position, and improve

20  existing store operations, as well as look towards expanding

21  our culinary contract service business.

22  Q.   So, has Luby's closed some under-performing stores?

23  A.   Yes, we -- as of -- we announced a cash flow improvement

24  and capital redeployment plan on October 15th of 2009, which

25  included the closure of 24 locations.

Gray - Direct                                    49

1  Q.  And what is the status of the real estate associated with

2  those locations?

3  A.  We have sold a number of those properties, which are

4  reflected on our results year-to-date as of our last third

5  quarter filing and continue to offer these properties for sale

6  in which the company will take the proceeds to redeploy,

7  including redeploying to cover the cost for the contemplated

8  acquisition of Fuddruckers.

9  Q.  And are those properties encumbered or unencumbered by -

10 A.  Unencumbered.

11 Q.  -- liens at this point?  Thank you, and at this stage of

12 the company's plan, how would you characterize the company's

13 balance sheet health?

14 A.  The company's balance sheet, currently we're observed at

15 outstanding and --

16 Q.  And operational performance?

17 A.  Operational performance, we've recently -- our last

18 quarterly results was a book profit of $1.3 million for the

19 quarter.

20 Q.  And what's your sense of the company's prospects for

21 performing going forward?

22        MS. MICHELSON:  Objection, Your Honor.

23        THE COURT:  Grounds?

24        MS. MICHELSON:  Lack of expertise.  He's asking for

25 an expert opinion.

1           THE COURT:  He's the CFO of the company.

2           MS. MICHELSON:  Doesn't make him an expert in

3    projections, Your Honor.

4           THE COURT:  Does make him an expert in his opinion

5    about the current prospects of the company.  I will accord it

6    the way it's entitled to, but, I mean, I just conducted a

7    valuation trial.  I'm really not that impressed with the

8    general expertise concept.

9        (Laughter)

10          THE COURT:  We'll leave that as it is.  But I

11   understand the objection, but I think it goes, really, to the

12   weight to be accorded.  He's the CFO of the company.  I have a

13   pretty good idea of what he's going to tell me about he thinks

14   of the prospects of the company, but you'll have a full and

15   fair opportunity to cross him on it.  The question is allowed.

16   If you want to reask, you're welcome to.

17   A.  Thank you, Your Honor.  I would just state that our

18   sequential same store sales results have improved as of the

19   last quarter.  As reported, our investor conference call, which

20   we recently held a few weeks ago, we did share with our

21   shareholders that we felt that there's signs of improvement in

22   our guest frequency, which we believe is positive for our

23   existing units, and a sign that there may be a little bit more

24   of a loosening of a discretionary spending from our customers.

25          THE COURT: Okay.

1   BY MR. WERKHEISER:

2   Q.  All right, thank you.  And so did there come a time where

3   Luby's became aware of the opportunity to acquire Fuddruckers

4   business and assets?

5   A.  Yes.

6   Q.  And you -- Luby's made a decision -- or did Luby's make --

7   Luby's obviously made a decision to participate in the auction

8   process.  And were you involved in formulating the bid that

9   Luby's prepared?

10  A.  Yes, I was.  We -- I was involved with working with our

11  lenders to obtain an expansion of our existing credit facility,

12  which will be substantially identical to the existing credit

13  facility we have with these credit lenders in contemplation of

14  the acquisition.

15  Q.  Okay.

16       (Pause in proceedings)

17            MR. WERKHEISER:  Your Honor, if I may approach the

18  witness?

19            THE COURT:  Sure.

20  BY MR. WERKHEISER:

21  Q.  I'm sorry, but given the time constraints, we don't have

22  very many copies of these.  I will give you --

23  A.  Okay.

24  Q.  -- the remaining copy, and I will manage the best I can.

25            MR. WERKHEISER:  All right, I guess -- can we mark

1   that for identification purposes as Debtor's 1?

2            THE COURT:  Debtor's 1.

3        (Debtor's Exhibit-1 marked for identification)

4            MR. WERKHEISER:  Your Honor -- and then I would mark

5   this additional item for identification purposes as Debtor's 2.

6        (Debtor's Exhibit-2 marked for identification)

7            THE COURT:  Thanks.

8   BY MR. WERKHEISER:

9   Q.  Mr. Gray, could you describe the -- just the first document

10  that I handed to you?

11  A.  This represents our bid -- opening bid in the amount of $42

12  million, with the seven Spirit location contemplated for the

13  acquisition of Fuddruckers.

14  Q.  And could you describe the second document that I handed to

15  you?

16  A.  And this -- the second document represents a bid for two

17  locations in Minnesota, with an opening bid of $1.2 million.

18  Q.  Thank you.  And were you involved in formulating both of

19  those bids?

20  A.  Yes, I was.

21  Q.  And you're familiar with the contents of those bids?

22  A.  Yes.

23  Q.  Could I ask you, and I apologize because I no longer have a

24  copy for myself, but -- I think it's -- hopefully it's Exhibit-

25  F to that document.  Should be all the way -- very close to the

1  back.

2  A.  I have -- I found it.

3          UNIDENTIFIED SPEAKER:  Okay.

4  BY MR. WERKHEISER:

5  Q.  Okay.  Could you describe that document for the record?

6  A.  This is a commitment letter from our lenders which

7  indicates that they had received Creditors' Committee approval

8  at both banking institutions to provide the company with

9  sufficient support of a bidding range inclusive of an opening

10  bid amount of $42 million.

11  Q.  And this was the form of commitment letter that was

12  submitted with Luby's bid?

13  A.  Yes, it was.

14  Q.  And did Luby's have any existing relationship with either

15  of these lending institutions?

16  A.  Yes.

17  Q.  And, for the record, could you just state who the lending

18  institutions were?

19  A.  Wells Fargo Bank and Amegy Bank.

20  Q.  And what was Luby's existing relationship with these

21  lending institutions?

22  A.  A credit facility, a $20 million credit facility.

23  Q.  And what was the status of that facility at the time that

24  --

25  A.  It was in good standing.

1  Q.  And were any amounts drawn under?

2  A.  Zero amounts drawn under the line.

3  Q.  So, the full $20 million was available, is that correct?

4  A.  Correct.

5  Q.  If you could summarize the process you went through and

6  where you were in the process with obtaining this amendment to

7  your lending facility.

8  A.  This was -- if the company was successful at the bidding

9  auction, this commitment would be utilized for the purchase.

10 Q.  And -- if you could look to the bottom of the first page of

11 the letter, there's a section entitled Conditions to

12 Commitment, do you see those?

13 A.  Yes.

14 Q.  And if you could take a moment to review all those.

15 A.  Okay, obviously there's -- there are no material adverse

16 change occurring.  There was any -- if there was any issue with

17 reps and warranties with the transactions -- with the

18 transaction, this was -- this letter was -- is typical, what I

19 have seen in my experience, from a lender once a commitment is

20 provided for.

21 Q.  And had you received any indication at or prior to the time

22 making your bid that any of those conditions had not been

23 satisfied or could not be satisfied?

24 A.  None.

25 Q.  And have you since received any indications from any of the

Gray - Direct                                55

1  banks?

2  A.  No indication of any issues.  We're proceeding with

3  documentation of our amended credit facility once we have been

4  awarded the offer to purchase to company.

5  Q.  Okay.  Thank you.

6           MS. MICHELSON:  I don't think he's done.

7           UNIDENTIFIED SPEAKER:  Okay.

8           MS. MICHELSON:  I thought you were done, I'm sorry.

9           MR. WERKHEISER:  I guess we can treat this as

10  Debtor's 3, for the record.

11           THE COURT:  Okay.

12      (Debtor's Exhibit-3 marked for identification)

13  A.  Thank you.

14           THE COURT:  Thank you.

15  BY MR. WERKHEISER:

16  Q.  Mr. Gray, could you describe what this document is, for the

17  record?

18  A.  This document represents the full commitment amount which

19  the company and its banks have agreed to, to expand the

20  existing credit facility to $53 million in contemplation of

21  this acquisition.

22  Q.  Is it otherwise identical to the prior commitment letter,

23  which I believe is attached as Exhibit-F to Debtor's 1?

