UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .
IN RE:                        .        Chapter 11
                              .
Magic Brands, LLC, et al.,    .
                              .
                              .
     Debtors.                 .        Bankruptcy #10-11310 (BLS)
.............................................................
```

Wilmington, DE
June 23, 2010
9:15 a.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtors:                Daniel DeFranceschi, Esq.
                                Richards Layton & Finger, PA
                                One Rodney Square
                                920 North King St.
                                Wilmington, DE, 19801

                                Drew Sloan, Esq.
                                Richards Layton & Finger, PA
                                One Rodney Square
                                920 North King St.
                                Wilmington, DE, 19801

                                Douglas Rosner, Esq.
                                Goulston & Storrs, P.C.
                                400 Atlantic Ave.
                                Boston, MA 02110

                                Peter Bilowz, Esq.
                                Goulston & Storrs, P.C.
                                400 Atlantic Ave.
                                Boston, MA 02110

```
For the Official Committee:    Eric Wilson, Esq.
of Unsecured Creditors         Kelley Drye & Warren, LLP
                               101 Park Ave.
                               New York, NY 10178

                               Dana Kane, Esq.
                               Kelley Drye & Warren, LLP
                               101 Park Ave.
                               New York, NY 10178

                               Domenic Pacitti, Esq.
                               Klehr Harrison Harvey
                               Branzburg, LLP
                               919 Market St.-Ste. 1000
                               Wilmington, DE 19801

For Wells Fargo Capital:       Cassie Coppage, Esq.
Management                     Paul Hastings Janofsky
                               & Walker, LLP
                               Park Ave. Tower
                               75 E. 55th St.-1st Fl.
                               New York, NY 10022

                               Richard Riley, Esq.
                               Duane Morris, LLP
                               1100 N. Market St.-Ste. 1200
                               Wilmington, DE 19801

For Tavistock Ventures, LLC:   Randy Michelson, Esq.
                               Michelson Law Group
                               150 Spear St.-Ste. 1600
                               San Francisco, CA

                               Bruce Grohsgal, Esq.
                               Pachulski Stang Ziehl & Jones
                               919 N. Market st.-17th Fl.
                               Wilmington, DE 19899

For The U.S. Food Service:     Michael Farnan, Esq.
                               Saul Ewing, LLP
                               222 Delaware Ave.-Ste. 1200
                               Wilmington, DE 19801

For Luby's, Inc.:              Ann Cordo, Esq.
                               Morris Nichols Arsht & Tunnell
                               1201 N. Market St.-18th Fl.
                               Wilmington, DE 19899
```

```
                              Gregory Werkheiser, Esq.
                              Morris Nichols Arsht & Tunnell
                              1201 N. Market St.-18th Fl.
                              Wilmington, DE 19899

For Fuddruckers, Intl.:       David Fournier, Esq.
                              Pepper Hamilton, LLP
                              Hercules Plaza
                              1313 Market St.-Ste. 5100
                              Wilmington, DE 19899

(Via Telephone)

For Wells Fargo Capital:      Leslie Plaskon, Esq.
Management                    Paul Hastings Janofsky
                              & Walker, LLP
                              Park Ave. Tower
                              75 E. 55th St.-1st Fl.
                              New York, NY 10022

