## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| DEEL, LLC, et al.,[1] | ) | Case No. 10-11310 (BLS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | Re: D.I. 453 |

### MOTION OF LUBY'S, INC., AND LUBY'S FUDDRUCKERS RESTAURANTS, LLC, (I) TO VACATE SALE ORDER SOLELY WITH RESPECT TO ASSUMPTION AND ASSIGNMENT OF DALTEX FRANCHISE AGREEMENTS, (II) TO COMPEL DEBTORS' REJECTION OF DALTEX FRANCHISE AGREEMENTS AND (III) FOR RELATED RELIEF

Luby's, Inc. ("Luby's"), and Luby's Fuddruckers Restaurants, LLC ("Luby's Fuddruckers," together with Luby's, the "Luby's Entities"), by and through their undersigned counsel, hereby move (the "Motion") for entry of an Order, pursuant to sections 105(a) and 365 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Federal Rule of Civil Procedure 60(b), made applicable to this proceeding by Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Court's inherent power, (I) partially vacating the *Order (A) Approving Asset Purchase Agreement Between the Debtors and Luby's, Inc.; (B) Authorizing the Sale of the Purchased Assets of the Debtors Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (C) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith* (D.I. 453) (the "Sale Order") solely with respect to the assumption and assignment to Luby's Fuddruckers

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Deel, LLC, f/k/a Magic Brands, LLC (8989); Brosna, Inc., f/k/a Fuddruckers, Inc. (8267); Atlantic Restaurant Ventures, Inc. (9769); King Cannon, Inc. (8671), and KCI, LLC (9281). The address for all of the Debtors is 5700 Mopac Expressway, Suite C300, Austin, Texas 78749.

of the Daltex Franchise Agreements (as defined herein), (II) compelling the Debtors' rejection of the Daltex Franchise Agreements, and (III) granting the Luby's Entities related relief. In support of this Motion, the Luby's Entities rely on and incorporate by reference the Declaration of K. Scott Gray, attached as **Exhibit A** hereto (the "<u>Gray Declaration</u>"), and respectfully state as follows:[2]

### INTRODUCTION[3]

1.      By this Motion, the Luby's Entities seek relief from the assumption and assignment to Luby's Fuddruckers of nine franchise agreements (the "<u>Daltex Franchise Agreements</u>") with Daltex Restaurant Management, Inc. ("<u>Daltex</u>"), as franchisee or successor franchisee. The Daltex Franchise Agreements contain terms far different, and far more onerous to Luby's Fuddruckers as the assignee-frachisor, than what was represented to the Luby's Entities by the Debtors and their advisors in the diligence materials made available during the sale process and in the Luby's APA. To this end, the Luby's Entities request that the Court exercise its broad discretion to partially vacate the Sale Order insofar as it provides for the assumption and assignment to Luby's Fuddruckers of the Daltex Franchise Agreements.

2.      Whether by accident or artifice, the electronic Data Room established by the Debtors – which was the repository of vast majority of the documents and information upon which the Luby's Entities relied in making the decision to acquire the assets and business of the Debtors – contained outdated versions of the Daltex Franchise Agreements and omitted other material agreements between the Debtors and Daltex. Furthermore, the representations in the Luby's APA and Schedules thereto, upon which the Luby's Entities were entitled to rely in

---

[2]      Except as noted in footnote 3 below, capitalized terms not defined in this Motion have the meanings ascribed to such terms in the Luby's APA (as defined herein).

[3]      Capitalized terms not defined in the Introduction are defined elsewhere in the Motion.

deciding which Contracts to acquire in connection with the Sale, not only failed to disclose that the Daltex Franchise Agreements had been materially modified but also materially misrepresented, among other things, that the Daltex Franchise Agreements had not been modified in any material manner from the Debtors' form franchise agreement. Only after the Sale closed and after Luby's Fuddruckers had accepted the assignment of the Daltex Franchise Agreements based on this faulty and misleading information, did the Luby's Entities learn from Daltex of a Master Agreement and Master Addendum between the Debtors and Daltex that materially modified the terms of the Daltex Franchise Agreements in a manner adverse to the interest of Luby's Fuddruckers as the assignee of the Debtors' interests as franchisor.

3.      Thereafter, the Luby's Entities immediately contacted the Debtors to inquire why those important documents had not been shared with the Luby's Entities prior to the closing of the Sale. No response, however, was immediately forthcoming. Only after repeated requests from the Luby's Entities, did the Debtors finally concede in writing that the Master Agreement and Master Addendum had been omitted from the Data Room. Nevertheless, the Debtors and Daltex have steadfastly refused to consent to any relief for the Luby's Entities from the Sale Order as it relates to the Daltex Franchise Agreements.

4.      Why the Debtors would feel entitled to be so intransigent on this issue is puzzling. Under the terms of the Luby's APA, the Luby's Entities always had the "sole option" up to the Closing Date to designate which "Contracts" (a term defined in the Luby's APA to include all of the Franchise Agreements) of the Sellers were to be assigned to Luby's Fuddruckers. *See* Luby's APA § 2.1(b)(vii). And, the Debtors were always exclusively responsible for any cure obligations on Contracts to be assumed and assigned to Luby's Fuddruckers and for rejection claims and other liabilities relating to Contracts not acquired by

Luby's Fuddruckers. *See* Luby's APA § 2.4(c) & (d). In short, if this relief is granted, it will simply return the Debtors and the Luby's Entities to the respective positions that they bargained for. The Debtors will be no worse off than had the Luby's Entities been provided accurate information about the Daltex Franchise Agreements and exercised their absolute right under the Luby's APA to reject those franchise agreements.

5. The Luby's Entities, on the other hand, are substantially prejudiced by being burdened with undisclosed material changes to the Daltex Franchise Agreements. On the whole, the Master Addendum appears to have operated to broadly revise the Daltex Franchise Agreements, almost without exception, to the benefit of Daltex and to the detriment of its franchisor. Indeed, many of the modifications made to the Daltex Franchise Agreements are extraordinary and unique among all of the Franchise Agreements to which the Debtors were party. The many undisclosed changes made to the Daltex Franchise Agreements less than a year before the Debtors filed there bankruptcy cases include the following:[4]

- The expansion of Daltex's exclusive protected area from a four (4) to a six (6) mile radius around franchised Restaurants. Master Addendum, § 40.

- The reduction of Daltex's royalty fee from 5% of Gross Sales to 3% of Gross sales for certain franchised Restaurants and the granting of a four (4) year holiday from royalties for the two Purchased Restaurants. Master Addendum, § 43.

- The elimination of personal guarantees previously provided by Daltex's principals. Master Addendum, § 52.

- The elimination of the franchisor's option to purchase the assets of a Restaurant. Master Addendum, § 51.

---

[4] This summary of changes to the Daltex Franchise Agreements is non-exclusive. Furthermore, by identify and describing these changes, the Luby's Entities do not admit the validity, enforceability or construction of the Master Agreement, the Master Addendum, or the Daltex Franchise Agreements. All rights, claims and defenses with respect to such agreements and any other agreements with Daltex or its affiliates are hereby expressly reserved.

- Modification of the provisions governing defaults favorable to Daltex, including by removing Daltex's unauthorized closing of a Restaurant as grounds for a default under the Daltex Franchise Agreements. Master Addendum, § 50.

- The relaxation of restrictions on changes in control of the franchisee and other Transfers (as defined in the Daltex Franchise Agreements). Master Addendum, § 48.

- The imposition of substantial limitations on the franchisor's access to the books and records of Daltex. Master Addendum, § 44.

- The relaxation of the franchisor's controls over Daltex's choice of goods and materials for us at the franchised Restaurants. Master Addendum, § 45.

- The elimination of a General Release provision that, among other things, protected the franchisor from liability arising from Daltex's operation of the franchised Restaurants and required Daltex to indemnify its franchisor for such losses. Master Addendum, § 31.

- The elimination of the franchisor's option to acquire or take assignment of certain assets associated with the operation of the franchised Restaurants. Master Addendum, § 29.

- The significant relaxation of restrictions on the ability of Daltex and/or its affiliates and principals to, among other things, develop, own and operate other restaurant concepts. Master Addendum, § 28.

- Material changes to the funding and use of marketing funds. Master Addendum, § 22.

- The relaxation or elimination of requirements for the leases of franchised Restaurant locations that were intended to protect the franchisor in the event of, among other things, the termination of the Daltex Franchise Agreements or Daltex's breach thereof. Master Addendum, § 18.

6. The near doubling of Daltex's exclusive Protected Area has the risk to be particularly damaging to the future prospects of the business and brand going forward. Because the Daltex Franchise Agreements generally cover the high density and profitable Dallas – Fort Worth – Arlington, Texas metropolitan area, this material change substantially restricts

development and expansion opportunities for Luby's Fuddruckers and harms its future business prospects in incalculable ways.