24  A.  Yes.

25  Q.  And could you explain, for the record, why Luby's has one

1   commitment letter in the amount of $42 million which was

2   submitted with its bid, and a second commitment letter in the

3   amount of 53 million?

4   A.  The company felt that exposing the total limit on its

5   available credit line would provide an indication to some

6   party, potentially, of the limit of the company's bidding

7   capacity.

8   Q.  And did there come a point where the company provided this

9   commitment letter to the Debtor's?

10  A.  Yes, we provided this that evening after the auction had

11  been completed.

12  Q.  Thank you.  If you could refer to the term sheet that is

13  attached to both of the commitment letters.  Has --

14          MS. MICHELSON:  Your Honor, the document that's just

15  been referred to as a term sheet has a variety of redactions.

16  It would be appropriate, I think, to use a document that's not

17  redacted, if we're gonna just refer to it as a term sheet.

18          THE COURT:  Response?

19          MR. WERKHEISER:  I was gonna elicit some testimony,

20  Your Honor, from the witness explaining why it was redacted.

21  Given the short notice, this is what we have available today,

22  and if I could just have a little leeway to do that.

23          THE COURT:  I'll give you a little bit of leeway,

24  but, I mean, we're not going to go very far with this document

25  in any respect unless a full and unredacted version is at least

Gray - Direct                                  57

1   made available to counsel for purposes of cross examination.

2              MR. WERKHEISER:  Understood, Your Honor, and I don't

3   intend to go very deep into the document.

4              THE COURT:  All right.

5   BY MR. WERKHEISER:

6   Q.  Mr. Gray, if you could just explain for the record why

7   certain portions of this document have been redacted?

8   A.  Due to the fact that we're a publicly traded company, it

9   has sensitive information regarding the terms redacted.

10  Q.  And did Luby's have some concerns about confidential

11  information being disseminated?

12  A.  Yes.

13  Q.  If you could just turn to the second page -- or excuse me,

14  the third page of the term sheet on the section that is marked

15  Existing Loan Documents.  Could you read what that states into

16  the record?

17  A.  It's "Unless otherwise herein stated, the loan

18  documentation for the facility described herein shall be

19  substantially identical to the loan documentation evidencing

20  the existing credit facility of borrower, agent, by Wells Fargo

21  Bank."

22  Q.  And what is your understanding of that language?

23  A.  We will be basically editing the existing credit facility

24  where applicable.  It will be a substantially identical

25  document without having to draft a new agreement.

1  Q.  And has that process begun?

2  A.  Yes.

3  Q.  And is -- have you been made aware of any problems with

4  documenting the loan at this stage?

5  A.  None.

6  Q.  Did there come a point in time in connection with

7  submitting your bid that you had discussions with your lenders

8  in contemplation of making this bid?

9  A.  Repeat the question.

10  Q.  I'm sorry, it was a poorly worded question.  In connection

11  with submitting your bid, did you have discussions with your

12  lenders?

13  A.  Absolutely.

14  Q.  And did representatives of the Debtors participate in those

15  discussions?

16  A.  Yes, we did, on a couple of occasions.

17  Q.  And was it your understanding following -- well, strike

18  that.  What information was communicated with the lenders

19  during those discussions?

20          MS. MICHELSON:  Objection, Your Honor, to the extent

21  it's asking for communications from the lenders to the Debtor.

22  I'm not sure if that's (indiscern.) but that's hearsay if it

23  is.

24          THE COURT:  Sustained.

25  BY MR. WERKHEISER:

1  Q.  If you could summarize what information you provided to

2  your lenders and to the Debtors in connection with those

3  communications?

4  A.  We discussed the document, page one, Conditions to

5  Commitment; explained that the banks had received approval from

6  their credit department for the expansion of the existing

7  credit facility, and there would not be anything other than

8  documentation, which the bank parties had represented could be

9  completed by a target date of June 28th, in enough time to have

10  executed the expanded facility, and would provide for the funds

11  available to close the transaction.

12  Q.  And when those -- when that -- when did that discussion

13  occur, approximately?  Would it help if I told you that the bid

14  deadline was June 14th?

15      (Laughter)

16  A.  Yes.  Yes, absolutely.

17  Q.  Which is a matter of public record, Your Honor.  I think we

18  can take judicial notice of.

19           THE COURT: Let's move on.

20  BY MR. WERKHEISER:

21  Q.  What was your understanding following the conclusion --

22           THE COURT: I love this when it's would it refresh

23  your recollection if I gave you the answer?

24      (Laughter)

25           THE COURT:  Let's move on.

1            MR. WERKHEISER:  Your Honor, I was just trying to

2   refresh his recollection based on when the bid deadline was,

3   which I think is beyond dispute and a matter of public record.

4   BY MR. WERKHEISER:

5   Q.  But when -- what was your understanding of the status of

6   your financing with your Lenders at the conclusion of that

7   discussion?

8   A.  That the -- we had the ability to close the transaction at

9   the contemplated close date, which at that time, at that

10  meeting, was July 9th.

11  Q.  And after the auction on June 17th, did you have another

12  discussion with the Lenders and with representatives of the

13  Debtors?

14  A.  Yes, that was yesterday morning at 10 a.m.

15  Q.  And who participated from the Debtors' side?

16  A.  Mr. Steve Simms and Alex Stevenson.

17          MR. WERKHEISER:  At the risk of testifying, Your

18  Honor, I think it's a matter of public record that Mr. Simms is

19  a professional for the Creditors Committee.

20  BY MR. WERKHEISER:

21  Q.  And what sort of information did you communicate to the

22  Lenders in the context of that discussion?

23  A.  I had both banking parties present, both teams, and

24  basically turned the call over to their side to ask questions

25  of -- directly to the Lenders to reconfirm that there were only

1  documentation required for the execution of the expanded credit

2  facility.  There would not be any issues with meeting the

3  closing date.

4  Q.  And what was your understanding of the status of the loans

5  and the documentation thereof when you completed that call?

6  A.  They were underway and in process.

7  Q.  Thank you.  If we could talk for a moment about Luby's cash

8  and cash equivalents.  What cash on hand did Luby's report for

9  the period ended May 5th, 2010?

10 A.  Approximately 7.7 million.

11 Q.  And is that the amount of cash that Luby's has on hand as

12 of today?

13 A.  No.

14 Q.  How much cash does Luby's have presently?

15 A.  In excess of 13 million.

16 Q.  And what accounts for the difference between the cash on

17 hand and the cash that --

18 A.  Subsequent to our previous release, the company had

19 investments in auction rate securities in an ongoing litigation

20 against Credit Suisse.  The company was successful in having

21 Credit Suisse refund the full par value of those investments,

22 just above $7 million.  And we've -- the company has received

23 those funds and are included in that total.

24 Q.  And the company had received those funds on the date that

25 it submitted its bid?

1  A.  Yes, and included in our bid package, we did make reference

2  to and provide support from our bank accounts representing that

3  the company had $13 million, as well as stating the

4  availability under the existing credit facility.

5  Q.  And just -- we may be back covering old ground but, the

6  company's existing facility is on your own currently, is that

7  accurate?

8  A.  Correct.

9  Q.  And how much is available under that?

10 A.  The only portion of the 20 million (indiscern.) a Letter of

11 Credit that accounts for a differential, so the bid was

12 reported as is consistent with our recent 10Q is $18.4 million.

13 A.  And once documentation is finalized under the amended loan

14 facility, how much will the company have available?

15          MS. MICHELSON:  Objection, calls for speculation.

16          THE COURT:  I'll allow it.

17 BY MR. WERKHEISER:

18 A.  The company will have its cash on hand, plus a goodly

19 portion of the expanded credit facility available to use for

20 the purchase of Fuddruckers up to $53 million under the

21 revolver.

22 Q.  So it'll be $53 million under the loan facility?

23 A.  Yes.

24 Q.  Separate and apart from any cash on hand that the company -

25 -

1   A.   Correct.

2            MR. WERKHEISER:  Your Honor, if I could just take a

3   moment?

4            THE COURT:  Sure.

5        (Pause in proceedings)

6   BY MR. WERKHEISER:

7   Q.   Thank you, Mr. Gray, just one or two more questions.

8   Although you were still documenting your additional financing

9   at the time you submitted your bid, did your bid itself contain

10  any financing contingency?