Audio Operator:               Theresa Pullan

Transcribing Firm:            Writer's Cramp, Inc.
                              6 Norton Rd.
                              Monmouth Jct., NJ 08852
                              732-329-0191
```

**Proceedings recorded by electronic sound recording, transcript produced by transcription service.**

4

## Index

|                                  | Direct | Cross | Redirect | Recross | Further Redirect |
|----------------------------------|--------|-------|----------|---------|------------------|
| **Witnesses For The Debtor:**    |        |       |          |         |                  |
|                                  |        |       |          |         |                  |
| **Witnesses For Tavistock**      |        |       |          |         |                  |
| Mr. Wood                         | 12     | 30    | 35       |         |                  |
| Mr. Gavin                        | 39     |       |          |         |                  |

**MOTIONS:**

| EXHIBITS: |                        | Marked | Received |
|-----------|------------------------|--------|----------|
| D-4       | Proof of Funds Letter  | 6      |          |
| D-5       | Auction Transcript     | 50     | 50       |
| T-1       | Luby's 2009 10-K Excerpt | *    | *        |
| T-2       | Email Package          | 19     | 50       |
| T-3       | Email Package          | 21     | 50       |

**SUMMATION BY:**

| Mr. Rosner      | 51 |
|-----------------|----|
| Mr. Werkheiser  | 58 |
| Mr. Wilson      | 61 |
| Ms. Coppage     | 64 |
| Ms. Michelson   | 65 |

**THE COURT: Finding**

| As To Tavistock Objection | 71 |
|---------------------------|----|
| As To The Sale            | 85 |

\* Indicates marked and/or admitted in previous proceeding

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.

3          MR. ROSNER:  Good morning, Your Honor --

4          THE COURT:  Good morning, Mr. Rosner.

5          MR. ROSNER:  -- Douglas Rosner for the Debtors and

6   Debtors-in-Possession.  My colleague, Chris Lynch, had to

7   return to Boston, so you've got the B team.

8       (Laughter)

9          MR. ROSNER:  The -- I believe the two witnesses

10  yesterday were the -- were the only two witnesses that the

11  Debtors and Luby's will have.  I do have one more exhibit to

12  submit --

13         THE COURT:  Okay.

14         MR. ROSNER:  -- which has been stipulated to --

15         THE COURT:  Okay.

16         MR. ROSNER:  Where did I put them now?  Did I --

17  didn't I have them?  Oh, we'll call this -- I believe it's

18  Debtors' Exhibit #5.

19         THE COURT:  I have a 1, 2, 3, and 4.

20         MR. ROSNER:  Do you have 4?

21         THE COURT:  I want to make sure I'm not missing.  I

22  have Debtors' 1 which is the bid, Debtors' --

23         MR. ROSNER:  2 should have been the commitment letter

24  with the 40 --

25         THE COURT:  No, the supplemental bid.

1            MR. ROSNER:  Oh, the supplemental bid is 2.

2            THE COURT:  Right.  3 is the commitment letter, and I

3    don't have a 4.

4            MR. ROSNER:  It's -- we -- was the Letter of Intent -

5    - the Letter of Intent that was attached -- or the terms and

6    conditions, the term sheet.

7            THE COURT:  The term sheet was -- okay, I had the

8    term sheet as the back of Debtors' 3 so --

9            MR. ROSNER:  All right, so we'll just keep it like

10   that.

11           THE COURT:  -- it's in, okay.

12           MR. ROSNER:  So Your Honor, I --

13           THE COURT:  This would be Debtors' 4?

14           MR. ROSNER:  -- would like to submit Exhibit --

15   Debtors' Exhibit-4.

16        (Debtor's Exhibit-4 marked for identification).

17           THE COURT:  Sure, what is it?

18        (The Court receives document)

19           THE COURT:  Thanks.

20           MR. ROSNER:  Your Honor, Exhibit 4 is the Proof of

21   Funds letter --

22           THE COURT:  Sure.

23           MR. ROSNER:  -- that Tavistock submitted on April

24   21st, which would be referenced in the bid procedures.

25           THE COURT:  Okay.

1          MR. ROSNER:  So that's 4, and then --

2     (Counsel confer)

3          MR. ROSNER:  Your Honor, we'll hold -- we filed last

4  night or this morning the transcript of the auction but --

5          THE COURT:  Oh, does anybody have a copy of it?  I

6  haven't seen it.

7          MR. ROSNER:  We -- before we submit that into

8  evidence, we'll -- we will give Tavistock's counsel an

9  opportunity to --

10          THE COURT:  Sure.

11          MR. ROSNER:  -- think about it.

12          THE COURT:  Okay.

13          MR. ROSNER:  So, Your Honor, that will close out our

14  evidence --

15          THE COURT:  Okay.

16          MR. ROSNER:  -- and obviously we reserve --

17          THE COURT:  Not entirely actually.

18          MR. ROSNER:  -- our closing arguments --

19          MR. WERKHEISER:  Your Honor, I'm sorry, just one more

20  note.  Thank you.

21          MR. ROSNER:  Oh, you have -- oh, that's right, I'm

22  sorry.

23          THE COURT:  Mr. Werkheiser.

24          MR. WERKHEISER:  Yes, Your Honor, thank you.  For the

25  record, Gregory Werkheiser on behalf of Luby's, Inc.  Your

1   Honor, Mr. Gray was examined yesterday based on Luby's 2009

2   10-K which was offered as an exhibit by Tavistock.  I don't

3   believe that was ultimately moved into evidence, but I would --

4   you're objecting to it coming in (indiscern.) --

5           MS. MICHELSON:  I'm just -- I'm agreeing that it was

6   not offered into evidence.

7           MR. WERKHEISER:  Okay, we would offer it into

8   evidence --

9           THE COURT:  Well, I think --

10          MR. WERKHEISER:  -- and I assume there's no objection

11  to it.

12          THE COURT:  -- what I had was a 10-K and it's an

13  excerpt, I have four pages of it, and I have that as Tavistock

14  1, admitted without objection?

15          MS. MICHELSON:  Yes, Your Honor.

16          THE COURT:  Okay, that's fine.

17          MR. WERKHEISER:  Thank you, Your Honor.

18      (Tavistock's Exhibit-1 previously marked for

19  identification)

20      (Tavistock's Exhibit-1 previously admitted into evidence)

21          THE COURT:  Very good.  Okay, so the Debtor rests?

22          MR. ROSNER:  Your Honor, The Debtor rests.  Obviously

23  we reserve the right for closings and rebuttal if --

24          THE COURT:  Let me ask you a question before you rest

25  --

1            MR. ROSNER:  Yes?

2            THE COURT:  -- because it is -- a lot of the

3  discussion and a lot of the focus of this has been on the --

4  the question of the qualified bid -- and I understand, and I'll

5  hear further from Tavistock on that -- but there were also

6  issues -- or frankly, I think they're better expressed as

7  concerns about the conduct of the auction and the prospect or

8  possibility of collusive communications between the parties.

9  And Ms. Lynch, yesterday in her opening, said, you know, this

10 is what we've all seen at the end of a long auction; somebody

11 decided that they'd tapped out, went over and said

12 congratulations and on their way.  But that's not evidence

13 before me, and I guess I need to know whether or not that issue

14 is still out there, and if it is, is there a substantive

15 response to it.  Ms. Michelson?

16           MS. MICHELSON:  Your Honor, may I speak?

17           THE COURT:  Sure.

18           MS. MICHELSON:  Thank you.  Tavistock advised the

19 Debtors and Luby's this morning that it is withdrawing that

20 issue.  We believe that it's not necessary to bring that issue

21 before the Court, given the qualified bid issue.

22           THE COURT:  Okay.  Well, let me -- that's fine.  I

23 want to make a point on it though, and without addressing the

24 merits of it.  I -- you've all been here for sales before, and

25 the integrity of the process is frankly more significant and

1   more important to this Court and to me and to my colleagues

2   than any one individual case.  So one, I understand and

3   appreciate the deliberation which parties would bring -- would

4   give to whether to raise these kind of concerns, but the fact

5   is that the concerns are raised, and then they're given and

6   opportunity to be evaluated between the parties.  One of the

7   difficulties with these kind of issues in a case, in a sale

8   case, is there's not a lot of time to really explore these.  So

9   I had an opportunity to review the papers, it's something I

10  obviously would attribute significant consideration to, but

11  it's not something that I would prejudge, and I appreciate the

12  communication that the parties had to dispose of those issues,

13  and we'll deal with the issue on the merits, okay?

14          MR. ROSNER:  Thank you, Your Honor.

15          THE COURT:  Sure.

16          MS. MICHELSON:  Thank you.

17          MR. ROSNER:  The Debtors will reserve the right to

18  bring a rebuttal witness and for closing arguments.

19          THE COURT:  Sure, okay.  Ms. Michelson?

20          MR. MICHELSON:  Thank you, Your Honor.  Your Honor,

21  Tavistock calls Michael Wood.

22          THE COURT:  Okay.  Swear the witness, please.

23          MR. ROSNER:  Your Honor?  Your Honor, just a minor

24  housekeeping matter.  One of -- Chris Lynch, who was here, has

25  sent an e-mail to me asking if she could have permission to

1    dial into CourtCall for listen only mode?

2             THE COURT:  Okay.

3             MR. ROSNER:  They won't let her on unless we ask your

4    permission.

5             THE COURT:  Sure.

6             MR. ROSNER:  We can?

7             THE COURT:  Yes.  Can they -- do I have to tell

8    anybody, or is it good enough?

9        (Laughter)

10            MR. ROSNER:  I'll send an e-mail and I'll tell them.

11   Thank you, Your Honor.

12            THE CLERK:  Do you want me to tell CourtCall now?

13            THE COURT:  Sure.

14            MR. ROSNER:  Thank you.

15            THE CLERK:  Operator?  Operator?

16            COURTCALL OPERATOR:  Yes?

17            THE CLERK:  Hi.  Ms. Lynch is trying to get on.

18            COURTCALL OPERATOR:  Okay.

19            THE CLERK:  Could you please put her on, please?

20            COURTCALL OPERATOR:  Certainly, as soon as she dials

21   in, we'll put her through.  What's her first name?

22            THE CLERK:  Chris?  Chris.

23            COURTCALL OPERATOR:  Okay.

24            THE CLERK:  Thank you.

25            COURTCALL OPERATOR:  We'll be on the look out for

1   her.

2            THE CLERK:  Thank you.  Would you please state your

3   name for the record, spelling your last?

4            MR. WOOD:  Michael Ervin Wood, W-O-O-D.

5            MICHAEL WOOD, TAVISTOCK'S WITNESS, SWORN

6                      DIRECT EXAMINATION

7   BY MS. MICHELSON:

8   Q.  Good morning, Mr. Wood.

9   A.  Good morning.

10  Q.  Where are you employed?

11  A.  Tavistock.

12  Q.  What is your capacity with Tavistock?

13  A.  I am a Vice President, I pursue investment opportunities.

14  Q.  Can you describe your career history briefly?

15  A.  Certainly.  I graduated from the University of North

16  Carolina in 1987 with an MBA.  I worked for 10 years at Xerox

17  Corporation in Real Estate and Finance, and then in 1997, moved

18  to C&L where I worked in Restaurant Finance and Restaurant Sale

19  Leaseback Real Estate.  I joined Tavistock in 2005.

20  Q.  What is C&L?

21  A.  C&L is -- the company that I worked for is one of the

22  largest -- was one of the largest real estate -- restaurant

23  finance companies in the country.

24  Q.  And what was your position at C&L?

25  A.  At C&L my last position was Chief Operating Officer of

1  C&L Restaurant Properties.

2  Q.  What were your duties in that position?

3  A.  My duties were to oversee portfolios of assets that C&L

4  owned, and I was also involved in the acquisition of additional

5  properties and closing loan transactions.

6  Q.  And were those assets principally restaurant related?

7  A.  They were.

8  Q.  Have you been involved in the 363 sale of the Debtors'

9  assets?

10  A.  Yes.

11  Q.  When did you begin to be involved in that process?

12  A.  I first learned about this opportunity in late February of

13  this year, and then began working quite a bit on it in early

14  March.

15  Q.  And were you involved in the negotiation of the APA --

16  A.  Yes.

17  Q.  -- for Tavistock's bid?

18  A.  Yes, I was.

19  Q.  What was your role in that process?

20  A.  I communicated with the attorneys regarding the APA

21  language and what was acceptable to Tavistock.  I was, probably

22  as much as anybody, the point person on the business side

23  negotiating the document.

24  Q.  Did the Debtors express to you any need to sign an APA by a

25  certain deadline?

1  A.   Yes, the Debtors were very concerned because they had a

2  franchise conference coming up, and they wanted to be able to

3  disclose at the franchise conference that there was a buyer and

4  who the buyer was because they felt like, in conjunction with

5  the bankruptcy that was planned, if they didn't have a buyer,

6  they would have unrest within the franchise community.

7  Q.   And when did the Debtors tell you they wanted the APA to be

8  signed?

9  A.   We had various conversations about dates, but we were

10  generally targeting, I think initially, April 18th.

11  Subsequently we expected to sign the agreement on April the

12  20th, and then ultimately signed the agreement on April the

13  21st.

14  Q.   And do you recall when the franchisee convention commenced?

15  A.   I believe it commenced on the Friday immediately following

16  the 21st, I'm not 100% sure.

17  Q.   Did Tavistock intend to sign the APA on April 20th?

18  A.   Yes.

19  Q.   Was there anything that happened late in the day that

20  changed that?

21  A.   I received an email from Janice Gross, counsel for the

22  Debtor, regarding the need for a guarantor.

23  Q.   And when did you receive that email?

24  A.   In the evening, approximately 6:44, on April 20th.

25  Q.   So 6:44 at night?

1  A.  6:44 p.m.

2  Q.  And at the time, who was projected to be the bidder under

3  the stalking horse bid?

4  A.  Tavistock Fuddruckers, LLC, an entity that we had created

5  for that purpose.

6  Q.  Had there ever been any objection to that purchaser entity

7  by the Debtors?

8  A.  No.

9  Q.  And so what did Ms. Gross tell you at just before 7 p.m. on

10 the day you were supposed to sign the APA?

11 A.  She said that the Debtor needed a guarantor for the

12 purchase agreement.

13 Q.  And can you describe what happened next?

14 A.  There were a series of emails and phone conversations,

15 including phone conversations with Mrs. Gross, regarding their

16 position -- the Debtors' position on the purchasing entity and

17 what we needed to do to show that we had the cash to close.

18         THE COURT:  Ms. Michelson -- it's not controversial

19 or anything, I just want to make sure I understand -- is the

20 dialog back and forth an issue that's raised by the Debtor

21 because they don't want to just be in contractual relationship

22 with an assetless shell of an acquisition vehicle, is that

23 where this guarantee request came from?  This is kind of news

24 to me so I'm not really --

25         MS. MICHELSON:  Yeah, that -- the issue, Your Honor,

Wood - Direct                                16

1   is that the Debtor wanted an entity either that had cash in the

2   bank or that had a guarantee from an entity that had cash in

3   the bank.

4            THE COURT:  Okay, I understand.

5            MS. MICHELSON:  This is how we got to the question of

6   qualified bidder.

7            THE COURT:  And here we are.

8            MS. MICHELSON:  And here we are.

9            THE COURT:  Okay.  All right.  Thanks, you've

10  clarified my question.

11  BY MS. MICHELSON:

12  Q.  You had a -- you testified that you had a series of emails

13  with Ms. Gross --

14  A.  And telephone conversations.

15  Q.  Can you describe the substance of those communications?

16  A.  Yes, she insisted that we provide an entity that either --

17  to sign the Asset Purchase Agreement -- that either had cash,

18  or we provide a guarantee from an entity that had cash, and I

19  protested because that, to me, was a very unusual request.

20  We've been involved in other transactions, both 363 and outside

21  of 363, where we've provided evidence that we have affiliates

22  that have cash, but we didn't actually have to provide an

23  entity that had cash to sign the Asset Purchase Agreement, and

24  she did not consider providing, you know, evidence that an

25  affiliate had cash to be sufficient, which, you know, frankly,