7.      In their current form, the Daltex Franchise Agreements are unpalatable to the Luby's Entities.  Had the Luby's Entities not been misled about the terms of the Daltex Franchise Agreements, they would not have designated them to be assumed and assigned to Luby's Fuddruckers under the Sale Order and Luby's APA.  This Motion has become necessary because neither the Debtors nor Daltex will consent to any redress for the Luby's Entities. Accordingly, the Luby's Entities respectfully submit that, under the circumstances, it would be highly inequitable for them to continue to be burdened by the Daltex Franchise Agreements and request that this Court grant them limited relief from the Sale Order to vacate the assumption and assignment to Luby's Fuddruckers of the Daltex Franchise Agreements.

## **JURISDICTION**

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § § 157 and 1334.  Additionally, this Court's jurisdiction is supported by paragraph 50 of the Sale Order, which provides:

> This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and ***each of the agreements*** executed in connection therewith to which the Debtors are a party or ***which has been assigned by the Debtors to the Purchaser,*** and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transactions.

Sale Order, ¶ 50 (emphasis added).

9.      Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

10. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein is section 105(a) of the Bankruptcy Code.

## BACKGROUND

### I. The Debtors And The Bankruptcy Cases

11. On April 21, 2010 (the "Petition Date"), Magic Brands, LLC, n/k/a Deel, LLC ("Magic"), Fuddruckers, Inc., n/k/a Brosna, Inc. ("Fuddruckers") and certain of their respective affiliates (collectively, with Magic and Fuddruckers, the "Debtors") each filed a voluntary petition for relief under the Bankruptcy Code, thereby commencing the above-captioned chapter 11 cases (the "Bankruptcy Cases"). The Bankruptcy Cases are being jointly administered for procedural purposes only.

12. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On May 3, 2010, the Office of the United States Trustee for the District of Delaware (the "US Trustee") appointed the Official Committee of Unsecured Creditors for these Bankruptcy Cases (the "Committee").

13. No chapter 11 plan has been filed in these Bankruptcy Cases. By Order, dated August 23, 2010 (D.I. 743), the Court extended the Debtors' exclusive period to file a plan through November 17, 2010.

### II. The Luby's Entities

14. Luby's, Inc., a Delaware corporation, operates restaurants under the brands Luby's, Fuddruckers and Koo Koo Roo. Its 96 Luby's restaurants are located throughout Texas. The restaurants recently acquired from the Debtors include 56 company-operated Fuddruckers locations and 129 franchises across the United States and in various countries and 3

Koo Koo Roo California Kitchens located in southern California. Luby's Culinary Services provides food service management to 17 sites consisting of healthcare, higher education and corporate dining locations.

15. Luby's Fuddruckers Restaurants, LLC, a Delaware limited liability company, is a wholly-owned subsidiary of Luby's, Inc.

### III. Daltex And The Daltex Agreements[5]

16. Daltex Restaurant Management, Inc., a Texas Corporation ("Daltex"), is a franchisee that presently operates nine (9) Fuddruckers restaurants in the Dallas – Fort Worth – Arlington, Texas metropolitan area. The principals of Daltex have included at various times Ernest Crawford, David Futrell, William H. Armstrong, II, William T. Armstrong, Terry L. Armstrong and others (the "Daltex Principals").

17. On information and belief, the history of the Daltex relationship with the Debtors dates to at least 1997 when the Daltex Individuals entered into franchise agreements with Fuddruckers, one of Debtors, and then immediately assigned over their interest in those franchise agreements to Daltex. Prior to July 31, 2009, the Debtors and Daltex were party to the following five Franchise Agreements (hereinafter, the "Existing Daltex Franchise Agreements"):[6]

| Unit No. | Address |
|----------|---------|
| 384 | 1612 Airport Freeway |

---

[5] Much of what the Luby's Entities now know or surmise about the various agreements between the Debtors and Daltex comes from documents obtained from Daltex and information developed by the Luby's Entities *after* the Closing of the Sale. The discussion of Daltex and the various Daltex agreements contained herein should not be deemed as an admission that the Luby's Entities had such information available prior to the Closing of the Sale.

[6] The Existing Daltex Franchise Agreement for the restaurant located at 1612 Airport Freeway, Bedford, Texas, which is representative of the Existing Daltex Franchise Agreements, is attached as **Exhibit B** hereto.

| | Bedford, Texas |
|---|---|
| 348 | 5601 Southwest Loop 820 <br> Forth Worth, Texas |
| 325 | 4520 Frankford Drive <br> Dallas, Texas |
| 340 | 2001 State Highway 121 <br> Grapevine, Texas |
| 314 | 5500 Greenville Avenue, #505 <br> Dallas, Texas |

Under the terms of the Existing Daltex Franchise Agreements, each of the Daltex Individuals initially remained personally liable for any sums owed by Daltex to Fuddruckers that Daltex failed to pay.

18. Subsequently, Daltex began operating restaurants at several other locations, including the following:

| Unit No. | Address |
|---|---|
| 118 | 2205 North Central Expressway <br> Plano, Texas <br> (the "Plano Restaurant") |
| 438 | 2947 Preston Road <br> Frisco, Texas <br> (the "Frisco Restaurant") |
| 636 | 1732 South Loop 288 <br> Denton, Texas <br> (the "Denton Restaurant") |
| 665 | 380 Towne Crossing Shopping Center <br> 2025 N. Central Expressway <br> McKinney, Texas <br> (the "McKinney Restaurant") |

(collectively, the "Additional Daltex Restaurants"). As best as the Luby's Entities have been able to determine, prior to July 2009 some of the Daltex Restaurants were operated under written management agreements, while the operating arrangements for other of the Additional Daltex Restaurants were not memorialized in writing.

19. Apparently, the Debtors and Daltex were not satisfied with these arrangements and subsequently entered into a Master Agreement, dated as of July 31, 2009 (the

"Master Agreement").[7] The Master Agreement established the framework for a wholesale restructuring of the business relationship between the Debtors and Daltex. It contemplated, among other things, that (i) Daltex would purchase the Plano and Frisco Restaurants from the Debtors pursuant to a separate Asset Purchase Agreement of equal date (the "Daltex APA"),[8] (ii) the Debtors and Daltex would terminate the five Existing Daltex Franchise Agreements and simultaneously enter into new franchise agreements with Daltex for those same locations, (iii) the Debtors and Daltex would enter into new franchise agreements to govern the Additional Daltex Restaurants, (iv) the Debtors and Daltex would enter into a new agreement of equal date to develop additional Fuddruckers restaurants (the "Development Agreement"), (v) the Debtors and Daltex would grant each other general releases, including from any breaches under the Existing Daltex Franchise Agreements, and (vi) the Daltex Individuals would be released from their respective personal guarantees under the Existing Daltex Franchise Agreements.

20. Significantly, the Master Agreement further contemplated that the form of the new franchise agreements to be executed by the Debtors and Daltex would depart materially from Magic's 06/2008 form of franchise agreement then approved for use with other franchisees. To this end, the Master Agreement provided that the Debtors and Daltex would execute a Master Addendum of even date therewith (the "Master Addendum"), which would, among other things, materially modify all of the Daltex Franchise Agreements.[9] It appears that one of the functions of the Master Addendum was to conform the terms of all of Daltex Franchise Agreements to the provisions of Magic's 06/2006 form franchise agreement, rather than the terms of Magic's 06/2008 form franchise agreement which was then generally in effect.

---

[7] The Master Agreement is attached as **Exhibit C** hereto.

[8] The Daltex APA is annexed as <u>Exhibit 3</u> to the Master Agreement (**Exhibit C** hereto).

[9] The Master Addendum is annexed as <u>Exhibit 5</u> to the Master Agreement (**Exhibit C** hereto).

21.     Additionally, the Master Addendum further modified each of the Daltex Franchise Agreements to provide Daltex with rights and benefits not generally enjoyed by the Debtors' other franchisees.    These include, but are not limited to, the 13 material changes summarized in the Introduction above. *See supra*, ¶ 5.    These changes are detrimental to the interests of the franchisor under the Daltex Franchise Agreements and make the Daltex Franchise Agreements unpalatable to the Luby's Entities.

22.     According to the Master Agreement, all of these changes were supposed to have been memorialized in new franchise agreements with Daltex. *See* Master Agreement, § 3.A.    The Luby's Entities, however, can find no evidence that any such New Franchise Agreements were ever actually executed.    Copies of "New Franchise Agreements" were not contained in the Data Room.    Indeed, as discussed herein, the Luby's Entities had no knowledge of the modifications made to the Daltex Franchise Agreements until after Closing of the Sale.