11  A.   No.

12  Q.   And finally, as someone who is familiar with the company's

13  finances, are you comfortable that Luby's has the ability to

14  consummate the transaction and pay the purchase price?

15           MS. MICHELSON:  Objection, Your Honor, calls for

16  expert testimony.

17           MR. WERKHEISER:  Your Honor, I think this is the same

18  issue --

19           THE COURT:  No, I'm going to overrule that.  I mean,

20  I think that that falls squarely within his job description.  I

21  mean, the question of whether he's right or not you can cross

22  him all day long.  Please don't, but --

23       (Laughter)

24           THE COURT:  But --

25           MS. MICHELSON:  You opened the door, Your Honor.

1          THE COURT:  I mean, I think he's -- you know, he's

2    the CFO of the company, he's being asked whether for not the

3    company's in a position to move forward with the transaction.

4    He ought to be able to answer that question within his opinion.

5    A.  Thank you, Your Honor.  As I mentioned before, we announced

6    a capital -- or cash flow improvement and capital re-employment

7    plan as of October 15th, 2009, since which time we've closed a

8    number of our under-performing restaurants.  Those assets will

9    be utilized to redeploy in some manner.  This acquisition is

10   perfect for our shareholders, to provide us a growth vehicle,

11   which we currently do not have with the unit economics which

12   Fuddruckers has.  We have those properties on the sidelines to

13   pay back the funds that we will utilize from the expanded

14   credit facility from our existing lenders.  We feel that that

15   provides the bankers with additional support of being able to

16   pay them back, not to mention the -- some improvement we are

17   seeing in our current company cash flow, as well as the cash

18   flow which we'll be taking from the assets purchased, which are

19   the remaining stores of a chain that had under-performing units

20   which are presumably being flushed through the process of

21   bankruptcy.  So, that -- based on that basis, we feel that we

22   can support utilization of the credit facility to make the

23   purchase in the future years and have the ability to perform

24   going forward.

25   Q.  Thank you.  And to touch base on one more piece of the

1  transaction, did Luby's submit a deposit in connection with

2  this bid?

3  A.  Yes.  The deposit --

4  Q.  How much was that deposit?

5  A.  It was 4.2 plus -- $4.2 million for the bid for the

6  Fuddruckers locations with the spirit, and then an additional

7  $120,000 for the Minnesota sites.

8  Q.  So $4.32 --

9  A.  32 million, yes, sir.

10  Q.  -- million in total in the aggregate.  And is it your

11  understanding that that deposit will be applied towards the

12  total purchase price upon closing the transaction?

13  A.  Correct.

14  Q.  And when you take together the deposit, the cash on hand

15  that Luby's has, and the additional financing that is committed

16  at this time and that is being documented on substantially the

17  same terms as exist with these lenders under Luby's existing

18  facility, do you believe that Luby's will have funds sufficient

19  to consummate this transaction?

20  A.  Yes.

21           MR. WERKHEISER:  Thank you, Your Honor, I have

22  nothing further at this time.

23           THE COURT:  Okay.

24           MR. WERKHEISER:  I reserve for redirect if necessary.

25           THE COURT:  Sure.  Cross?

1            MS. MICHELSON:  Thank you, Your Honor, Tavistock

2    reserves it's right with respect to crossing Mr. Ray until it

3    sees the unredacted term sheet because that is obviously

4    critical in this situation, but I'm prepared to continue --

5            THE COURT:  Okay.

6            MS. MICHELSON:  -- subject to that, Your Honor.

7                        CROSS EXAMINATION

8    BY MS. MICHELSON:

9    Q.  Good morning, Mr. Ray. On June 14th last week, Luby's did

10   not have $42.6 million in cash, did it?

11   A.  No.

12   Q.  And it didn't have the ability at that time under its

13   existing line of credit and the cash in the bank to write a

14   check to the estate for $42.6 million, did it?

15   A.  No, ma'am.

16   Q.  You haven't signed the extension, the amendment of the

17   existing credit facility, isn't that right?

18   A.  No.

19   Q.  It's correct that you haven't signed it, right?

20   A.  We have not signed the amended credit facility.  The

21   company has signed the commitment letter with our bankers.

22   Q.  Now Luby's reported losses in the fiscal year ending 2009

23   in the amount of $26.4 million, correct?

24   A.  Correct.

25   Q.  And in 2008 its losses were reported to be $2.2 million,

1  isn't that right?

2  A.   Yes.

3  Q.   And in 2007 it lost $10 million, right?

4  A.   I believe so.

5  Q.   Would it refresh your recollection to look at the public

6  filings?

7  A.   Yes.

8             MR. WERKHEISER:  Your Honor, I'm sorry to interrupt.

9  I just realized that I neglected to offer our exhibits into

10  evidence, and if I may have your leave I would do so.

11             THE COURT:  We have haven't -- the one issue that we

12  do have, at least immediately pending is the question of

13  whether or not there is an unredacted version of this available

14  for counsel to examine or not.  That's a central piece of the

15  discussion.  Counsel described it has critical, but you're

16  moving their admission and I think we ought to address that.

17             MS. LYNCH:  Your Honor, Christine Lynch, counsel for

18  the Debtors.  Your Honor, I don't believe that Mr. Werkheiser

19  is seeking to introduce that term sheet for the truth of the

20  matters that are asserted in the term sheet.  I think he's

21  seeking to introduce it to show what the Debtors reviewed as

22  part of the qualification process.

23             THE COURT:  Okay.  I understand.

24             MS. LYNCH:  So I don't think it's necessary at this

25  point to require an unredacted version of the term sheet.

1              THE COURT:  Right.

2              MS. LYNCH:  We've never seen one, Your Honor.  So I

3    submit that it's totally irrelevant to our qualification

4    process of Luby's.

5              THE COURT:  I understand.  Okay.  Well let's, before

6    we turn to the redaction are there any objections to the other

7    two items --

8              MS. LYNCH:  None, Your Honor.

9              THE COURT:  -- or I guess it's now three.  All right.

10   They are admitted and I'll withhold ruling on the redaction

11   issue as we get through the examination.

12             MR. WERKHEISER:  Thank you, Your Honor.

13             THE COURT:  Okay.

14        (Debtors' Exhibit-1 admitted into evidence)

15        (Debtors' Exhibit-2 admitted into evidence

16        (Debtors' Exhibit-3 admitted into evidence)

17             MS. MICHELSON:  Your Honor, may I approach the

18   witness?

19             THE COURT:  Sure.  Thank you.

20   BY MS. MICHELSON:

21   Q.  Mr. Ray I've handed you a document, do you recognize that

22   document?

23   A.  Yes, I do.

24   Q.  Can you tell the court what it is, please?

25   A.  This is an -- excerpts of the financial statements from our

1    Form 10K.

2    Q.  And I'd ask you to take a look at the final page of the

3    document and see if that refreshes your recollection with

4    respect to --

5    A.  Yeah, that -- you stumped me at, I didn't recall having a

6    loss in 2007.  As you can see it's net income of 10 million.

7    Q.  Ah, I see.  Thank you.  Now Luby's had a loss as well in

8    the first three quarters of 2010, is that right?

9    A.  Only in the first two of three.

10   Q.  And for the total -- for those, the cumulative three

11   quarters of 2010, how much did Luby's lose?

12   A.  A little over $3 million which includes discontinued

13   operations which largely impacted the first quarter, which was

14   the quarter when we launched our cash flow improvement and

15   capital redeployment plan which included closure costs with

16   closing the restaurants.

17   Q.  So in addition to the $26.4 million that Luby's lost in

18   2009 since that time it's lost an additional something in

19   excess of $3 million, right?

20   A.  In book losses, yes.

21   Q.  Now what have same store sales done in 2010?

22   A.  Same store sales were at a greater than 10 percent decline

23   the first two quarters and the most recent quarter we brought

24   that down into a single digit decline.

25   Q.  Okay.  So what's the total same store sale loss for 2010 to

1   date?

2   A.   Approximately 12, 12 percent.

3   Q.   Now what is the cafeteria segment doing in the restaurant

4   industry in terms of its performance today?