1  we found surprising.

2  Q.  So you weren't able to persuade her?

3  A.  That's correct.

4  Q.  What did you do to become the stalking horse bidder, given

5  her objection to the agreement with Tavistock Fuddruckers, LLC?

6  A.  We ultimately changed the purchaser to be Tavistock

7  Ventures, Inc. and provided a letter from HSBC, one of the

8  largest banks in the world, indicating that we had more than --

9  in excess of the $40 million necessary to close the

10 transaction.

11 Q.  And you initially provided a letter to Ms. Gross.  What did

12 -- what happened when you provided the letter?

13 A.  The first letter that we provided after we changed to

14 Tavistock Ventures, Inc. indicated that a shareholder of

15 Tavistock Ventures, Inc. had in excess of $40 million, and she

16 considered that to be unacceptable.

17 Q.  And who was that letter from?

18 A.  That letter was from HSBC.

19 Q.  So what did you do at that point?

20 A.  At that point, we arranged with HSBC to receive a letter

21 that indicated that Tavistock Ventures, Inc. had in excess of

22 $40 million of cash.

23 Q.  So you provided a supplemental letter because she objected

24 to the first letter?

25 A.  That is correct.

Wood - Direct                    18

1  Q.  And was she satisfied with the second letter?

2  A.  She was satisfied with the second letter in conjunction

3  with Tavistock Ventures, Inc. being the purchaser on the Asset

4  Purchase Agreement.

5  Q.  Now, did you have any concerns about qualified bids of

6  prospective overbidders?

7  A.  We did.  Since we thought that the request from the Debtor

8  was unusual, we felt that it was imperative that other bidders

9  be required to meet the same standard that we had been expected

10 to meet, and we insisted on that with Janice and the Debtor,

11 and they agreed.

12 Q.  And specifically, what was the standard that you insisted

13 on?

14 A.  That the purchaser either have cash or an entity -- or a

15 guarantee from an entity that had cash.

16 Q.  And that -- and by "cash," what did you mean by that?

17 A.  I mean cash in the bank.

18 Q.  That's the standard that you met, right?

19 A.  That is.

20 Q.  Did the Debtor ultimately agree to your request?

21 A.  Yes.

22 Q.  Did you have any communications with anybody else advising

23 the Debtor with respect to what is required to be a qualified

24 bidder?

25 A.  I had email and telephone conversations with Alex

1  Stevenson.

2  Q.  And what was the content of those communications?

3  A.  Alex was also seeking the letter indicating that the

4  purchaser had cash in the bank.

5  Q.  Okay.

6        MS. MICHELSON:  Your Honor, I would like to approach

7  the witness.

8     (Pause in proceedings)

9        MS. MICHELSON:  Just a second.  I apologize, Your

10 Honor.

11       THE COURT:  That's fine, take your time.

12    (Pause in proceedings)

13       MS. MICHELSON:  Your Honor, I've given a copy of this

14 exhibit to Mr. Rosner, and he has stipulated --

15       THE COURT:  Okay.

16       MS. MICHELSON:  (Indiscern.).

17       UNIDENTIFIED SPEAKER:  That's Alex's (indiscern.),

18 and then on the language?  Is that in this package here?

19    (The Court receives document)

20       THE COURT:  Thank you.

21       MS. MICHELSON:  This is Tavistock 2.

22    (Tavistock's Exhibit-2 previously marked for

23 identification)

24 BY MS. MICHELSON:

25 Q.  Mr. Wood, are those the emails that you exchanged with Mr.

1  Stevenson?

2  A.  Yes.

3  Q.  And can you read the subject line of Mr. Stevenson's

4  letters, please?

5  A.  The subject line on his --

6  Q.  Emails (indiscern.).

7  A.  -- email on April 21st at 2:21 p.m. says, "When will we get

8  the letter re: Tavistock Ventures having the money?  We

9  obviously need it very soon -- very, very soon."

10 Q.  And is that consistent with what he told -- with your

11 communications with the Debtors' representatives that Tavistock

12 had to have the money?

13 A.  Yes.

14 Q.  And what is the subject line on the next email?

15 A.  "I haven't seen the letter, where is it?"

16 Q.  So Mr. Stevenson was insistent that Tavistock demonstrate

17 that it had the money, is that right?

18 A.  Yes.

19 Q.  Following the provision of the second HSBC letter, was

20 there any communication with Mr. Stevenson about the language

21 in the bidding procedures regarding what it would be -- what it

22 would take to be a qualified bidder?

23         MR. ROSNER:  Your Honor, can -- can you repeat the

24 question?

25         MS. MICHELSON:  Surely, I think I was a little

1    convoluted.

2    Bu MS. MICHELSON:

3    Q.  Was there any written communication with Mr. Stevenson that

4    you participated in regarding language in the bidding

5    procedures involving what it takes to be a qualified bidder?

6    A.  There was.  I actually insisted on their approval of

7    language before I would provide the letter from HSBC.

8    Q.  And is the language attached to Exhibit-2 that Tavistock

9    insisted on?

10   A.  Yes, it is.

11            MS. MICHELSON:  May I approach, Your Honor?

12            THE COURT:  Sure.

13            UNIDENTIFIED SPEAKER:  So is this T-2?

14   BY MS. MICHELSON:

15   Q.  I've just handed you an Exhibit Tavistock's 3, I'd ask you

16   take a look and tell me what that package contains.

17        (Tavistock's Exhibit-3 previously marked for

18   identification)

19   A.  This package is emails regarding the proof of funds letter

20   and in some cases the bidding procedures language regarding the

21   qualifications that other bidders would need to meet.

22   Q.  Thank you.  And if you would look at the final page of

23   Tavistock's 3, can you tell me if that is the first indication

24   you had from the Debtor that the bidder would not be accepted?

25            MR. ROSNER:  Your Honor, I object.  I'm not sure what

1    -- there are a whole bunch of emails here, so I'm not sure what

2    she's referring to.

3            MS. MICHELSON:  Oh, I'm sorry, it's not --

4            MR. ROSNER:  So I'm not sure whether it says what she

5    says it says.

6            MS. MICHELSON:  And I misspoke, it's actually the

7    third from final page.

8            THE COURT:  Third from final page.

9            MS. MICHELSON:  That starts with "cc: Mike Woods

10   (indiscern.)."

11   BY MS. MICHELSON:

12   Q.  Perhaps we can look at an email from Janice S. Gross, sent

13   April 20th --

14           MR. ROSNER:  Your Honor, I object to her

15   chacterization of the language in the question.  It does not go

16   to --

17           THE COURT:  Hold on.  I actually -- I think I need to

18   be reminded of what the question is, and then we'll go from

19   there.

20   BY MS. MICHELSON:

21   Q.  My question was -- well, let me restate the question.

22           THE COURT:  Sure, okay.

23   BY MS. MICHELSON:

24   Q.  Looking at the email from Janice S. Gross at 6:46 p.m. on

25   April 20th, is that the first indication that Tavistock had

1   about any concern about its APA with respect to funding?

2   A.  Yes.

3             MR. ROSNER:  Your Honor, again, I would object.  I

4   don't think it goes to funding, it goes to the financial

5   wherewithal --

6             THE COURT:  Well, I think it goes -- whether we call

7   it --

8             MR. ROSNER:  -- to close of a subsidiary.

9             THE COURT:  Hang on.  Whether we call it funding or

10  certainty of payment, I think it goes to one or the other and

11  I'm satisfied with the question.  You may proceed.

12  BY MS. MICHELSON:

13  Q.  And then the prior page, there's an email from you, Mike,

14  dated April 21st at 8:30 a.m.  Why did you send that email?

15  A.  I sent the email to try to resolve the issue regarding

16  proof of funds and the purchasing entity and agreed to change

17  the purchaser to Tavistock Ventures, Inc. from Tavistock

18  Fuddruckes, LLC.  I also attached a letter from HSBC to that

19  email.

20  Q.  And is that letter the final page of Exhibit T-3?

21  A.  Yes, it is.

22             MS. MICHELSON:  (Indiscern.).

23             MR. ROSNER:  No, I've got it.

24  BY MS. MICHELSON:

25  Q.  Okay.  I'm going to ask you take a look at your email a few

1   pages earlier, at 8:44 a.m., to Janice Gross.

2           MR. ROSNER:  Your Honor, Douglas Rosner again.  I'm

3   still confused.  Is T-3 just this email or is T-3 this whole --

4           MS. MICHELSON:  The entire package.

5           MR. ROSNER:  -- package?

6           MS. MICHELSON:  The package.

7           MR. ROSNER:  Okay.

8           MS. MICHELSON:  I can give you a correct packet if

9   you --

10          MR. ROSNER:  No, I have it, so if counsel -- I've

11  laid out sort of all the emails, if counsel can just tell me

12  which one she's looking at at the time --

13          MS. MICHELSON:  I'm looking at --

14          MR. ROSNER:  -- I think that would help.

15          MS. MICHELSON:  Sure.  It's an email from Mike Wood,

16  April 20th, at 8:44 p.m.

17          MR. ROSNER:  Thank you.

18          THE COURT:  I'm there.

19          MS. MICHELSON:  Okay.

20  BY MS. MICHELSON:

21  Q.  The question, Mr. Wood, is did you attempt to respond to

22  Ms. Gross promptly with respect to her concerns?

23  A.  I did.  We were thinking that we would be signing the APA

24  that evening, and so we were trying to get this issue resolved

25  as quickly as possible.

1  Q.  And were you able to satisfy her that evening?

2  A.  Not on the evening of the 20th, no.

3  Q.  And why was that?

4          MR. ROSNER:  Your Honor, I object.  I'm not sure if

5  he can testify as to Janice Gross's thinking.

6          THE COURT:  Well, I'll let him testify --

7          MR. ROSNER:  He can testify as to what was said --

8          THE COURT:  -- to his understanding.  He was in the

9  negotiation, he was personally in the negotiation.  I think

10 he's probably got a good idea of why.

11 BY MS. MICHELSON:

12 Q.  Did you have any logistical constraints with respect to

13 providing the evidence that Ms. Gross had requested?

14 A.  Yes, the funds were in Switzerland and so we had to deal

15 with the time difference between Switzerland and the United

16 States.

17 Q.  Thank you.  I would like to ask you take a look at an email

18 from Mike Wood on April 21st at 9:46 a.m.

19          MR. ROSNER:  Is that in the same package?  I see 8:44

20 p.m. from Alex --

21 BY MS. MICHELSON:

22 Q.  I'm sorry, from Alex Stevenson at 8 -- 9:46 a.m.  And

23 beneath that do you see an email from Ms. Gross?

24 A.  Yes.

25 Q.  Can you read the last two sentences -- three sentences of

1    that email?

2    A.   The last three sentences of the email from --

3    Q.   From Ms. Gross.

4    A.   -- Ms. Gross?  Okay, the 6:39 a.m.?

5    Q.   Yes.

6    A.   "Can you give me a brief description of what this entity

7    does?  Unfortunately, what the letter says is that the

8    shareholder of this entity has the funds and we have no

9    recourse to that shareholder.  The letter is comforting and

10   helpful but doesn't show that the purchaser itself has the

11   funds on hand.  At this point if we could just understand what

12   this entity is/does, that would help.  Thanks."

13   Q.   Is that consistent with your understanding that she wanted

14   the purchasing entity to have the funds on hand?

15   A.   Yes.

16   Q.   And the email from Mr. Stevenson that is directly above

17   that, is that consistent with the same message that was being

18   conveyed to you?

19   A.   Yes.

20   Q.   In fact, he says that he assumes there are no approvals

21   necessary and upon but demand by Tavistock Ventures, Inc., the

22   money will be funded?

23   A.   Yes, that's what he says.

24   Q.   I refer you to your email of 8:30 a.m. on August 21st.  Is

25   that the email in which you expressed concern about other

1  bidders having to meet the same standard that Tavistock was

2  being required to meet?

3          MR. ROSNER:  Which one are you looking at?

4          MS. MICHELSON:  Mike Wood --

5          MR. WERKHEISER:  Objection, Your Honor --

6          MS. MICHELSON:  -- April 25th --

7          MR. WERKHEISER:  -- I just think she just

8  mischaracterized the email of August 21st.

9          MS. MICHELSON:  I'm sorry, April 21st.

10  A.  From whom?

11  BY MS. MICHELSON:

12  Q.  At 8:30 a.m. from Mike Wood.

13  A.  I'm sorry, could you repeat the question?

14  Q.  Yes.  In your email at 8:30 on April 21st, did you express

15  Tavistock's concern that other bidders should be required to

16  meet the same standard as Tavistock?

17  A.  Yes, I did.

18  Q.  Would you read the sentence that expressed that concern?

19  A.  Yes, "Each other potential bidder, in order to be a

20  qualified bidder, should have to meet this same requirement of

21  showing that it has sufficient funds on hand and not just

22  access to sufficient funds to close the transaction."

23  Q.  Did the company, the Debtors advise you they were agreeable

24  to that concept?

25  A.  Yes.

1  Q.  And where is that?  Was it in writing or orally?

2  A.  Orally.

3  Q.  And was there any confirmation email that the language that

4  Tavistock would be included?

5  A.  Yes.

6  Q.  Where is that?

7  A.  We had confirmation in an email from Alex Stevenson that

8  the language that we had proposed was acceptable?

9  A.  And does that show up in Mr. Stevenson's email on April

10  21st, 2010 at 1:27 p.m.?

11  A.  Yes, it does.

12  Q.  And the language specifically that Tavistock was insisting

13  on is on the following page of Exhibit T-3?

14  A.  Correct.

15  Q.  And that's the language that's in the bid procedures?

16  A.  That is my understanding.

17          MR. ROSNER:  Objection, Your Honor.

18          UNIDENTIFIED SPEAKER:  It's too late.

19          THE COURT:  Let's move on.

20  BY MS. MICHELSON:

21  Q.  Mr. Wood, Fidelity National dropped out of the auction at a

22  price of about $49.8 million, is that correct?

23  A.  That is correct.

24  Q.  Is Tavistock willing to close this transaction at the next

25  bidding increment above that price?

1  A.  We are ready, willing and able to close at the next bidding

2  increment above that price, yes.

3  Q.  What was the highest bid that Tavistock made at the

4  auction?

5  A.  The cash component was $59 million.

6          MR. ROSNER:  Your Honor, can he say that again,

7  please?

8  A.  The cash component was $59 million.

9          MR. ROSNER:  Your Honor, just to correct the record,

10  the cash component was $59,060,000.

11  BY MS. MICHELSON:

12  Q.  Were you speaking roughly, Mr. Wood?

13  A.  I don't recall, it might have been 60 -- 59, that's -- I'll

14  agree with that.

15  Q.  Is Tavistock ready to close this transaction at that price?

16  A.  Yes, we are ready and able to close the transaction at that

17  price.

18  Q.  And when could Tavistock do that?

19  A.  July 9th, as we had previously agreed, subject to Hart-

20  Scott-Rodino issues.

21          MS. MICHELSON:  Can I have a minute, Your Honor?

22          THE COURT:  Sure.

23          MS. MICHELSON:  Nothing further, Your Honor.

24          THE COURT:  Okay, thanks.  Cross?

25          MR. ROSNER:  Douglas Rosner for the Debtors and

1   Debtors-In-Possession.

2                          CROSS EXAMINATION

3   BY MR. ROSNER:

4   Q.   Mr. Wood, you -- I refer you to what the package, which is

5   Tavistock's Exhibit #3, the group of emails that we were just

6   talking about.  Those email correspondence went primarily to

7   the identify of the actual acquirer, is that correct?

8   A.   Some of the emails were about the identify of the buyer.

9   Q.   And it went to the -- and it's correct that the emails back

10  and forth were a negotiation between the Debtors' professionals

11  and yourself regarding whether the actual entity that Tavistock

12  had chosen had the ability to close, is that correct?

13  A.   No, I think it was a little bit different than the ability

14  to close, it was about providing evidence that the entity that

15  would be signing the purchase agreement had cash on hand.

16  Q.   And ultimately, after all of those emails back and forth

17  regarding whether it be cash on hand or whatever financial

18  ability to close, ultimately a letter was sent on April 21st at

19  3:21 p.m. that was acceptable to the Debtors, is that correct?

20  A.   Sir, can you direct me to where that is in the package?

21  Q.   I believe --

22             MR. ROSNER:  Was this the first page of T-3?

23  BY MR. ROSNER:

24  Q.   Okay, I'm directing you to the first three pages of Exhibit

25  Tavistock 3, which was the email from you on April 21 at

1   3:21 p.m. to Alex Stevenson attaching what you call a proof of

2   funds letter.