### IV.    The Sale Process

23.     According to the Debtors, they commenced these Bankruptcy Cases to complete their restructuring and position their business for sale after conducting a several month pre-petition sale process with the assistance of FocalPoint Securities, LLC ("FocalPoint"), as their investment banker. *See Debtors' Motion for Orders (I) Approving Bidding Procedures for the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing and (V) Approving Such Sale* (D.I. 21), at ¶¶ 7-12   (the "Sale Motion").    As part of this process, FocalPoint set up an electronic data room containing due diligence materials for prospective purchasers/investors (the "Data Room").    Although the Debtors have stated that they contacted

numerous parties and received prepetition expressions of interest from approximately 41 potential investors, the Luby's Entities were not contacted in connection with the prepetition marketing efforts and were then unaware that the Debtors were being offered for sale. Accordingly, the Luby's Entities had no opportunity prior to the Petition Date to engage in due diligence concerning the Debtors or their business or assets.

24.     On or near the Petition Date, the Debtors entered into that certain Asset Purchase Agreement, dated as of April 21, 2010 (the "Stalking Horse APA"), with Tavistock Restaurants, LLC ("Tavistock"), as their stalking horse bidder. Under the terms of the Stalking Horse APA, Tavistock offered to pay approximately $31 - 40 million for the Debtors' assets, depending upon the occurrence of a contingency relating to a Master Lease with Spirit Master Funding, LLC.

25.     Following the Court's entry on May 18, 2010 of an order approving bidding procedures (D.I. 267), the Debtors, with the assistance of FocalPoint, apparently resumed efforts to develop other offers for the Debtors' assets and business. The Luby's Entities, however, once again were not contacted in this postpetition sale process.

26.     Nevertheless, in late May, 2010, Luby's became aware through other means of the opportunity to acquire the Debtors' assets and business and made an expression of interest to the Debtors. On or about June 4, 2010, Luby's executed a confidentiality agreement as required by the Debtors and obtained access to the due diligence materials in the Data Room. Over the next several weeks, Luby's personnel and advisors worked feverishly to become familiar with the Debtors' business and assets. They relied heavily during this period on access to the documents and information contained in the Data Room and information supplied by FocalPoint personnel. At no time during Luby's diligence process did representative of the

Debtors or FocalPoint ever disclose to Luby's the terms of Master Agreement or Master Addendum or otherwise notify them that the Daltex Franchise Agreements had been substantially modified in the year prior to the Petition Date.

27. As part of its diligence process, Luby's downloaded from the Data Room copies of most material available contracts and leases related to the assets and business being offered for sale, including all available Franchise Agreements, all available Development Agreements and all other available material contracts with Franchisees. In this manner, Luby's obtained copies of several of the Existing Daltex Franchise Agreements. The versions of the Existing Daltex Franchise Agreements that Luby's obtained from the Data Room, however, did not reflect any modifications made pursuant to the Master Addendum or Master Agreement.[10]

28. Luby's was unable to locate other material agreements with Daltex in the Data Room because (it now knows or suspects) they were not present or did not exist. The omitted material agreements included: (i) the Master Agreement; (ii) the Master Addendum; and (iii) copies of the Daltex Franchise Agreements, as purportedly re-executed in connection with the transactions contemplated by the Master Agreement. In short, based on its review of the materials contained the Data Room, Luby's had no knowledge of the terms of the Master Agreement, the Master Addendum or the modifications made to the Daltex Franchise Agreements.

29. Thereafter, on June 14, 2010, Luby's timely submitted bids for the Debtors' assets and was qualified to bid at the June 17, 2010 auction. Bidding was heated at the

---

[10] Copies of the Development Agreement and the Daltex APA were available in the Data Room; however, the Development Agreement contains no reference to the Master Agreement or Master Addendum and the Daltex APA did not disclose the terms thereof. Luby's rejected both the Development Agreement and Daltex APA and had no reason, under the circumstances, to study either agreement closely.

auction, but at its conclusion Luby's prevailed with a winning bid of approximately $63,450,000 – more than $32,450,000 higher than the baseline stalking horse bid submitted by Tavistock.

30. Following a two day sale hearing held on June 22-23, 2010, the Court entered the Sale Order. The Sale Order, among other things, approved the Asset Purchase Agreement, dated as of June 23, 2010 (as amended, the "Luby's APA"), between Luby's, as Purchaser, and the Debtors and Non-Debtor Sellers, as Sellers, and authorized the Debtors to consummate the sale of the Purchased Assets to Luby's or its designee under the APA (the "Sale").[11] The Sale Order also authorized the Debtors to assume and assign to Luby's or its designee (*i.e.,* Luby's Fuddruckers) each of the Assumed Executory Contracts designated by the Purchaser at or before Closing. *See* Sale Order, ¶ 17.

31. The Closing occurred as scheduled on July 26, 2010. Luby's fully funded the purchase price of $63,064,214.84. And, Luby's Fuddruckers (as Luby's designee under the Luby's APA) acquired the Purchased Assets. Following the Closing, the Luby's Entities no longer had access to the Data Room.

## V. **The Luby's APA**

32. The Luby's APA, which follows the form of the Stalking Horse APA, is drafted to give the Purchaser maximum flexibility to designate which Contracts, including Franchise Agreements, to acquire or reject.[12] Furthermore, the terms of the Luby's APA and the Schedules thereto make clear that the Luby's Entities were entitled to rely on the Sellers'

---

[11] A copy of the Luby's APA (without schedules and exhibits thereto) is attached as **Exhibit D** hereto.

[12] Under the Luby's APA, the term "Contract(s)" means any contract, indenture, note, bond, lease, license, purchase or sale order, warranties, commitments, *franchises*, or other written or oral agreement, other than a Lease, in each case to which a Seller is a party and that is related or beneficial to the Business. Luby's APA, § 1.1 (emphasis added). According, a Contract includes any franchise agreement.

representations contained in the Luby's APA and Schedules thereto in making those decisions. As discussed herein, however, the inaccurate and misleading information contained in the Luby's APA and the Schedules thereto prevented the Luby's Entities from having a full and fair opportunity to designate whether or not the Daltex Franchise Agreements should be assumed and assigned to Luby's Fuddruckers.

33. The Luby's APA gave the Luby's Entities the absolute right to designate up to the Closing Date which Contracts would be assumed by the Debtors and assigned to it. Section 2.1(b)(vii) provides that the Contracts being acquired consist of

> all Contracts of the Sellers set forth on <u>Schedule 2.1(b)(vii)</u> or to be set forth thereon after the Effective Date (and until the Closing Date) *at the sole option of the Purchaser* (the "<u>Assumed Contracts</u>"), *as such Schedule may be amended from time to time by the Purchaser, in its sole discretion, by providing written notice to the Sellers up to the Closing Date, in order to add or remove Contracts listed thereon* (unless any such Contract has already expired, terminated or been rejected), together with the right to receive income in respect of such Assumed Contracts on or after the Closing Date, and any causes of action relating to past or present breaches of the Assumed Contracts.

APA, § 2.1(b)(vii) (emphasis added). This provision was materially unchanged from the Stalking Horse APA. *See* Stalking Horse APA, § 2.1(b)(vii) (Sale Motion, Ex. B).

34. The Luby's APA provides further that all liabilities incurred as a result of the Purchaser's decision to acquire or not acquire any given contract are the exclusive responsibility of the Debtors. Excluded Liabilities include, among other things: (i) "all Liabilities under any Excluded Executory Agreement or under any Assumed Executory Agreement which arises after the Closing Date but which is based on or relates to a breach of such Assumed Executory Agreement occurring prior to the Closing Date;" and (ii) "all Cure Costs related to the Assumed Executory Contracts (including, without limitation, unpaid Lease obligations for the month in which the Petition Date occurs) . . . ." Luby's APA, § 2.4(c) & (d).

These provisions likewise were materially unchanged from the Stalking Horse APA. *See* Stalking Horse APA, § 2.4(c) & (d).

35. Important to the current dispute, the Luby's APA also contains representations and warranties of the Sellers directed to "Material Contracts," Luby's APA, § 5.11, and "Franchise Matters," Luby's APA, § 5.17. Specifically, as to Material Contracts, the Sellers represented:

> Schedule 5.11(a) contains a list, as of the Effective Date, of all Contracts (the "Material Contracts") pursuant to which any Seller has any rights or benefits or undertakes any obligations or liabilities with respect to the Business, that . . . (iv) involves any Contract (A) granting or obtaining any right to use any material Purchased Intellectual Property (including, without limitation, any Franchise Agreements) or (B) restricting the Sellers' rights to the use of any Purchased Intellectual Property . . . .

Luby's APA, § 5.11(a). The Sellers further represented, falsely as it turns out, that "[t]he Sellers have delivered to or made available to the Purchaser a complete and accurate copy of each Material Contract." *Id.* at § 5.11(b).