5   A.   There's not many remaining direct competitors with that

6   format.   I think we find that many restauranteurs have elements

7   of a cafeteria in the way the food is delivered to its guests.

8   Our cafeterias are still a traditional food, home-style cooking

9   served in a display format.   We can compete, feel that we

10  compete with not necessarily just cafeterias.

11  Q.   Isn't it correct that the cafeteria segment in the

12  restaurant industry is declining overall, nationwide?

13  A.   There are not any competitors I'm aware of that are opening

14  up and launching expansions of cafeterias that I could speak

15  of, so.

16  Q.   Do you know whether the cafeteria segment in the restaurant

17  industry is declining nationwide?

18  A.   Would think that would fall under the family dining

19  segment.

20  Q.   But my question, sir, is do you know whether the cafeteria

21  segment is declining?

22  A.   I don't know that we have -- that they really categorized

23  it as segment on its own, under cafeteria.   I think we're part

24  of the food that the family dining segment.

25  Q.   My question is really just for a yes or no.   Do you know

1  whether the cafeteria segment in the restaurant industry is

2  declining nationwide?

3  A.  As I previously stated I think that, we do not -- do not

4  see any other competitors opening up cafeterias.  So we are one

5  of the last cafeteria operations in the country.

6  Q.  Maybe I'm not making my self clear.  My question is --

7          MR. WERKHEISER:  Your Honor --

8          MS. LYNCH:  She's badgering.

9          MR. WERKHEISER:  -- the question has been asked and

10 answered several times already.

11         THE COURT:  I'm not sure he's answered the question.

12 He's clearly indicated that he's not, that they're one of the

13 last providers and that they're not aware of anybody else

14 that's expanding in this industry.  I think the question is, is

15 this business declining or dying.  Is that the question?

16         MS. MICHELSON:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MS. MICHELSON:  It calls for a yes or no answer.

19         THE COURT:  If he knows.

20         MS. MICHELSON:  If he knows.  The question was does

21 he know.

22         MR. WERKHEISER:  I think, Your Honor, I think there's

23 just a definitional issue the witness is trying to say there is

24 no segment per se called the cafeteria segment.  There's not a

25 foundation for that and maybe the question could be rephrased.

1            MS. MICHELSON:  Let me see if I can rephrase it.

2    That may make it easier.

3            THE COURT:  Sure.

4    BY MS. MICHELSON:

5    Q.  Do you know if there is a cafeteria segment in the

6    restaurant industry?

7    A.  There are other competitors out there.  I would say

8    Piccadilly would be another cafeteria that would come to mind.

9    Q.  So then your answer is yes?

10   A.  The -- I would agree with that the number of cafeterias in

11   operation have declined over the years, yes.

12   Q.  And do you know if the performance of the existing

13   cafeteria restaurants has declined recently?

14   A.  I think every restaurant has been effected by the impact of

15   the overall economy, including cafeterias.  Some more so than

16   cafeterias.

17   Q.  But cafeteria style restaurants have declined as well,

18   correct?

19   A.  Yes.

20   Q.  Now at the time that you submitted the bid to the Debtors,

21   you submitted Exhibit F as part of that package, correct?

22   A.  Correct.

23   Q.  Now Exhibit F has a term sheet attached to it in the

24   original does it now?

25   A.  In my copy it does not.

1  Q.  Does the original have a term sheet attached to it?

2  A.  Based on this, it would have to not contain the redacted

3  term sheet which was provided subsequently with the full $53

4  million, $53 million commitment letter.

5  Q.  So there was a term sheet attached to the original?

6  A.  I don't recall that, based on this document I don't believe

7  there was, that I've been provided, it has a term sheet

8  attached.

9  Q.  Let me draw your attention to the end of the first

10  paragraph.  The last sentence says, "unless otherwise herein

11  all terms used herein which are defined in the term sheet will

12  have the meaning when used therein as so defined."  And the

13  prior sentence says, "the financing proposed hereby the

14  facility is described in the term sheet attached as Exhibit A."

15  Does that change your testimony?

16  A.  No.

17  Q.  Did you see the original of this document?

18  A.  Yes.

19  Q.  Did it have a term sheet that accompanied it?

20  A.  Based on this document I've been provided I don't know that

21  the term sheet it not attached.

22  Q.  No.  I'm asking you if you've seen an -- you did see the

23  original of the June 11th letter that references --

24  A.  Yes.

25  Q.  -- a term sheet?

1  A.  Yes, that a term sheet attached.  Yes, from my bankers.

2  Yes.

3  Q.  Yes.  But that wasn't provided to the Debtors, is that

4  correct?

5  A.  It has been, it was provided.

6          MS. LYNCH:  Your Honor, just -- let's move past this

7  issue.  In the original bid submission that Luby's made that

8  term sheet was not attached.

9          THE COURT:  Okay.

10          MS. MICHELSON:  Thank you.

11          THE COURT:  Point made.  Thank you.

12  BY MS. MICHELSON:

13  Q.  Now the June 11th letter that was included in your

14  submission is customarily called a commitment letter, isn't it?

15  A.  Yes.

16  Q.  And it is often the case is it not that banks don't fund

17  even when they've written a commitment letter, right?

18          UNIDENTIFIED SPEAKER:  Objection, no basis.

19          MR. WERKHEISER:  Objection, Your Honor.  He's not an

20  expert on the banking industry.

21          THE COURT:  Well, yeah I mean I think we can on.  I'm

22  familiar with the concept of commitment letters and I've seen

23  them go one way or the other.

24  BY MS. MICHELSON:

25  Q.  Okay.  There are conditions to the commitment letter, are

1  there not?

2  A.   Yes.

3  Q.   And, in fact, there's a section in the commitment letter

4  called "Conditions to Commitment", correct?

5  A.   Correct.

6  Q.   So is it your understanding that if there was a material

7  adverse change in Luby's business or performance or that of any

8  of its subsidiaries or in the Luby's ability to operate in

9  accordance with it's financial projections and to comply with

10 whatever financial covenants are in the term sheet we don't

11 have, the bank could decline to expand the existing credit

12 facility?

13 A.   As provided in the conditions to commitment the banks have

14 this in their language for a, for that remote possibility.

15 Q.   So the banks could decline to expand the credit facility

16 under this clause, isn't that correct?

17             MS. LYNCH:  Your Honor, I think that this testimony

18 was covered on direct.  I think the witness did testify about

19 the conditions that were set forth in the commitment letter and

20 that there was a subsequent conversation with the lender --

21             THE COURT:  Is there an objection?

22             MS. LYNCH:  -- to clarify those --

23             THE COURT:  Is this an objection?

24             MS. LYNCH:  Objection; asked and answered.

25             MS. MICHELSON:  May I respond, Your Honor?

1            THE COURT:  No.  I think you can keep going.

2            MS. MICHELSON:  Thank you, Your Honor.

3    BY MS. MICHELSON:

4    Q.  Let me ask the question again.  Is your --

5            THE COURT:  I will say this -- hang on, just for

6    substance though.  I've read the Conditions to Commitment so I

7    mean you don't need to walk him through.  You're welcome to do

8    it however you want, but if you want me to, to know that I've

9    looked at -- I have now read it a couple of times being up

10   here.

11           MS. MICHELSON:  Okay.

12           THE COURT:  All right.

13           MS. MICHELSON:  Can I take a short break, Your Honor?

14   Just -- I may be able to --

15           THE COURT:  Yeah.

16           MS. MICHELSON:  -- conclude very quickly, if?

17           THE COURT:  Sure.

18           MS. MICHELSON:  I just want to confer with my client

19   briefly.

20           THE COURT:  Yeah, that's fine.  Do you want to take a

21   break or do you want just a moment to talk to your client?

22           MS. MICHELSON:  Uhm --

23           THE COURT:  It's easier if you -- I'm happy to give

24   you the moment.  It's hard to get a group this large to break

25   for anything less than about 10 minutes.