3   A.   Yes.

4   Q.   So I refer you to the third page of that, which is the

5   actual letter from HSBC Bank, do you see that?

6   A.   Yes.

7   Q.   And does -- where in that letter does it say that Tavistock

8   Ventures, Inc. has $40 million on deposit with HSBC Bank?

9   A.   It says "We confirm that Tavistock Ventures, Inc. has the

10  financial capacity to provide adequate funding of up to US

11  dollars 40 million to close the deal."  HSBC will not send the

12  letter without the cash --

13  Q.   Well --

14  A.   -- being on deposit.

15           MR. WERKHEISER:  Objection, You Honor.

16           MR. ROSNER:  I move to strike that because he --

17  BY MR. ROSNER:

18  Q.   Are you an employee of HSBC?

19           THE COURT:  It's stricken.

20           MR. ROSNER:  Okay, thank you.

21  BY MR. ROSNER:

22  Q.   And this letter was acceptable by -- to the Debtor?

23  A.   Yes.

24  Q.   In your emails to the Debtor in Exhibit-3 regarding --

25  where you state -- well, let me refer you to the April 21, 2010

1  8:30 a.m. email from yourself to Janice Gross.  Second

2  paragraph, you state what Tavistock's request would be as far

3  as a qualification, is that correct, in the second paragraph of

4  that email?

5  A.  I'm sorry, I haven't found that email yet.  Okay --

6  Q.  I'm sorry, it's the April 21, 2010 at 8:30 a.m.

7  A.  Yes.

8  Q.  That's Tavistock's request, isn't that correct?

9  A.  That is Tavistock's request, yes.

10  Q.  Okay, can you point to me an email back from Ms. Gross or

11  Mr. Stevenson agreeing to that specific qualification?

12  A.  Ms. Gross agreed to that in a conversation.

13  Q.  And what did Ms. Gross say?

14  A.  I insisted and she agreed that all bidders would have to

15  meet the same standard, which was that they would have cash or

16  a guarantee from an entity that had cash.

17  Q.  And she insisted that they have to meet the same standard

18  as in the April 21st letter that was accepted?

19  A.  The standard that was discussed was the purchaser had to

20  have cash or there had to be a guarantee from an entity that

21  had cash sufficient to cover the purchase price.

22  Q.  And what evidence did you show the Debtors that you had

23  cash -- $40 million of cash in the bank?  You meaning Tavistock

24  Ventures, Inc.

25  A.  Tavistock provided a letter from HSBC dated April 21st.

1    It's an attachment to the April 21st, 3:21 p.m. email.

2    Q.   Okay.  You also referred, in your testimony, to an email

3    from Alex Stevenson, April 21st, 2010 at 1:27 p.m., do you see

4    that email in Exhibit-3?

5    A.   Yes.

6    Q.   And in that email has attached to it some proposed language

7    to insert into the bid procedures, is that correct?

8    A.   That is correct.

9    Q.   And Mr. Stevenson's response, and I believe you agreed with

10   this, is that the language is fine, is that correct?

11   A.   Mr. Stevenson's response was, yes, the language you

12   proposed is fine.

13   Q.   Thank you.  Were you at the auction on Thursday, June 17th?

14   A.   Yes.

15   Q.   And you participated in that auction, is that correct?

16   A.   I did not make Tavistock's bids, but I was there, yes.

17   Q.   But you were there -- you were present?

18   A.   Yes.

19   Q.   At any time did Tavistock object to -- during the auction,

20   at any time did Tavistock object to the qualification of any of

21   the other bidders?

22   A.   No.

23   Q.   And at any time did Tavistock put any reservations on their

24   bids with respect to the qualification of other bidders?

25   A.   No.

1  Q.  At any time did Tavistock state on the record that they

2  were bidding under protest?

3  A.  No.

4  Q.  Is Daniel Harf (ph.) one of your colleagues at Tavistock?

5  A.  Yes.

6  Q.  And are you aware that Daniel Harf sent an email to Chris

7  Pappas after the auction?

8  A.  I heard something about it yesterday, I have not seen that

9  email.

10 Q.  Are you aware that he sent an email to Chris Pappas saying

11 that, "We fought a good fight but clearly God had a different

12 plan for us and this was meant for you and your group"?

13 A.  No, I'm not aware of that.

14 Q.  And are you aware that he sent an email -- in the same

15 email he said that, "I wish you all the best"?

16 A.  No.

17          MR. ROSNER:  Your Honor, the Debtors don't have any

18 further questions for this witness, I'm not sure about Luby's

19 counsel.

20          THE COURT:  Okay.  Mr. Werkheiser?

21          MR. WERKHEISER:  Your Honor, may I just have a

22 moment?

23          THE COURT:  Sure.

24     (Pause in proceedings)

25          MR. WERKHEISER:  No questions, Your Honor, thank you.

1             THE COURT:  Okay, redirect?

2                        REDIRECT EXAMINATION

3   BY MS. MICHELSON:

4   Q.  Mr. Wood, at any time during the day of the auction was

5   Tavistock aware that Luby's was relying on the commitment

6   letter as evidence to support its bid?

7   A.  We were not.

8   Q.  When did Tavistock first learn that?

9   A.  Tavistock first learned of the commitment letter and the

10  language in the commitment letter yesterday in Court.

11  Q.  And do you have any reason to believe that Mr. Harf knew

12  about the commitment letter when he sent those emails?

13  A.  I do not.

14             MS. MICHELSON:  Nothing further, Your Honor.

15             THE COURT:  Okay.  Thank you, sir, you may step down.

16  Any more witnesses?

17             MS. MICHELSON:  Yes, Your Honor.

18             THE COURT:  Okay.

19             MS. MICHELSON:  Tavistock calls Ted Galvin.

20             MR. ROSNER:  Your Honor, before Mr. Gavins takes the

21  stand, I would like Tavistock's counsel to explain why they're

22  calling this witness --

23             THE COURT:  Okay.

24             MR. ROSNER:  -- and to -- and have some argument on

25  that.

1           THE COURT:  Can we take an offer of proof?

2           MS. MICHELSON:  Your Honor, I seem to have a problem

3   on last names, it's Gavin.  I botched Mr. Gray's name yesterday

4   --

5           THE COURT:  That's all right.

6           MS. MICHELSON:  -- as well, I apologize.

7           THE COURT:  I'm familiar with Mr. Gavin.

8           MS. MICHELSON:  I understand that's the case.  Mr.

9   Gavin -- we're calling Mr. Gavin and plan to qualify him as an

10  expert with respect to 363 sales and customary terms and

11  conditions.

12          MR. ROSNER:  Your Honor, we would object.  We're not

13  sure what -- it's our understanding that specific issues that

14  Mr. Gavin would testify to are the meanings of certain

15  conditions or terms in the commitment letter from the bank to

16  Luby's and the meaning of readily available funds in the Bid

17  Procedures Order.  The question -- the issue in this case is

18  did -- were the bid procedures satisfied, and the requirements

19  in the bid procedures are unambiguous.  So I don't think the

20  Court needs extrinsic evidence to understand what it means when

21  the Court went as far as when the Debtor determines it is

22  satisfied that a bidder is qualified.  I mean, that's really

23  the question.  The question isn't what does readily available

24  funds means, the question doesn't mean -- the question isn't

25  whether Luby's, in fact --

1          THE COURT:  I understand.

2          MR. ROSNER:  -- will close --

3          THE COURT:  No, I understand the question.  Here's

4    what we'll do.  I will hear Mr. Gavin's testimony, and I'll

5    tell you this, I've said it a couple of times because we -- the

6    process that sales come in require, I think, a measure of

7    flexibility both by counsel and by the Court.  And if this were

8    a longer lead-in and if you had taken a deposition or if you

9    had some -- I mean, the primary concern that I see is surprise.

10   I mean, how long have you known that Mr. Gavin was out there?

11   Yesterday?

12          MR. ROSNER:  Quarter of, this morning.

13      (Laughter)

14          THE COURT:  All right, well, you're going to do your

15   best.  I'm going to allow it.  But I guess what I would say is

16   in sort of warning to Michelson, a number of the issues that

17   are raised by counsel resonate.  This is driven by documents,

18   Mr. Gavin didn't write these documents, I signed the order, and

19   frankly, we're all pretty familiar with the sale -- with the

20   process of Section 363 sales.  Second is that I'm not exactly

21   sure how you're going to conduct this examination, but it would

22   seem to me that if you tread much further past what you

23   described, he's going to be opining on my job.  And -- or

24   frankly, providing legal conclusions.  But I will allow, I

25   think, some limited testimony to allow the process to go

1   forward, again, primarily in recognition of the circumstances

2   that we're under.  You know, you need a sale hearing and --

3           MR. ROSNER:  We need a sale, too.

4           THE COURT:  Yes, I know.  But, you know, in other

5   circumstances, we'd have a Motion in Limine and we'd have some

6   jockeying back and forth, but I believe that it's appropriate

7   to allow his testimony.  But I want to give you the heads up

8   that if this heads much further down the path, I'm not sure

9   that I'm going to let him opine about whether or not something

10  is or isn't a qualified bid, I think that's my job, okay?

11          MS. MICHELSON:  Understood, Your Honor.  We are

12  operating at lightening speed, and both sides have a fair

13  amount of surprise.  We got -- literally got the commitment

14  letter yesterday afternoon before the hearing started so we're

15  both operating from the same disadvantage.

16          THE COURT:  No, I -- and I want to be clear, I mean,

17  that in other litigation circumstances, this would be the

18  subject of some pre-trial jockeying back and forth, and I could

19  imagine it going another way.  I'm not exactly certain what the

20  range of the examination is going to be or the scope of the

21  testimony, I have a little bit of heartburn about it, but I

22  understand the concept, and I think it's a fair line of inquiry

23  and I'm going to allow you to pursue it.

24          MS. MICHELSON:  And we intend to keep it fairly --

25          THE COURT:  Okay.

1            MS. MICHELSON:  -- concise, Your Honor.

2            THE COURT:  All right, we'll swear the witness,

3    please.

4            THE CLERK:  Would you please state your name for the

5    record.

6            MR. GAVIN:  Edward Thomas Gavin, IV, G-A-V-I-N.

7             EDWARD GAVIN, TAVISTOCK'S WITNESS, SWORN

8            MS. MICHELSON:  Your Honor, I was prepared to qualify

9    Mr. Gavin --

10            THE COURT:  I'm familiar with Mr. Gavin, you can

11    cross all you want.

12            MS. MICHELSON:  Thank you, Your Honor, we can jump to

13    the issue.

14                        DIRECT EXAMINATION

15    BY MS. MICHELSON:

16    Q.  Mr. Gavin, have you had an opportunity to review

17    information in this case?

18    A.  Yes.

19    Q.  Can you identify the --

20            THE COURT:  Actually, you know something, fairness

21    requires me to chime in.  I'm familiar with Mr. Gavin, but I'm

22    not sure that Mr. Rosner is.  If you wish for a more fulsome

23    background, then you're welcome to.  If you've gotten a CV

24    that's fine.

25            MR. ROSNER:  Your Honor, I'm still a little unclear

1   on the scope of what his testimony is.  If his testimony is

2   familiarity with 363(b) sales, I'm fine with that.   If -- as

3   the scope broadens or widens, I just would reserve the right to

4   question whether he's the appropriate expert for a particular

5   line of questioning.

6              THE COURT:  Yes, and -- all right, so whey don't we

7   let that process play itself out.  I heard it as 363(b) sales,

8   but if -- and that's fine.  I have no problem with listening to

9   or qualifying Mr. Gavin in that regard.  If your examination is

10  going to have him testify with respect to his understanding of,

11  frankly, internal bank processes and construction of financial

12  institution letters, commitment letters, and how a V.P. of a

13  bank or a committee of a bank thinks, operates, and decides,

14  then we're going to need to expand to see whether or not he's

15  qualified to opine on that.  But why don't you go through your

16  examination and we'll deal with it, okay?

17             MS. MICHELSON:  Thank you, Your Honor.

18  BY MS. MICHELSON:

19  Q.  Mr. Gavin, what information -- what documents have you

20  reviewed in this matter?

21  A.  I reviewed the bid procedures as approved by this Court,

22  and also the commitment letter that was provided in association

23  with the Luby's bid package.

24  Q.  And did you do any research about any terms?

25  A.  I did.  I looked up commonly available terms, such as

1   available funds, readily available funds, and their context in

2   how they impact, frankly, the balance sheet assets of a

3   company.

4   Q.  And where did you look that up?

5   A.  Fitch's Dictionary of Banking Terms, 5th Edition, contains

6   definitions as both -- as they apply both to lending and

7   depository institutions, as well as depositors with respect to

8   available funds.

9   Q.  And what did -- what did you learn from that research?

10  A.  Available funds for a depositor are -- is the current cash

11  balance of the depositor's account, net any outstanding

12  obligations, such as issued checks not yet cleared.

13  Q.  Did you look at the bid package that contained a commitment

14  letter?

15  A.  I looked at the commitment letter; I don't believe I've

16  seen the entire bid package.

17  Q.  Did you see -- did you see a -- did you review any

18  attachments to the commitment letter?

19  A.  I believe there was a term sheet that was attached to the

20  commitment letter which I reviewed.

21  Q.  And was that term sheet complete?  Was that term sheet

22  complete?

23  A.  I don't know what you mean by complete.  It appeared to be

24  a redacted term sheet.

25  Q.  You have advised committees as a financial advisor in the

1   past?

2   A.   I have.

3   Q.   How often?

4   A.   That is, perhaps, 90 to 95% of my total business, between

5   30 and 50 committees over the last five years.

6   Q.   And does that advice extend to 363 sales and bidding

7   procedures and qualification for bids?

8   A.   Yes, it does.

9   Q.   As -- is it customary, in your experience, to -- let me

10   strike that.  Did you form an opinion about whether the

11   commitment letter, without the term sheet attached, satisfied

12   the bidding procedures in this matter?

13              MR. ROSNER:  Your Honor, I would object.  Your Honor,

14   this -- that goes to --

15              THE COURT:  I'm going to sustain the objection.

16              MR. ROSNER:  -- the ultimate issues.

17              THE COURT:  You can tighten up the question and see

18   if we can move forward.

19   BY MS. MICHELSON:

20   Q.   Did the commitment letter evidence readily available funds,

21   in your view?

22              MR. ROSNER:  Your Honor, I would object.  All he's

23   testified to is that he has experience advising unsecured

24   Creditors' committees.

25              THE COURT:  Well, I'll allow him to testify on it

1   because I think that he would have performed -- he's -- his

2   testimony is that he would have performed a role similar to

3   what the committee did in this case, and similar to what your

4   financial advisor did, which was to evaluate it.  He can tell

5   me what he thought.  I'm not sure of the weight that I would

6   accord to it, but I'm going to allow that and we'll go forward.

7           MR. ROSNER:  Your Honor, if I can just note that his

8   understanding of readily available funds is based on looking up

9   the term in Fitch's Banking Dictionary, not based on his

10  experience or his expertise.  And so I'm still not sure -- I

11  mean, I could look up the term, too, and I actually did, and I

12  can say that it means -- you know, it's funds that are

13  available without hesitation or without much difficulty.  And I

14  don't think I'm an expert on the -- on that --

15          THE COURT:  Yes, well, hang on.

16          MR. ROSNER:  -- subject.

17          THE COURT:  I'm going to allow -- I'm going to allow

18  the question, but again, I'm going to repeat that I just think

19  that this examination, at least on these points, is not

20  particularly helpful to the Court.

21          MS. MICHELSON:  Okay.

22          THE COURT:  And that's obviously with due respect to

23  Mr. Gavin, but, you know, this is -- these are -- I'm not sure