36. Schedule 5.11(a), in turn, fails to individually identify any Daltex Franchise Agreements.[13] Instead, it refers generically to "Franchise Agreements by and between the Company and the Franchisees listed on Schedule 5.17(a)." Furthermore, while Schedule 5.11(a) lists two other agreements with Daltex, it omits the Master Agreement and the Master Addendum, through which the offending changes were made to the Daltex Franchise Agreements.

37. Section 5.17 states as follows with respect to Franchise Matters:

> Schedule 5.17(a) sets forth the Franchisee of record for each Person who has a currently-effective Franchise Agreement.

---

[13] Relevant excerpts from the Schedules to the Luby's APA, including Schedules 5.11(a), 5.11(b) and 5.17(a) are attached as **Exhibit E** hereto.

> ***Except as set forth on <u>Schedule 5.17(a)</u>, each of the currently-
> effective Franchise Agreements is substantially similar to the
> form of Franchise Agreement incorporated into the current
> FDD, a copy of which form was made available to Purchaser.
> Except as described in <u>Schedule 5.17(a)</u>, no Seller has waived
> any material right or benefit of any Seller, or any material
> obligation of any Franchisee, under any Franchise Agreement.
> Except as set forth on <u>Schedule 5.17(a)</u>, there are no other
> material Contracts in effect between any Seller and any
> Franchisee (in its capacity as such) other than the Franchise
> Agreements.*** No Seller nor any of its Affiliates has, since January
> 1, 2006 and until the Effective Date, (i) sold Franchises anywhere
> in the world except for the United States, Canada, and the Middle
> East, and (ii) offered Franchises anywhere in the world except for
> the United States, Canada, Mexico, the Middle East, Greece and
> the Dominican Republic.

Luby's APA, § 5.17(a) (emphasis added). Accordingly, Section 5.17(a) expresses, without

qualification other than as disclosed on Section 5.17(a), that all Franchise Agreements will

conform to form of the "<u>FDD</u>." The "FDD" is defined in the Luby's APA as "the franchise

disclosure document prepared in accordance with the FTC Rule (or its predecessor) or any

applicable Franchise Law." Even more critically, Section 5.17(a) states, that except for contrary

disclosures on Schedule 5.17(a), the Franchise Agreements are the only material Contracts in

effect between such parties and that the Sellers have not waived any material terms of the

Franchise Agreements.

       38.     Review of Schedule 5.17(a) of the Luby's APA reveals only a list

containing the names, addresses and store numbers and locations of Franchisees. It disclosed

nothing of the terms of their respective Franchise Agreements, or even when such Franchise

Agreements were executed or, if applicable, amended. While there are four Franchise

Agreements identified under the caption "Franchise Agreements that have been amended and are

substantially different from the Franchise Agreement in the Franchise Disclosure Statement,"

none of those are the Daltex Franchise Agreements.[14]  Based on the contents of Schedule 5.17(a), the Luby's Entities had no reason to suspect that there had been pervasive modifications to the Daltex Franchise Agreements.

39.     In reliance on the representations made in the Luby's APA and Schedules thereto, as well as the absence of other documents and information disclosing the wholesale revisions made to the Daltex Franchise Agreements, prior to Closing, the Luby's Entities timely delivered their final list of Contracts to be assumed and assigned to Luby's Fuddruckers. Reasonably expecting that the Franchise Agreements they were assuming were without unusual or especially onerous terms, the Luby's Entities designated all nine (9) of the Daltex Franchise Agreements for assumption and assignment to Luby's Fuddruckers.  These were the only Contracts with Daltex that the Luby's Entities affirmatively designated for assumption and assignment to Luby's Fuddruckers.  Accordingly, by reason of the Luby's Entities' failure to specifically designate them, all other Contracts with Daltex were rejected, including the Master Agreement, the Master Addendum, the Development Agreement and the Daltex APA.[15]

## VI.     Events Leading To The Filing Of This Motion

40.     Following the Closing, on or about August 13, 2010, representatives of Luby's Fuddruckers and Daltex met to confer regarding various transition issues and plans for development of the business and the Fuddruckers brand going forward.  At this meeting, it soon

---

[14]  Schedule 5.17(a) also states: "In addition to the Franchise Agreements listed in the table below, some of the older Franchise Agreements may be on a form that slightly differs from the form of Franchise Agreement incorporate into the current FDD."  This statement could hardly describe the Daltex Franchise Agreements as (i) the Master Addendum does more than make them "slightly different" from the form Franchise Agreement and (ii) the changes to the Daltex Franchise Agreements are recent, not old.

[15]  Notably, Luby's Fuddruckers accepted the assignment of no Development Agreements.  The Daltex Development Agreement was among dozens of development agreements entered into by the Debtors that were not acquired by Luby's Fuddruckers.

became clear to the representatives of Luby's Fuddruckers that Daltex was effectively operating off of different sets of franchise documents than the ones which the Luby's Entities believed to govern the franchisor-franchisee relationship with Daltex. Among other discrepancies, the Daltex representatives asserted that each of their franchises had a Protected Area defined by a six (6) mile radius, while the Luby's Entities' representatives believed that the Daltex Protected Area was only a four (4) mile radius. After further discussions, Daltex furnished the Luby's Entities with copies of the Master Agreement and Master Addendum.

41. The Luby's Entities then immediately set about attempting to determine why they were unaware of such material modifications to the Daltex Franchise Agreements. Initially, they reviewed all of the due diligence materials that had been downloaded from the Data Room, but were unable to locate copies of the Master Agreement, the Master Addendum or any Franchise Agreements with Daltex executed on or after July 31, 2009. Next, counsel to the Luby's Entities contacted counsel to the Debtors and expressed concern that the Master Addendum and other Daltex agreements had not been shared with the Luby's Entities prior to Closing of the Sale.[16] Thereafter, the Luby's Entities shared their concerns at a hearing before this Court on August 25, 2010, explaining that their investigation was ongoing.[17] Counsel for the Luby's Entities followed up again by email to Debtors' counsel in which the Luby's Entities renewed their request for information concerning the Daltex Agreements and asked the Debtors to cooperate in resolving this matter without Court involvement.[18]

---

[16] *See* e-mail, dated August 20, 2010, from Gregory W. Werkheiser to Douglas Rosner, *et al.,* attached as **Exhibit F** hereto.

[17] *See* transcript of hearing, dated August 25, 2010, before the Honorable Brendan L. Shannon, at 17:1 – 18:1, attached as **Exhibit G** hereto.

[18] *See* e-mail, dated September 3, 2010, from Gregory W. Werkheiser to Douglas Rosner, *et al.,* attached as **Exhibit H** hereto.

42.     The Debtors finally responded by letter, dated September 8, 2010.[19]   In that letter, the Debtors admitted that the Master Agreement and Master Addendum had been omitted from the Data Room, but asserted that the Debtors would "vigorously oppose" any attempt by the Luby's Entities to seek redress from this Court.

43.     Meanwhile, the Luby's Entities have made several attempts to resolve this matter through discussions with Daltex.  Luby's Fuddruckers is not opposed to continuing in a franchise relationship with Daltex, provided that Daltex will agree to reform the Daltex Franchise Agreements to be more in line with the terms the Luby's Entities had been induced by the Debtors to expect they would contain and that otherwise prevail in the Fuddruckers franchise system.  Thus far, however, Daltex has been unwilling to agree to any accommodation.

## RELIEF REQUESTED

44.     By this Motion, the Luby's Entities respectfully request entry of an Order, pursuant to section 105(a) of the Bankruptcy Code, Federal Rule of Civil Procedure 60(b), made applicable to this proceeding by Bankruptcy Rule 9024, and the Court's inherent power, (i) partially vacating the Sale Order solely with respect to the assumption and assignment of the Daltex Franchise Agreements to Luby's Fuddruckers at closing of the Sale, (ii) compelling the Debtors' rejection of the Daltex Franchise Agreements, and (iii) granting the Luby's Entities related relief.

---

[19]   *See* letter, dated September 8, 2010, from Douglas Rosner to Gregory W. Werkheiser, attached as **Exhibit I** hereto.

## BASIS FOR RELIEF

**I.  PURSUANT TO FED. R. CIV. P. 60(b) AND FED. R. BANKR. P. 9024, THE SALE ORDER SHOULD BE PARTIALLY VACATED SOLELY WITH RESPECT TO THE DEBTORS' ASSUMPTION OF THE DALTEX FRANCHISE AGREEMENTS FROM THE ASSUMED EXECUTORY CONTRACTS AND THEIR ASSIGNMENT TO LUBY'S FUDDRUCKERS AT CLOSING.**

45.     Rule 60(b) of the Federal Rules provides in pertinent part that:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1)     mistake, inadvertence, surprise, or excusable neglect;

(2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party . . . or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Bankruptcy Rule 9024, in turn, makes Rule 60(b) applicable to case under the Bankruptcy Code with limited exceptions not applicable here. *See* Fed. R. Bankr. P. 9024.