1            MS. MICHELSON:  Let me confer with my client briefly,

2    Your Honor.

3            THE COURT:  Sure.

4            MS. MICHELSON:  And I'll let you know.

5            THE COURT:  Take your time.  Thank you.

6        (Pause in proceedings)

7            MS. MICHELSON:  Thank you, Your Honor.

8            THE COURT:  You okay?

9    BY MS. MICHELSON:

10   Q.  Mr. Ray, the letter that you provided with, that Luby's

11   provided with the bid to the Debtors included conditions for a

12   material adverse change in the bank loan syndication markets,

13   provided for a condition involving the bank's due diligence,

14   condition for a material adverse change in the capital markets,

15   a contingency for acceptable loan documents, a contingency

16   requiring real estate valuation of property owned by Luby,

17   required two lenders to agree to terms, that is Wells Fargo and

18   Amegy, it required guarantees of all the Debtor's subsidiaries

19   and it required some financial covenants; isn't that right?

20   A.  Correct.  I mean we've worked with this existing bank group

21   and they know the company well, and we were going to expand

22   existing credit line and this is their standard letter.  We

23   fully believe that our lenders were able to close once we had

24   documented the edits or amendment to the existing facility.

25   Q.  Now let me turn your attention to Defendant's 3 and the

1   redacted document entitled "Term Sheet".  Do you have that

2   document?  See the section entitled, "Guarantors", there's a

3   redaction that appears beneath the word "all subsidiaries of

4   the borrower".  Was there an additional guarantee that was

5   required in order to get an expanded credit --

6   A.   That refers to the members of the management team, Chris

7   and Harris Pappas, pledging an amount as additional credit

8   consideration for the deal.

9   Q.   Okay.  Why was that redacted in this document?

10  A.   Again, we felt there was a privacy with regards to, regards

11  to that.  I think we fully disclosed that there was a pledge on

12  deposit as part of the deal.

13  Q.   Can you explain what you mean by "pledge on deposit"?

14  A.   There would be an amount placed in an account at the banks

15  and there was a suggested reduction in that pledged deposit

16  over time.  That is contemplated to be accelerated as assets

17  are sold and used to reduce the credit facility from, what we

18  anticipate to be approximately $49 million at closing.

19  Q.   And how much was that pledge to be?

20  A.   13 million.

21  Q.   Has that been deposited with Wells Fargo bank and Amegy?

22  A.   As of today it has not, but will be before closing.

23  Q.   Now the Pappas are involved with a company called Pappas

24  Restaurants, isn't that correct?

25  A.   Yes.

1  Q.  What is their position with Pappas Restaurants?

2  A.  They are the owners of the company.

3  Q.  And Pappas Restaurants operates a number of seafood

4  restaurants in Texas, correct?

5  A.  Yes.

6  Q.  And the British Petroleum oil spill has caused those

7  companies severe problems, has it not?

8           MR. WERKHEISER:  Objection, Your Honor, there's no

9  foundation for that question.

10           THE COURT:  I'll let him answer it if he can.

11  A.  This not a, this pledge is not associated with Pappas

12  Restaurants.  This is two individuals that are the CEO and COO

13  of Luby's, Inc.

14  Q.  And they are also involved with the Pappas Restaurant chain

15  as you testified, right?

16  A.  Yeah, that's the restaurant chain they built and they have

17  a whole team running that operation.

18  Q.  And it's correct that Pappas Restaurant has sued British

19  Petroleum alleging that their business has been seriously

20  impaired as a result of the oil spill, isn't it?

21  A.  I think that's a matter of public record.

22  Q.  And there's a complaint on file as far as you know, right?

23  A.  I cannot comment on that in any detail.

24  Q.  Have you seen a complaint?

25  A.  I have not.  Again, I said it's available -- basically I

1  was aware that that was out there.

2            MS. LYNCH:  Your Honor, the Debtor objects on

3  relevance grounds.

4            THE COURT:  Yeah, we're at the ragged edges of it,

5  but I understand the point that's being made.  But I don't

6  think you can get much further with this witness on that point

7  unless he's, unless there's something else that I haven't heard

8  yet.

9            MS. MICHELSON:  I'll move on, Your Honor.

10            THE COURT:  Okay.

11  BY MS. MICHELSON:

12  Q.  Mr. Ray, there is a section on the term sheet that we

13  looked at, the redacted term sheet, next to the section

14  entitled "Banks", it appears to be redacted I can't tell.  Can

15  you tell me what was redacted?

16  A.  Under Banks those are this 26.5 per bank to support the 53

17  million.  Just for the record my last name is Gray.

18  Q.  Oh, I'm sorry.

19  A.  It's okay.

20  Q.  I apologize.

21  A.  No big deal.  G-R-A-Y.  I have three last names, I get that

22  all the time.

23  Q.  There are additional redactions in the term sheet or it

24  could -- are you in a position right now to tell me what those

25  redactions are?

1   A.   Can you specify which one you would like to discuss?

2   Q.   All of them.

3   A.   I can give you some general parameters.

4   Q.   But you can't tell me specifically what was redacted?

5   A.   Yes.  You know, in terms of all of the amounts?

6   Q.   I'm interested in knowing exactly what was redacted.  You

7   don't have the ability to --

8   A.   Well, I can, I'll take you through as many as I can if

9   you'd like.

10  Q.   Can you tell ms specifically --

11  A.   Okay.  The top one, the top one is $53 million revolver.

12  Q.   Okay.  And what was redacted after the word "include A"?

13  A.   It's 53 million or 14 million sublimit on insurance of

14  letters of credit, 14 million I think there.

15  Q.   You think that's 14 million?

16  A.   Yes, yes.

17  Q.   But you're not really sure?

18  A.   No, I mean that's what I recollect is 14 million.

19  Q.   Okay.  And under "facility" what's been redacted there?

20  Under the words "closing".

21  A.   $53 million and then $2 million for each of the dates going

22  below that in terms of reduction in the facility size as we pay

23  down each facility.

24  Q.   So are there four figures included in the unredacted copy?

25  A.   I believe so.

1  Q.  And what are those four figures?

2  A.  Let me ask you quick -- can I ask you question?

3            THE COURT:  Sure.

4  A.  Without having to go through the entire term sheet and

5  indicate all of the amounts can we just furnish, I mean, do we

6  need to furnish a copy -- again I think the point was made that

7  in consideration that there was an agreement between the banks

8  and the company to be able to close and represented as such by

9  the company, that we had mutually agreed to terms.  Those terms

10 were laid out not in detail as to not disclose something that

11 is not publicly available to the rest of our shareholders as to

12 the structure of the deal until which time we had closed it and

13 filed it subsequent to June 28th when we believe to actually

14 document the expanded revolver which sale would be publicly

15 available.  So we, that's why we had redacted the amounts.

16           MS. MICHELSON:  Your Honor, we need to see the

17 unredacted copy rather than --

18           THE COURT:  You know I'm not really satisfied that

19 you do.  The issue here and the burden here is not really with

20 this, it is ultimately perhaps, shared between Luby's and the

21 Debtor with respect to the ability to provide and prove that,

22 proof of adequate insurance.  The record does reflect that at

23 least based upon counsel's representations that this term sheet

24 along with the commitment letter were what was received and

25 evaluated by the estate fiduciaries and the secured creditor in

1   determining whether or not to permit them to bid and to move

2   forward.  So I'm satisfied right now and I'm not going to

3   require production of the redacted term sheet absent further

4   developments in the testimony, but I will -- I believe the

5   witness has testified, but I don't believe that, I don't

6   believe that production of the redacted version is required at

7   present.  You may proceed.

8           MS. MICHELSON:  Thank you, Your Honor.

9   BY MS. MICHELSON:

10  Q.  Mr. Gray, at any time did you provide evidence to the

11  Debtors that Luby's had cash in the bank plus an existing

12  credit facility in the amount of $42.6 million?

13  A.  No.  We provided, as part of our package, that Luby's had

14  13 million in cash, available credit of 18.4 out of the

15  existing credit facility and a commitment letter to expand that

16  existing facility up to an amount including a bidding range

17  with an opening bid of $42 million.

18  Q.  Thank you.

19          MR. MICHELSON:  No further questions.

20          THE COURT:  Okay.  Redirect?

21          MR. WERKHEISER:  Your Honor, I have some limited

22  redirect.