24  that his testimony in this regard is really driving the

25  analysis one way or the other, but you're welcome to proceed.

1   A.   Would counsel reask the question, please?

2              MS. MICHELSON:  Your Honor, can I have a brief break?

3              THE COURT:  Five minutes?

4              MS. MICHELSON:  I'm trying to respond to the Court's

5   concerns in a way that we can move this along.  That would be

6   appreciated.

7              THE COURT:  That'll be fine.  Why don't we do this:

8   We'll take ten minutes; you can leave all of your stuff.  I

9   have what should be a five-minute hearing.  Mr. -- okay, I have

10  a five-minute hearing.  Yes?

11             MR. ROSNER:  I would just ask --

12             THE COURT:  The witness will --

13             MR. ROSNER:  -- the Court to admonish the witness as

14  far -- or --

15             THE COURT:  Right.

16             MR. ROSNER:  -- advise the witness that he's still

17  under oath and shouldn't be communicating.

18             THE COURT:  Right, you remain under oath.  You can't

19  discuss your testimony with anybody during the break.  We'll go

20  ten minutes.  I'll deal with my -- with mine.  You can leave

21  all of your stuff, and we'll reconvene with Meadowcraft in 60

22  seconds.  Stand in recess.

23             ALL:  Thank you, Your Honor.

24             THE COURT:  Thanks.

25       (Court in recess)

1            THE CLERK:  All rise.

2            THE COURT:  Please be seated.  Mr. Gavin, I would

3    remain -- I would remind you that you remain under oath.

4            MR. GAVIN:  Thank you, Your Honor.

5            MS. MICHELSON:  Thank you for the break, Your Honor.

6            THE COURT:  Sure.

7            MS. MICHELSON:  I'm prepared to proceed.

8                 DIRECT EXAMINATION (CONT'D)

9    BY MS. MICHELSON:

10   Q.  Mr. Gavin, in your experience, is it customary to require a

11   bidder to have cash in the bank in the full amount of the

12   purchase price at the time of the bid in order to be deemed a

13   qualifying bid?

14   A.  That is one of the more common requirements.  There are

15   occasions where that is not a requirement, but that the access

16   -- the ready access to funds necessary to consummate the

17   transaction is a requirement.  But the ability to close on the

18   transaction is a typical requirement in bid procedures.

19   Q.  And is it customary to require a bidder to have readily

20   available funds in the full amount of its bid at the time it

21   makes its bid?

22   A.  I believe that is customary.  Such is the definition of

23   readily available funds is -- I've seen it go both ways.  There

24   are cases where if everybody is playing according to the same

25   playing field and they all have cash on hand, then they all

1   have cash on hand.  If there are contingencies, then that needs

2   to be considered in evaluating the bid.

3   Q.  And is it important in this process to have everybody play

4   on the same playing field?

5   A.  Yes.  I believe the Court, earlier today, summarized it

6   best, that the process is often more important than any single

7   instance.

8   Q.  And is a commitment letter with conditions equivalent to

9   cash?

10  A.  No.

11  Q.  Yesterday, Mr. Stevenson testified that he believe that

12  Luby's commitment letter constituted readily available funds.

13  If you were a financial advisor --

14          MR. ROSNER:  Your Honor, object.  I don't think

15  that's a correct characterization of his testimony.  I believe

16  he testified that the commitment letter, in combination with

17  the term sheet, in combination with follow up, due diligence

18  with Luby's proposed Lenders and with Luby's in the aggregate,

19  allowed Mr. Stevenson to arrive at his conclusion.

20          MS. MICHELSON:  My recollection is somewhat

21  different, Your Honor.  I don't know if we can get to the

22  record on this.

23          THE COURT:  I mean, his testimony -- you know, part

24  of the issue is, here, that there is a difference between what

25  was initially proposed and how the dynamic played out, leading

1  to the stakeholders or the estate fiduciaries expressing

2  satisfaction with the Luby's bid.  I don't think that it's fair

3  to say -- I think the testimony was pretty clear that the

4  Debtors were not satisfied with the bid.  They made the phone

5  call, said we want to get on the phone, and I think that that's

6  what Mr. Gray testified to, that they got on the phone with the

7  representatives.  So I think it was a staged exercise, that the

8  commitment letter was not sufficient to satisfy their concerns,

9  and that their concerns were addressed through subsequent

10  dialog.  I think that's how I would characterize it.  But in

11  the exchange right now, I've lost track of what your question

12  was.  Why don't --

13          MS. MICHELSON:  Maybe I should restate the question.

14          THE COURT:  Okay.

15          MS. MICHELSON:  Or change the question to deal with

16  that.

17  BY MS. MICHELSON:

18  Q.  If you were a financial advisor to the Debtors in this

19  case, you had concerns about the commitment letter, would you

20  have relied on an oral conversation from the bank with respect

21  to the conditions in the commitment letter?

22          MR. ROSNER:  Your Honor, I would object.

23          THE COURT:  I'll allow him to answer.

24  A.  Depending upon what the concerns were, a conversation may

25  or may not have alleviated them.  Ultimately, though, a

1   commitment letter is a commitment letter.  It's a promise,

2   absent certain events, or contingent upon certain occurrences

3   to make funds available at some point in the future, if

4   conditions are met.  It's conditional.  It's non-binding.

5   There are outs, some more than others, but condition letters

6   are by and large condition letters.  So depending on what my

7   concerns were, it either would or would not have alleviated it.

8   If -- what I was looking for is the basis of comparison was, do

9   they have the cash in hand today to close the transaction, then

10  a commitment letter doesn't get there.  And unless the verbal

11  conversation is, we'll do away with all the contingencies, it

12  wouldn't satisfy it.  I don't know of a single lender that

13  would issue a binding commitment to lend, absent any

14  contingencies, when, by the terms of the commitment letter

15  itself, their due diligence wasn't yet complete.

16          MS. MICHELSON:  Nothing further, Your Honor.

17          THE COURT:  Okay.  Cross?

18          MR. ROSNER:  Your Honor, Debtors have no questions.

19          THE COURT:  Okay, very well.  You may step down.

20  Thank you, Mr. Gavin.

21          MR. GAVIN:  Thank you, Your Honor.  And, Your Honor,

22  since -- as Debtors' counsel pointed out, this was a bit of a

23  surprise; may I be excused from the Courtroom?

24          THE COURT:  Have a good afternoon.

25          MR. GAVIN:  Thank you, you as well, Sir.

1           MR. WERKHEISER:  Your Honor, I know --

2           THE COURT:  Oh, I'm sorry, did you wish to examine?

3           MR. WERKHEISER:  No, no questions.

4           THE COURT:  Oh.

5           MR. WERKHEISER:  But, simply, I know you reserved on

6    the issue of whether you would accept the testimony and simply

7    want to decide from Luby's standpoint that --

8           THE COURT:  Yes, I'm accepting the testimony.  It

9    goes to weight.

10          MR. WERKHEISER:  But we join that objection and --

11          THE COURT:  Okay.

12          MR. WERKHEISER:  -- want to make sure we preserve.

13          THE COURT:  The objection is noted and overruled.

14   Okay, any other witnesses?

15          MS. MICHELSON:  No, Your Honor.  At this time

16   Tavistock would like to offer its exhibits into evidence.

17          UNIDENTIFIED SPEAKER:  Do you want to just give them

18   to me as you --

19          THE COURT:  It's -- yes, I have -- that's not --

20          MR. ROSNER:  Oh, the ones that you already -- okay.

21          MS. MICHELSON:  Yeah.

22          THE COURT:  Yes.

23          MR. ROSNER:  I thought you meant -- yeah, that's

24   fine.

25          THE COURT:  Okay, they're admitted.

1    (Tavistock's Exhibit-2 admitted into evidence)

2    (Tavistock's Exhibit-3 admitted into evidence)

3         MS. MICHELSON:  In addition, Your Honor, I'd ask the

4    Court to take judicial notice of a complaint that I'm providing

5    to counsel and can provide to the Court.

6         THE COURT:  Thank you.

7    (Pause in proceedings)

8         MR. WERKHEISER:  Your Honor, for the record, Gregory

9    Werkheiser on behalf of Luby's.  No objection to the complaint

10   coming in for the limited purpose of showing that such a

11   lawsuit was filed, but not for the truth of anything contained

12   in there.

13        THE COURT:  Okay, it's admitted for that purpose.

14        MS. MICHELSON:  Thank you, Your Honor.

15        MR. ROSNER:  Your Honor, as I mentioned earlier in

16   the morning, we're asking that we admit into evidence the

17   transcript of the auction proceedings that were filed with the

18   Court earlier.  I have the original.

19        THE COURT:  Okay.  Any objection?

20        MS. MICHELSON:  No, Your Honor.

21        THE COURT:  Okay, that's admitted.

22        MR. ROSNER:  So that would be Debtors' Exhibit-5.

23        THE COURT:  Okay.

24   (Debtors' Exhibit-5 marked for identification)

25   (Debtors' Exhibit-5 admitted into evidence)

1                THE COURT:  All right, closing?

2                MR. ROSNER:  Who goes first?  Your Honor, is this --

3    this is the closing on this discreet issue.  I guess I still

4    have to do --

5                THE COURT:  Well, I think it's a closing on the sale.

6    Oh.

7                MR. ROSNER:  There's still some good faith --

8                THE COURT:  Right.

9                MR. ROSNER:  -- proffers and things, the general sort

10   of sale stuff.

11               THE COURT:  All right, then why don't we -- shall we

12   argue the objection, then?

13               MR. ROSNER:  Does that --

14               THE COURT:  Okay.

15               MR. ROSNER:  Is that all right?

16               THE COURT:  Yes.

17               MR. ROSNER:  Your Honor, Douglas Rosner for the

18   Debtors and Debtors-in-Possession.  I -- we have not heard

19   anything, yesterday or today, that I think -- that would put

20   into question whether the bidding procedures were complied with

21   and whether Luby's satisfied the requirements in those bidding

22   procedures with respect to being a qualified bidder.  Now -- I

23   refer the Court to the actual bidding procedures that were

24   approved by the Court, and Section 4 of those procedures lays

25   out what the requirements are.  The language in that section is

1  unambiguous, and what we focused on over the last two days is

2  subsection little I.  And I believe -- and I would argue that

3  the language in that subsection is unambiguous, so all of the

4  extrinsic evidence that you may have heard with respect to it

5  really should not be given any weight whatsoever.  And I don't

6  think the Court needs to give it any weight.

7        The Debtors have satisfied the bidding procedures.  Luby's

8  has satisfied the bidding procedures as far as being a

9  qualified bid.  It's undisputed their bid was timely.  It's

10  undisputed that they satisfied the overbid amount.  It's

11  undisputed that the bid was accompanied by a signed asset

12  purchase agreement.  And I'm going through the list of

13  eligibility or qualified bidder requirements.  The asset

14  purchase agreement had no contingencies other than as set forth

15  or permitted in the bidding procedures.  The asset purchase

16  agreement, and there was evidence that you heard, had no

17  financing contingency.  The offer was irrevocable.  It was

18  accompanied by a cash deposit of $4.32 million, which is

19  actually a little bit more.  The offer was on the same or

20  better terms, as was submitted by the stalking horse.  And so

21  then that leaves the last paragraph, and that's little I.  And

22  that says that it must be submitted with evidence substantially

23  equivalent to that provided by the stalking horse bidder,

24  establishing to the satisfaction of the Debtors, in

25  consultation with the prepetition agent and the Committee, that

1  such prospective bidder has readily available funds sufficient

2  to enable it to timely consummate its competing offer.

3      You've heard evidence over the last day, mostly yesterday,

4  that the evidence submitted in conjunction with the follow up

5  and due diligence, which I -- which gave me the comfort, and

6  I'm sure gave the Court the comfort, that the Debtors did what

7  the Debtors are supposed to do, and that is they followed up on

8  the commitment letter.  They looked at the term sheet.  They

9  talked to the Lenders.  They talked to Luby's.  They consulted

10  with the Creditors' Committee.  They consulted with the Agent.

11  And through that due diligence, we've learned that the Lenders

12  had already given the financing Credit Committee approval, that

13  they have completed their due diligence, that the real estate

14  related conditions would be post-closing, that these lenders

15  were already in a relationship with Luby's, so this is a pre-

16  existing lender relationship, and that the way they were going

17  to structure the loan was to amend the existing lender

18  relationship so it was easy to document, and that they were

19  ready, willing and able to close by June 28th, which, at the

20  time, with a $42 million offer, would have been possible

21  because the Hart-Scott-Rodino concerns were not relevant at

22  that time.  The question before the Court is whether the

23  Debtors -- whether what Luby's provided established, to the

24  satisfaction of the Debtors, that they were qualified.  The

25  Court isn't being asked, and shouldn't answer the question, are

1    they a qualified bidder in the sense that -- other than to find

2    that the Debtors satisfied their duty and they complied with

3    the bid procedures and they're qualified to that extent.  But I

4    don't think it's the Court's role to question whether the

5    Debtors used their reasonable business judgment, in

6    consultation with the Committee and the agent, to deem that

7    this bidder satisfied the conditions to be a qualified bidder.

8    There's been no evidence at all to suggest that what they

9    Debtors did to qualify this bidder, to qualify Fidelity, the

10   other competing bidder, was not an exercise of reasonable

11   business judgment, and that they did not -- and there is no

12   question that the Debtors, in consultation with the Committee

13   and the agent, exercised prudent business judgment, due

14   diligence, et cetera, in making the determination whether these

15   bidders were qualified.

16       The -- Luby's satisfied -- or Luby's established, to the

17   satisfaction of the Debtors, as well as the Committee and

18   Wells, as agent, that they had readily available funds

19   sufficient to enable Luby's to timely close.  Now, Tavistock

20   makes -- raises as an issue whether the evidence is

21   substantially equivalent to that provided by the stalking horse

22   bidder.  And they brought in a lot of extrinsic evidence,

23   negotiations, that lead to what was finally submitted on April

24   21st, which the Debtors accepted as sufficient to move forward

25   as -- with Tavistock as the stalking horse.  And that letter is

1    a letter from a bank confirming that Tavistock Ventures, Inc.,

2    which is –- has the financial capacity to provide adequate

3    funding of up to $40 million to close –- up to $40 million to

4    close a deal.  Nowhere in that letter does it say there's $40

5    million of cash sitting there in a bank account.  Nowhere in

6    that letter does it say that the $40 million would be in

7    escrow, would be preserved, wouldn't be withdrawn the next day,

8    wouldn't –- nowhere in the letter does it say that $40 million

9    cash on hand.  So it was just a letter from HSB Private Bank

10   saying that their customer has the financial capacity to

11   provide adequate funding.  Now, compare that to what Luby's

12   submitted, and what Luby's submitted was a commitment letter

13   with a term sheet, made their Lenders available so that we can

14   ask all the appropriate questions, and they satisfied the

15   Debtors, in consultation with the Agent and the Committee, that

16   they had the readily available funds in the form of committed

17   financing where due diligence has already been completed, where