46.     This Court has broad discretion to grant relief under Rule 60(b). *See Lasky v. Continental Products Corp.,* 804 F.2d 250, 256 (3d Cir. 1986); *Smith v. Delaware,* C.A. No. 99-440-JJF, 201 WL 1687787 at *1 (D. Del. April 26, 2010).  In exercising that discretion, Rule 60(b) should be applied liberally in order to avoid injustice.  *Patton v. Secretary of Dept. of Health and Human Services,* 25 F.3d 1021, 1030 (Fed. Cir. 1994) ("[a]s a remedial provision, Rule 60(b) is to be "liberally construed for the purpose of doing substantial justice.") *see also Klapprott v. United States,* 335 U.S. 601, 609 (1949); *Steverson v. GlobalSantaFe Corp.,* 508 F.3d 300, 305 (5th Cir. 2007) ("although 'final judgments should not lightly be disturbed," the

'rule should be liberally construed in order to achieve substantial justice.'") (quoting *Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396, 402 (5th Cir.1981)); *Falk v. Allen,* 739 F.2d 461, 463 (9th Cir. 1984) ("Rule 60(b) is meant to be remedial in nature and therefore must be liberally applied."); *Blois v. Friday,* 612 F.2d 938, 940 (5th Cir. 1980) (noting that a "Rule 60(b) Motion must be equitably and liberally applied to achieve substantial justice.").

47.     Multiple reasons under Rule 60(b) support vacating the Sale Order with respect to the Debtors' assumption and assignment to Luby's Fuddruckers of the Daltex Franchise Agreements.  First, relief is warranted under Rule 60(b)(3) because, whether by accident or artifice, the Debtors misrepresented to the Luby's Entities that the Daltex Franchise Agreements had not been materially modified and engaged in other misconduct that has denied the Luby's Entities access to information that would have revealed the existence of such modifications.  Second, relief is warranted under Rule 60(b)(2) because the post-Closing assertion by Daltex that the Daltex Franchise Agreements had been modified pursuant to the Master Agreement and Master Addendum constitutes newly discovered evidence.  Third, even assuming the Luby's Entities bear some measure of fault for the non-discovery of the material modifications to the Daltex Franchise Agreements, any such mistake can and should be corrected pursuant to Rule 60(b)(1).  Finally, if for any reasons the other provisions of Rule 60(b) do not apply, the Court should grant relief under Rule 60(b)(6) because of the extraordinary circumstances present here and the manifest injustice to the Luby's Entities if the mistaken

assignment of the Daltex Franchise Agreements is not corrected.[20]

### A. The Luby's Entities Are Entitled To Relief Under Fed. R. Civ. P. 60(b)(3) Because Of The Debtors' Misrepresentations And Other Misconduct In Connection With The Sale.

48. The Luby's Entities are entitled to prevail under Rule 60(b)(3) if they prove that the Debtors "engaged in fraud or other misconduct and that this conduct prevented [them] from fully and fairly presenting [their] case." *In re MUMA Services, Inc.,* 279 B.R. 478, 485 (Bankr. D. Del. 2002) (citing *Stridiron v. Stridiron,* 698 F.2d 204, 207 (3d Cir. 1983)). *See also In re Spansion, Inc.,* 426 B.R. 114, 124 (Bankr. D. Del. 2010) (same). A further requirement is that the fraud, misrepresentation or misconduct was material to the outcome of the case, *Bandia Am. Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70, 73 (3d Cir. 1985), although the "misconduct need not be result-altering in order to merit Rule 60(b)(3) redress." *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 924 (1st Cir. 1988). *See also Lonsdorf v. See-feldt,* 47 F.3d 893, 897 (7th Cir. 1995) ("A determination of whether the alleged misrepresentation altered the result of the case is unnecessary because Rule 60(b)(3) protects the fairness of the proceedings, not necessarily the correctness of the verdict.").

49. Actionable misconduct under Rule 60(b)(3) is not limited to affirmative misrepresentations, although those are present here. "Rule 60(b)(3) 'misconduct' includes

---

[20] This Motion is timely under Rule 60(c)(1), having been filed approximately four months after entry of the Sale Order. Approximately one month elapsed between entry of the Sale Order on June 24, 2010 and the Closing on July 26, 2010. It was only after Closing that the issues surrounding the Daltex Franchise Agreements became apparent to the Luby's Entities. The Luby's Entities proceeded with this Motion promptly after concluding their investigation into this matter and after determining that the Debtors and Daltex would not consent to granting the Luby's Entities relief from the assignment of the Daltex Franchise Agreements to Luby's Fuddruckers.

withholding information that one is obligated to disclose." *In re Firrone,* 272 B.R. 213, 215 (Bankr. N.D. Ill. 2000). *See also, e.g., Cryovac,* 862 F.2d at 923 (holding that "[f]ailure to disclose or product materials requested in discovery can constitute 'misconduct' within the purview of this subsection"); *Stridiron,* 698 F.2d at 207 ("Failure to disclose or produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct.").

50.    Nor is there any absolute requirement that the Luby's Entities demonstrate that the Debtors acted with a "nefarious intent or purpose." *Cryovac,* 862 F.2d at 925. This Court and others have held repeatedly that "Rule 60(b)(3) applies to both intentional and unintentional misrepresentations." *MUMA,* 279 B.R. at 486. *See also, e.g., Lonsdorf,* 47 F.3d at 897 (7th Cir. 1995); *DiPirro v. United States,* 189 F.R.D. 60, 65 (W.D.N.Y. 1999); *In re Staff Investment Co.,* 146 B.R. 256, 264 (Bankr. E.D. Cal. 1993).

> 1.    *The Debtors Committed Misrepresentations And Other Misconduct For Which Relief Under Rule 60(b)(3) Should Be Available To The Luby's Entities.*

51.    Here, it is clear on the record before the Court that all components for relief under Rule 60(b)(3) are present. The Debtors have made both affirmative misrepresentations concerning the terms of the Daltex Franchise Agreements and have failed to disclose, despite being under a duty to do so, the existence of material amendments to the Daltex Franchise Agreements.

52.    For example, the Debtors make affirmative misrepresentations in Section 5.17(a) and Schedule 5.17(a) the Luby's APA that induced the Luby's Entities to believe that (a) the Daltex Franchise Agreements would track the applicable form franchise agreement that prevails in the Fuddruckers franchise system and (b) that the Debtors had not waived any material terms of the Daltex Franchise Agreements.

53. The Debtors also misrepresented in Section 5.11(b) that the had "delivered to or made available to the Purchaser a complete and accurate copy of each Material Contract." but, the Debtors now admit that they failed to include copies of the Master Agreement and Master Addendum in the Data Room. Moreover, the copies of the Daltex Franchise Agreements available in the Data Room were dated and did not disclose the pervasive modifications made less than nine months prior to the Debtors' bankruptcy filing.

54. Nor did FocalPoint or other representative of the Debtors alert the Luby's Entities to the terms of the Master Agreement and Master Addendum or the existence of material modifications to the Daltex Franchise Agreements.

2. *The Debtors' Misrepresentations And Misconduct Were Material To the Luby's Entities' Decision To Accept The Assignment Of The Daltex Franchise Agreements.*

55. As the Luby's Entities were expressly permitted under the terms of the Luby's APA, they relied on the representations and warranties contained in Sections 5.11(a), 5.11(b) and 5.17(a) of the Luby's APA and the associated Schedules in making the decision to accept the assignment of the Daltex Franchise Agreements. The Luby's Entities further relied on the facts that the Data Room (a) contained copies of Daltex Franchise Agreements executed long before the July 2009 transactions between the Debtors and Daltex and (b) did not contain copies of any agreements with Daltex disclosing the existence of material modifications to the Daltex Franchise Agreements or the terms of the Master Agreement or Master Addendum. But for these affirmative misrepresentations and omissions by the Debtors, the Luby's Entities would not have designated the Daltex Franchise Agreements to be assumed by the Debtors and assigned to

Luby's Fuddruckers. Accordingly, the Debtors' misrepresentations and misconduct were material to the outcome here.[21]

> 3.    *The Court Should Exercise Its Discretion To Grant Relief Under Rule 60(b)(3).*

56.    Rule 60(b)(3) is clearly applicable here such that this Court may grant relief under this provision. And, the equities just as clearly demonstrate that the Court should grant relief to the Luby's Entities. If the Luby's Entities are unable to obtain relief, they will be settled with the onerous Daltex Franchise Agreements that will inhibit the growth and development of the Luby's Fuddruckers business and the Fuddruckers brand. For example, the Debtors' granting to Daltex of a six (6) mile Protected Area in connection with nine (9) franchises effectively forecloses further development in the high density and profitable Dallas – Fort Worth – Arlington, Texas metropolitan area. Similarly, the Debtors' release of the Daltex Principals from their personal guarantees under the Daltex Franchise Agreements leaves Luby's Fuddruckers with much less security that Daltex will fully perform its obligations under the Daltex Franchise Agreements going forward. While these are two of the most glaring ways the