23          THE COURT:  Okay.

24          MR. WERKHEISER:  For the record, again, Gregory

25  Werkheiser.

1                         REDIRECT EXAMINATION

2    BY MR. WERKHEISER:

3    Q.   Mr. Gray, what segment of the restaurant industry is

4    Fuddruckers in?

5    A.   Fast casual.

6    Q.   Is that different than cafeteria?

7    A.   Yes.

8    Q.   And what to your understanding are the prospects near term

9    for that industry?

10   A.   Much more ability to grow meaning and particularly with the

11   70 percent mix of hamburgers being a growth vehicle and we're

12   seeing a lot of interest in different concepts being launched

13   into the marketplace finding appeal with customers with

14   reinventing how burgers are served.

15   Q.   How do the costs compare as between operating a cafeteria

16   format as run and operating a restaurant like a Fuddruckers?

17   A.   In the economics with this model prior, particularly prior

18   to any rent, rent cost is significantly greater than a

19   comparable owned cafeteria location from a percentage of sales

20   standpoint as well as from an investment standpoint for our

21   company's ability to grow and add value to our shareholders,

22   this would require, this expansion of this model would require

23   less capital to achieve the same level of cash flow to support

24   the valuation of the company.

25   Q.   Thank you.  With respect to the redacted term sheet that

1  has been inquired about, if you recall could you tell the court

2  when that was provided to the Debtors?

3  A.  It was provided upon request.

4  Q.  Approximately when was that if you remember?

5  A.  It was attached to the $53 million commitment letter

6  provided last Thursday evening.

7  Q.  Was it provided any time prior to that?

8  A.  It was requested, I don't recall it being requested or

9  attached to the original.  We sent the original letter and

10  asked for any follow-up questions and each time we've been

11  questioned or asked for additional information we have

12  complied.

13  Q.  When did the Luby's first become aware that Tavistock was

14  contesting the results of the auction?

15  A.  When we landed here in Philadelphia last night, somewhere

16  around 10 p.m.

17  Q.  And so did you have any knowledge that you would need to

18  have a unredacted version of the term sheet in court today?

19  A.  No, I did not.

20  Q.  And finally, you were asked several questions about the

21  conditions contained in the commitment letter and just so the

22  record is clear, has any lender indicated to you that those

23  conditions have not been or will not be satisfied?

24          MS. MICHELSON:  Objection, calls for hearsay.

25          THE COURT:  Sustained.

**Gray - Recross**                                                86

1  BY MR. WERKHEISER:

2  Q.  Is it your, do you have any reason to believe that those

3  conditions have not been or will not be satisfied prior to

4  closing?

5  A.  I do not have any reason to believe.

6           MR. WERKHEISER:  Nothing further, Your Honor.  Thank

7  you.

8           MS. MICHELSON:  Famous words of lawyers, briefly,

9  Your Honor.

10          THE COURT:  Tell that to the folks outside for my

11  10:30.

12          MS. MICHELSON:  I'll try to stick with that, that

13  representation, Your Honor.

14                       RECROSS EXAMINATION

15  BY MS. MICHELSON:

16  Q.  Mr. Gray, you testified that Luby's has dozens of parcels

17  of real value -- of real property, correct?

18  A.  Yes.

19  Q.  When, were all of those -- have all of those parcels been

20  appraised currently?

21  A.  Which ones?

22  Q.  All of the real estate that Luby's owns.

23  A.  By whom?  No.  No.

24  Q.  One of the conditions in the term sheet is, is a certain

25  loan to value ratio for real estate based on the current

Gray - Further Redirect                         87

1   appraisals, isn't that right?

2   A.   That's correct.  Can I --

3             MS. MICHELSON:  No further questions.

4             THE COURT:  The witness was asking for the

5   opportunity to clarify his answer.

6   A.   I wanted to clarify, you said --

7             THE COURT:  And I'll allow it.

8   A.   -- had the properties been appraised.  The answer is yes,

9   but then the question is when.  So had it previously as it

10  relates, I'm presuming to the term sheet, we have clarified for

11  the Debtors through conversation that there is an outside date,

12  post closing, for getting the leverage ratio to the

13  requirement.  So it's not a condition to close.  There's an

14  amount of days to perfect the appraisals on an x number of

15  locations to meet the requirement and support the expanded

16  line.

17  BY MS. MICHELSON:

18  Q.   And has Luby's perfected those appraisals on those

19  locations as we sit here today?

20  A.   No, and they're not required to prior to closing.

21            MS. MICHELSON:  No further questions.

22            THE COURT:  Okay.

23            MR. WERKHEISER:  Your Honor, I'm not sure if it got

24  into the record clearly.

25                    FURTHER REDIRECT EXAMINATION

1    BY MR. WERKHEISER:

2    Q.  But the properties just discussed Mr. Gray, they have in

3    fact been appraised previously, correct?

4    A.  All of Luby's properties at one time or another have been

5    appraised.  On a relevant date, I don't know it's relevant for

6    this.

7              MR. WERKHEISER:  Thank you.

8              THE COURT:  Okay.  Thank you, sir.  You may step

9    down.

10         (Witness excused)

11             MS. LYNCH:  Your Honor, I'd like to call to the

12   witness stand, Mr. Alex Stevenson.

13             THE COURT:  Swear the witness, please.

14             THE CLERK:  Would you state your name, spelling your

15   last.

16             MR. STEVENSON:  Alexander William Stevenson, S-T-E-V-

17   E-N-S-O-N.

18             THE COURT:  There's no exhibits up here.

19             MR. WERKHEISER:  Didn't want to leave a mess up here,

20   sorry, Your Honor.

21             THE COURT:  That's all right.  Are we going to

22   proceed by proffer or with direct?

23             MS. LYNCH:  We're going to proceed by direct, live

24   direct testimony, Your Honor, at the request of Tavistock's

25   counsel.

Stevenson - Direct                          89

1          THE COURT:  Okay.

2          UNIDENTIFIED SPEAKER:  Your Honor, may I approach the

3  witness just for a moment?

4          THE COURT:  Sure.

5          MS. LYNCH:  I think our preference would have been to

6  do it by proffer, but they insisted that --

7          THE COURT:  You may proceed.

8          MS. LYNCH:  -- we do it by live direct.

9          THE COURT:  That's all right.  You may proceed.

10          ALEXANDER STEVENSON, DEBTORS' WITNESS, SWORN

11                      DIRECT EXAMINATION

12  BY MS. LYNCH:

13  Q.  Mr. Stevenson, would you please tell us about your

14  background.

15  A.  Sure.  I'm managing director with Focal Point Securities a

16  boutique investment bank in Los Angeles.  I run our special

17  situations and restructuring practice.  I've been in the

18  business of advising companies and stakeholder groups in

19  distress situations for approximately 15 years, including

20  numerous bankruptcy cases and out-of-court restructuring

21  situations.

22  Q.  And Mr. Stevenson what is Focal Point's role in this case?

23  A.  We are the investment banker for the company.

24  Q.  When was Focal Point retained by the company?

25  A.  February 3rd, 2010.

Stevenson - Direct                          90

1  Q.  Mr. Stevenson, are you familiar with the bid procedures

2  approved by the court in this case?

3  A.  Yes.

4  Q.  Are you familiar with the provisions concerning qualified

5  bids set forth in the bid procedures?

6  A.  I am.

7           MS. LYNCH:  Your Honor, I'd like the court to take

8  judicial notice of the bid procedures that have been approved

9  in this case.

10          THE COURT:  Okay.

11 BY MS. LYNCH:

12 Q.  Mr. Stevenson, were any bids received by the June 14th bid

13 deadline?

14 A.  Yes.  We received two bids for competing transactions.

15 Q.  And who submitted those bids?

16 A.  Fidelity National, otherwise known as American Blue Ribbon,

17 and Luby's.

18 Q.  Were they received prior to the 4 o'clock bid deadline?

19 A.  Yes, they were.

20 Q.  What did you do upon receipt of the bids?

21 A.  We reviewed the marked up APAs and financial information

22 that accompanied them in order to understand and assess the

23 financial ability of the parties to perform.

24 Q.  With respect to Luby's bid, what specifically did you

25 review once we received the bids?