18   Credit Committee approval has already been obtained, and where

19   they were dealing with existing lenders, existing

20   relationships.  So we –- it gave the Debtors the comfort and

21   the satisfaction that these were, in fact, readily available

22   funds.  Nowhere in the bid procedures does it require cash on

23   hand, and if it did require cash on hand, I'm speculating that

24   the Creditors' Committee would have objected and this Court

25   would have had an issue as far as chilling the bidding.

1          In addition, you've heard evidence, both on the record in

2     the form of the transcript of the auction proceeding, as well

3     as testimony, that at no time during the auction where there

4     any objections.  At no time were there any reservations.

5          THE COURT:  Now, let me ask you the significance of

6     that.

7          MR. ROSNER:  Yes.

8          THE COURT:  I mean, typically, the competing bidders

9     are not given the other parties' financial information.  They

10     may only find it out later.  We made a couple comments, or at

11     least I have, about, you know, the pace at which these things

12     proceed.  Do I really want to be encouraging people to be

13     putting protective or prophylactic objections on the record

14     about, well, we haven't seen anything, but we're not sure, and

15     then -- I mean, you've been to these auctions.  People stand up

16     and, you know, sometimes it takes ten minutes to get a bid out,

17     even the phrase, and then everybody breaks and they all go back

18     to their conference rooms.  And so, I mean, I'm wondering --

19     you know, you've raised it and I'm not being critical, I -- but

20     I'm trying to figure out what to do with that information.  I

21     mean, should they have, if they didn't have it?

22          MR. ROSNER:  I raise it in the context that the

23     process was fair.

24          THE COURT:  Okay.

25          MR. ROSNER:  The process was complied with.  We

1   haven't heard any complaints about the auction process and the

2   -- et cetera.  I also -- there were no -- the stalking -- the

3   bid procedures do not require that the Debtors share the

4   competing bids with the stalking horse.  That is clear.  But

5   even more importantly is that the bid procedures clearly and

6   unambiguously say that it's the Debtors, in consultation with

7   the other constituents, the Committee and the agent, that get

8   to decide who's qualified.  It doesn't say establish to the

9   satisfaction of the stalking horse who is qualified.  And so

10  they may not -- they may not agree with our decision, but

11  there's nothing in here that gives them the right to veto,

12  override, or make that decision for us.  And if the Debtors and

13  the other constituents, stakeholders, were satisfied, then that

14  ends the discussion.  We have three qualified bidders and let's

15  get on with the auction.  And that's what we did.  So, Your

16  Honor, we would ask that you overrule the objection, and we can

17  then conclude the hearing with some proffers and move forward

18  with the transaction.

19              THE COURT:  Okay.

20              MR. ROSNER:  Which, by the way, as you're well aware,

21  on the first day of the case we told the Court that we were

22  looking at maybe a 15-cent case, and that this auction was

23  extremely successful, and that Creditors are now looking at a

24  substantial recovery that could reach as high as 100%.  So this

25  is not a sale that, in any regard -- in any form, should be

1  disrupted.  Thank you.

2             THE COURT:  I understand.  Okay.

3             MR. WERKHEISER:  Good morning, Your Honor, for the

4  record again, Gregory Werkheiser, Morris, Nichols, Arsht &

5  Tunnell, on behalf of Luby's, Inc.  Your Honor, I'll try to

6  keep my remarks brief.  I do adopt everything that Mr. Rosner

7  said in support of the sale motion and the acceptance of our

8  bid.  Your Honor, Luby's was obviously late on the scene in

9  this case.  We were not around for much of what occurred

10  earlier on, the disputes of the bid procedures hearing.  We

11  found out about the opportunity to acquire the company through

12  publicly available information.  We mobilized to be a bidder,

13  to participate in the bid process, and did everything that was

14  asked of us to be here today and be in a position to complete

15  this transaction and fund it and go forward with this business.

16             Tavistock, on the other hand, Your Honor, I can -- I can

17  sympathize with their position somewhat.  They've been around

18  the deal for a long time.  They thought they had the deal in

19  hand early on.  They presented the Court, early in the case,

20  with what, as it turned out, was a very below-market offer to

21  acquire the assets for $40 million in cash and other

22  consideration, which, after the auction, is now $61 million at

23  minimum in cash and other consideration.  They thought they

24  would come into the auction with the protection of a break-up

25  fee in excess of a million dollars, which ism after entry of

1   the bid procedures order, $400,000.  But that doesn't change

2   where we are and it doesn't change the fact that Luby's was a

3   participant in this process, and a good faith participant in

4   this process who did everything asked of it to present a bid on

5   a timely basis and to provide all the information, meet all the

6   requirements that were requested of Luby's, and is here today,

7   ready to go forward with this transaction, and close by the end

8   of July in accordance with the terms of the purchase agreement

9   between the parties, which is finalized, Luby's believes, and

10  ready for execution.

11      Your Honor, Luby's, just to summarize, presented a bid by

12  the bid deadline which demonstrated $13 million in cash on

13  hand, an undrawn financing facility with at least 18.4 million

14  available under it, and a fully baked commitment from their

15  existing lenders to amend that facility to create availability

16  of $53 million, using substantially the same documentation and

17  with minimal conditions.  The testimony also establishes that

18  Luby's has more than 60 fee owned properties that are

19  unencumbered among its asset base, and that Luby's came to the

20  auction and bid and participated fully and in accordance with

21  the process set forth by this Court.

22      Your Honor, Luby's' financial performance was questioned,

23  and I think I just wanted to clarify to the record on that,

24  because Mr. Gray was examined initially without benefit of

25  having Luby's' 10K in front of him.  That document was later

1   admitted into evidence.

2            THE COURT:  It is.

3            MR. WERKHEISER:  And it clearly establishes that

4   Luby's, both for fiscal years 2007 and 2008, had a net income

5   on an annual basis.  It had a net loss in 2009 fiscal year.

6   But, as Your Honor heard, that was a difficult year industry-

7   wide, and Luby's made very prudent management decisions to

8   close down under-performing locations.  Those, in turn,

9   provided it with assets they could redeploy in connection with

10  its business and this transaction going forward.  And, in fact,

11  if Your Honor reviews the financial statements, you will see

12  that once you back out, the provision for asset impediment and

13  depreciation and amortization related to the closing of those

14  locations, that on an operating basis Luby's would have had a

15  negative income.  We also heard that for the 2010 fiscal year,

16  in the most recent quarter, Luby's had a net income from

17  operation of its business.  This is a healthy business and a

18  business that will prosper with Fuddruckers.

19           Your Honor, with regard to the bid procedures order, what

20  it says there matters and it doesn't say cash on hand.  It says

21  funds available to consummate the transaction, which is what

22  Luby's has provided to the Debtors.  And we all know, as

23  experienced practitioners, and Your Honor, I suspect, knows not

24  to speculate about what the Court will say on this issue, but

25  what a chilling effect on bidding, requiring all bidders to

1   show up with cash in a bank account as of the moment they

2   submitted their bid would have in this and other deals.

3        What I would say about the bid procedures order, Your

4   Honor, is that's just that, a procedures order.  It's an aid,

5   producing the highest and best offer for the Estate.  It's not

6   a final judgment on the merits.  It's not the sale order

7   itself.  It's designed to position the Estate to get the best

8   offer available for the assets.  We believe that's what we've

9   provided to the Court, and we respectfully submit that our

10   offer should be accepted.

11             THE COURT:  Okay.

12             MR. WERKHEISER:  Thank you, Your Honor.

13             THE COURT:  Thank you.  Briefly from the Committee?

14             MR. WILSON:  Briefly, Your Honor.

15             THE COURT:  Sure.

16             MR. WILSON:  Good morning, Your Honor, Eric Wilson of

17   Kelley, Drye & Warren for the Creditors Committee.  I'd just

18   like to make a couple of points on behalf of the Committee,

19   Your Honor having read through the papers and listened to the

20   evidence that's been presented over the last couple of days.

21   There's really, as has been pointed out, one issue before the

22   Court today, and that is whether Luby's submitted a qualified

23   bid under the procedures as determined by the Debtor in its

24   business judgment in consultation with the agent and the

25   Committee.  On that point, Your Honor, the question has been

1   raised whether the term readily available funds actually means

2   cash, or something other than cash, and I can tell you that,

3   from the Committee's perspective, readily available funds

4   certainly did not mean cash to the Committee.  A plain read of

5   the language of paragraph 4(i) of the bid procedures says

6   readily available funds, not cash, and cash, from the

7   Committee's perspective, has a very specific meaning.  I think

8   it has a very specific outside this Courtroom and in a variety

9   of contexts.  It's not the language that was used.  If the

10  Debtors had -- excuse me, proposed procedures that required

11  bidders to have $40 million in cash on deposit in a bank

12  account prior to becoming qualified bidders, I can assure you

13  that the Committee would have had a significant problem with

14  that concept.  The Committee would have objected because, as

15  Mr. Werkheiser points out, I think that would have dramatically

16  chilled the bidding here, and would, a matter of practice, in

17  any number of cases that I've been involved with.

18       So, you know, in this case, in particular, if readily

19  available funds under these procedures meant cash, there is a

20  possibility that not only was Luby's not a qualified bidder,

21  but perhaps that ADR or Fidelity -- the third bidder was not a

22  qualified bidder.  So playing that out, if we didn't have any

23  qualified bidders, this estate would not have realized the

24  incredible result that we have had at this auction.  That's

25  what these procedures are designed to do, is to create robust

1   bidding and successful auctions.  That's what's happened here.

2   I just -- I'm not sure, as a matter of practice, many bidders

3   would meet the standard that Tavistock purports to hold them to

4   under the bid procedures, and I certainly, again, can't tell

5   you what anyone else was thinking about what those terms meant.

6   But I can assure you that, to the Committee, it did not mean

7   cash on hand.  And I think, to that point, there's a question,

8   based on the evidence that Tavistock has submitted, whether

9   they actually have the cash on hand.  I'm not sure that the

10  read of the letter that's been provided to the Court supports

11  that conclusion.

12      So not to walk back through the qualifications of Luby's

13  bid, we did consult with the Debtors, Focal Point, FTI, the

14  banks, the bidders, extensively as to the qualifications of the

15  bids.  Concerns regarding the bids were addressed.  There were

16  reports prepared by both Focal Point and FTI that were

17  considered by the Committee, and we believe that it did satisfy

18  the requirements to rise to the level of a qualified bid.

19      As for the financing commitment, the bid was not

20  contingent on the financing commitment.  Even if you were to

21  consider the financing commitment, it's clear that it was not -

22  - this was a commitment from an existing lender, the expansion

23  of an existing facility.  We're talking about a situation where

24  the bank was starting into a new relationship with the Debtor,

25  and there was a question as to whether there was the ability to

1   close.  As recently as this week, the Committee has had

2   conversations with the bank.  They've assured us that there are

3   funds --

4                  MS. MICHELSON:  Objection, Your Honor.

5                  MR. WILSON:  -- available.

6                  THE COURT:  Yes.  You're -- do you want to get sworn

7   in?

8                  MR. WILSON:  I'll move on, Your Honor.  I'll

9   conclude, in fact.  I think the Court understands where the

10  Committee stands on this issue.  We support the bid.  We

11  believe it was sound exercise of the Debtors' business judgment

12  and was done with the active and full support and participation

13  of the Creditors' Committee.

14                 THE COURT:  Okay.

15                 MR. WILSON:  Thank you.

16                 THE COURT:  We've got the lender.

17                 MS. COPPAGE:  Good morning, Your Honor.  Cassie

18  Coppage on behalf of Wells Fargo Capital Finance, as

19  prepetition agent and D-I-P agent.  We would simply like to

20  note for the record our support of the Debtors' request for

21  entry of an order approving the sale to Luby's, and the

22  Committee's position that we have been fully consulted

23  throughout the auction process, and we were satisfied, after

24  Luby's submitted its bid and the Debtors did their follow-up

25  due diligence, that Luby's will be able to close the deal and

1   had the committed financing necessary to do so.  We certainly

2   feel that requiring that all bidders having cash on hand to be

3   qualified would have chilled the bidding process and would have

4   been unusual and possibly have left us with only one bidder or

5   no bidders at all.  We feel that the Debtors conducted a

6   careful and methodical auction process, and we would certainly

7   support a finding of good faith to move forward with the sale.

8   Thank you.

9           THE COURT:  Thank you.  Ms. Michelson?

10          MS. MICHELSON:  Thank you, Your Honor.  Yesterday I

11  told the Court that Tavistock did not intend to interfere with

12  a legitimate sale, and at the time I stood here yesterday and

13  said that, I did not have any evidence other than the

14  information that was in our brief.  I did not have the

15  commitment letter.  We've looked at the evidence.  We've looked

16  at the commitment letter.  We've heard the testimony.  And

17  Tavistock is convinced that we do not have a sale that complies

18  with the Court-approved bidding procedures, and that's why

19  we're here today.

20          It's uncontroverted that the Debtor -- I mean that Luby's

21  did not have, in its bank account or in its existing facility,

22  funds to support the amount of its bid.  Now, I've heard a lot

23  this morning about cash in the bank.  As the Court heard from

24  Mr. Wood, that was the standard the Debtor imposed on

25  Tavistock, cash in the bank by either the purchaser or a

1   guarantor of the purchaser's obligations.  The Debtor was

2   satisfied with the evidence that Tavistock supplied on the

3   second round.  First time, the Debtor said, no, we don't like

4   this letter from the bank.  The second time the letter

5   satisfied the Debtor.  The Debtor cannot stand here today and

6   say that it didn't meet the appropriate standard.

7        Now, the language in the bidding procedures order in

8   section 4(i), admittedly, does not say cash in the bank.  It's

9   very important to look at that language.  What it does say is

10  that a bidder has to produce evidence that is substantially

11  equivalent to that provided by Tavistock, showing that the

12  bidder, or its guarantor, {quote} "has readily available funds

13  sufficient to enable it to timely consummate its bid."  Okay?

14  So that the standard that the Court approved is that the