---

[21]    In the Debtors' letter, dated September 8, 2010, the Debtors argued, in reliance on Section 12.1 of the Luby's APA, that the Luby's Entities were foreclosed from obtaining *any* remedy on account of the Debtors' misconduct. Section 12.1 of the Luby's APA provides: "The parties hereto agree that representations and warranties contained in this Agreement shall not survive the Closing hereunder and no Person shall have any liability for any breach thereof." Reliance on this provision is misplaced. At issue here is the Luby's Entities reliance on the Debtors' representations and warranties during the pre-Closing period. Furthermore, while the Luby's Entities reserve all other rights and claims against the Debtors and others involved in the Sale, by this Motion, the Luby's Entities are not seeking to make the Debtors liable for their breach of the representations and warranties. Instead, the Luby's Entities are seeking to be returned to the position they would have occupied but for such breaches and other misconduct. Moreover, it would violate public policy to allow the Debtors to rely on such language to avoid the consequences of their fraudulent or intentional misconduct. *See, e.g., Airborne Health, Inc. v. Squid Soap, LP,* 984 A.2d 126, 136-37 (Del. Ch. 2009) ("Because of Delaware's strong public policy against intentional fraud, a knowingly false contractual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies.") (citing *Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1061-64 (Del. Ch. 2006)).

Daltex Franchise Agreements were modified just nine months before the Petition Date to significantly prejudice the franchisor, they are far from the only ones. Other harmful amendments include the following:

- The reduction of Daltex's royalty fee from 5% of Gross Sales to 3% of Gross sales for certain franchised Restaurants and the granting of a four (4) year holiday from royalties for the two Purchased Restaurants. Master Addendum, § 43.

- The elimination of the franchisor's option to purchase the assets of a Restaurant. Master Addendum, § 51.

- Modification of the provisions governing defaults favorable to Daltex, including by removing Daltex's unauthorized closing of a Restaurant as grounds for a default under the Daltex Franchise Agreements. Master Addendum, § 50.

- The relaxation of restrictions on changes in control of the franchisee and other Transfers (as defined in the Daltex Franchise Agreements). Master Addendum, § 48.

- The imposition of substantial limitations on the franchisor's access to the books and records of Daltex. Master Addendum, § 44.

- The relaxation of the franchisor's controls over Daltex's choice of goods and materials for us at the franchised Restaurants. Master Addendum, § 45.

- The elimination of a General Release provision that, among other things, protected the franchisor from liability arising from Daltex's operation of the franchised Restaurants and required Daltex to indemnify its franchisor for such losses. Master Addendum, § 31.

- The elimination of the franchisor's option to acquire or take assignment of certain assets associated with the operation of the franchised Restaurants. Master Addendum, § 29.

- The significant relaxation of restrictions on the ability of Daltex and/or its affiliates and principals to, among other things, develop, own and operate other restaurant concepts. Master Addendum, § 28.

- Material changes to the funding and use of marketing funds. Master Addendum, § 22.

- The relaxation or elimination of requirements for the leases of franchised Restaurant locations that were intended to protect the franchisor in the event of, among other things, the termination of the Daltex Franchise Agreements or Daltex's breach thereof. Master Addendum, § 18.

57.     These and other materially adverse changes to the Daltex Franchise Agreements that now burden Luby's Fuddruckers will operate to prevent the Luby's Entities from realizing the full benefit of their bargain under the Sale Order and Luby's APA. While the exact scope of that harm may be difficult to calculate at this stage, the Debtors should not be heard to complain that the harm to the Luby's Entities is speculative when it was their misconduct that created this situation. As the *Cryovac* court aptly observed, "since parties ought not to benefit from their own mis-, mal-, or nonfeasance, uncertainties attending the application of hindsight in this area should redound to the movant's benefit." 862 F.2d at 910. *See also Minneapolis, St. Paul, & Sault Ste. Marie Ry. Co. v. Moquin,* 283 U.S. 520, 521-22 (1931) (litigant who engages in misconduct "will not be permitted the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent"). The Debtors are no exception to this rule.

58.     That is especially true here where granting the relief requested by the Luby's Entities will do no more than return the parties to the respective positions they would have occupied as of the Closing of the Sale, but for the Debtors' misrepresentations and misconduct. The Luby's Entities had the absolute right to designate Contracts, including all Franchise Agreements if they had so chosen, to be rejected under the Luby's APA. *See* Luby's APA, § 2.1(b)(vii). And, had they done so, the Debtors would have been exclusively responsible for the claims arising from those decisions. *Id.,* § 2.4(c).

59.     Moreover, both the Debtors and Daltex were placed on notice by the Luby's Entities within mere weeks after the Closing of the possibility that the Luby's Entities

would seek to be relieved from the assignment to Luby's Fuddruckers of the Daltex Agreements. In particular, the Luby's Entities' announced in open Court on August 25, 2010 (less than a month after the Closing) that they were considering pursuing this Motion. Neither the Debtors nor Daltex can point to any intervening equities that should forestall granting the Luby's Entities they relief they seek.

60.  This is especially true of the Debtors, which have made little visible progress toward concluding these cases since the Sale closed. No chapter 11 plan has yet been filed. No major settlements have been entered into or consummated. No major claims have been objected to or otherwise adjudicated. For all apparent purposes, the status of the Bankruptcy Cases remains essentially as it was when the Sale closed.

61.  Accordingly, for all of the foregoing reasons, the Sale Order should be vacated with respect to the Debtors' assumption and assignment to Luby's Fuddruckers of the Daltex Franchise Agreements.

**B.    The Post-Closing Contention By Daltex That The Daltex Franchise Agreements Were Amended Pursuant To The Master Addendum Constitutes Newly Discovered Evidence Warranting Relief Under Rule 60(b)(2).**

62.  Rule 60(b)(2) states that "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial" can warrant relief from a judgment or order. Fed. R. Civ. P. 60(b)(2). "[T]he term 'newly discovered evidence' refers to 'evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant.'" *TA Instr., Inc. v. Perkin-Elmer Corp.,* C.A. No. 95-545 (SLR), 2000 WL 152130 at *3 (D. Del. Jan. 24, 2000) (quoting *Bohus v. Beloff,* 950 F.2d 919, 930 (3d Cir.1991)). In the Third Circuit, the standard to obtain relief under Rule 60(b)(2) "requires that the new evidence (1) be material and not merely cumulative, (2) could not have been discovered before trial

through the exercise of reasonable diligence and (3) would probably have changed the outcome of the trial." *Compass Tech., Inc. v. Tseng Lab., Inc.,* 71 F.3d 1125, 1330 (3d Cir. 1995) (citing *Bohus,* 950 F.2d at 930). That standard is plainly met here.

63. Following the Closing, in meetings between the Luby's Entities and Daltex, Daltex communicated for the first time its position that the Daltex Franchise Agreements had been substantially amended in the July 2009 transactions. The Luby's Entities subsequent investigation through which the Luby's Entities for the first time obtained copies of the Master Agreement and Master Addendum confirmed that this was the case. This newly discovered evidence goes to the heart of the question of whether the Daltex Franchise Agreements should have been assumed and assigned to Luby's Fuddruckers. Accordingly, this evidence is clearly material and not merely cumulative.

64. For the reasons discussed above, the Luby's Entities reasonably could not have been expected to discover this information pre-Closing. Notably, the Debtors made affirmative misrepresentations in the Luby's APA and Schedules thereto to the effect that the Daltex Franchise Agreements had not been materially modified. And, the Daltex agreements that would have been most likely to reveal the extent of those modifications (*i.e.,* the Master Agreement and Master Addendum) were mysteriously absent from the Data Room. Under the circumstances, it simply would be neither fair nor reasonable to impose on the Luby's Entities a duty to inquire further than they did.

65. Had the Luby's Entities been in possession of this information pre-Closing, Luby's Fuddruckers would not have taken the assignment of the onerous Daltex Franchise Agreements. Thus, unless Daltex had voluntarily agreed to further modify the Daltex Franchise Agreements in accordance with the requests of the Luby's Entities, knowledge of the

material modifications made to the Daltex Franchise Agreements, almost certainly would have changed the outcome.

### C. Based Upon The Debtors' Professed Lack Of Knowledge That the Master Agreement And Master Addendum Were Not Posted To The Data Room, Rule 60(b)(1) Should Afford Relief.