1  A.  We reviewed bank statements indicating 12 or $13 million of

2  cash on hand, we reviewed the commitment letter from Wells

3  Fargo and Amegy Bank.  We subsequently had a call with Wells

4  Fargo and Amegy to discuss the commitment letter.  On that call

5  we confirmed that both lenders had Creditor Committee approval

6  to complete the transaction.  That their diligence was

7  complete.  That any real estate issues related to lien

8  perfection or appraisals or otherwise would be post-closing

9  requirements of the transaction.  That, and that they were

10  working toward -- and that it would be done as amendment to the

11  existing credit facility, making documentation very simple.

12  And that they were prepared, willing and able to close by -- at

13  that point the goal date was set for June 28th, the requirement

14  was July 9th.

15  Q.  And again you learned these details how, Mr. Stevenson?

16  A.  With a call on which I participated, Steve Sims from FDI,

17  advisor to the Committee participated, representatives of Wells

18  Fargo in Houston, Amegy Bank and Scott Gray from Luby's.

19  Q.  And when did that call take place?

20  A.  The morning of June 15th.

21          MS. LYNCH:  Your Honor, I'd like to approach the

22  witness.

23          THE COURT:  Okay.

24  BY MS. LYNCH:

25  Q.  Mr. Stevenson, I'm handing you Debtors' Exhibit-1.

1  A.   Thank you.

2  Q.   Which is the original bid of Luby's, Inc.  Mr. Stevenson

3  would you turn to Exhibit D of the bid.

4  A.   They're not tabbed, bear with me for a second.  D, yes.

5  Cash total.

6  Q.   D.   Yes.  It's titled "Letters confirming that Luby's has

7  cash equivalents in excess of $12 million".  Mr. Stevenson, did

8  you review Exhibit D upon receipt of Luby's bid?

9  A.   We did.  I did.

10  Q.   And what did you determine based on your review of Exhibit

11  D?

12  A.   That as of June 14th they had approximately $13 million of

13  cash, on hand.  $13 million of cash.

14  Q.   Mr. Stevenson, please turn to Exhibit E to the bid.

15  A.   Yes.

16  Q.   Can you describe Exhibit E?

17  A.   It's the Form 10Q for Luby's, for the period ending May

18  5th, quarter ending May 5th, 2010.

19  Q.   And upon receipt of Luby's bid, did you review Exhibit E?

20  A.   We did.

21  Q.   And did you form any conclusions based on your review of

22  Exhibit E?

23  A.   Well we noted that they had cash on hand of seven, we noted

24  that they availability under their existing line of 18 million,

25  400 thousand, I believe, and that was potentially it.

1  Q.  Mr. Stevenson, did you review the, Luby's balance sheet

2  included in Exhibit D?

3  A.  Yes, we looked at it.

4  Q.  And did you review all of the categories of assets set

5  forth on Luby's consolidated balance sheet?  I think it's on

6  Page 4.

7  A.  We reviewed their balance sheet.

8  Q.  Mr. Stevenson, would you turn to Exhibit F to the bid?

9  A.  Yes, thanks.

10 Q.  And Mr. Stevenson could you please describe Exhibit F?

11 A.  Yes.  Exhibit F is a commitment letter from Wells Fargo and

12 Amegy Bank dated June 11th to provide up to, or up to $42

13 million of financing in support of their acquisitioning of

14 Fuddruckers.

15 Q.  Upon your initial review of this letter, did you do any

16 follow up?

17 A.  Yes, we did.  We --

18 Q.  To confirm any of the information set forth in the letter?

19 A.  Yes.  It's a fairly, it's a very typical commitment letter

20 from a financial institution and in my experience.  We did

21 follow up on the morning of June 15th with a call with the two

22 lenders in question to confirm, again, that they had Creditor

23 Committee approval, that there was no further diligence, so

24 they confirmed that their diligence was complete.  They also

25 confirmed that any issues related to real estate appraisals or

1  perfection would be handled post-closing and that they were

2  doing this as an amendment to the existing credit facilities as

3  so the documentation would be, you know, simpler and easy to

4  complete within the timeframes committed.

5  Q.  Mr. Stevenson, turn to the first paragraph of that

6  commitment letter, there's a reference to Exhibit A?

7  A.  Yes.

8  Q.  Are you aware whether Exhibit A was attached to --

9  A.  Exhibit A was not initially attached to the bid.

10  Q.  Did you ever request a copy of Exhibit A?

11  A.  We did. I believe it was provided that evening or the

12  following morning.  I can't recall which.

13  Q.  And do you recall what Exhibit A was?

14  A.  Exhibit A was a redacted term sheet that summarized the

15  terms of the loan with obviously portions of it redacted for

16  confidentiality purposes.

17            MS. LYNCH:  Your Honor, may I approach.

18            THE COURT:  Yes.

19            MS. LYNCH:  Your Honor, I am handing the witness

20  Debtors' Exhibit-3.

21  A.  No, wait.  Four, I'm sorry four.

22            MS. LYNCH:  Just handed the witness Debtors' Exhibit-

23  4.

24      (Debtors' Exhibit-4 previously marked for identification)

25  BY MS. LYNCH:

1  Q.  Mr. Stevenson take a moment to review that, please.

2      (Pause in proceedings)

3  BY MS. LYNCH:

4  Q.  Is that the same document that you just testified you

5  received on June 15th from Luby's?

6  A.  Yes, I believe it is.

7  Q.  At time of receipt of that document did you do anything in

8  response?

9  A.  We reviewed it with -- amongst ourselves and with counsel,

10  and believed it to be consistent with the representations that

11  were made to us on our telephone call with Wells Fargo and

12  Amegy earlier that day or the prior morning.

13  Q.  So, Mr. Stevenson, now let's go back to June 15th.  June

14  15th you testified you had a call with Luby's and Luby's'

15  lenders.  What happened subsequent to that call?

16  A.  Subsequent to that call, we held a call with the Debtors

17  and counsel to review the bids and the bidders' qualifications.

18  On that call, we went through each of the economics of the

19  bids.  We went through the fact that each of the bidders had

20  submitted a deposit.  Each of the bidders had submitted a

21  signed APA.  Each of the bidders had provided evidence of

22  financial wherewithal that, in our opinion, showed that they

23  could close the transaction under the time permitted, based on

24  our diligence and that, in our view, both bidders were

25  qualified bidders.  And, if I could add, that neither bid --

1  none of the bids had financing or due diligence contingencies.

2  Q.   Thank you, Mr. Stevenson.   Subsequent to the conference

3  call with the Debtors and the Debtors' professionals, did you

4  have any discussions in consultation with the Committee?

5  A.   Yes.   That afternoon we held a conference call to, again,

6  review the bids with the Committee.   On that call were

7  representatives of the Debtor, counsel, myself, and the

8  Committee's counsel and the Committee's financial advisor.   We

9  reviewed the bids and, on that call, the Committee agreed with

10  our assessment that the bidders were both qualified bidders.

11  Q.   During that call, Mr. Stevenson, did you provide a report

12  to the Committee's professionals about your review of the

13  Luby's bid?

14  A.   We discussed that, yes.

15  Q.   And did you state your personal conclusion?

16  A.   I believe that it was discussed, and I -- that I provided

17  that conclusion, yes.

18  Q.   And did the Committee, on that conference call, state

19  whether they had a position on whether the Luby's bid was

20  qualified or not?

21  A.   They agreed with our conclusion.

22  Q.   That?

23  A.   That the Luby's bid was a qualified bid.

24  Q.   And do you know the reasons why the Committee concurred

25  with the Debtors' conclusion that the Luby's bid was a

1  qualified bid?

2              MS. MICHELSON:  Objection, calls for --

3              THE COURT:  Sustained.

4  BY MS. LYNCH:

5  Q.  Mr. Stevenson, did you at any time consult with Wells Fargo

6  about the Luby's bid?

7  A.  Yeah.  See, the later that evening, the evening of the

8  15th, or first thing the morning of the 16th, I had a call with

9  Steve Scott from Wells Fargo, Foothill, where we had the same

10  conversation and he, again, concurred that they were qualified

11  bids.  The same conversation being the review of the bids and

12  the qualifications of the bidders.

13  Q.  And did Mr. --

14  A.  Scott.

15  Q.  -- Scott express an opinion about whether the Luby's bid

16  was a qualified bid?