15  evidence the bidder provides has to be substantially equivalent

16  to what Tavistock provided.

17       The testimony of Mr. Gavin is that a commitment letter,

18  with outs, that both he identified and Mr. Stevenson admitted

19  to yesterday, is very different from cash in the bank, and

20  that's what Tavistock provided.  And the commitment letter that

21  Luby's submitted with its bid on June 14th was not

22  substantially equivalent to what Tavistock provided.  In fact,

23  the commitment letter did not evidence readily available funds.

24  It evidenced an option, as Mr. Gavin called it, a possible

25  agreement to provide funds so long as a number of conditions

1  were absent.  And we heard that this is a typical commitment

2  letter, a normal commitment letter.  Those letters, and, in

3  particular, the letter that Luby's submitted with its bid, had

4  conditions.  It had a MAC condition regarding the bank loan

5  syndication markets.  It has a condition in it that talks about

6  the bank's due diligence.  That is the evidence that Luby's

7  submitted on June 14th.  It had an out, a condition about the

8  capital markets.  It had an out, a condition about the

9  execution of acceptable loan documents.  It has an out about

10 real estate valuation.  It has a requirement that there be

11 guarantees of Luby's subs.  It has a requirement that others

12 guarantee the obligation, including the Pappas.

13          THE COURT:  Individuals.

14          MS. MICHELSON:  It has various financial covenants,

15 which we don't know, because they were redacted.  So to say

16 that the commitment letter was substantially equivalent to the

17 evidence of readily available funds that Tavistock provided,

18 simply is not supported by the evidence.  Now, it's disturbing,

19 Your Honor, to have the Debtors say that they seem to have

20 complete discretion to decide what constitutes compliance with

21 the Court-approved bidding procedures.  That goes to the heart

22 of the integrity of the sale process in this Court.  If the

23 Debtors negotiate terms and don't exercise their discretion in

24 an appropriate fashion, there is not a level playing field in a

25 363 process, and that will have a tremendous chilling effect on

1   bidding.  To have the Debtors say that they could just decide

2   because they chose to, rather than based on the evidence and

3   the facts and the standard and the bidding procedures, would be

4   a terrible rule, and I don't think that is what anyone in this

5   process wants.

6       In connection with what constitutes readily available

7   funds, we heard Mr. Gavin's testimony.  I'd like to have the

8   Court -- I'd like to refer the Court to a couple of cases which

9   talk about what constitutes readily available funds.  And, in

10  fact, the 3rd Circuit in the case of Manicini vs. Grant, 955

11  F.2d 1224, in talking about the need for certainty and finality

12  in a bank system for processing checks, talked about that

13  system depending on readily available funds, which, as we all

14  know, means that checks clear, virtually, immediately.  In

15  addition, the California Court of Appeal has determined that

16  funds disbursed by a electronic or wire transfer are readily

17  available funds, in the case of Washington Mutual Bank vs.

18  Superior Court, 95 Cal.Ap.4th 606, so via electronic or wire

19  transfer, not pursuant to a commitment letter with multiple

20  conditions.  The Bankruptcy Court in Arizona has held that

21  failing to provide readily available funds to close an escrow

22  is problematic, and that was because they were not disbursed

23  immediately, in the case of A&E Family Investment, 2007 Westlaw

24  1411623.  And in a final case I'll refer the Court to, in a

25  bankruptcy case in the Western District of Missouri by a Judge

1   who has sat as a visiting Judge in this District, Judge

2   Dentners, <u>A.G. Service Centers, LC</u>, 239 Bankruptcy Reporter

3   545, the Court said that such -- to be readily available funds

4   means that the funds must be in depositable form.  One could

5   not deposit a commitment letter, Your Honor.

6        Now, with respect to one item in the commitment letter,

7   Mr. Gray testified yesterday that a requirement was the

8   guarantees of the Pappas.  The Court has taken judicial notice

9   of a complaint which Pappas Restaurants filed, which was filed

10   in connection with the BP oil spill, talking about how those

11   restaurants in which the Pappas have a significant interest

12   suffered irrevocable damage as a result of the BP disaster,

13   that that leak is ruining Pappas' ability to obtain in the

14   necessary food to serve at its restaurants at a fair price,

15   they've seen a steep increase in costs and a sharp decline in

16   patrons, sales, and overall business.  Certainly raises

17   questions about whether this is readily available funds, given

18   the requirement of a guarantee.

19        Now, Mr. Rosner raised the question of should Tavistock

20   have said something about Luby's qualification at the bidding,

21   and I think the Court had the right approach.  We don't want

22   people standing up and objecting to other bidders'

23   qualification, and, in fact, we would have gotten nowhere.

24   Because when I did ask for the evidence on Saturday, at the

25   conclusion of the auction, I was told I could not have it.  So

1   to ask that I engage in a futile action does not make sense.

2       The Court heard evidence from Mr. Wood about the Debtors'

3   concern that a bidder have cash in the bank or a guarantee by

4   someone who did at the time it made its bid, in the full amount

5   necessary to close the transaction.  Tavistock met that

6   standard, and it bargained for the right to insist the

7   competing bidders meet that standard as well.  That standard

8   wasn't met here.  Luby's did not have substantially equivalent

9   -- anything that was -- evidence that it was substantially

10  equivalent to cash in the bank.  It did not have readily

11  available funds.  There's no other conclusion based on the

12  commitment letter and the bid package.  Tavistock, as the Court

13  heard, is ready, willing and able to close this transaction on

14  July 9th, not July 26th, subject to any Hart-Scott-Rodino

15  concerns, as it committed to do, not only at the price that it

16  should have won this auction at, which was about $50 million,

17  but at the price it bid, $59 million, 60 -- $59,060,000.

18  That's the right result here.  That's the integrity of the

19  process, and it ensures that the estate gets the appropriate

20  value for the assets.  Thank you, Your Honor.

21          THE COURT:  Thank you.  All right, I need five

22  minutes to review my notes.  I will come back and deal with the

23  objection.  We stand in recess.

24          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

25      (Court in recess)

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  In the context of the

3  Debtors' request for an order authorizing the sale of their

4  assets the matter before the court is the objection of

5  Tavistock serving as stalking horse.  Tavistock has challenged

6  the, whether or not the Luby's bid which the Debtors and

7  others, the stakeholders, have identified as the highest and

8  best bid, was a qualified bid consistent with the provisions of

9  the bid procedures that the court has previously ruled.  For

10  the reasons that I will state I will overrule the objection and

11  I will essentially find that the Luby's bid was, in fact, a

12  qualified bid.

13          First, qualified bids are defined -- pardon me --

14  qualified bids are defined and described in paragraph 4,

15  sections A through I, of the bid procedures that were approved

16  by my order dated May 18, 2010.  There appears to be no dispute

17  that Luby's bid has satisfied the requirements of 4A through

18  4H.  It was in writing and timely delivered.  It was signed.

19  It included a signed non-contention asset purchase agreement

20  and was accompanied by a substantial deposit.  The issue here

21  as noted lies with compliance with paragraph 4, sub I, relating

22  to proof of financial wherewithal to consummate its competing

23  offer.  The record here reflects that the Debtor required

24  Tavistock to go through a number of steps in April of 2010 to

25  ensure that it had and had posted the necessary resources to

1   close the proposed deal.  Specifically, the communications

2   included in Tavistock Exhibit-3, which was admitted, paint a

3   picture of a deal negotiation where the Debtor expressed

4   concerns about moving forward with a stalking horse that was

5   simply an acquisition vehicle with no assets or with no assets

6   beyond a deposit albeit a substantial deposit.

7        And to satisfy these concerns Tavistock procured or sent a

8   letter that appears at docket -- I'm sorry, Exhibit 4 and

9   Tavistock Exhibit 3 establishing that Tavistock has "financial

10  capacity to provide adequate funding of up to $40 million to

11  close a deal".

12       Tavistock then negotiated certain language appearing at

13  Tavistock 3, Exhibit-3, which was then built into paragraph 4,

14  sub I of the bid procedures detailing proof of financial

15  wherewithal to accompany qualified bids.  I will quote that

16  language appearing in 4, sub I now.

17       It requires "evidence substantially equivalent to that

18  provided by the stalking horse bidder establishing to the

19  satisfaction of the Debtors in consultation with the pre-

20  petition agent and the Committee that such prospective bidder

21  or an entity that has executed a written guarantee of such

22  prospective bidders' bid has readily available funds sufficient

23  to enable it to timely consummate its competing offer."  And

24  the section then goes on.

25       Tavistock asks that I construe this language to provide

1    that a competing bid must be accompanied by proof of cash on

2    hand or in the bank to close the deal, and I will not impose

3    that requirement here.

4         First, that's not what the plain language of the bid

5    procedures require or provide.  Second, in this court's

6    experience such an affirmative requirement is inconsistent with

7    practice in the industry and with bankruptcy sales generally,

8    and I believe and I'm confident that it would in fact have a

9    chilling effect on the sale procedures generally if this court

10   was to impose an obligation that a competing bidder needs to

11   slug away the full consideration of a proposed sale simply to

12   participate in bidding.

13        As a matter of fact, I actually recall that in another

14   case I have rejected such an affirmative requirement that

15   competing bidders post or have all of the cash on hand as an

16   overly onerous restriction on competing bidders.  Rather,

17   potential buyers are typically required to show evidence

18   satisfactory to the Debtor and to other stakeholders that they

19   will be able to close, and often, as here, that evidence takes

20   the form of a commitment letter, and then often and typically

21   direct communications with lender entities supporting a bidder

22   to allay, address or respond to any concerns, and to develop

23   sufficient confidence that a fair and appropriate auction

24   procedure can move forward.

25        I would also observe that to the extent that Tavistock was

1   pressed by the Debtors in its negotiations that was in the

2   context of the Debtor deciding to move forward with Tavistock

3   as a stalking horse.  Where the record does reflect that there

4   was at least one other interested bidder.  Tavistock responded

5   to those requests as the record provides and ultimately was

6   awarded with the benefits and position of being the stalking

7   horse.

8        But here I'm satisfied that the Luby's bid complied with

9   the bid procedures and fully complied as a matter of

10  professional diligence with the way that the court would expect

11  estate fiduciaries and stakeholders to test competing bidders

12  and to move forward to an auction.  The record reflects that

13  Luby's submitted its bid and the Debtor and others tested and

14  ultimately were satisfied that Luby's has readily available

15  funds to close the transaction.

16       I'm satisfied that the bid procedures that I approved were

17  complied with and I will not second guess the business judgment

18  of the Debtor, the Committee and other estate fiduciaries and

19  stakeholders.  The Tavistock objection will be overruled.

20       That leaves us with the issue of the balance of the

21  Debtor's case with respect to approval of a sale, and I believe

22  that that is largely uncontested.  Mr. Werkheiser?

23            MR. WERKHEISER:  Yes, Your Honor.  There is one

24  ancillary issue related to the Tavistock objection.  They did

25  file a motion yesterday morning for a 2004 examination, which I

1   believe in light of Your Honor's --

2          THE COURT:  That motion will be denied.

3          MR. WERKHEISER:  -- other ruling -- thank you, Your

4   Honor.  I think we did bring a proposed Form of Order today

5   that is just a plain Form of Order it provides it's denied for

6   the reasons stated on the record.

7          THE COURT:  Right.  You're going to let counsel take

8   a look it and we'll deal with it.

9          MR. WERKHEISER:  Thank you.  May I approach, Your

10  Honor?

11         THE COURT:  Sure.  Okay.  Mr. Rosner?

12         MR. ROSNER:  Your Honor, Douglas Rosner for the

13  Debtors and Debtors-in-Possession.  I'm not going to repeat

14  the, yesterday's opening presentation by my partner, Chris

15  Lynch, and I'll sort of start where she left off.

16         THE COURT:  Yeah, I think in our discussion we

17  confirmed that a number of objections have been reserved for

18  further negotiation and disposition at a later hearing, but

19  otherwise I believe that there are no objections remaining to

20  the Section 363 sale, is that correct?

21         MR. ROSNER:  The answer is yes that is correct as I

22  understand it.

23         THE COURT:  Okay.

24         MR. ROSNER:  Throughout yesterday there were drafts,

25  revised drafts of the sale order circulating and I believe all

1   of the other parties who have filed objections have consented

2   to the language in the Order where, I think, we're just

3   finalizing it right now, you know, we'll finalize it and submit

4   today.

5              THE COURT:  Okay.

6              MR. ROSNER:  There is one, Spirit asked that the

7   order include some language about a real estate tax payment

8   that, I believe, is payable this month.  So we are waiting, I

9   haven't had a chance to check emails.  So we're waiting for

10  confirmation of that and then we'll probably add a simple

11  sentence and that will take care of the order.  It is my

12  understanding that the Committee, the agent for the pre-

13  petition lenders and DIP lender and Luby's are all fine with

14  the draft of the sale order as it currently exists.

15             THE COURT:  Okay.

16             MR. ROSNER:  I think the next step in today's process

17  or sale hearing would be the, what I would call the good faith

18  proffers.  And you are going to hear proffers from Alex

19  Stevenson, a managing director of Focal Point Securities, the

20  investment bankers in these cases, as well as a proffer from

21  Luby's, I believe it will be Chris Pappas.

22             THE COURT:  Very well.

23             MR. ROSNER:  Mr. Stevenson -- I will make the proffer

24  for Mr. Stevenson and he is in the courtroom and available for

25  cross examination.  Mr. Stevenson is a managing director of

1   Focal Point Securities LLC.  Alex Stevenson has specialized in

2   advising companies in their various stakeholder groups in

3   special and distress situations, including in numerous Chapter

4   11 cases for approximately 15 years.

5       On February 3, 2010 the Debtors retained Focal Point as

6   their investment banker to assist the Debtors in their efforts

7   to locate a new investor or market and sell substantially all

8   of the Debtor's assets as a going concern.  The Debtor's Board

9   of Directors or Board of Managers had determined that it was

10  critical to locate a potential buyer and consummate a sale of

11  substantially all of the Debtor's assets in Chapter 11 in order

12  to preserve the value of the business to the maximum extent

13  possible.

14      Mr. Stevenson led the Focal Point team on the Fuddruckers

15  engagement and is intimately familiar with the marketing and

16  auction process for the sale of the Debtor's assets.  If Mr.