66.     Rule 60(b)(1) authorizes relief from a final judgment or order for "mistake, inadvertence, surprise, or excusable neglect" and should provide the Luby's Entities with relief here. *See* Fed. R. Civ. P. 60(b)(1).  The mistake here – one shared by both the Debtors and the Luby's Entities if the Debtors' September 8, 2011 letter is to be believed – is the erroneous belief that the Debtors had provided the Luby's Entities with accurate and complete information about the Daltex Franchise Agreements.  In their September 8, 2010 letter, the Debtors acknowledge that the Master Agreement and Master Addendum were not posted to the Data Room, but assert that "[t]he omission of these documents from the dataroom was inadvertent and was only discovered once we looked into the matter following our receipt of your August 20 email."  Otherwise stated, the Debtors contend that prior to Closing of the Sale, they were operating under the mistaken notion that they had supplied the Luby's Entities with all information germane to the Daltex Franchise Agreements.[22]  The Luby's Entities, in turn, were operating under the mistaken belief that they were in possession of all relevant information relating to the Daltex Franchise Agreements.

67.     The Supreme Court has provided guidance as to the meaning of the term "excusable neglect" in the context of Fed. R. Bankr P. 9006(b)(1), but analyzed the term as used in other Federal Rules, including Fed. R. Civ. P. 60(b)(1).  As used in Rule 60(b)(1), the word

---

[22]   The Luby's Entities do not concede that the Debtors' failure to provide accurate and complete information about the Daltex Franchise Agreements was unintentional.  However, it is unnecessary for purposes of Rule 60(b)(1) do examine the Debtors' intent.

"neglect" encompasses negligence and carelessness. *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 398-99 (1993). The Third Circuit in *In re O'Brien Environmental Energy, Inc.*, extended the Pioneer holding to Rule 60(b) actions. 188 F.3d 116, 126, n. 7 (3d Cir. 1999).

68.     Whether a particular instance of neglect is "excusable" is an equitable determination. *Pioneer*, 507 U.S. at 395. In making the determination, a court must take account of all relevant circumstances, including (1) the danger of prejudice to the adverse party; (2) the length of any delay caused by the neglect and its effect on the proceedings; (3) the reason for the neglect, including whether it was within the reasonable control of the moving party; and (4) whether the moving party acted in good faith. *Id.*

69.     In *Pioneer*, the Supreme Court expressly rejected the narrow approach formerly taken by some circuits, which had held that negligence was *per se* inexcusable neglect, or that neglect would be excusable only if caused by circumstances beyond the movant's control. *Id.* at 392. It acknowledged that the mere use of the word "neglect" encompassed "omissions caused by carelessness", but took comfort in the fact that parties would still be deterred from ignoring court ordered deadlines since the neglect must be "excusable". *Id.* at 395. Thus, the *Pioneer* decision makes clear that negligence or carelessness can constitute excusable neglect. Pioneer, 507 U.S. at 398-99 (holding that a chapter 11 creditor was entitled to file its proof of claim after the deadline set by the bar date because its failure to timely file was the result of

"excusable neglect").[23]

70.     In applying the *Pioneer* factors to this matter, the Luby's Entities demonstrate that any failure to recognize the that the Daltex Franchise Agreements had been amended was inadvertent and the result of excusable neglect.   First, there is no meaningful danger of prejudice to the Debtors because the Luby's Entities are seeking to vacate the Sale Order both with respect to the assignment *and* the assumption of the Daltex Franchise Agreements.   Prejudice is not merely the loss of an advantageous position, but must be something more clearly tied to the merits of the issue.   *See O'Brien Environmental*, 188 F.3d at 127 (citing *Pratt v. Philbrook*, 109 F. 3d 18 (1st Cir. 1997)).   This relief would merely return all the parties to their pre-Closing position and free the Debtors to reject the Daltex Franchise Agreements, which presumably they would do.

71.     Second, the length of the delay here has been minimal.   The Luby's Entities first became aware of the possibility that the Daltex Franchise Agreement had been amended in mid-August 2010.   Shortly thereafter, the Luby's Entities shared their concerns with counsel for the Debtors and Daltex.   Since that time, the Luby's Entities have been investigating what changes were made via the Master Addendum and why the Luby's Entities were not aware of such changes.   The Luby's Entities have also been exploring whether a consensual resolution

---

[23]   *See also, e.g., O'Brien Environmental*, 188 F.3d at 130 (holding that a creditor's failure to respond to debtor's application expunging its claim, which resulted in a court order expunging claim, was the result of excusable neglect and vacated the order); *Consolidated Freightways Core. of Delaware v. Larson*, 827 F. 2d 916 (3d Cir. 1987) (holding that a typist's error which caused a notice of appeal to be filed in the wrong district was excusable neglect); *In re Tygart Industries, Inc.*, 139 B.R. 145 (Bankr. W.D. Pa. 1991) (holding that creditor's inadvertent failure to comply with the Bankruptcy Court's scheduling order constituted excusable neglect).

is possible. Once the Luby's Entities completed their investigation and it became clear that Daltex and the Debtors would not consent to relief, the Luby's Entities acted promptly.

72.     No relevant developments have occurred in the Debtors' bankruptcy cases since the Sale was consummated that would make it unfair to any party in interest to grant this relief. No claims of Daltex have been adjudicated. No plan has been confirmed. No distributions to creditors have been made on such a scale as would prejudice anyone. Accordingly, the Luby's Entities have been sufficiently diligent to obtain this relief.

73.     Third, as discussed above, the Debtors' actions and inactions, even assuming they were not exclusively responsible, played a dominant role in causing Luby's Fuddruckers to mistakenly accept the assignment of the Daltex Franchise Agreements. *See O'Brien Environmental*, 188 F.3d at 128-29. *See also Chemetron Corp. v. Jones*, 72 F.3d 341, 350 (3d Cir. 1995) (stating that the district court erred in failing to consider the debtor's role in the creditor's delay); *In re Sharon Steel Corp.*, 110 B.R. 25, 206 (Bankr. W.D. Pa. 1990) (stating that the debtor was just as much at fault as the creditor for failing to consider its claim and thus was equally at fault for the delay). The Debtors concede that they did not supply relevant documents in the Data Room. And, the representations contained in the Luby's APA and Schedules thereto concerning the Daltex Franchise Agreements were materially inaccurate and misleading. Under any conceivable scenario, as between the Debtors and the Luby's Entities, the Debtors bear the far greater portion of the fault and equitable should bear any associated loss.

74.     Fourth, there can be no serious challenge to the good faith of the Luby's Entities in pursuing this Motion. The Luby's Entities seek only the opportunity to exercise – this time with complete and accurate information – the absolute right that they had under the Luby's APA to designate Contracts for assumption and assignment or rejection. The Debtors and Daltex

will be no worse off than they would have been post-Closing had the Luby's Entities been able to make this decision with complete and accurate information in the first instance.

75.     Not only this the right result under the traditional *Pioneer* factors for excusable neglect under Rule 60(b)(1), but it also finds support in state law doctrines of mutual and unilateral mistake, which apply here.  As between the Debtors and the Luby's Entities, the Sale Order was essentially an agreed order.  "An agreed order, like a consent decree, is in the nature of a contract . . . ." *Covington v. Covington landing L.P.,* 71 F.3d 1221, 1227 (6th Cir. 1995).  As such, an agreed order or "consent decree inherent[s] all the infirmities" of the underlying contract. *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.,* 343 F.2d 655, 658 (7th Cir. 1965).  As one leading commentator has explained concerning agreed orders and consent decrees:

> The judgment results not from adjudication but from a basically contractual agreement of the parties.  It can be entered only if the parties have in fact agreed to entry.  It is to be enforced in accord with the intent of the parties, and it can be vacated according to basically contractual principles of fraud, ignorance, mistake, mutual breach, or special protection of favored parties.

18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE & PROCEDURE § 4443 at 251 (2d ed. 1987).  Accordingly, if the contract doctrine of "mistake" would apply here, relief should be granted under Rule 60(b)(1).  *See Verma v. Polaris Software Lab Ltd.,* 229 Fed. Appx. 112, 115, 2007 WL 1218014 at *3 (3d Cir. April 26, 2007) (Unpublished) ("A mutual mistake renders a consent order-like any other contract-voidable.").

76.     Delaware law (which governs the Luby's APA) would grant reformation on grounds of mistake for the Sale Order and Luby's APA under these circumstances.  The doctrine of mutual mistake supports reformation upon a showing that "both parties were mistaken as to a material portion of the written agreement." *Cerberus Int'l, Inc. v. Apollo Mgmt,*

*L.P.,* 794 A.2d 1141, 1151 (Del. 2002). Here, if the Debtors' statement in the September 8, 2010 letter is take at face value, it is evident that such a mutual mistake was made concerning the treatment of the Daltex Franchise Agreements. That is, both the Debtors and the Luby's Entities were operating in the mistaken belief that all of the relevant information concerning the Daltex Franchise Agreements had been made available to the Luby's Entities prior to Closing. In hindsight, both now know that to have been in error.