17              MS. MICHELSON:  Objection.  Calls for hearsay.

18              THE COURT:  I'll allow it.

19  A.  He communicated to me that he thought they were both

20  qualified bids.

21  BY MS. LYNCH:

22  Q.  Mr. Stevenson, is there any requirement in the bid

23  procedures that a bidder show evidence that it has cash on hand

24  to close as of the time of submission of the bids?

25              MS. MICHELSON:  Objection, Your Honor.  Calls for a

1  legal conclusion.

2              THE COURT:  Well, he's the financial advisor and

3  investment banker for the Debtor.  I assume that he had a hand

4  in the preparation of the bid procedures.  The Court has

5  approved the bid procedures, so the bid procedures you could

6  say, speak for themselves.  But I'll allow him to answer the

7  question.

8  A.  The bid procedures indicate that it's the Debtors', the

9  Committee, and the lenders' right to deem whether any of the

10  parties are -- have the financial wherewithal to close the

11  transaction on the, you know, on the closing date.

12  BY MS. LYNCH:

13  Q.  So, it's your understanding that it's within the discretion

14  of the Debtors, in consultation with the Committee and the

15  agent on the issue of whether a bidder would have that

16  financial wherewithal to close on the terms of its bid?

17  A.  That's my understanding, yes.

18  Q.  Mr. Stevenson, do you think that requiring bidders have

19  necessary cash on hand at the time of the bid deadline, prior

20  to the auction, would have any effect on the bidding process?

21  A.  It would likely have a chilling effect on the bidding

22  process.

23  Q.  And why is that, Mr. Stevenson?

24  A.  Because it may, you know, preclude bidders who are able to

25  finance their bid with committed financing to actually bid at

1  the auction.

2  Q.  Is it your understanding, Mr. Stevenson, and I'm sorry if

3  you've already testified to this, that the Luby's bid contains

4  any financing contingency?

5  A.  It does not.

6  Q.  And, based on your review of the information submitted by

7  Luby's and the subsequent conversations that you testified you

8  had, do you, at this -- are you, at this point, satisfied that

9  Luby's had the ability to close on its $42 million bid?

10 A.  I am satisfied to that, yes.

11 Q.  And, are you satisfied that Luby's currently has the

12 ability to close on its highest bid submitted at the auction?

13 A.  I am satisfied to that as well.

14      (Pause in proceedings)

15 BY MS. LYNCH:

16 Q.  Mr. Stevenson, based on your experience, is the commitment

17 letter submitted by Wells Fargo and Amegy unusual in any

18 respect?

19 A.  No, it's a very standard form, commitment letter issued by

20 a financial institution to commit to providing financing.

21          MS. LYNCH:  I have no further questions, Your Honor.

22          THE COURT:  Okay.

23      (Pause in proceedings)

24                      CROSS EXAMINATION

25 BY MS. MICHELSON:

1  Q.  Mr. Stevenson, your testimony is that the commitment letter

2  attached as Exhibit-F to Defendant's Exhibit-1, is a normal

3  commitment letter, correct?

4  A.  That's correct.

5  Q.  And it's contingent, is it not?

6  A.  There are typical conditions to the commitment letter.

7  Those are not contingencies, and through our diligence, we

8  satisfied ourselves that they, you know, that we weren't

9  concerned with their ability to complete the transaction.

10  Q.  You understood that the bidding procedures required that a

11  bidder meet the requirements on June 4th, correct -- or June

12  14th, correct?

13  A.  Could you restate the question?

14  Q.  Did you understand --

15  A.  Requirements for what?

16  Q.  -- the requirements to be a qualified bidder?  Let me

17  restate the question.

18  A.  Please.

19  Q.  Did you understand that bidders were required to meet the

20  standards of the bidding procedure's order by June 14th?

21  A.  It was my understanding that bidders had to show the

22  financial wherewithal to complete the transaction, and that was

23  the Debtors', the Committee's, and the agents' job to determine

24  whether that was adequate.

25  Q.  And you understood that the evidence was supposed to be

1    submitted on June 14th, right?

2    A.   The package was supposed to be submitted on June 14th.

3    Q.   And June 14th, you did not believe that Luby's had in

4    excess of $40 million in cash, did you?

5    A.   They did not have $40 million of cash.

6    Q.   And their evidence didn't suggest that they did, correct?

7    A.   That's correct.  Their evidence was a commitment letter.

8    Q.   And, as of June 14th, they had not provided you evidence

9    that they had cash plus an existing credit facility in the

10   amount of $40 million, correct?

11   A.   No, they provided evidence that they had cash plus a

12   commitment to extent their existing credit facility to an

13   amount necessary to close the transaction.

14   Q.   So, they didn't have an existing credit facility and cash

15   in an amount of $40 million on --

16   A.   No, they did not.

17   Q.   -- June.  Thank you.

18            THE COURT:  Where does it say in the bid procedures

19   that a party to submit has to have $40 million in cash in hand?

20   I'm just looking for it.

21            MS. MICHELSON:  Your Honor, I would direct the Court

22   to page 3, paragraph 4(i), and the language is that, "A

23   prospective bidder must have readily available funds sufficient

24   to enable it to timely consummate its offer and provide

25   adequate assurance."  Now, we're prepared to put on testimony

1   that my client, in order to be a stalking-horse bidder, was

2   required either to have cash in the bank, or a guaranty from an

3   entity which did, and was assured that the same requirements

4   would be applied to any competing bidders, and --

5                    THE COURT:  I understand.

6                    MS. MICHELSON:  -- this was an 11th-hour requirement

7   that was imposed on my client.

8                    THE COURT:  Okay.  I understand.

9                        REDIRECT EXAMINATION

10  BY MS. LYNCH:

11  Q.  Mr. Stevenson, what is your understanding of the term

12  "readily available funds"?

13  A.  It would mean the cash or other committed financing

14  necessary to complete the transaction by the time that it was

15  supposed to close.

16  Q.  So, in your experience, it wouldn't mean immediately

17  available funds?

18  A.  No, it wouldn't -- they wouldn't need to be available that

19  day.

20  Q.  And, had there been a requirement that bidders have cash on

21  hand sufficient to enable it to consummate its transaction, do

22  you think the bid procedures would have said so?

23                    MS. MICHELSON:  Calls for speculation, Your Honor.

24                    THE COURT:  Sustained.

25                    MS. LYNCH:  I have no further questions, Your Honor.

1              THE COURT:  Okay.  Anything else?

2         (Pause in proceedings)

3                         RECROSS EXAMINATION

4    BY MS. MICHELSON:

5    Q.  Mr. Stevenson, when are the conditions to the commitment

6    letter, Exhibit-F to Debtors' Exhibit-1, is no material change

7    in the capital markets, correct?

8    A.  If I could just refer to it --

9    Q.  Sure.

10   A.  -- just quickly?

11   Q.  It's at the top of page 2 if that would help.

12   A.  Yeah, all the pages got out of order, I apologize.  I'm

13   sorry, here it is.  Yep, page 2, yes, I see that.

14   Q.  And it has occurred in recent times that the capital

15   markets have had a material adverse change, isn't that correct?

16   A.  In --

17   Q.  In the last several years?

18   A.  Over the last several years, there have -- the capital

19   markets have fluctuated from, you know -- they've fluctuated.

20   Q.  So, there have been changes in the capital markets that are

21   material?

22   A.  Over the last several years?  Yes, I'd say that's true,

23   over the last several years.

24   Q.  Thank you.

25              THE COURT:  Okay.  Thank you, sir.  You may step

1   down.  We're going to have to adjourn to 9 a.m. tomorrow

2   morning.  I don't have time.  I have a number of witnesses out

3   for my morning hearing, and we will adjourn and reconvene at 9

4   a.m.  Any questions?

5           ALL:  (No verbal response).

6           THE COURT:  All right.  See you tomorrow morning.

7   Stand in recess.

8       (Court adjourned)

9

10                      CERTIFICATION
11  I certify that the foregoing is a correct transcript from the
12  electronic sound recording of the proceedings in the above-
13  entitled matter.
14
15  *Lewis Parham*                          6/23/10
16  _____      _____
17  **Signature of Transcriber**             **Date**