17  Stevenson was asked to testify about the Debtor's marketing

18  process and selection of the successful bidder he would testify

19  as follows:  Shortly after being engaged by the Debtors Focal

20  Point started preparing to take the Fuddruckers' Koo Koo Roo

21  business investment opportunity to market by compiling a list

22  of potential investors and buyers, preparing what we call a

23  teaser, preparing a form of nondisclosure agreement for

24  interested parties, and also working with the Debtors to

25  prepare a more full some memorandum.

1          Prior to the petition date Focal Point contacted

2     approximately 72 parties and sent the teasers and a form of

3     nondisclosure agreement to approximately 58 of these parties.

4     Approximately 41 potential buyers expressed interest in

5     learning more about the opportunity by executing nondisclosure

6     agreements.

7          Between March 15 and March 26th, Focal Point received nine

8     indications of interest in acquiring substantially all of the

9     assets of the Debtors.  Those parties were given a deadline of

10    April 14 to submit binding offers to acquire the Debtor's

11    assets.  They were also provided with a form of asset purchase

12    agreement prepared by the Debtors and were asked to submit

13    their bids using that form or a mark up of that form.

14         Two parties submitted a mark up Form APA by April 14th;

15    Tavistock Ventures, Inc. and American Blue Ribbon Fidelity.

16         On April 17, the Debtors in consultation with Focal Point

17    and counsel determined that Tavistock had made the highest and

18    best stalking horse offer and selected Tavistock as the

19    stalking horse.

20         On April 21, the Debtors and Tavistock executed an asset

21    purchase agreement that provided for the sale of substantially

22    all of the Debtor's assets to Tavistock for a purchase price of

23    $40 million dollars, including certain locations subject to

24    what we call the Spirit Master Lease, and $31 million without

25    those locations.

1        And if the Court recalls at that time there was -- the

2   Spirit deal had not yet been approved so there was uncertainty

3   there.

4            THE COURT:  I understand.

5            MR. ROSNER:  On April 22nd the Debtors filed a motion

6   to approve the sale to Tavistock subject to higher and better

7   offers and to approve bidding and auction procedures.  The

8   court approved the bidding procedures after a hearing on May

9   17th, and I believe the -- and the court is aware of the, and

10  we would incorporate the record obviously of that hearing and

11  the other hearings leading up to today.

12       Post-petition marketing efforts.  Immediately after the

13  filing of the sale motion, Focal Point resumed its efforts to

14  market the Fuddruckers' Koo Koo Roo opportunity.  Sixteen

15  additional prospective bidders signed nondisclosure agreements

16  and were provided access to the due diligence materials.  I

17  would also add that prior to the petition date Focal Point

18  through a third-party service provider set up an electronic

19  data room for buyers to access.

20       Focal Point arranged an additional five management

21  presentations and meetings including with Fidelity American

22  Blue Ribbon as well as Luby's, Inc.  During the post-petition

23  marketing process a colleague of Alex Stevenson's, a gentleman

24  by name of Rod Gwinn (ph.) spent considerable time with

25  individual franchisees, by phone and in person, to answer

1   questions about the process.

2        In addition Mr. Stevenson would testify that Focal Point

3   was approached by counsel to certain franchisees about their

4   potential interest.

5        By the bid deadline of June 14, the Debtors received two

6   competing offers.  One from Fidelity National Holdings, which

7   we also call American Blue Ribbon sometimes, for $41 million

8   with Spirit, $32 million without.  And one from Luby's, Inc.,

9   $42 million with Spirit, $34 million without.

10       In addition Luby's made an offer for an additional sum in

11  the event the Debtors were able to deliver possession and

12  control of the two restaurants in Minnesota currently occupied

13  by RJ Management.

14        The Debtors, Debtors' counsel and Focal Point analyzed

15  the competing offers, reviewed information concerning the

16  financial wherewithal of each bidder to complete the

17  transaction and information concerning such party's ability to

18  provide adequate assurance of future performance under leases

19  and executory contracts.

20       The Debtors then consulted with Wells Fargo as agent of

21  the pre-petition and DIP lenders as well as the professionals

22  engaged by the Official Committee of Unsecured Creditors and

23  collectively determined that the bids of Fidelity National and

24  Luby's were qualified bids within the meaning of the bid

25  procedures.

1        An auction was held on Thursday, June 17 at the officers

2   of Richards, Layton & Finger in Delaware, co-counsel to the

3   Debtors.  Tavistock, Luby's and Fidelity National attended the

4   auction, including their representatives.

5        It began with an opening bid by Luby's in the amount of

6   42.6 million for all locations including Spirit, and 34.6

7   million for all locations except Spirit, plus $200,000

8   contingent consideration if the Minnesota locations were

9   delivered.

10       The auction concluded after approximately 16 rounds of

11  bidding at around 9:00 or 9:30 p.m. that evening.  At that time

12  at the conclusion of the auction, Luby's was declared the

13  winning bidder with a bid of $61 million in cash, plus $2.45

14  million of additional cash in the event that the Debtors'

15  contract with Pepsi is not assumed, plus an additional $200,000

16  of contingent consideration if the Minnesota locations are

17  delivered, subject to the terms and conditions of an asset

18  purchase agreement which will be executed shortly after this

19  hearing.

20       Mr. Stevenson would testify that Focal Point and FDI have

21  reviewed the information that demonstrates that Luby's has the

22  financial ability to close the transaction at this price.

23       In addition, at the conclusion of the auction it was

24  announced that Tavistock Ventures, Inc. had the second highest

25  bid valued by the Debtors and the Committee at 6.1 million 550

1   thousand which consists of 59 million 60 thousand in cash, plus

2   an agreement that their right to reject or designate leases not

3   to be assumed and assigned would be limited to 12 leases, plus

4   an additional amount with respect -- the same amount, the 2.45

5   with respect to the Pepsi, on the same terms as Luby's.  And

6   then they, the Minnesota piece of the transaction was baked

7   into their offer and that was given a certain value as well.

8   And so in the aggregate their second highest bid was valued at

9   61 million 550 thousand.

10          The order that will be presented to the court consistent

11  with the bidding procedures will request the approval of the

12  transaction with Luby's but it will also contain a provision

13  consistent with the procedures that the second place bid is

14  held open for a period of time, I believe it's 60 days, and

15  remains irrevocable and that the order would apply to the

16  second place bidder if for some reason the Luby's wasn't, did

17  not close the transaction as agreed to.

18          THE COURT:  Okay.

19          MR. ROSNER:  And Your Honor that would conclude our

20  proffer of good faith as well as the process that was

21  undertaken in order to achieve the results that were achieved

22  over the last couple of weeks.

23          THE COURT:  Okay.  Does anyone wish to cross?  Very

24  well I'll accept the proffer.  Mr. Werkheiser?

25          MR. WERKHEISER:  It's still morning, Your Honor.

1    Good morning, Your Honor, Gregory Werkheiser on behalf of

2    Luby's.  Your Honor, I just rise to offer a brief proffer on

3    behalf of Mr. Christopher Pappas of Luby's.

4            Mr. Pappas is present in the courtroom today, seated

5    behind me to the left.

6            THE COURT:  Okay.

7            MR. WERKHEISER:  And available for cross examination

8    should anyone wish to do so.

9            THE COURT:  Very good.

10           MR. WERKHEISER:  If called to testify Mr. Pappas

11   would testify as follows:  He has been the president and chief

12   executive officer and a director at Luby's since March 2001.

13   He's also been chief executive officer of Pappas Restaurants,

14   Inc. since 1980, which is a privately controlled restaurant

15   group based out of Houston, Texas, that in addition to owning

16   an interest in Luby's, owns and operates approximately 90

17   restaurants across state, restaurant chains.

18       Mr. Pappas would testify further that he became aware of

19   the opportunity to acquire the Fuddruckers' assets through

20   publicly available information.  That in furtherance in making

21   inquiries to submit a bid that they complied at all times with

22   the bidding procedures established by the Debtors and the terms

23   of their nondisclosure obligations.

24       He would further testify that he is aware of no

25   relationship between Luby's and Fidelity Newport a/k/a American

1   Blue Ribbon, Tavistock or the Debtors prior to embarking upon

2   this process.

3        Mr. Pappas would further testify that he has not at any

4   time since submitting a bid discussed the substance of that bid

5   or the auction process with any other bidder in connection with

6   this sale process.

7        Finally, Mr. Pappas would testify that he believes that at

8   all times Luby's participated in good faith in this and at all

9   times acted to fulfill to the best of its ability the terms of

10  the auction procedures and the DIP procedures.

11              Thank you, Your Honor.

12              THE COURT:  Very good.  Mr. Rosner, anything else?

13              UNIDENTIFIED SPEAKER:  Oh, Your Honor, can I -- also

14  the witness is available for cross.

15              THE COURT:  Oh, yeah.  Does anyone wish to cross

16  examine Mr. Pappas?  Very well.  I'll accept the proffer.

17              MR. WERKHEISER:  Thank you, Your Honor.  Your Honor,

18  one housekeeping matter related to the testimony of Mr. Gray

19  from yesterday.  He testified at some length about Luby's

20  financial condition and financial ability to go forward with

21  this transaction.  Adequate assurance of future performance is

22  not actively contested by any party except for a handful with

23  whom we've reserved until the July 14th hearing, and without

24  prejudicing their rights on the issue to the extent Your Honor

25  has an independent obligation to consider whether we've

1   satisfied that threshold, we'd ask that his testimony be

2   considered for that purpose.

3           THE COURT:  So noted.

4           MR. WERKHEISER:  Thank you, Your Honor.  And as well

5   as the other evidence that we've offered --

6           THE COURT:  Sure.

7           MR. WERKHEISER:  -- concerning Luby's financial

8   performance.

9           THE COURT:  Okay.  I understand.

10          MR. ROSNER:  So, Your Honor, I think the record,

11  yesterday's and today's hearings as well as the previous

12  hearings and the pleadings that have been filed to date are

13  sufficient for this court to find that Luby's, Inc. or it's

14  designees good faith purchaser that there's been no collusion

15  or bad faith here, that the amount being tendered in

16  consideration for the sale is recently equivalent value and

17  maybe more, and that Luby's had provided adequate assurance of

18  future performance subject to the reservation of rights that

19  will be set forth in the order.  And that for those reasons and

20  other reasons that I may have forgotten to mention that the

21  sale should be approved subject to this court's review of the

22  final form of sale order.

23          THE COURT:  Okay.  Does anyone wish to be heard?  All

24  right.  I am preparing to approve the sale.  I do find based

25  upon the record that has been developed before me over the last

1  couple of days that the Debtors have carried their burden with

2  respect to Section 363 and their request for approval of the

3  sale, and assumption and assignment of the related contracts.

4      Specifically the standard for approval of the sale in this

5  jurisdiction is not in controversy, it comes from the seminal

6  case of <u>Abbott's Dairies</u> and it's progeny.  But it basically

7  provides that the debtor needs to establish that it has a

8  reasonable business purpose for the sale and that the sale

9  itself is being pursued and conducted in good faith.  On both

10 of those prongs I'm satisfied that the Debtors have more than

11 carried their burden.

12     The record and testimony developed this afternoon does

13 provide that the sale itself is in good faith.  There is no

14 indication of any insider or other party receiving an improper

15 benefit as a result of the sale.  And I am further satisfied by

16 the substantial record that's been developed here, that the

17 sale itself has been conducted in good faith, appropriately and

18 professionally.  I have had the opportunity to review the

19 transcript of the auction and I commend all parties for their

20 efforts in ensuring, rigorously, that process was open, fair

21 and honest and achieved for this estate a very positive result.

22     With respect to the request for approval of the sale under

23 Section 363(b), as noted, I'm satisfied that the documentary

24 and testimony record that we've developed here is sufficient to

25 carry the Debtor's burden, and I'm prepared to approve and

1   authorize the sale as requested.

2       Similarly I'm satisfied that the Debtors have carried

3   their burden, that the proposed purchaser, Luby's, has

4   established sufficient financial wherewithal to provide both a

5   likelihood of it's ability to close the sale as well as

6   adequate assurance to counter parties subject to the reserved

7   rights of those parties for further hearings.

8       But there is, I believe, an initial finding that I do need

9   to make with respect to even those parties that have not

10  objected that there is adequate assurance of the ability to

11  perform on the assumed contracts and I so make that finding

12  based upon the record as developed here.

13      And so the, I believe where we stand now is that the sale

14  order is being finalized between and among the parties.  I

15  think there are some short strokes necessary, and that the

16  Debtors anticipate closing in the middle of July and there may

17  be a Hart-Scott-Rodino issue that needs to get explored.  Have

18  we run that to ground or is that still an open issue?

19          MR. ROSNER:  Your Honor, the, I believe the outside

20  closing date is July 26th.  July 26th is the outside closing

21  date which should give the parties sufficient time to comply

22  with Hart-Scott-Rodino.  The Hart-Scott-Rodino filings will be

23  made on before July 2nd, is that correct?  Yes.

24          THE COURT:  Okay.

25          MR. ROSNER:  So -- and we will submit through

1   Richards Layton the proposed Form of Order and will be,

2   obviously, copying the appropriate parties.

3           THE COURT:  Okay.  All right.  I will look for the

4   order then under certification.  Counsel, is there anything

5   further today?  Mr. Werkheiser?

6           MR. WERKHEISER:  Your Honor, I believe -- we really

7   just rise to thank the Court.  I know we wrought havoc with

8   Your Honor's schedule for the week and we thank the court for

9   its time and --

10          THE COURT:  That's what I get paid for.

11          MR. WERKHEISER:  -- efforts in connection with the

12  proceeding, so thank you.

13          THE COURT:  All right.

14          UNIDENTIFIED SPEAKER:  I think we've reeked havoc for

15  the last two months.

16          MR. WERKHEISER:  I'll only take responsibility for

17  this week.

18          THE COURT:  But it's a fine burger, and I appreciate

19  it.  All right.  Thank you very much counsel, I do appreciate

20  it on all parties and best of luck to the parties.  Stand in

21  recess.

22          (Court adjourned)

23

24

25

```
1                        CERTIFICATION
2    I certify that the foregoing is a correct transcript from the
3    electronic sound recording of the proceedings in the above-
4    entitled matter.
5
6    Lewis Parham                          6/24/10
7    _____        _____
8    Signature of Transcriber                  Date
```