77.     Alternatively, if the Debtors were aware or should have been aware of the Luby's Entities' mistaken belief concerning the terms of the Daltex Franchise Agreements and remained silent, the relief should likewise be available to the Luby's Entities under the doctrine of unilateral mistake. *See Cerberus,* 794 A.2d at 1151-52 ("The party asserting this doctrine must show that it was mistaken and that the other party knew of the mistake but remained silent."). *See also In re UAL Corp.,* 411 F.3d 818 (7th Cir. 2005) (applying doctrine of unilateral mistake to relieve debtor from mistaken assumption of aircraft leases when the lender knew of the debtor's mistake yet allowed it to proceed).

78.     Whether mutual mistake or unilateral mistake is the basis for relief under Rule 60(b)(1), it is evident that there was no reasonable detrimental reliance by the Debtors, Daltex or anyone else in the period before this Motion was brought. The Debtors could not detrimentally rely because they never had a choice in the matter – the Luby's Entities always had the absolute right to choose which Contracts were assumed and which were rejected and the costs associated with that decision were always on the Debtors. Daltex can claim no detrimental reliance because little time has elapsed since the Closing and, as discussed above, Daltex was made aware that the Luby's Entities disputed whether they should be bound by the assignment of the Daltex Franchise Agreements within a month of the Closing.

**D. If For Any Reason Relief Is Unavailable Elsewhere Under Rule 60(b), The Court Should Find That The Luby's Entities Are Entitled To Extraordinary Relief Under Rule 60(b)(6).**

79.     The Luby's Entities respectfully submit that the Court should grant them relief under Rule 60(b)(1), (2) and (3).  If, however, for some reason the Court determines those provisions are unavailable, then this is an appropriate case for the Court to grant extraordinary relief under Rule 60(b)(6).  Such relief has been granted in the past to correct mistakes necessary to award a purchaser the benefit of its bargain in a sale. *See Olle v. Henry & Wright Corp.,* 910 357, 365 (6th Cir. 1990) (granting purchaser's request to reform Sale Order in recognition of "the special circumstances of a bankruptcy sale where a purchaser must rely on agents of the bankruptcy court to process the documents of transfer").  Rule 60(b)(6) also has been relied upon as the basis for vacating the assumption of an executory contract where, with the later benefit of full information about the contract, it appeared that the contract could not have been assumed in the first instance.  *See In re International Fibercom, Inc.,* 503 F.3d 933 (9th Cir. 2007) (granting trustee's motion to vacate order assuming contract that was legally non-assumable under section 365(c) of the Bankruptcy Code).

**II. THIS COURT SHOULD EXERCISE ITS INHERENT POWER AND AUTHORITY UNDER 11 U.S.C. § 105(a) TO MODIFY THE SALE ORDER WITH RESPECT TO THE DALTEX FRANCHISE AGREEMENTS.**

80.     If for any reason relief is unavailable under Rule 60(b), this Court should exercise its inherent authority and the power vested in it pursuant to section 105(a) of the Bankruptcy Code to amend the Sale Order.  "It is well settled that a bankruptcy court has the power to vacate or modify its orders, as long as it is equitable to do so." *In re Marcus Hook Dev't Park, Inc.,* 943 F.2d 261, 265 n.5 (3d Cir. 1991) (quoting *Big Shanty Land Corp. v. Comer Properties, Inc.,* 61 B.R. 272, 282 (N.D. Ga. 1985) (internal quotations omitted)).  This power

extends to modification of orders, like the Sale Order, that are in the nature of consent decrees. *See Landy,* 804 F.2d at 255 (citing *Sansom Comm. By Cook v. Lynn,* 735 F.2d 1535, 1538 (3d Cir. 1984)). Rule 60(b) does not displace this power, but complements it. *See International Fibercom,* 503 F.3d at 940 (citing *Meyer v. Lenox (In re Lenox),* 902 F.2d 737, 740 (9th Cir. 1990)). While equitable remedies under section 105(a) of the Bankruptcy Code are limited, they can and should be used when, as is true here, the "modification will not offend any provision of the Code." *In re Argose, Inc.,* 377 B.R. 148, 150 (Bankr. D. Del. 1007).

81.     Granting the relief requested by this Motion is necessary to do substantial justice for the Luby's Entities. The Debtors' misrepresentations and failure to provide relevant information concerning the Daltex Franchise Agreements have denied the Luby's Entities the benefit of their bargain under the Sale Order and Luby's APA, leaving them saddled with the burdensome and undesirable Daltex Franchise Agreements. Modifying the Sale Order to exclude the Daltex Franchise Agreements from the Assumed Executory Contracts assigned to Luby's Fuddruckers at closing is the only way to ensure that the Luby's Entities do not continue to be prejudiced by the misconduct of the Debtors.

**III.     THIS COURT SHOULD COMPEL REJECTION OF THE DALTEX FRANCHISE AGREEMENTS.**

82.     If the assumption and assignment of the Daltex Franchise Agreements is vacated, as should occur here, the only remaining viable option for the Debtors will be to reject the Daltex Franchise Agreements. Pursuant to the Sale Order and Luby's APA, all of the goodwill and intellectual property, including the Fuddruckers trademarks and trade dress, was

sold to Luby's Fuddruckers free and clear of any Encumbrances.[24]  Conversely, the Debtors

retained no interest whatsoever in such property.

83.     Upon vacation of the assumption and assignment of the Daltex Franchise

Agreements, the Debtors – no longer the owners of the goodwill, trademarks, trade dress and

other intellectual property – will be incapable of further performance under the Daltex Franchise

Agreements.  The only choice available to the Debtors – both as a matter of law and as a matter

of sound business judgment – would be to immediately reject the Daltex Franchise Agreements.

*See In re Taylor,* 913 F.2d 102, 107 (3d Cir. 1990) (affirming conclusion that no useful purpose

would be served by delaying rejection of contract that could not be assumed).

84.     Accordingly,  this  Court  should  order  that  the  Daltex  Franchise

Agreements are immediately rejected by the Debtors.  This result is necessary both to ensure that

the Luby's Entities get the benefit of their bargain (*i.e.,* free and clear title to the intellectual

property assets) and to ensure that the Debtors' estates are not exposed to claims for postpetition

claims for breach of the Daltex Franchise Agreements.[25]

---

[24]  Specifically, under the Luby's APA, the Debtors conveyed all "right, title and interest in, to and under," among other things, goodwill and Intellectual Property, "free and clear of all Encumbrances, other than the Permitted Exceptions and the Assumed Liabilities, to the maximum extent permitted by Section 363 of the Bankruptcy Code." Luby's APA § 2.1(a). *See also* Sale Oder, ¶ 10 (decreeing transfer free and clear of Encumbrances of Purchased Assets).  The only conceivable "Assumed Liability" applicable here would be an Assumed Liability incident to assuming the Daltex Franchise Agreements.  Furthermore, no "Permitted Exception" independent of an Assumed Liability related to the assumption of the Daltex Franchise Agreements could exist here.  Accordingly, but for the assumption of the Daltex Franchise Agreements that should now be rescinded, Luby's Fuddruckers would have acquired all such property free and clear of any Encumbrances held or asserted by Daltex.

[25]  This result causes no unfair prejudice to Daltex.  Daltex received notice of the Sale Motion, including the Debtors' request for authority to sell, among other things, their goodwill and intellectual property free and clear of all Encumbrances.  It did not object to this result.  That the Debtors may have Daltex notice of the *possibility* that the Daltex Franchise Agreements could be assumed is of no moment.  As is clear on the face of the Luby's APA (§ 2.1(b)(vii) and as set forth in the Sale Motion, it was always contemplated that the decision on what Contracts to assume or reject would be made *after* the Sale hearing and *after* the Sale Order was entered.

## NOTICE

85.     Notice of the Motion has been given by hand delivery or first class U.S. mail to: (a) the Debtors; (b) Daltex; (c) the U.S. Trustee; (d) the Committee; and (e) those parties who have requested notice in these Bankruptcy Cases pursuant to Bankruptcy Rule 2002.  The Luby's Entities submit that under the circumstances no other or further notice is necessary.

WHEREFORE, for all of the foregoing reasons, the Luby's Entities respectfully request that the Court enter an order, substantially in the form attached as **Exhibit J** hereto, (i) granting this Motion, (ii) vacating the Sale Order solely with respect to the assumption and assignment to Luby's Fuddruckers of the Daltex Franchise Agreements, (iii) rejecting the Daltex Franchise Agreements, and (iv) granting the Luby's Entities such other and further relief as is just and proper.

Dated: October 29, 2010
       Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (No. 3553)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for Luby's Inc., and Luby's Fuddruckers Restaurants, LLC*

3769654.5