# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------- x
                                           :    Chapter 11
In re:                                     :
                                           :    Case No. 10-11310 (BLS)
DEEL, LLC, et al.,                         :
                                           :    (Jointly Administered)
                          Debtors.¹        :
                                           :
                                           :
------------------------------------------- x
```

## ~~AMENDED~~ DISCLOSURE STATEMENT FOR THE DEBTORS' AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

Douglas B. Rosner
Christine D. Lynch
Peter D. Bilowz
Vanessa V. Peck
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, Massachusetts 02110
Telephone: (617) 482-1776

Daniel J. DeFranceschi (DE No. 2732)
Drew G. Sloan (DE No. 5069)
Julie A. Finocchiaro (DE No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

*Co-counsel for Deel, LLC, et al.*
*Debtors and Debtors-in-Possession*

Dated: ~~February 11~~ March 18, 2011
Wilmington, Delaware

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. THIS AMENDED DISCLOSURE STATEMENT IS BEING FILED, BUT HAS NOT YET BEEN SUBMITTED FOR APPROVAL, NOR HAS IT BEEN APPROVED, BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Deel, LLC (f/k/a Magic Brands, LLC) (8989); Brosna, Inc. (f/k/a Fuddruckers, Inc.) (8267); Atlantic Restaurant Ventures, Inc. (9769); King Cannon, Inc. (8671); and KCI, LLC (9281).

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT .......................................................................... 3

II.  BRIEF OVERVIEW OF THE PLAN OF LIQUIDATION .................................. 4

    A. ...................................................................................................................S
ummary of Chapter 11 Objectives and Plan of Liquidation ......................................... 4

B.  Summary of Classification and Treatment of Claims and Interests ....................... 4

III.  INSTRUCTIONS REGARDING VOTING AND CONFIRMATION ................. 9

A.  Voting ......................................................................................................................9
B.  Objections to Confirmation....................................................................................10
C.  Confirmation Hearing ............................................................................................11
D.  Importance of a Creditor's Vote to Confirmation of Plan .....................................11

IV.  HISTORICAL INFORMATION....................................................................... 12

A.  Description of Debtors' Business ...........................................................................12
B.  Corporate History and Structure ............................................................................12
C.  Management of the Debtors....................................................................................12
D.  Summary of Prepetition Indebtedness ...................................................................13
E.  Events Leading to the Filing of These Chapter 11 Cases ......................................13

V.  THE CHAPTER 11 CASES ............................................................................... 15

A.  Overview.................................................................................................................15
B.  Employment of the Debtors' Professionals ...........................................................15
C.  Appointment of the Official Committee of Unsecured Creditors and
    Employment of Committee Professionals ..............................................................16
D.  Significant Events During the Chapter 11 Cases....................................................16
E.  Other Material Relief Obtained During the Chapter 11 Cases ...............................19

VI.  SUMMARY OF THE PLAN OF LIQUIDATION ............................................ 21

A.  Payment of Administrative and Priority Tax Claims.............................................22
B.  Classification and Treatment of Claims and Interests ...........................................22
C.  Substantive Consolidation of the Assets and Liabilities of the Debtors................24
D.  Closing of Chapter 11 Cases of the Non-Lead Debtors.........................................26
E.  Treatment of Directors and Officers ......................................................................26
F.  The Liquidating Trust ............................................................................................27
G.  Reconciliation of Claims........................................................................................34
H.  General Rules Regarding Distributions Under The Plan........................................35
I.  Executory Contracts and Unexpired Leases ..........................................................38
J.  Retiree Benefits......................................................................................................39
K.  Releases, Exculpation and Injunction....................................................................39
L.  Certain Other Plan Provisions................................................................................41

VII.  CONFIRMATION OF THE PLAN.................................................................... 42

A.  Introduction............................................................................................................42
B.  Conditions Precedent to the Effective Date ...........................................................42

GSDOCS\2004847.6
RLF1 3922042v. 13803871v

| | | |
|---|---|---|
| C. | Acceptance | 42 |
| D. | Plan Confirmation | 43 |
| VIII. | EFFECT OF CONFIRMATION | 46 |
| A. | Discharge | 46 |
| B. | Binding Effect | 47 |
| IX. | CERTAIN RISK FACTORS TO BE CONSIDERED | 47 |
| A. | Allowance of Claims | 47 |
| B. | Post-Confirmation Date Administrative Claims | 47 |
| C. | Litigation Risks | 48 |
| D. | IRS Audit | 48 |
| E. | Objection to Classifications | 48 |
| F. | Non-Confirmation of the Plan | 48 |
| G. | Delays of Confirmation and/or Effective Date | 48 |
| X. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 48 |
| A. | General | 49 |
| B. | Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally | 49 |
| C. | Treatment of the Liquidating Trust and its Beneficial Owners | 50 |
| D. | Information Reporting and Withholding | 51 |
| XI. | ALTERNATIVES TO LIQUIDATING PLAN | 52 |
| XII. | CONCLUSION AND RECOMMENDATION | 52 |

GSDOCS\2004847.6
RLF1 3922042v. 13803871v

# TABLE OF EXHIBITS

EXHIBIT A: The Plan

EXHIBIT B: Debtors' Organizational Chart as of Petition Date

EXHIBIT C: Liquidation Analysis

EXHIBIT D: Letter from the Creditors' Committee in Support of the Plan

GSDOCS\2004847.6
RLF1 3922042v. 13803871v

THIS AMENDED DISCLOSURE STATEMENT (HEREINAFTER REFERRED TO AS THE "DISCLOSURE STATEMENT"), THE PLAN (ATTACHED HERETO AS EXHIBIT A) AND THEIR RELATED DOCUMENTS AND EXHIBITS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION AS TO THE MERITS OF THE PLAN.

PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF THE CREDITORS AND IS FAIR AND EQUITABLE, AND URGE YOU TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT RATHER IS INTENDED TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE FULL TEXT OF THE PLAN AND READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THERE CAN BE NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS MAY VARY FROM THOSE SHOWN, POSSIBLY BY MATERIAL AMOUNTS.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE PLAN SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THE DISCLOSURE STATEMENT MAY BE OBTAINED FROM KURTZMAN CARSON CONSULTANTS LLC BY CALLING (310) 823-9000 OR BY ACCESSING THEIR WEBSITE AT www.kccllc.net/MagicBrands. COPIES OF PAPERS FILED IN THESES CASES, INCLUDING THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO, MAY ALSO BE INSPECTED DURING REGULAR COURT HOURS IN THE CLERK'S OFFICE OF THE UNITED STATES BANKRUPTCY COURT, 824 NORTH MARKET STREET, WILMINGTON, DELAWARE.

THE DEBTORS RESERVE THE RIGHT TO FURTHER AMEND THIS DISCLOSURE STATEMENT AND THE ATTACHED PLAN.

*[Remainder of Page Intentionally Left Blank]*

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

# I. PRELIMINARY STATEMENT

The above-captioned debtors (the "Debtors") have prepared and filed their Amended Consolidated Chapter 11 Plan of Liquidation (as may be amended, the "Plan"). The primary objective of the Plan is to provide for the wind down and efficient liquidation of the Debtors in a manner designed to maximize the recovery to all creditors. The Plan provides for the transfer of all of the Debtors' Assets to the Liquidating Trust, including, without limitation, the Debtors' Cash and the Debtors' Rights of Action, and the distribution of the Liquidating Trust Assets to the Debtors' creditors holding Allowed Claims against the Debtors, their Estates and the Liquidating Trust. Because the Plan is a plan of liquidation, pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors will not receive a discharge, and will not engage in business after a Final Decree has been entered and the Chapter 11 Cases are closed. It is not anticipated that there will be sufficient funds to pay Allowed Claims in full. Accordingly, unless all Allowed Claims are Paid in Full, no Distributions under the Plan will be made to Holders of Interests, and all Interests in the Debtors will be cancelled upon the Final Distribution Date. Finally, although the Debtors are distinct legal entities, the Plan contemplates the substantive consolidation of their Assets and liabilities. Therefore, this Disclosure Statement and accompanying Plan relate to all of the Debtors.

This Disclosure Statement is provided pursuant to section 1125 of the Bankruptcy Code to all known Holders of a Claim against, or Interest in, the Debtors. The purpose of this Disclosure Statement is to provide sufficient information to enable creditors who are entitled to vote to make an informed decision on whether to accept or reject the Plan. The Debtors reserve their right to amend this Disclosure Statement.

This Disclosure Statement describes, among other things:

- the former businesses of the Debtors and the reasons for commencing their Chapter 11 Cases;

- significant events that have occurred in the Chapter 11 Cases;

- material provisions of the Plan, including a description of the Liquidating Trust, classification, treatment and reconciliation of Claims and Interests and how Distributions will be made under the Plan;

- the procedure and requirements for confirming the Plan; and

- certain federal income tax consequences of the Plan.

Most words or phrases used in this Disclosure Statement shall have their usual and customary meanings or the meanings ascribed to them in the Bankruptcy Code. Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. **A copy of the Plan is attached hereto as Exhibit A. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.**

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

By order dated _____, 2011, the Bankruptcy Court approved this Disclosure Statement as containing "adequate information," in accordance with section 1125 of the Bankruptcy Code.

## II.     BRIEF OVERVIEW OF THE PLAN OF LIQUIDATION

### A.     Summary of Chapter 11 Objectives and Plan of Liquidation

A principal goal of a chapter 11 bankruptcy case is to reorganize or liquidate a debtor's business for the benefit of its creditors and interest holders. The plan of reorganization or liquidation is the blueprint for accomplishing these goals. It provides the rules and procedures pursuant to which a debtor's creditors and interest holders will be paid and lists the steps a debtor will take to either reorganize or wind up its business.

After selling substantially all of their Assets during these Chapter 11 Cases, the Debtors, in consultation with the Creditors' Committee, focused on formulating a plan of liquidation. The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. In summary, the Plan provides for, among other things: (i) classification and treatment of unclassified and classified Claims and Interests; (ii) substantive consolidation of the Assets and liabilities of all of the Debtors for voting and Distribution purposes only; (iii) the creation of the Liquidating Trust and appointment of the Liquidating Trustee to make Distributions to Holders of Allowed Claims from the proceeds from the liquidation of the Debtors' Assets (most of which have been realized through the sale of the substantially all of the Debtors' Assets earlier in these Chapter 11 Cases) and oversee the winding down of the Debtors' Estates; and (iv) reconciliation of Claims and prosecution of Rights of Action.

### B.     Summary of Classification and Treatment of Claims and Interests

The table below sets forth a brief summary of the unclassified Claims and the Classes of Claims and Interests under the Plan as well as their general treatment, the estimated aggregate amount of Claims (or Interests) in each Class and the estimated range of recoveries by each Class. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (which include Professional Fee Claims) and Priority Tax Claims have not been classified and, subject to the deadlines for filing such Claims and the rights of the Liquidating Trustee to object to, seek subordination of, or offset against such Claims, will be Paid in Full in Cash to the extent such Claims become Allowed Claims. All other Claims and Interests have been classified.

The estimated amount of Claims shown in the table below is based upon the Debtors' preliminary review of their books and records and Proofs of Claim filed in the Chapter 11 Cases and may be revised substantially following further analysis. The amount designated in the table as the "Estimated Recovery" for each Class is the quotient (expressed as a percentage) of the estimated Cash that should be available for distribution to Holders of Allowed Claims in such Class divided by the estimated aggregate amount of Allowed Claims in such Class. **As of the Effective Date of the Plan, the Debtors estimate that Cash to be transferred to the Liquidating Trust for distribution to Holders of Allowed Claims will be approximately $17,500,000 to $18,000,000.**

GSDOCS\2043892.1
RLF1 3922042v. 1~~3803871~~v

| CLASS | DESCRIPTION AND AMOUNT OF CLAIMS OR INTERESTS | SUMMARY OF TREATMENT UNDER THE PLAN | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY |
|---|---|---|---|---|
| N/A | **Administrative Claims**:<br><br>Administrative Claim means any Administrative Expense Claim or Professional Fee Claim. An Administrative Expense Claim is any right to payment constituting a cost or expense of administration of the Estates Allowed under sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code. A Professional Fee Claim is any Claim of a Professional for compensation and/or reimbursement of expenses under sections 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or the Creditors' Committee prior to the Effective Date of the Plan.<br><br>The Debtors have been paying all of their operating expenses in the ordinary course and therefore expect that most, if not all, Administrative Claims, with the exception of Professional Fee Claims, have been satisfied or will be paid in the ordinary course of business. | Administrative Claims are not classified under the Plan.<br><br>Each Holder of an Administrative Claim, to the extent not already satisfied and except to the extent that such Holder agrees to less favorable treatment, shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim, Cash in an amount equal to the amount of such Holder's Allowed Administrative Claim, as soon as practicable after the date that such Administrative Claim becomes an Allowed Administrative Claim. | $4,400,000 - $4,900,000 | 100% |
| N/A | **Priority Tax Claims**:<br><br>Priority Tax Claim means any Claim by a governmental unit (as that term is defined in section 101(27) of the Bankruptcy Code) against a Debtor to the extent entitled to priority pursuant to section 507(a)(8) or 507(c) of the Bankruptcy Code. | Priority Tax Claims are not classified under the Plan.<br><br>Each Holder of an Allowed Priority Tax Claim, to the extent not already satisfied and except to the extent that such Holder agrees to less favorable treatment, shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, Cash in an amount equal to the amount of such Holder's Allowed Priority Tax Claim, as soon as practicable after the date that such Priority Tax Claim becomes an Allowed Priority Tax Claim. | $1,300,000 | 100% |

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

| CLASS | DESCRIPTION AND AMOUNT OF CLAIMS OR INTERESTS | SUMMARY OF TREATMENT UNDER THE PLAN | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY |
|---|---|---|---|---|
| 1 | **Priority Non-Tax Claims**: Class 1 consists of any Claim against a Debtor to the extent entitled to priority pursuant to section 507(a)(4), (5), (6), (7) or (9) of the Bankruptcy Code.<br><br>The Debtors believe that all of these Claims, including Claims filed by the Debtors' former employees, have been paid or satisfied pursuant to various orders entered by the Bankruptcy Court at the beginning of these Chapter 11 Cases or are otherwise not entitled to priority treatment, are duplicates, or will be Disallowed by the Bankruptcy Court for other reasons. | Class 1 is Unimpaired by the Plan. Each Holder of a Priority Non-Tax Claim is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan and, therefore, will not receive a Ballot.<br><br>Each Holder of an Allowed Priority Non-Tax Claim, to the extent not already satisfied and except to the extent that such Holder agrees to less favorable treatment, shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Non-Tax Claim, Cash in an amount equal to the amount of such Holder's Allowed Priority Non-Tax Claim, on the first Distribution Date that is at least ten (10) Business Days after the date that such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim. | $2,000 | 100% |
| 2 | **Secured Claims**: Class 2 consists of any Claim against a Debtor that is secured by a Lien on Assets of the Debtors to the extent of the value of such Assets, as determined in accordance with section 506(a) of the Bankruptcy Code.<br><br>The Debtors believe that all Secured Claims (other than certain creditors holding valid, perfected mechanics' liens) have been previously satisfied in full out of the proceeds of the Sale or are not entitled to be treated as Secured Claims. With respect to any Claims allegedly secured by a right of offset, the Debtors reserve their right to object to such alleged right of offset. | Class 2 is Unimpaired by the Plan. Each Holder of a Secured Claim is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan and, therefore, will not receive a Ballot.<br><br>At the sole option of the Liquidating Trustee, each Holder of an Allowed Secured Claim, to the extent not already satisfied and except to the extent that such Holder agrees to less favorable treatment, shall be entitled to receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Secured Claim, either the collateral securing such Allowed Secured Claim or Cash in an amount equal to the amount of such Holder's Allowed Secured Claim, on the first Distribution Date that is at least ten (10) Business Days after the date that such Secured Claim becomes an Allowed Secured Claim. | $26,000 | 100% |

6

| CLASS | DESCRIPTION AND AMOUNT OF CLAIMS OR INTERESTS | SUMMARY OF TREATMENT UNDER THE PLAN | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY |
|---|---|---|---|---|
| 3 | **Convenience Claims**: Class 3 consists of any Allowed General Unsecured Claim against a Debtor that would otherwise be treated as a Class 4 Claim, that is either (i) equal to or less than $1,000.00, in the aggregate amount owed to a single Holder, or (ii) greater than $1,000.00 in the aggregate, but as to which the Holder has elected to have such Holder's Class 4 Claim(s) in the aggregate reduced to $1,000.00 and treated as a Class 3 Convenience Claim. | Class 3 is Unimpaired by the Plan. Each Holder of a Convenience Claim is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. Note that each Holder of a General Unsecured Claim greater than $1,000.00 in the aggregate will receive a Ballot on which such Holder may make an election to have such Holder's General Unsecured Claim treated as a Convenience Claim. **All Holders of General Unsecured Claims should read the instructions on the ballots concerning making the Convenience Class Election as such Convenience Class Election will affect a Holder's voting rights and Distributions under the Plan.**<br><br>Each Holder of an Allowed Convenience Claim, except to the extent that such Holder agrees to less favorable treatment, shall be entitled to receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Convenience Claim, Cash in an amount equal to 100% of such Holder's Allowed Convenience Claim, on the first Distribution Date that is at least ten (10) Business Days after the date that such Convenience Claim becomes an Allowed Convenience Claim. | $140,000 | 100% |
| 4 | **General Unsecured Claims:** Class 4 consists of any Claim against a Debtor that is not an Administrative, Priority, Secured, Convenience, Non-Compensatory Penalty or Intercompany Claim. | Class 4 is Impaired by the Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan. However, as noted above, a Holder of a General Unsecured Claim shall be entitled to make the Convenience Class Election on the Ballot, in which case such Holder's Claim shall be an Unimpaired Class 3 Claim by election and such Holder will be deemed to have accepted the Plan, which acceptance will not be counted for plan confirmation purposes. All Holders of General Unsecured Claims should read the instructions on the Ballots concerning making the Convenience Class Election as such Convenience Class Election will affect a Holder's voting rights and Distributions under the Plan.<br><br>Each Holder of an Allowed General Unsecured Claim that does not choose the Convenience Claim Election shall be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Holder's Allowed Class 4 | $24,300,000 - $37,200,000 | 37.4% - 61.0% |

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

| CLASS | DESCRIPTION AND AMOUNT OF CLAIMS OR INTERESTS | SUMMARY OF TREATMENT UNDER THE PLAN | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY |
|---|---|---|---|---|
| | | Claim, (i) Cash in an amount equal to such Holder's Pro Rata share of Distributable Cash, or (ii) such less favorable treatment as the Liquidating Trustee and the Holder of such Allowed Class 4 Claim may agree upon. Distributions to Holders of Allowed General Unsecured Claims shall be made on the Distribution Dates applicable to Allowed General Unsecured Claims. | | |
| 5 | **Subordinated Claims**: Class 5 consists of any Claim against one or more of the Debtors that is subordinated to all Allowed Claims, other than to other Class 5 Claims, which Claim is (a) subordinated pursuant to section 510(b) or (c) of the Bankruptcy Code, (b) a Non-Compensatory Penalty Claim, or (c) an Untimely Claim. | Class 5 is Impaired, but is conclusively presumed to have rejected the Plan. Accordingly, Holders of Class 5 Subordinated Claims are not entitled to vote to accept or reject the Plan and will not receive Ballots. <br><br> If, as of the Final Distribution Date, the value of the Liquidating Trust Assets is insufficient for all Allowed Claims in Class 4 and Liquidation Expenses to be Paid in Full, then Holders of Allowed Subordinated Claims shall not receive any Distributions on account of such Claims. If, however, all Allowed Claims and Liquidation Expenses are Paid in Full, then each Holder of an Allowed Subordinated Claim shall be entitled to a Pro Rata Distribution from any excess Cash, in full satisfaction, settlement and release of and in exchange for each such Holder's Allowed Subordinated Claim. Distributions to Holders of Allowed Subordinated Claims shall be made, if at all, as soon as practicable after the later of (i) the date that is thirty (30) days after the date that the Liquidating Trustee determines that all Liquidation Expenses and Allowed Class 4 Claims have been Paid in Full, and (ii) the first Distribution Date that is at least ten (10) Business Days after the date that a Subordinated Claim becomes an Allowed Subordinated Claim. | $0.00 | 0% |
| 6 | **Interests**: Class 6 consists of any "equity security," as such term is defined in section 101(16) of the Bankruptcy Code, in any Debtor. Interests shall also include all shares, partnership, membership or other ownership rights or interests in any Debtor, units, unit appreciation rights, warrants, options, or other rights to purchase, acquire or sell shares or partnership, membership or | Class 6 is Impaired, but is conclusively presumed to have rejected the Plan. Accordingly, Holders of Class 6 Interests are not entitled to vote to accept or reject the Plan and will not receive Ballots. <br><br> If, as of the Final Distribution Date, the value of the Liquidating Trust Assets is insufficient for all Allowed Claims and Liquidation Expenses to be Paid in Full, then Holders of Interests shall not receive any Distributions on account of such Interests. If, however, all Allowed Claims and Liquidation Expenses are Paid in Full, then each | $0.00 | 0% |

8

| CLASS | DESCRIPTION AND AMOUNT OF CLAIMS OR INTERESTS | SUMMARY OF TREATMENT UNDER THE PLAN | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY |
|---|---|---|---|---|
| | other ownership interests, each of the foregoing as to any Debtor(s). | Holder of an Allowed Interest shall be entitled to a Pro Rata Distribution from any excess Cash, in full satisfaction, settlement and release of and in exchange for each such Holder's Allowed Interest. Distributions to Holders of Allowed Interests shall be made, if at all, as soon as practicable after the later of (i) the date that is thirty (30) days after the date that the Liquidating Trustee determines that all Liquidation Expenses and Allowed Claims have been Paid in Full, and (ii) the first Distribution Date that is at least ten (10) Business Days after the date that an Interest becomes an Allowed Interest. | | |

The information set forth in the above table is for convenience of reference only. The Debtors' estimates for recoveries by each Class, in particular Class 4, are based on, among other things, the Debtors' current view of the likely amount of Allowed Administrative Claims incurred by the Debtors through confirmation of the Plan and the costs of administering and winding down the Liquidating Trust. Each Holder of a Claim or Interest should refer to the Plan for a full description of the classification and treatment of Claims and Interests provided under the Plan. **THE ACTUAL RECOVERIES UNDER THE PLAN BY CREDITORS AND HOLDERS OF INTERESTS WILL DEPEND UPON A VARIETY OF FACTORS INCLUDING, BUT NOT LIMITED TO, WHETHER, AND IN WHAT AMOUNT, CONTINGENT, DISPUTED AND UNLIQUIDATED CLAIMS AGAINST THE DEBTORS BECOME ALLOWED AND TO WHAT EXTENT RECOVERIES, IF ANY, ARE OBTAINED FROM THE RIGHTS OF ACTION AND OTHER LIQUIDATING TRUST ASSETS. THERE CAN BE NO GUARANTY THAT THE DEBTORS' ESTIMATES WILL PROVE TO BE ACCURATE.**

## III.     INSTRUCTIONS REGARDING VOTING AND CONFIRMATION

### A.     Voting

With respect to Claims in Classes that are Impaired under, but not deemed to have rejected, the Plan, each Holder of a Claim in such Classes will receive a copy of this Disclosure Statement, a Ballot for the acceptance or rejection of the Plan, and other related voting materials. As more fully defined in section 1124 of the Bankruptcy Code, any Holder of a Claim or Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under a plan of reorganization or liquidation is considered "Impaired."

Under the Plan, Class 4 Claims are Impaired and Holders of such Claims, to the extent that they have not chosen the Convenience Class Election, are entitled to vote on the Plan unless such Claims are Disallowed for voting purposes. Claims in Class 1 (Priority Non-Tax Claims),

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

Class 2 (Secured Claims) and Class 3 (Convenience Claims) are Unimpaired under the Plan and Holders of such Claims will be deemed to accept the Plan and are not entitled to vote on the Plan. Holders of Claims in Class 5 (Subordinated Claims) and Holders of Interests in Class 6 will likely receive no Distributions and are deemed to reject the Plan and, therefore, are not entitled to vote on the Plan.

The Bankruptcy Court has fixed _____, 2011 as the "Voting Record Date." Only Holders of Claims or Interests on the Voting Record Date and certain other parties specified by the Bankruptcy Court are entitled to receive a copy of this Disclosure Statement and related materials.

A form of Ballot is being provided to Holders of Class 4 Claims, specifically designed for the purpose of soliciting votes on the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed Ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the Ballot in the envelope provided for this purpose to Kurtzman Carson Consultants LLC, the Balloting Agent. As set forth in the summary chart above concerning Claim classification and treatment, the Ballots also permit Holders of Class 4 Claims to choose the Convenience Class Election. By choosing the Convenience Class Election, Holders of Class 4 Claims elect to have their Class 4 Claims treated as Class 3 Claims and become ineligible to vote on the Plan. **Furthermore, because the Plan provides for certain releases of Non-Debtor Released Parties (described in Section 12.2 of the Plan), subject to an opt-out right for Holders of Class 4 Claims, if you do not want to release such Non-Debtor Released Parties, you must vote on the Plan and check the appropriate box on the Ballot.**

**ALL PROPERLY COMPLETED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR TO _____, 2011 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "VOTING DEADLINE") WILL BE COUNTED FOR PURPOSES OF (I) DETERMINING WHETHER CLASS 4 HAS ACCEPTED THE PLAN AND (II) GIVING EFFECT TO THE CONVENIENCE CLASS ELECTION. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT. ANY BALLOTS RECEIVED BY FACSIMILE OR EMAIL WILL NOT BE ACCEPTED, UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT. The Balloting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.**

### B.    Objections to Confirmation

Any objection to confirmation of the Plan must be in writing, filed with the Bankruptcy Court and served in a manner **so as to be received on or before _____, 2011 at 4:00 p.m. (Prevailing Eastern Time) (the "Plan Objection Deadline")** by: (1) co-counsel to the Debtors, Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110-3333, Attn: Douglas B. Rosner, Esq. and Christine D. Lynch, Esq., and Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801, Attn: Daniel J. DeFranceschi, Esq.; (2) counsel to the Official Committee of Unsecured Creditors, Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178, Attn: James S. Carr, Esq. and Eric R. Wilson, Esq., and Klehr Harrison

10

Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, Delaware 19801 (Attention: Domenic E. Pacitti, Esq.); and (3) the Office of the United States Trustee, 2311 J. Caleb Boggs Bldg., 844 King Street, Room 2311, Wilmington, Delaware 19801, Attn: David Buchbinder, Esq.

## C. Confirmation Hearing

**The Bankruptcy Court will hold the Confirmation Hearing on _____, 2011, at \_\_:\_\_ \_.m. (Prevailing Eastern Time), at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom 1, Wilmington, Delaware 19801, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge.** The Confirmation Hearing may be adjourned from time to time without further notice. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite vote has been obtained for Class 4, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

## D. Importance of a Creditor's Vote to Confirmation of Plan

The Plan represents a proposed, legally-binding agreement among the Debtors and their creditors, and should be read together with this Disclosure Statement so an informed judgment concerning the Plan can be made. **CREDITORS ARE URGED TO READ THE PLAN IN FULL.**

**YOUR VOTE ON THE PLAN IS IMPORTANT.** To confirm the Plan, there must be at least one Impaired Class of Claims that votes to accept the Plan. Under section 1126 of the Bankruptcy Code, a class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims of such class held by creditors that have voted to accept or reject a plan. Under the Plan, it is expected that there will be only one Impaired Class of Claims that will receive Distributions, Class 4, meaning that there is only one voting Class under the Plan. The Debtors recommend that each Holder of a Claim in Class 4 accept the Plan. A Holder of a Claim in Class 4 who does not vote for the acceptance or rejection of the Plan will not be considered in the tabulation of votes for or against the Plan.

Assuming that Class 4 accepts the Plan (within the meaning of section 1126 of the Bankruptcy Code), the Debtors may seek to satisfy the requirements for confirmation of the Plan under the "cram down" provisions of section 1129(b) of the Bankruptcy Code with respect to the Classes of Impaired Claims and Interests that are deemed not to accept the Plan. Without acceptance by Class 4, the Plan cannot be confirmed, and the Debtors' Chapter 11 Cases may be converted to chapter 7 cases. In a liquidation case under chapter 7 of the Bankruptcy Code, a trustee or trustees would be appointed to liquidate the remaining Assets of each Debtor and distribute proceeds to creditors. The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by chapter 7 of the Bankruptcy Code. The Debtors believe that confirmation and consummation of the Plan is preferable to a conversion of these Chapter 11 Cases to chapter 7.

11

## IV.   HISTORICAL INFORMATION

### A.   Description of Debtors' Business

Prior to the Petition Date, the Debtors owned and operated 85 Fuddruckers™ restaurants and 13 Koo Koo Roo™ restaurants and franchised 135 Fuddruckers restaurants in 33 states, the District of Columbia, Puerto Rico and Canada.   As of the Petition Date, the Debtors had approximately 2,400 employees, of which approximately 65 were corporate-level employees and regional managers employed by Magic Brands, LLC (now known as Deel, LLC) ("Magic"), and approximately 2,335 were restaurant-level employees and managers employed by Fuddruckers, Inc. (now known as Brosna, Inc.) ("Fuddruckers").   Shortly after the Petition Date, the Debtors closed 34 restaurants, leaving 61 corporate Fuddruckers restaurants and 3 corporate Koo Koo Roo restaurants at the time of the sale of substantially all of the Debtors' Assets (described in Section V.D.3, below).

### B.   Corporate History and Structure

The first Fuddruckers restaurant was opened in 1980 in San Antonio, Texas, with the unique concept of serving high-quality hamburgers that customers could dress themselves with fresh toppings.   Over the next few decades, Fuddruckers expanded its operations to well over 200 restaurants (corporate-owned and franchise) located across the country and became a leader in the fast casual restaurant segment, establishing a reputation for upscale hamburgers grilled fresh-to-order.   In 1998, Michael Cannon, a successful British pub operator, acquired the Fuddruckers restaurant chain in a stock purchase.   In 2003, the Debtors acquired the Koo Koo Roo restaurant chain, a fast casual concept that focused on providing healthy, flavorful chicken dishes.   Founded in 1988, Koo Koo Roo restaurants operated exclusively in the Southern California area.

In connection with Mr. Cannon's acquisition of the Fuddruckers business, all of the intellectual property relating to Fuddruckers was acquired by Magic, a wholly-owned subsidiary of KCI, while all of the Debtors' tangible Assets, including their restaurants, continued to be held by Fuddruckers, a wholly-owned subsidiary of King Cannon.   Both KCI and King Cannon are wholly-owned by Fuddruckers International, LLC ("International"), a non-debtor, which is in turn wholly-owned by Mr. Cannon.

The organizational chart attached hereto as Exhibit B illustrates the organizational structure of the Debtors and certain non-debtor subsidiaries as of the Petition Date.

### C.   Management of the Debtors

As of the Petition Date, the Debtors maintained their corporate headquarters at 5700 Mopac Expressway South, Suite C300, Austin, Texas.   The executive officers, directors and managers, as applicable, for each of the Debtors and certain non-debtor affiliates, each as of the Petition Date, are identified on Exhibit B.

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

## D. Summary of Prepetition Indebtedness

### 1. Prepetition Credit Facility

The Debtors (with the exception of Atlantic, which was a guarantor) were borrowers under a Credit Agreement, dated as of December 1, 2006 (the "Prepetition Credit Agreement") with Wells Fargo Foothill, now known as Wells Fargo Capital Finance, Inc. (the "Prepetition Lender"). The Prepetition Credit Agreement provided for a credit facility consisting of (i) a term loan in the original principal amount of $16,000,000 and (ii) a revolving credit facility in the maximum aggregate amount of $10,000,000 (collectively, the "Prepetition Credit Facility").

The obligations of the Debtors under the Prepetition Credit Agreement were secured by first priority liens on substantially all of the Debtors' Assets and were guaranteed by certain subsidiaries of the Debtors, including Atlantic, a Debtor herein. The Prepetition Credit Facility was set to mature on November 30, 2011. As of the Petition Date, the prepetition senior indebtedness under the Prepetition Credit Agreement was approximately $23.5 million (the "Prepetition Senior Indebtedness"). The Prepetition Senior Indebtedness was paid in full at the closing of the Sale (described below) and the liens released.

### 2. Other Significant Prepetition Obligations of the Debtors

On December 1, 2006, International loaned Fuddruckers and Magic, jointly and severally, the principal sum of $3,050,000 (the "International JPMC Obligation"). The International JPMC Obligation, which has not been discharged, is unsecured and is evidenced by a promissory note. The International JPMC Obligation is fully subordinated to the Debtors' obligations in respect of the Prepetition Credit Facility. In addition, the Debtors' audited financials for fiscal year ended June 2009 and books and records for fiscal year ended June 2010 show an additional $7,500,000 owing to International (the "Other International Obligations"), on account of unsecured intercompany loans made by International to Fuddruckers and Magic in fiscal year 2009 and in October and November 2009.

As of the Petition Date, the principal amounts outstanding under the International JPMC Obligation and the Other International Obligations remained $3,050,000 and $7,500,000, respectively.

The Creditors' Committee believes that some or all of the foregoing obligations to International are not loans or debt obligations, but rather evidence infusions of capital by International and should be characterized as equity, may be subordinated pursuant to section 510(c) of the Bankruptcy Code, and/or are otherwise subject to disallowance.

### E. Events Leading to the Filing of These Chapter 11 Cases

The Debtors commenced these Chapter 11 Cases to accomplish the sale of substantially all of their Assets and preserve their enterprise value for the benefit of creditors and other constituents. The Debtors began to experience a significant decline in profits in 2006 and 2007. The Debtors hired Peter Large as President and Chief Executive Officer in 2007, and Gregor Grant as Chief Financial Officer in June 2008, in large part, to formulate and implement a business turnaround plan. The new management team re-established proper financial controls and

13

corporate governance, tightened franchise controls and accountability, and improved relationships across the franchise system, all of which had begun to erode under the direction of former management. After stabilizing the business, the new management team implemented certain operational changes to build sales and improve gross margins by, among other things, introducing market differentiators, reducing costs of goods sold and developing new value and menu strategies. A longer term stabilization and turnaround plan was then developed, which was intended to significantly improve cash flow and earnings and position the Debtors' business for a potential sale or recapitalization.

Before the turnaround plan could be accomplished, the recession hit in 2008. Rising unemployment and a tightening of credit markets led to a dramatic cut in discretionary consumer spending which, in turn, had a substantial negative impact on the Debtors' restaurant sales. At the same time, energy and beef costs increased, further negatively impacting the Debtors' profits. In the fiscal year ended June 2009, the Debtors' gross revenues from corporate-owned and franchise operations were approximately $144 million, down more than 5% from the 2008 fiscal year. Same store sales at corporate-owned restaurants declined by 4.1% in the fiscal year ending June 2008, and by 2.8% in the fiscal year ending June 2009. Same store sales for the period July to December 2009 declined by 10.3%. Similarly, same store sales at franchised restaurants declined in fiscal years 2008 and 2009, by 1.9% and 4.6%, respectively. The Debtors' financial performance was also adversely impacted by the costs related to a credit card fraud perpetuated on the Debtors in the second half of 2008, which cost the Debtors in excess of $1.5 million.

In the face of such difficult economic conditions and liquidity challenges, the new management team continued efforts to implement the turnaround plan, focusing more immediately on negotiations with landlords to eliminate liabilities with respect to approximately 54 unprofitable corporate-owned restaurants subject to long-term leases. Among the long-term leases was a master lease (the "Spirit Lease") covering 22 restaurant locations. In the Fall 2009 through the Petition Date, the Debtors negotiated with the landlord under the Spirit Lease, Spirit Master Funding, LLC ("Spirit"), in an attempt to shed the liabilities associated with 12 of the 22 restaurant locations (some of which were closed and vacant). On the Petition Date, the parties finally reached agreement to amend the Spirit Lease, as described in more detail below.

The costs associated with so many unprofitable locations, as well as the Debtors' cash flow difficulties, created a need for greater than projected cash infusions from International, the Debtors' ultimate parent, which is controlled by Mr. Cannon. After having infused $7.5 million into the Debtors' business in fiscal year 2009 and in the first half of fiscal year 2010 through International, and in light of the significant deterioration in restaurant sales performance, Mr. Cannon would not advance the more than $5 million that would have been needed to fund settlements with Spirit and other landlords. Absent an agreement with Spirit, the Debtors could not complete their turnaround. As a result, the Debtors' management, in consultation with counsel and financial advisors, explored a range of alternative options, including an orderly liquidation, chapter 11 reorganization and a sale in or outside of a chapter 11 process.

In February, 2010, the Debtors retained FocalPoint Securities LLC ("FocalPoint"), as investment bankers to assist the Debtors in their efforts to locate a new investor and/or market and sell substantially all of the Debtors' Assets as a going concern. FocalPoint began contacting potential investors and buyers in early February, and, by late March 2010, FocalPoint had

14

received nine serious indications of interest to be the stalking horse bidder in a chapter 11 sale process.

After continued negotiations with several potential purchasers, the Debtors determined, with the advice of FocalPoint and counsel, and in consultation with the Prepetition Lender, that the highest and best offer to date was the one submitted by Tavistock Ventures, Inc. ("Tavistock"). Shortly before the commencement of these Chapter 11 Cases, the Debtors executed an asset purchase agreement with Tavistock (the "Stalking Horse APA"). The Stalking Horse APA provided for a purchase price of $40 million for substantially all of the Debtors' Assets if the Debtors were able to successfully modify the Spirit Lease to permit assignment of just seven locations thereunder to Tavistock, or $31 million without the assignment of those locations (the "Stalking Horse Bid"). The Stalking Horse APA provided a floor for competitive bidding in the Chapter 11 Cases.

## V. THE CHAPTER 11 CASES

### A. Overview

On April 21, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Chapter 11 Cases have been jointly administered for procedural purposes. The Debtors continue to hold their Assets as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, subject to the supervision of the Bankruptcy Court.

The Debtors commenced these Chapter 11 Cases believing them to be in the best interests of their creditors and other parties in interest. These Chapter 11 Cases have enabled the Debtors to complete the sale of substantially all of their Assets, which served to significantly enhance the value of the Debtors' Assets and Estates for the benefit of their creditors and preserve jobs and the Fuddruckers and Koo Koo Roo brands.

### B. Employment of the Debtors' Professionals

The Debtors retained and have been represented and advised in the Chapter 11 Cases by (i) the law firms of Goulston & Storrs, P.C., located at 400 Atlantic Avenue, Boston, Massachusetts 02110-3333, and Richards, Layton & Finger, P.A., located at 920 North King Street, Wilmington, Delaware 19801, as bankruptcy counsel; (ii) Wiley Rein LLP, located at 1776 K Street NW, Washington, District of Columbia 20006, as special franchise counsel; (iii) CRG Partners Group LLC ("CRG"), located at 2 Atlantic Avenue, Boston, Massachusetts 02210, as their management consultants; (iv) FocalPoint Securities, LLC, located at 11150 Santa Monica Boulevard, Suite 1550, Los Angeles, California 90025, as their investment banker; (v) Sitrick and Company, Inc., located at 1840 Century Park East, Suite 800, Los Angeles, California 90067, as their corporate communications consultant; and (vi) Grant Thornton, LLP, located at 1717 Main Street, Suite 1500, Dallas, Texas 75201, as their accountants. The Debtors also retained various ordinary course professionals to assist the Debtors with respect to matters unrelated to the Debtors' Chapter 11 Cases.

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

### C. Appointment of the Official Committee of Unsecured Creditors and Employment of Committee Professionals

On May 3, 2010, the United States Trustee appointed the Official Committee of Unsecured Creditors. The Creditors' Committee is comprised of the following entities: Pepsi-Cola North America (vendor), U.S. Foodservice, Inc. (vendor), Marcelo and Berna Montalvan (franchisee), White Marsh General Partnership (landlord), and P & D Realty Company LLC (landlord).

The Creditors' Committee retained and has been represented and advised in the Chapter 11 Cases by (i) the law firms of Kelley Drye & Warren LLP, located at 101 Park Avenue, New York, New York 10178, and Klehr Harrison Harvey Branzburg LLP, located at 919 N. Market Street, Suite 1000, Wilmington, Delaware 19801, as bankruptcy counsel and (ii) FTI Consulting, Inc., located at Three Times Square, New York, New York 10036, as financial advisor.

### D. Significant Events During the Chapter 11 Cases

#### 1. First Day Orders

At the first day hearing held in these Chapter 11 Cases on April 23, 2010, the Debtors sought approval of numerous motions seeking immediate relief intended to facilitate the transition, and avoid interruption, of the Debtors' ordinary business operations in Chapter 11. The Bankruptcy Court entered numerous first day orders, which authorized, among other things:

a) joint administration of the Chapter 11 Cases for procedural purposes;

b) payment to employees of accrued prepetition wages, salaries and benefits;

c) payment of certain Claims asserted under the Perishable Agricultural Commodities Act;

d) payment of certain prepetition tax obligations;

e) maintenance, renewal, cancellation or replacement of existing insurance programs and payment of all premiums, fees and insurance premium financing obligations in connection with such insurance programs;

f) continuation of utility services during the first months of the Chapter 11 Cases and procedures for utility providers to request additional adequate assurance of payment;

g) maintenance of the Debtors' bank accounts and operation of their existing cash management system;

h) continuation of certain prepetition customer programs;

i) procedures for the sale of *de minimis* Assets in connection with the Debtors' rejection of certain restaurant leases and restaurant closures; and

j) retention of Kurtzman Carson Consultants LLC as the Debtors' Claims Agent and Balloting Agent in these Chapter 11 Cases.

## 2. The Debtors' DIP Facility

In addition, at the first day hearing, the Debtors requested interim approval of a post-petition financing arrangement with their Prepetition Lender. After extensive negotiations, the Debtors entered into a debtor-in-possession credit agreement (the "DIP Credit Agreement") with the Prepetition Lender on April 21, 2010 pursuant to which the Prepetition Lender agreed to provide post-petition financing (the "DIP Facility"). The DIP Credit Agreement was approved on an interim basis by the Bankruptcy Court on April 23, 2010. A final order approving the DIP Credit Agreement (the "Final DIP Order") was entered on May 17, 2010. Under the Final DIP Order, the Debtors were authorized to borrow funds under the DIP Facility up to an aggregate principal amount of $13,780,500 to fund the Debtors' ordinary working capital and capital expenditure needs and administrative expenses, including professional fees, incurred in the Chapter 11 Cases. On or about July 26, 2010, the amounts outstanding under the DIP Credit Agreement were paid in full using the proceeds of the sale of substantially all of the Debtors' Assets.

## 3. Sale of Substantially all of the Debtors' Assets

On April 22, 2010, the Debtors filed a motion for authority to sell substantially all of their Assets pursuant to the terms of the Stalking Horse APA with Tavistock and seeking approval of a combined break-up fee and expense reimbursement of 3.5% of the cash purchase price (or $1.2 million based on a $40 million cash purchase price) and procedures for competitive bidding and an auction (the "Sale Motion"). Among the objections raised to the proposed sale procedures was one by American Blue Ribbon Holdings, LLC ("ABR"), which had unsuccessfully sought to be the stalking horse bidder prepetition. ABR objected to, among other things, the size of the breakup fee requested by Tavistock. The Creditors' Committee also objected to approval of the proposed breakup fee. A hearing to approve the proposed sale procedures was held on May 18, 2010, at which Tavistock ultimately agreed to reduce their combined breakup fee and expense reimbursement to $400,000.

By order dated May 18, 2010, the Bankruptcy Court approved the reduced breakup fee and expense reimbursement and approved the Debtors' proposed sale procedures, which included scheduling an auction for the sale of substantially all of the Debtors' Assets for June 17, 2010 (the "Auction"), and a hearing on the approval of the sale to the successful bidder at Auction for June 22, 2010 (the "Sale Hearing").

Following the Bankruptcy Court's approval of the sale procedures, FocalPoint continued to market the Debtors' Assets as a going concern to potential bidders. By the final bid deadline of June 14, 2010, the Debtors received two competing offers, one from ABR for $41 million ($32 million without the modified Spirit Lease), and one from Luby's, Inc. ("Luby's"), for $42 million ($34 million without the modified Spirit Lease) plus $1.2 million contingent consideration (relating to the Minnesota restaurant locations which were not controlled by the Debtors). The Debtors, in consultation with the Creditors' Committee, deemed both competing offers to be "Qualified Bids" within the meaning of the court-approved sale procedures, and Luby's bid was determined to be the highest bid going into the Auction.

GSDOCS\2043892.1
RLF1 3922042v. 1~~3803871~~v

The Auction was highly competitive. After numerous rounds of bidding by Tavistock, ABR and Luby's over a period of nine (9) hours, the Auction concluded with Luby's final bid of $61 million in cash, plus $2.65 million in additional, contingent consideration (consisting of $2.45 million consideration in the event that Luby's required the Debtors to reject their contract (the "Pepsi Contract") with Pepsi-Cola Fountain Company, Inc. ("Pepsi"), and $200,000 additional consideration in the event that the Debtors delivered to Luby's possession of certain Minnesota restaurant locations which were not then under the Debtors' control). Luby's bid was determined by the Debtors, in consultation with the Creditors' Committee, to be the highest and best bid for the Debtors' Assets. Luby's successful bid was more than $20 million higher than the Stalking Horse Bid. Following the Auction, the Debtors and Luby's entered into an asset purchase agreement (the "APA").

On the eve of the Sale Hearing, Tavistock filed an objection to the proposed sale to Luby's, alleging, among other things, that Luby's had not submitted a "Qualified Bid" prior to the bid deadline and, therefore, should not have been permitted to participate in the Auction. The Debtors and Creditors' Committee vigorously opposed Tavistock's objection at the Sale Hearing held on June 23 and June 24, 2010. The Bankruptcy Court overruled Tavistock's objection, and, by order dated June 24, 2010 (the "Sale Order"), approved the sale to Luby's pursuant to the terms of the APA (the "Sale").

The Sale closed on July 26, 2010. Proceeds from the Sale were sufficient to pay, in full, the Prepetition Senior Indebtedness and the DIP Facility. The Sale not only should provide a meaningful recovery to Holders of General Unsecured Claims, but also enabled the Debtors to save approximately 1,500 jobs, and, under the direction of Luby's, the Fuddruckers brand will continue. In connection with the Sale, Luby's took assignment of most of the Debtors' contracts and leases, including most of the Debtors' franchise agreements. However, Luby's elected not to take assignment of the Pepsi Contract, certain franchise agreements, franchise development agreements, and certain other leases and contracts, forcing the Debtors to reject such agreements and incur related liabilities (partially offset by Luby's payment of $2.45 million in contingent consideration under the APA as a result of the Pepsi Contract rejection).

### 4. Modification of the Spirit Lease

Shortly before the commencement of these Chapter 11 Cases, the Debtors and Spirit were able to reach agreement on an amendment to the Spirit Lease (the "Spirit Amendment"), which allowed the Debtors to shed fifteen of their closed or unprofitable locations. Pursuant to the Spirit Amendment, Spirit agreed, among other things, to (i) remove from the Spirit Lease fourteen closed or unprofitable restaurant locations, as well as an additional location that was being subleased to a franchisee; and (ii) reduce the annual base rent under the Spirit Lease from $3,247,302.84 to $1,029,647. It was anticipated that elimination of the unprofitable locations and a reduction in annual base rent would increase significantly the value and attractiveness of the Debtors' business for potential buyers. In exchange for Spirit's concessions under the Spirit Amendment, the Debtors agreed to pay a lease modification fee tied to the consideration received upon the sale of substantially all of the Debtors' Assets. The lease modification fee was to be paid at the time of the closing of a sale of the Debtors' Assets, provided that the modified Spirit Lease was assumed by the Debtors and assigned to the successful purchaser. On May 21, 2010, the Bankruptcy Court approved the conditional assumption of the Spirit Lease, as modified.

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

Following closing of the Sale to Luby's which took assignment of the Spirit Lease, as modified by the Spirit Amendment, the Debtors paid Spirit a lease modification fee of $6.25 million pursuant to the Spirit Amendment.

Based on initial bids during the sale process, the Debtors believe that the ability to include the desired Spirit restaurant locations in the Sale (and eliminate closed and underperforming locations) substantially enhanced the sale price. Moreover, the Debtors avoided a substantial rejection damages Claim that Spirit would have otherwise had against the Debtors' Estates if the Debtors were forced to reject the Spirit Lease.

### E. Other Material Relief Obtained During the Chapter 11 Cases

#### 1. Rejection of Unexpired Leases of Non-Residential Real Property and Executory Contracts

Prior to the filing of these Chapter 11 Cases, the Debtors had already closed and vacated or determined to close approximately 43 underperforming Fuddruckers and Koo Koo Roo restaurants. In order to relieve the Estates from rent and other rent-related charges associated with the real property leases for these locations as well as certain sublet locations, the Debtors filed a motion seeking rejection of such leases pursuant to section 365 of the Bankruptcy Code (the "Lease Rejection Motion"). To streamline future lease rejections in the Chapter 11 Cases, the Debtors also filed a motion seeking approval of procedures for the rejection of unexpired leases (the "Rejection Procedures Motion"). The Court approved both the Lease Rejection Motion and Rejection Procedures Motion. With the exception of leases and contracts necessary to the Debtors' wind-down, leases and contracts that were not designated for assignment by Luby's have been rejected during the course of these Chapter 11 Cases.

#### 2. Rejection of Minnesota Agreements with R.J. Management, LLC and Other Relief Related Thereto

Pursuant to the terms of a restaurant management agreement and letter of intent (together, the "Minnesota Agreements") between Magic and R.J. Management, LLC ("RJM") and its member, Ralph Flannery ("Flannery"), RJM had been managing and operating six Fuddruckers restaurants in Minnesota pending their sale to entities controlled by Flannery. Prior to the Petition Date, in December 2009, Magic had sent RJM notices of termination of the Minnesota Agreements. RJM and Flannery commenced litigation against Magic in the United States District Court for the District of Minnesota, alleging, among other things, that the termination was invalid. The filing of these Chapter 11 Cases stayed RJM's action against Magic.

On June 7, 2010, the Bankruptcy Court approved the Debtors' protective motion to reject the Minnesota Agreements, if not already terminated, effective as of June 4, 2010. Notwithstanding the Court-approved rejection of the Minnesota Agreements, RJM continued to operate two Minnesota restaurants (known as Bloomington and St. Louis Park) and refused to turn over possession of those restaurants to the Debtors. On June 11, 2010, the Debtors commenced eviction proceedings against RJM and entities controlled by Flannery in the District Court for the 4th Judicial District of the State of Minnesota, (the "Minnesota Court"). The Minnesota Court entered summary judgment in favor of the Debtors and the Flannery parties

appealed. The Flannery parties voluntarily dismissed the appeal on September 27, 2010 and the Debtors subsequently regained possession of the Bloomington restaurant and surrendered the St. Louis Park restaurant to the landlord.

The APA provided that Luby's would pay the Debtors $200,000 of additional consideration if the Debtors obtained possession of and assigned to Luby's (in Luby's discretion) one or both of the Bloomington and St. Louis Park restaurants and that Luby's would pay the expenses of obtaining possession of those restaurants. In September 2010, Luby's exercised its right to direct the Debtors to reject the lease with respect to the St. Louis Park restaurant, and the Debtors rejected such lease effective as of September 28, 2010. At the same time, Luby's designated the lease for the Bloomington restaurant to be assumed and assigned to it. On October 1, 2010, the Debtors assigned to Luby's the lease for the Bloomington restaurant and received the agreed upon consideration.

### 3. Key Employee Incentive Plan

On April 29, 2010, the Debtors filed a motion to approve a Key Employee Incentive Plan ("KEIP"), which was designed to motivate certain key employees to continue driving performance of the business and at the same time to participate actively in the sales process. At the request of the Creditors' Committee and the United States Trustee, the Debtors made certain adjustments to the KEIP, which was approved by Order of the Bankruptcy Court dated May 17, 2010. The employees subject to the KEIP were entitled to a transaction bonus equal to a percentage of their respective salaries, which increased based on the value of the Sale, up to a maximum of 125% of the salaries for "Tier 1" employees and 33% of the salaries for "Tier 2" employees. The value achieved through the Sale resulted, in significant part, from the efforts of the employees covered by the KEIP. After the closing of the Sale, the Debtors paid the KEIP bonuses in the aggregate amount of $1,659,375.

### 4. Employee Severance Plan

On July 9, 2010, the Debtors filed a motion seeking authorization to make severance payments to certain non-insider employees who were not being retained by Luby's following the Sale. The proposed severance plan was intended to incentivize these employees to assist with the transition of the business to Luby's and assist the Estates with the post-Closing wind-down. By Order dated July 14, 2010, the Bankruptcy Court approved the non-insider employee severance plan. The Debtors have paid or will pay aggregate severances of up to $280,000 under the court-approved severance plan.

### 5. Extension of Exclusive Periods

By Order dated August 23, 2010, the Bankruptcy Court extended the Debtors' exclusive period to propose a plan through November 17, 2010 and exclusive period to solicit acceptances to such plan through January 18, 2011. By Order dated November 16, 2010, the Bankruptcy Court further extended these periods through January 18, 2011 and March 21, 2011, respectively.

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

## 6. Summary of the Bar Dates and Scheduled and Filed Claims

Each of the Debtors filed Schedules of Assets and Liabilities and a Statement of Financial Affairs (collectively, the "Schedules") with the Bankruptcy Court on May 21, 2010. Among other things, the Schedules set forth the Claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.

By Order dated July 14, 2010 (the "Bar Date Order"), the Bankruptcy Court established August 19, 2010 at 5:00 p.m. (Pacific Daylight Time) as the deadline for filing non-governmental Proofs of Claim, against the Debtors, including administrative expense requests pursuant to section 503(b)(9) of the Bankruptcy Code (the "General Bar Date") and October 18, 2010 at 5:00 p.m. (Pacific Daylight Time) as the deadline for governmental units to file Proofs of Claim against the Debtors (the "Governmental Units Bar Date" and together with the General Bar Date and any supplemental bar dates established by the Bankruptcy Court, the "Bar Dates"). Notice of the Bar Dates was mailed to creditors on July 16, 2010 and published in USA Today on July 20, 2010. On September 1, 2010, the Bankruptcy Court established a supplemental bar date of October 4, 2010 for certain creditors that did not receive the initial bar date notice by mail (the "Supplemental Bar Date").

Under the Bar Date Order, unless otherwise ordered by the Bankruptcy Court, any Holder of a Claim against any of the Debtors who is required, but fails, to file proof of such Claim in accordance with the Bar Date Order on or before the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution, and tardily filed Claims shall constitute Subordinated Claims under the Plan. As of the date of this Disclosure Statement, over 1,700 Claims have been Scheduled (which are not otherwise disputed, contingent or unliquidated) or filed (and not withdrawn), including administrative expense requests, in the Chapter 11 Cases (including duplicates).

The Debtors and the Creditors' Committee are currently in the process of reviewing Proofs of Claim filed in these Chapter 11 Cases. The Debtors, and, after the Effective Date, the Liquidating Trustee, expect to file objections to certain Claims. Consequently, the Debtors anticipate that the figures set forth above, which reflect the Face Amount of Proofs of Claim or Scheduled Claims, will be reduced significantly following completion of the Claims reconciliation process.

## VI. SUMMARY OF THE PLAN OF LIQUIDATION

The Plan provides for, among other things: (i) classification and treatment of unclassified and classified Claims and Interests; (ii) substantive consolidation of the Assets and liabilities of all of the Debtors for voting and distribution purposes only; (iii) the creation of the Liquidating Trust and appointment of the Liquidating Trustee to make Distributions to Holders of Allowed Claims from the proceeds from the liquidation of the Debtors' Assets (most of which have been realized through the sale of substantially all of the Debtors' Assets earlier in these Chapter 11 Cases) and oversee the winding down of the Debtors' Estates; and (iv) reconciliation of Claims and prosecution of Rights of Action. The summary of the Plan, which is provided below, is qualified in its entirety by reference to the Plan and the Exhibits to this Disclosure Statement. It is

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

the Plan and orders entered by the Bankruptcy Court and not this Disclosure Statement that govern the rights and obligations of the parties.

## A. Payment of Administrative and Priority Tax Claims

### 1. Administrative Claims

Except to the extent that the Holder of an Allowed Administrative Claim agrees to less favorable treatment and to the extent that such Claim has not already been satisfied, each Holder of an Allowed Administrative Claim shall be entitled to receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Administrative Claim, Cash in an amount equal to the amount of its Allowed Administrative Claim. Distributions to Holders of Allowed Administrative Claims shall be made by the later of (i) thirty (30) days after the Effective Date, and (ii) as soon as practicable after the date that such a Holder's Claim becomes an Allowed Administrative Claim; provided, however, that Allowed Administrative Claims representing obligations incurred in the ordinary course of business of the Debtors after the Confirmation Date and through the Effective Date in the administration or liquidation of the Debtors' estates shall be Paid in Full in accordance with the terms and conditions of the particular transactions and any applicable agreements. Holders of Administrative Claims are not entitled to vote to accept or reject the Plan.

### 2. Priority Tax Claims

Except to the extent that the Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, and only to the extent that such Claim has not already been satisfied, each Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Priority Tax Claim, Cash in an amount equal to the amount of its Allowed Priority Tax Claim. Distributions to Holders of Allowed Priority Tax Claims shall be made by the later of (i) thirty (30) days after the Effective Date, or as soon thereafter as is reasonably practicable, and (ii) the first Distribution Date that is at least ten (10) Business Days after the date that such a Holder's Claim becomes an Allowed Priority Tax Claim. Holders of Priority Tax Claims are not entitled to vote to accept or reject the Plan.

## B. Classification and Treatment of Claims and Interests

The Plan provides for the classification and treatment of six Classes of Claims and Interests described below. A Claim or Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class.

### 1. Unimpaired Classes of Claims

(a) Class 1: Priority Non-Tax Claims

Class 1 consists of all Priority Non-Tax Claims. Except to the extent that the Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, and only to the extent that such Claim has not already been satisfied, each Holder of an Allowed Priority Non-Tax Claim shall be entitled to receive, in full satisfaction, settlement, release and discharge of and in

exchange for its Allowed Priority Non-Tax Claim, Cash in an amount equal to the amount of its Allowed Priority Non-Tax Claim. Distributions to Holders of Allowed Priority Non-Tax Claims shall be made by the later of (i) thirty (30) days after the Effective Date, and (ii) the first Distribution Date that is at least ten (10) Business Days after the date that such a Holder's Claim becomes an Allowed Priority Non-Tax Claim. Class 1 is deemed to have accepted the Plan and, therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

(b) Class 2: Secured Claims

Class 2 consists of all Secured Claims. At the sole option of the Liquidating Trustee, each Holder of an Allowed Secured Claim shall be entitled to receive, to the extent that such Claim is not already satisfied, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Claim, either (a) the collateral securing such Holder's Allowed Secured Claim, (b) Cash in an amount equal to the amount of such Holder's Allowed Secured Claim, or (c) any other less favorable treatment as may be agreed upon by the Liquidating Trustee and such Holder. Distributions to Holders of Allowed Secured Claims shall be made by the later of (i) thirty (30) days after the Effective Date, and (ii) the first Distribution Date that is at least ten (10) Business Days after the date that such a Holder's Claim becomes an Allowed Secured Claim. Class 2 is deemed to have accepted the Plan and, therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan.

(c) Class 3: Convenience Claims

Class 3 consists of all Convenience Claims. The Holder of an Allowed Convenience Claim shall be entitled to receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Convenience Claim, Cash in an amount equal to 100% of such Allowed Convenience Claim. Distributions to Holders of Allowed Convenience Claims shall be made by the later of (i) thirty (30) days after the Effective Date, and (ii) the first Distribution Date that is at least ten (10) Business Days after the date that such a Holder's Claim becomes an Allowed Convenience Claim. Class 3 is deemed to have accepted the Plan and, therefore, Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

## 2. Impaired Classes of Claims or Interests

(a) Class 4: General Unsecured Claims

Class 4 consists of all General Unsecured Claims. Each Holder of an Allowed General Unsecured Claim of record as of the Distribution Record Date, shall be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Holder's Allowed General Unsecured Claim (i) Cash in an amount equal to such Holder's Pro Rata share of Distributable Cash, or (ii) any less favorable treatment as the Liquidating Trustee and the Holder of such Allowed General Unsecured Claim may agree upon. Distributions to Holders of Allowed General Unsecured Claims shall be made on the Distribution Dates applicable to Allowed General Unsecured Claims. However, a Holder of a General Unsecured Claim shall be entitled to choose the Convenience Claim Election on the Ballot, in which case such Holder's Claim shall be an Unimpaired Class 3 Claim by election (see description of treatment of Class 3 Claims, above).

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

(b)     Class 5:  Subordinated Claims

Class 5 consists of all Subordinated Claims. Holders of Subordinated Claims shall not receive or retain any property or interest in property on account of such Claims unless and until all Allowed Class 4 Claims and Liquidation Expenses have been Paid in Full.  If all Allowed Class 4 Claims and Liquidation Expenses are Paid in Full, then any excess Cash shall be distributed Pro Rata to Holders of Allowed Subordinated Claims of record as of the Distribution Record Date, in full satisfaction, settlement and release of and in exchange for such Holders' Allowed Subordinated Claims.  Distributions to Holders of Allowed Subordinated Claims shall be made, if at all, as soon as practicable after the later of (i) the date that is thirty (30) days after the date that the Liquidating Trustee determines that all Allowed Class 4 Claims and Liquidation Expenses have been Paid in Full, and (ii) the first Distribution Date that is at least ten (10) Business Days after the date that a such a Holder's Subordinated Claim becomes an Allowed Claim.  Class 5 is deemed to have rejected the Plan and, therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject the Plan.

(c)     Class 6:  Interests

Class 6 consists of all Interests.  It is anticipated that the value of the Liquidating Trust Assets will be less than the total amount of Allowed Claims against the Estates.  If, as of the Final Distribution Date, the value of the Liquidating Trust Assets is insufficient for all Liquidation Expenses and Allowed Claims to be Paid in Full, then Holders of Interests shall not receive any Distributions on account of such Interests.  If, however, all Liquidation Expenses and Allowed Claims are Paid in Full, then any excess Cash shall be distributed Pro Rata to Holders of Allowed Interests of record as of the Distribution Record Date, in accordance with the respective priorities of such Interests as they existed prior to the Petition Date, in full satisfaction, settlement and release of and in exchange for such Holders' Allowed Interests.  Distributions to Holders of Allowed Interests shall be made, if at all, as soon as practicable after the later of (i) the date that is thirty (30) days after the date that the Liquidating Trustee determines that all Liquidation Expenses and Allowed Claims have been Paid in Full, and (ii) the first Distribution Date that is at least ten (10) Business Days after the date that such a Holder's Interest becomes an Allowed Interest.  Class 6 is deemed to have rejected the Plan and, therefore, Holders of Interests are not entitled to vote to accept or reject the Plan.

## C.     Substantive Consolidation of the Assets and Liabilities of the Debtors

### 1.     Substantive Consolidation Order

The Plan shall serve as a motion for an order substantively consolidating the Assets and liabilities of the Debtors for distribution and voting purposes.  Unless an objection to substantive consolidation is filed and served by a Holder of an Impaired Claim affected by the Plan on or before the Plan Objection Deadline or such other date as may be established by the Bankruptcy Court, an order substantively consolidating the Assets and liabilities of the Debtors for distribution and voting purposes may be entered by the Bankruptcy Court.  In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may coincide with or precede the Confirmation Hearing.  In addition, the Debtors expressly reserve their right to file a memorandum of law and submit evidence

supporting substantive consolidation and confirmation of the Plan following the filing of any objection.

Substantive consolidation is an equitable remedy which a bankruptcy court may be asked to apply in cases involving affiliated debtors. In addition, consolidation is authorized by statute under section 1123(a)(5)(C) of the Bankruptcy Code. As contrasted with joint administration,[2] substantive consolidation may affect the substantive rights and obligations of creditors and debtors. Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors; all of the debtors in the substantively consolidated group are treated as if they were a single corporate/economic entity. The consolidated assets create a single fund from which all claims against the consolidated debtors are to be satisfied. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored.

The overriding purpose of substantive consolidation of these Chapter 11 Cases is to insure the equitable treatment of creditors. Under Third Circuit precedent, substantive consolidation is appropriate where the affiliated debtors disregarded separateness so significantly that their creditors treated them as one legal entity or where postpetition the debtors assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

The Debtors believe that substantive consolidation is appropriate in these Chapter 11 Cases. Without substantive consolidation, the Debtors would have to determine the appropriate allocation of the proceeds of the sale of the Debtors' Assets among all five of the Debtors, as well as the proper allocation of all prepetition and postpetition liabilities, including the obligations to the Prepetition Lender and other joint and several obligations. In addition, there exist accrued intercompany payables and receivables between and among the Debtors that date back to as many as twelve years ago, which would require an extensive audit to try to confirm. The Debtors believe that any such allocations and audits could be unreliable and, moreover, would be prohibitively expensive to undertake. Further, it is unlikely that parties in interest would be able to reach a consensus on the proper allocation of Assets and liabilities among the Debtors. The resulting prohibitive costs, risks and delay would be detrimental to all creditors. In addition, the Debtors believe that creditors, in their prepetition dealings with the Debtors, did not rely on the financial independence or separate legal existence of each Debtor. Under the circumstances, substantive consolidation is appropriate pursuant to existing applicable law.

## 2. Effect of Substantive Consolidation

Assuming that substantive consolidation is authorized, on the Effective Date or such other date as may be set by an order of the Bankruptcy Court, but subject to the occurrence of the Effective Date, (i) all Intercompany Claims, for purposes of determining Distributions, shall be

---

[2] Joint administration is the process (contemplated by Bankruptcy Rule 1015(b)) whereby the proceedings of two or more affiliated debtors are conducted as part of a single proceeding for the convenience of the bankruptcy court and parties in interest. Joint administration does not affect the substantive rights of the debtors or their respective creditors and interest holders. The Chapter 11 Cases were jointly administered pursuant to the Bankruptcy Court's order authorizing such joint administration, dated April 23, 2010.

25

eliminated, (ii) all Assets and liabilities of the Debtors, including, without limitation, any and all Rights of Action of or by any of the Debtors, shall be merged into the Lead Debtor and transferred to the Liquidating Trust (described below), (iii) the guarantees of the Debtors shall be deemed eliminated so that any Claim against the Debtors and any guarantee thereof executed by another Debtor and any joint and several liability of the Debtors with one another shall be deemed to be a single Claim Against the Lead Debtor, and (iv) all duplicative Claims identical in amount and subject matter filed against more than one Debtor shall be automatically expunged so that only one Claim survives against the Lead Debtor. Notwithstanding anything to the contrary in the Plan, the substantive consolidation of the Assets and liabilities of the Debtors as described herein may not be recognized as a merger of the Debtor entities for tax purposes or state organizational purposes. Substantive consolidation of the Assets and liabilities of the Debtors shall be without prejudice to any and all legal or equitable rights and defenses of the Debtors and the Liquidating Trustee, including, but not limited to, (i) any rights of offset that the Debtors had immediately prior to the date on which substantive consolidation becomes effective, and (ii) any rights that the Estates may have in connection with Rights of Action. Additionally, substantive consolidation shall not affect the obligation of each and every on the Debtors under 28 U.S.C. § 1930 until a particular case is closed.

### 3. Reservation of Rights

The Debtors reserve the right at any time up to the conclusion of the Confirmation Hearing to withdraw their request for substantive consolidation of these Chapter 11 Cases, to seek confirmation of the Plan as if there were no substantive consolidation, and to seek confirmation of the Plan with respect to one Debtor even if confirmation with respect to the other Debtors is denied.

### D. Closing of Chapter 11 Cases of the Non-Lead Debtors

On the Effective Date or as soon thereafter as practicable, provided that the Substantive Consolidation Order has been entered, the Debtors shall file an appropriate motion with the Bankruptcy Court to close each Chapter 11 Case of the Non-Lead Debtors, consisting of Brosna, Inc. (f/k/a Fuddruckers, Inc.), Atlantic Restaurant Ventures, Inc., King Cannon, Inc., and KCI, LLC. The Chapter 11 Case of the Lead Debtor, Deel, LLC, will remain open until such time as the Liquidating Trustee determines it is appropriate to close such case and the Bankruptcy Court enters a Final Decree.

### E. Treatment of Officers and Directors

On the Effective Date, the authority, power and incumbency of the persons then acting as officers and directors of the Debtors shall be terminated and such officers and directors shall be deemed to have resigned, without further action by the Debtors. The Plan will be administered and actions will be taken in the name of the Debtors through the Liquidating Trustee, subject to the Liquidating Trust Oversight Committee (discussed in more detail below).

GSDOCS\2043892.1
RLF1 3922042v. 1~~3803871v~~

## F.    The Liquidating Trust[3]

### 1.    Establishment of Liquidating Trust

On the Effective Date, the Liquidating Trust shall be created pursuant to the Liquidating Trust Agreement to provide Distributions to Holders of Allowed Claims and, if sufficient funds are available after all Allowed Claims and Liquidation Expenses are Paid in Full, Holders of Interests.  The Liquidating Trust shall be established as a liquidating grantor trust for the sole purpose of liquidating the Estates and making Distributions to Beneficiaries, in accordance with the Plan and Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  The Liquidating Trust shall consist of all of the Debtors' Assets, including, but not limited to, Rights of Action and Cash.  As of the Effective Date, the Debtors shall have no further obligations to fund any amounts into the Liquidating Trust and shall bear no further financial obligation of any kind to the Liquidating Trustee.  The Liquidating Trust Agreement shall be filed with the Bankruptcy Court prior to the Confirmation Hearing as part of the Plan Supplement.

### 2.    Transfer of Powers

#### (a)    Debtors' Professionals

Upon the Effective Date, the Debtors' Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to any: (i) obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms; (ii) applications for and/or objections to Professional Fee Claims; and (iii) motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.  The Professionals retained by the Debtors shall not be entitled to compensation and reimbursement of expenses for services rendered in that capacity after the Effective Date, except for services rendered in connection with Fee Applications pending on the Effective Date or filed after the Effective Date.  The Liquidating Trustee, in its discretion, may retain former Professionals of the Debtors.

#### (b)    Dissolution of the Creditors' Committee

Upon the Effective Date, the Creditors' Committee shall automatically dissolve, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to any: (i) obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms; (ii) applications for and/or objections to Professional Fee Claims; (iii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iv)

---

[3]    The following contains only a summary of certain provisions governing the Liquidating Trust and Liquidating Trustee.  For a full description of the provisions governing the Liquidating Trust and Liquidating Trustee, please see the Plan and the Liquidating Trust Agreement.

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Professionals retained by the Creditors' Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered in that capacity after the Effective Date, except for services rendered in connection with Fee Applications pending on the Effective Date or filed after the Effective Date, or in connection with the Liquidating Trust. The Liquidating Trustee, in its discretion, may retain former Professionals of the Creditors' Committee.

(c)     Succession by Liquidating Trustee

On the Effective Date, the Liquidating Trustee shall be deemed appointed and shall succeed to such powers as would have been applicable to the Debtors' officers, directors and shareholders, and the Debtors shall be authorized to be dissolved without further action by their shareholders, directors, or officers. All property of the Debtors not distributed to the Holders of Allowed Claims on the Effective Date, including, without limitation, title to any moneys held in escrow or separate segregated accounts during the pendency of the Chapter 11 Cases, shall be transferred to the Liquidating Trust and managed by the Liquidating Trustee. The Liquidating Trustee shall make the Distributions required under the Plan in accordance with the Plan's terms. The Liquidating Trustee shall be deemed to be a judicial substitute for each of the Debtors or the Creditors' Committee as the party-in-interest in these Chapter 11 Cases, under the Plan or in any judicial or administrative proceeding or appeal to which a Debtor or the Creditors' Committee is a party.

**3.     Appointment of Liquidating Trustee**

The Liquidating Trustee is identified in the Plan Supplement. The Liquidating Trustee shall have the rights, powers and duties that are set forth in Section 7.2(c) of the Plan and in the Liquidating Trust Agreement. The terms of the Liquidating Trustee's employment, including the Liquidating Trustee's duties and compensation, to the extent not set forth in the Plan or the Liquidating Trust Agreement, may be set forth in an agreement to be executed between the Liquidating Trustee, Debtors, and Creditors' Committee, and any such agreement shall be filed with the Bankruptcy Court prior to the Confirmation Hearing. In general, the Liquidating Trustee shall serve as trustee of the Liquidating Trust in a fiduciary capacity. The primary duties of the Liquidating Trustee shall be to manage the Liquidating Trust and the Liquidating Trust Assets, to reconcile Claims asserted against the Debtors' Estates, to pursue and, where appropriate, settle Rights of Action held by the Debtors, and to make Distributions to Beneficiaries of the Liquidating Trust. The rights, powers and duties of the Liquidating Trustee are designed to further the ultimate goal of maximizing Distributions to Beneficiaries of the Liquidating Trust under the Plan.

**4.     Liquidating Trust Oversight Committee**

The Creditors' Committee shall designate up to three Holders of General Unsecured Claims (as identified in the Plan Supplement) as the members of the Liquidating Trust Oversight Committee, effective as of the Effective Date. The Liquidating Trust Oversight Committee shall have the specific rights and duties set forth in Section 7.2(d) of the Plan and in the Liquidating Trust Agreement and shall generally oversee the actions taken by the Liquidating Trustee.

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

## 5. Limitation of Liability

None of the members of the Liquidating Trust Oversight Committee or the Liquidating Trustee, professionals engaged by or on behalf of such parties, or any duly designated agent or representative of the Liquidating Trust Oversight Committee or the Liquidating Trustee (each solely in their capacity as such), shall be liable for the act or omission of any other agent or representative of the Liquidating Trust Oversight Committee or the Liquidating Trustee, nor shall members of the Liquidating Trust Oversight Committee or the Liquidating Trustee be liable for any action taken, suffered or omitted to be taken in their capacity as members of the Liquidating Trust Oversight Committee or the Liquidating Trustee or in reliance on any provision of the Plan or the Liquidating Trust Agreement, as applicable, other than acts or omissions resulting from members of the Liquidating Trust Oversight Committee, the Liquidating Trustee, or their respective professionals, agents or representatives (each solely in their capacity as such), willful misconduct or gross negligence (which gross negligence or willful misconduct must be determined by a Final Order of a court of competent jurisdiction). In no event shall the Liquidating Trust Oversight Committee or the Liquidating Trustee be liable or responsible for special, punitive, indirect, consequential or incidental loss or damages of any kind whatsoever to any Person (including without limitation lost profits), even if the Liquidating Trust Oversight Committee or the Liquidating Trustee has been advised of the likelihood of such loss or damage. The Liquidating Trust Oversight Committee and the Liquidating Trustee each may consult with professionals, and the advice or opinion of such professional(s) will be full and complete authorization and protection to the Liquidating Trust Oversight Committee or the Liquidating Trustee and the Liquidating Trust Oversight Committee or the Liquidating Trustee, as applicable, shall incur no liability and shall be fully indemnified for or in respect of any action taken, suffered or omitted by it and in accordance with such advice or opinion as provided for under Section 7.2(f) of the Plan. ~~Any liability of the Liquidating Trust Oversight Committee, the Liquidating Trustee, or their respective professionals, agents or representatives (each solely in their capacity as such) under the Plan or the Liquidating Trust Agreement, as applicable, will be limited to the amount of fees paid to the applicable party in connection therewith.~~

## 6. Indemnification

The Liquidating Trust shall indemnify the Liquidating Trust Oversight Committee and each of its members, the Liquidating Trustee, and their respective heirs, beneficiaries, estates, agents, employees, officers, directors, principals, professionals and other representatives, each in their capacity as such (collectively, the "Indemnified Parties") for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, Claim, demand, settlement, cost or expense (including, without limitation, the reasonable fees and expenses of their respective professionals), incurred without gross negligence or willful misconduct on the part of the Indemnified Parties (which gross negligence, or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction), for any action taken, suffered or omitted to be taken by the Indemnified Parties in connection with the acceptance, administration, exercise and performance of their duties under the Plan or Liquidating Trust Agreement, as applicable. The costs and expenses incurred in enforcing the right of indemnification in Section 7.2(f) of the Plan shall be paid by the Liquidating Trust. The provisions of Sections 7.2(e) and 7.2(f) of the Plan shall survive the termination of the Liquidating Trustee Agreement, and the resignation,

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

replacement or removal of the Liquidating Trustee or the dissolution of the Liquidating Trust Oversight Committee.

### 7. No Security; Insurance

Neither the Liquidating Trust Oversight Committee nor the Liquidating Trustee shall be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court; and, in the event that either the Liquidating Trust Oversight Committee or the Liquidating Trustee is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Liquidating Trust.

The Liquidating Trustee, however, shall be authorized under the Plan to obtain all reasonably necessary insurance coverage for itself and its respective agents, and members of the Liquidating Trust Oversight Committee, including, but not limited to, coverage with respect to the liabilities, duties and obligations of the Liquidating Trustee, which insurance coverage may, at the sole option of the Liquidating Trustee, be extended for a reasonable period after the closing of the Chapter 11 Case of the Lead Debtor and termination of the Liquidating Trust Agreement, as applicable.

### 8. Liquidation Expense Reserve

The Liquidating Trustee may, but shall not be obligated to, physically segregate and maintain separate accounts for the Liquidation Expense Reserve. The Liquidation Expense Reserve may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable the Liquidating Trustee to determine reserves and amounts to be paid to Holders of Allowed Claims.

### 9. Resignation, Death or Removal of the Liquidating Trustee

The Liquidating Trustee may resign at any time upon not less than thirty (30) days' written notice to the Bankruptcy Court and the Liquidating Trust Oversight Committee. Any party in interest may apply to the Bankruptcy Court at any time to remove the Liquidating Trustee upon a showing of cause. In the event of the death, resignation, or removal of the Liquidating Trustee, the Liquidating Trust Oversight Committee shall appoint a successor Liquidating Trustee or in the event the Liquidating Trust Oversight Committee has been dissolved or is not able to obtain the approval of a successor Liquidating Trustee, any party in interest (including, in the case of resignation, the Liquidating Trustee) may file a motion in the Bankruptcy Court to appoint a successor Liquidating Trustee. Counsel to the Liquidating Trustee shall file a notice with the Bankruptcy Court identifying any successor Liquidating Trustee. Any successor Liquidating Trustee shall not have any liability or responsibility for the acts or omissions of any of its predecessors.

### 10. Termination of the Liquidating Trust

Notwithstanding anything to the contrary herein or in the Liquidating Trust Agreement, the Liquidating Trust will terminate on or before the fifth (5th) anniversary of the Effective Date; provided, however, that, at any time within six (6) months of such termination, the Bankruptcy Court, upon motion by the Liquidating Trustee or any Beneficiary, may extend the term of the

Liquidating Trust if such extension is determined to be in the best interests of the Beneficiaries; provided, further, that such extension or extensions shall not exceed three (3) years after the initial termination date, unless the Liquidating Trustee receives a favorable ruling from the IRS, or an opinion of counsel, that such extension will not adversely affect the status of the trust as a liquidating trust.

## 11. Governance Action

Any action under the Plan to be taken by or required of the Liquidating Trustee, including, as may be appropriate, dissolution of the Debtors and the amendment of organizational documents of the respective Debtors, as applicable, shall be authorized and approved in all respects, without any requirement of further action by the directors or shareholders of any of the Debtors.

## 12. Effectuating Documents and Further Transfers

The Debtors and, subsequently, the Liquidating Trustee, with approval of the Liquidating Trust Oversight Committee, as required, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Liquidating Trust Agreement.

## 13. Preservation of Rights

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, OR IN ANY DOCUMENT, INSTRUMENT, RELEASE OR OTHER AGREEMENT ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONFIRMATION ORDER OR ANY OTHER ORDERS OF THIS BANKRUPTCY COURT, IN ACCORDANCE WITH SECTION 1123(b) OF THE BANKRUPTCY CODE AND SECTION 303 OF DELAWARE GENERAL CORPORATION LAW, ALL RIGHTS OF ACTION ARE PRESERVED NOTWITHSTANDING THE OCCURRENCE OF THE EFFECTIVE DATE OF THE PLAN. THE LIQUIDATING TRUSTEE MAY INVESTIGATE, ENFORCE, SUE ON, SETTLE OR COMPROMISE (OR DECLINE TO DO ANY OF THE FOREGOING) ANY OR ALL RIGHTS OF ACTION. THE LIQUIDATING TRUSTEE SHALL BE VESTED WITH THE RIGHTS, POWERS AND BENEFITS AFFORDED TO A "TRUSTEE" UNDER SECTIONS 704 AND 1106 OF THE BANKRUPTCY CODE.

The Plan and Liquidating Trust Agreement will effectuate the transfer of all Rights of Action to the Liquidating Trust. Such transferred Rights of Action include, without limitation, the following:

- Any and all Rights of Action of any kind or character whatsoever, whether arising prior to, on or after the Petition Date, in contract or tort, at law or in equity, or under any other theory of law, held by the Debtors or Estates, against any Person;

- Avoidance Actions arising under chapter 5 of the Bankruptcy Code;

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

- Claims arising out of breaches of duties imposed by law including, without limitation, breach of fiduciary duty by any Person owing such a duty to the Debtors, the Debtors in Possession and/or the Estates;

- Claims and defenses relating to fraud, duress, mistake and usury;

- Rights of setoff, counterclaim or recoupment;

- Rights to recharacterize and/or subordinate (under section 510 of the Bankruptcy Code) any Claim or Interest; and

- Rights and defenses relating to any Claim or Interest asserted against the Debtors and the Estates, including the right to object or seek estimation of any such Claim or Interest.

### a)     Avoidance Actions Arising Under Chapter 5 of the Bankruptcy Code

The Liquidating Trustee intends to investigate prepetition transfers of interests in the Debtors' property, including, but not limited to, payments made to creditors and insiders or Liens on Assets of the Debtors, and, if appropriate, commence Avoidance Actions to avoid and recover such transfers. The two most common Avoidance Actions are those to avoid preferential transfers and fraudulent transfers.

A "preference" is any transfer of a debtor's property, including payments of cash and pledges of security interests, made while the debtor was insolvent during the 90 days immediately prior to the commencement of the bankruptcy case (or, in the case of a transfer to or for the benefit of an "insider," one year prior to the commencement of the bankruptcy case) with respect to antecedent debts to the extent the transferee received more than it would have received on account of such pre-existing debt had transfer not been made and the debtor been liquidated under chapter 7 of the Bankruptcy Code. Under the Bankruptcy Code, a debtor is presumed to have been insolvent during the 90-day preference period. The Bankruptcy Code's preference statute can be very broad in its application because it allows the debtor to recover payments regardless of whether there was any impropriety in such payments, although there may be defenses to recovery.

During the 90-day period prior to the Petition Date, the Debtors made payments to creditors totaling at least $31,801,935.37, as indicated in the Debtors' Statements of Financial Affairs filed in these Chapter 11 Cases. The Debtors may also have made various payments to "insiders" (as defined in the Bankruptcy Code) within the one-year period prior to the Petition Date, also as set forth in the Statements of Financial Affairs. The Liquidating Trustee will examine these transfers and any other similar transfers that may not have been included in the Statements of Financial Affairs and, to the extent that the Liquidation Trustee determines it to be appropriate, may pursue actions to avoid and recover such transfers or the value of the property transferred.

Fraudulent transfers are, in most cases, transfers of interests in property, including the grant of a security interest, made with the intent to defraud creditors or made when a debtor was insolvent and in exchange for less than reasonably equivalent value. Under the Bankruptcy Code

GSDOCS\2043892.1
RLF1 3922042v. ~~13803871v~~

and under various state laws, a debtor or trustee may recover or set aside fraudulent transfers. The Liquidating Trustee will examine transfers made by the Debtors and, to the extent that the Liquidation Trustee determines it to be appropriate, may pursue actions to avoid and recover such transfers or the value of the property transferred.

The above are only illustrations and are without prejudice to the Liquidating Trustee's right to pursue any and all Avoidance Actions, which right is hereby expressly preserved.

### b) Director and Officer Claims

Under applicable non-bankruptcy laws, the Debtors may have Rights of Action arising from the prepetition conduct of the Debtors' former directors, officers, and limited liability company managers, including, but not limited to, claims arising under chapter 5 of the Bankruptcy Code and claims under state law for breach of fiduciary duties, self-dealing and breach of contract. Subject to the release provisions in the Plan, the Liquidating Trustee shall have the right, under the Plan and Liquidating Trust Agreement, to pursue Rights of Action against the Debtors' former directors, officers and limited liability company managers; provided, however, that the Liquidating Trustee must bring any such Rights of Action against certain Non-Debtor Released Parties no later than the date that is six (6) months after the Effective Date or such Rights of Action shall be deemed to be released, in accordance with the Plan.

### c) Other Rights of Action/Other Assets

In addition to the Rights of Action described above, the Debtors may possess other Rights of Action, including, but not limited to, breach of contract Claims, insurance adjustments or refunds, tax refunds, bank account surpluses, deposits and prepayments, unused retainers currently held by professionals, accounts receivable, escrows and other miscellaneous Assets. The Debtors, and the Liquidating Trustee on behalf of the Liquidating Trust, expressly reserve the right to pursue any and all Rights of Action and to seek to recover all other Assets for the benefit of the Liquidating Trust Beneficiaries.

### 14. No Revesting of Assets

Except as otherwise provided in the Plan, on the Effective Date, all Assets comprising the Estates of the Debtors shall vest in the Liquidating Trust, free and clear of all Claims, Liens, charges, encumbrances and interests of Holders of Claims or Interests (except to the extent that such Claims, Liens, charges, encumbrances and/or interests have been reinstated, or as otherwise expressly provided in the Plan), which will become the Liquidating Trust Assets, to be held for the benefit of the Beneficiaries. Upon the transfer of the Assets to the Liquidating Trust, the Debtors shall have no further interest in or with respect to Claims, the Liquidating Trust Assets or the Liquidating Trust.

### 15. Tax Treatment of Transfers to Liquidating Trust

Unless the IRS requires otherwise, any transfer of Assets to the Liquidating Trust for the benefit of the Beneficiaries, including but not limited to any transfer under Section 7.2 of the Plan, shall be treated for all federal income tax purposes by all parties involved as a deemed transfer of such Assets to the Beneficiaries followed by a deemed transfer by such Beneficiaries

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

of such Assets to the Liquidating Trust. The Assets so transferred shall be valued consistently by the Liquidating Trustee and the Beneficiaries, including all valuations used for federal income tax purposes, and such Beneficiaries shall be treated as the grantors and deemed owners of the Liquidating Trust.

### 16. Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, including, without limitation, any transfer by the Debtors to the Liquidating Trust, transfer of Liquidating Trust Assets by the Liquidating Trustee to any entity, or any transfer pursuant to merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or transfers of tangible property, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax or other similar tax. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property by the Debtors, their estates, or the Liquidating Trust on or after the Effective Date, shall be deemed to have been in furtherance of, or in connection with, the Plan.

### 17. Compensation of Liquidating Trustee and Professionals

The fees and expenses of the Liquidating Trustee and its retained professionals shall be paid from the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement and payment of such fees and expenses shall not be subject to the approval of the Bankruptcy Court.

### G. Reconciliation of Claims

### 1. Resolution of Disputed Claims

After the Effective Date, the Liquidating Trustee shall have the right to file objections to Claims and Interests, whether evidenced by a Proof of Claim or Proof of Interest or Scheduled, and to settle or withdraw such objections. The Liquidating Trustee shall also have the right to seek estimation of Claims and Interests. The Liquidating Trustee shall file and serve all objections to, or pleadings seeking estimation of, Claims and Interests upon the Holder of such Claims or Interests no later than 120 days after the later of the Effective Date or the date on which a Proof of Claim, Proof of Interest or request for payment is filed with the Bankruptcy Court (the "Claim Objection Deadline"). The Claim Objection Deadline may be extended for one sixty (60) day period by the Liquidating Trustee by filing a notice of the extended Claim Objection Deadline with the Bankruptcy Court. Thereafter, the Claim Objection Deadline may be further extended only by an Order of the Bankruptcy Court at the request of the Liquidating Trustee. The Claim Objection Deadline shall not apply to requests to reduce Claims as a result of mitigation, or objections under section 502(d) of the Bankruptcy Code.

### 2. Rights of Subordination Preserved

All rights of any Holder of a Claim or Interest (or the Liquidating Trustee) to seek or obtain subordination of another Claim or Interest based on contractual subordination or, only in the case of the Liquidating Trustee (or its designee or assignee), equitable subordination or

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

subordination under section 510(b) of the Bankruptcy Code, is expressly preserved and may be asserted at any time prior to the Final Distribution Date. The right of the Liquidating Trustee (or its designee or assignee) to seek to recharacterize a Claim as an Interest, based on the true substance of the Claim, is also expressly preserved and may be asserted at any time prior to the Final Distribution Date.

### 3. Rights of Offset and Recoupment Preserved

Except as otherwise provided in the Plan or the Confirmation Order, the Liquidating Trustee may, pursuant to applicable law, offset or recoup against any Claim or Interest (including for purposes of determining the Allowed amount of such Claim or Interest), any and all of the Claims and Rights of Action of any nature that the Liquidating Trust may hold against the Holder of such Claim or Interest; provided, however, that neither the failure of the Liquidating Trustee to do so nor the allowance of any such Claim or Interest that may be subject to setoff or recoupment shall constitute a waiver or release by the Liquidating Trustee of any setoff, recoupment or other Right of Action that he may have against such Holder.

### H. General Rules Regarding Distributions Under The Plan

### 1. Distribution Record Date

As of the close of business on the Distribution Record Date, the Claims Register as maintained by the Claims Agent, the Debtors and/or the Liquidating Trustee shall be deemed closed. The Debtors and the Liquidating Trustee shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. The Debtors and the Liquidating Trustee shall be required to recognize and deal for all purposes hereunder only with those record Holders identified on the Claims Register as of the close of business on the Distribution Record Date, to the extent applicable.

### 2. Funding of Distributions

Except as otherwise provided in the Liquidating Trust Agreement, all Distributions to Holders of Allowed Claims, and, if applicable, Allowed Interests, shall be made by the Liquidating Trustee and funded by Cash that the Liquidating Trustee, in its sole discretion, determines is available for Distributions to Holders of Allowed Claims and, if applicable, Allowed Interests, in accordance with the Plan.

### 3. No Distributions Pending Allowance

Except as expressly provided in the Plan, no Distribution provided under the Plan shall be made on account of a Claim or Interest unless and until such Claim or Interest becomes an Allowed Claim or Allowed Interest.

### 4. Establishment of Disputed Claims Reserve

For the purpose of maintaining adequate reserves for Disputed Claims, at the time of the first Distribution Date, the Liquidating Trustee shall establish, on the books and records of the Liquidating Trust, reserves equal to the Distribution(s) that would have been made to each Holder

of a Disputed Claim or, if applicable, a Disputed Interest, if such Disputed Claim or Disputed Interest were an Allowed Claim or an Allowed Interest, respectively, in the Face Amount, except as otherwise agreed by the Holder of a Disputed Claim or Disputed Interest, or as otherwise ordered by the Bankruptcy Court; however, the Disputed Claims Reserve may consist of book entries only and does not need to be a physically separate or segregated account.

### 5. Distributions After Allowance

Subject to the occurrence of the Effective Date, Distributions to each Holder of a Disputed Claim or Disputed Interest, to the extent that such Claim or Interest ultimately becomes an Allowed Claim or Allowed Interest, shall be made in accordance with the provisions of the Plan governing the Class of Claims or Interests in which such Claim or Interest is classified. On the next Distribution Date (or earlier in the discretion of the Liquidating Trustee) that is not less than ten (10) Business Days after the date that the order of the Bankruptcy Court allowing any Disputed Claim or Interest or holding that such Claim or Interest is otherwise Allowed becomes a Final Order, the Liquidating Trustee shall distribute to the Holder of such Claim or Interest any Distribution(s) that would have otherwise been made to such Holder if the Claim or Interest had been Allowed on the Effective Date, without any interest thereon. The Liquidating Trustee shall have the discretion to make Distributions from the Liquidating Trust, including with respect to amount, timing, reserves and other holdbacks. Pursuant to section 502(d) of the Bankruptcy Code, to the extent that a Holder of a Claim has received an avoidable transfer, such Holder may not be entitled to receive any Distributions until such time as such Holder has returned the avoidable transfer (including in accordance with settlement arrangements or a Final Order).

### 6. No Waiver of Right to Bring Chapter 5 Avoidance Action

The fact that a Claim or Interest is Allowed or that a Distribution is made on an Allowed Claim or Allowed Interest shall not be deemed a waiver of the Liquidating Trustee's right to bring an Avoidance Action or other Right of Action against the Holder of such Allowed Claim or Allowed Interest nor an admission that the Holder is not a transferee of a transfer avoidable under Chapter 5 of the Bankruptcy Code. Distributions made to Holders of Claims of Interest shall remain subject to disgorgement to recover on any Avoidance Action or other Right of Action.

### 7. Interest on Claims

Postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim, other than to the extent payable under section 726(a)(5) of the Bankruptcy Code.

### 8. Delivery of Distributions

Subject to Rule 9010 of the Bankruptcy Rules, and except as otherwise provided herein, Distributions to Holders of Allowed Claims and Allowed Interests shall be sent to the address of each such Holder as set forth in the Schedules filed by the Debtors with the Bankruptcy Court unless superseded by the address set forth on such Holder's proof of Claim or Interest, or in a written notice delivered to the Liquidating Trustee and its counsel and filed on the docket of the Chapter 11 Cases, to the extent that such notice is provided at least ten (10) Business Days before the applicable Distribution Date, by such Holder (or at the last known address of such Holder if

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

no Proof of Claim is filed and there is no address in the Schedules, and the Liquidating Trustee has not been notified in writing of the address). If any Distribution to any Holder is returned as undeliverable, the Liquidating Trustee may, but shall not be required to, use reasonable efforts to determine the current address of such Holder, but no subsequent Distribution to any such Holder shall be made unless and until the Liquidating Trustee has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest. The Liquidating Trustee shall retain all amounts in respect of any undeliverable Distributions made by the Liquidating Trustee until such Distributions are claimed, subject to Section 8.8 of the Plan.

### 9. Unclaimed Distributions

If any Distribution is not claimed by, or remains undeliverable under Section 8.7 of the Plan by, the Unclaimed Distribution Date applicable to such Distribution, such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such unclaimed Distribution(s) shall be available for Distribution to other Holders of Allowed Claims (or, if applicable, Allowed Interests) as part of the next Distribution, in accordance with the terms of the Plan. The Holder of any Claim or Interest for which a Distribution is deemed unclaimed property hereunder shall not be entitled to receive any future Distributions and shall be deemed to have relinquished all rights to any future Distributions and all such future Distributions shall be available for Distribution to other Holder of Allowed Claims and Allowed Interests under the Plan.

### 10. Manner of Payment Under the Plan

At the option of the Liquidating Trustee, any Distribution of Cash to be made pursuant to the Plan may be made by a check or wire transfer.

### 11. Withholding and Reporting Requirements

In connection with all Distributions made under the Plan, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state or local taxing authority. The failure of a Holder of a Claim or Interest to respond timely to a request by the Liquidating Trustee for tax withholding or reporting information will result in the Holder being treated in the same manner as the Holder of a Claim or Interest for which a Distribution is undeliverable or unclaimed.

### 12. Allocation of Plan or Liquidating Trust Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of principal indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

GSDOCS\2043892.1
RLF1 3922042v. 1~~3803871~~v

### 13. Special Provisions Regarding Insured Claims

Distributions under the Plan shall not be made on account of Allowed Claims to the extent satisfied or to be satisfied from proceeds payable under any pertinent insurance policies.

## I. Executory Contracts and Unexpired Leases

### 1. Treatment of Executory Contracts and Unexpired Leases

Under the Plan, all executory contracts and unexpired leases to which any Debtor is a party, except for any executory contract or unexpired lease that (a) has been assumed, assigned or rejected by the Debtors prior to the Effective Date, or (b) is the subject of a separate motion filed under section 365 of the Bankruptcy Code and pending on the Effective Date, shall be deemed rejected within the meaning of section 365 of the Bankruptcy Code without further action of the Bankruptcy Court. Rejection of a contract or lease pursuant to Section 9.1 of the Plan shall not constitute an admission by the Debtors or the Liquidating Trustee that any such contract or lease is, in fact, an executory contract or unexpired lease or that any Debtor or Liquidating Trust has any liability thereunder.

Notwithstanding the foregoing, any agreements, documents or instruments relating thereto that are postpetition contracts shall continue to operate unaffected by the Plan, including, without limitation, the Liquidating Trust Agreement. Further, notwithstanding the foregoing, all Insurance Policies shall remain in full force and effect unless otherwise validly terminated, and issuers of such Insurance Policies shall remain responsible for Claims, in accordance with the terms and provisions of such Insurance Policies. The Debtors do not consider Insurance Policies that have expired as of the Effective Date (whether entered into prior or subsequent to the Petition Date) to be executory contracts subject to assumption or rejection. However, the issuers of Insurance Policies shall be responsible for continuing coverage obligations thereunder, regardless of the payment status of any retrospective or other insurance premiums.

Nothing in the Plan shall constitute or be deemed to be a waiver of any Right of Action that the Debtors may hold against any Persons, including, without limitation, any issuer under any Insurance Policy of the Debtors.

### 2. Deadline for Asserting Claims Arising from Rejection of Executory Contracts and Unexpired Leases under the Plan

If the rejection of any executory contract or unexpired lease under the Plan results in damages to the other party or parties to such contract or lease, a proof of Claim for such damages must be filed with the Claims Agent **on or before the date which is thirty (30) days after the date on which notice of the Effective Date is served**. Unless otherwise ordered by the Bankruptcy Court, any Holder of a Claim for rejection damages against any of the Debtors who fails to timely file proof of such Claim shall not be treated as a creditor with respect to such Claim for the purposes of voting and Distributions, and tardily filed Claims shall be subject to disallowance under section 502(b)(9) of the Bankruptcy Code. Moreover, such Holder shall not receive further notices regarding such Claim.

38

### J. Retiree Benefits

The Debtors have not funded or maintained any retiree benefit plans, funds or programs, as defined in section 1114 of the Bankruptcy Code, for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise). To the extent any such retiree benefit plans, funds, or programs are found by the Bankruptcy Court to have existed, such plans, funds, or programs are hereby terminated and shall be deemed null and void effective immediately prior to the Petition Date. Accordingly, no such payments will be or are required to be, made pursuant to section 1129(a)(13) of the Bankruptcy Code.

### K. Releases, Exculpation and Injunction

As part of the Plan, the Debtors seek the following releases and injunctions, which, if approved, will be incorporated into the Confirmation Order.

#### 1. Releases by the Debtors

**As of the Effective Date, the Debtors, the Estates and their respective successors and assigns, including the Liquidating Trustee, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released the Released Parties from any and all Rights of Action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, agreement, event or occurrence, taking place on or prior to the Effective Date in any way relating to any Debtor or the Chapter 11 Cases, including, but not limited to the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any version of the Plan, or the property to be distributed under the Plan, the Disclosure Statement concerning the Plan, any contract, employee pension, retirement or other benefit plan, instrument, release or other agreement or document created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party, or any other act taken or omitted to be taken in connection with the Debtors' Chapter 11 Cases, except for Rights of Action against any Released Party resulting from the willful misconduct or gross negligence of such Released Party as determined by Final Order of a court of competent jurisdiction.**

#### 2. Releases by Holders of Claims

**As of the Effective Date, to the fullest extent permitted by applicable law, each Holder of a Claim who does not ~~vote to reject~~ opt out of the releases provided by Section 12.2 of_the Plan shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive, and discharge the Released Parties and the Non-Debtor Released Parties from any and all Claims, demands, rights, defenses, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets, powers and privileges of any kind or character whatsoever, suspected or unsuspected, whether arising on or prior to the**

GSDOCS\2043892.1
RLF1 3922042v. 1~~3803871v~~

Effective Date, in contract or in tort, at law or in equity, or under any other theory of law, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, based in whole or in part upon any act or omission, transaction, agreement, event or occurrence, taking place on or prior to the Effective Date relating to any Debtor or the Chapter 11 Cases, including, but not limited to any contract, employee pension, retirement or other benefit plan, or any other act taken or omitted to be taken in connection with the Debtors' business operations, Assets, liabilities or employees, or the Chapter 11 Cases, except for Claims and causes of action against any Released Party or Non-Debtor Released Party resulting from the willful misconduct or gross negligence of such Released Party or Non-Debtor Released Party, respectively, as determined by Final Order of a court of competent jurisdiction.

Holders of Class 4 Claims may opt-out of releasing Non-Debtor Released Parties under Section 12.2 of the Plan, whether or not such Holders vote to reject the Plan, by checking the appropriate box on the Ballot. Each Holder of a Claim granting a release under Section 12.2 of the Plan shall be deemed to have accepted as its sole recourse on account of such released Claims and causes of action its right to receive Distributions on its Allowed Claim pursuant to the Plan.

3. Exculpation

As of From and after the Effective Date, the Released Parties, the Non-Debtor Released Parties, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Oversight Committee and its members, and any property of such parties, or direct or indirect predecessor in interest to any of such parties, shall not have or incur any liability to any Person for any act taken or omission occurring action taken, suffered or omitted to be taken in connection with or related to the Debtors, the Estates, the Liquidating Trust or the Chapter 11 Cases, including, but not limited to: (a) formulating, preparing, disseminating, implementing, confirming, consummating or administering (a) the Plan (including soliciting acceptances or rejections thereof); , (b) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan, and; (c) any Distributions made pursuant to the Plan, except, in all cases, for acts or omissions constituting willful misconduct or gross negligence as determined by Final Order of a court of competent jurisdiction, and in all respects such parties shall be entitled to rely upon the advice of professionals with respect to their duties and responsibilities under the Plan, and such reliance shall form an absolute defense to any Claim, cause of action, or liability. Without limiting the generality of the foregoing, each of the Released Parties, the Non-Debtor Released Parties, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Oversight Committee and its members, shall be entitled to and granted protections of section 1125(e) of the Bankruptcy Code.

4. Injunction

The Confirmation Order shall provide, among other things, that all Persons who have held, hold or may hold Claims against or interests in any of the Released Parties are, with respect to any such Claims or interests, permanently enjoined from and after the

Confirmation Date from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors or any of their property; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors or any of their property; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or any of their property; (d) asserting any right of setoff, directly or indirectly, against any obligation due by the Debtors or any of their property, except as contemplated or allowed by the Plan; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan; and (f) prosecuting or otherwise asserting any right, Claim or cause of action released pursuant to the Plan; **provided, however,** that nothing in Section 12.4 of the Plan shall be construed to enjoin any of the Debtors' Rights of Action, whether commenced by the Debtors, the Liquidating Trust or the Liquidating Trustee, that may exist in connection with any Insurance Policy of any of the Debtors.**

### L. Certain Other Plan Provisions

#### 1. Payment of United States Trustee Fees

All outstanding quarterly fees due to the United States Trustee, pursuant to 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date. Thereafter, the Liquidating Trust shall be responsible for the payment of quarterly fees to the United States Trustee as to each Debtor until such time as such Debtor's case is closed.

#### 2. Establishment of Bar Dates for Administrative Expense Claims Other Than Section 503(b)(9) Claims

Except for Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code, which Claims were subject to the August 19, 2010 Bar Date or, if applicable, the October 4, 2010 Supplemental Bar Date, the deadline for filing requests for allowance of Administrative Claims, other than for statutory fees of the United States Trustee, shall be the date that is thirty (30) days after the date on which notice of the Effective Date is served (the "Administrative Claims Bar Date"). This shall also be the deadline by which Professionals must file final Fee Applications or other requests for payment of Professional Fee Claims incurred through the Effective Date (to the extent not already Allowed).

#### 3. Amendments to Claims; Filing of Claims after Effective Date

After the Effective Date, except as expressly permitted by the Plan or order of the Bankruptcy Court, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or consent of the Liquidating Trustee, and any such Claim or amendment shall, unless the Bankruptcy Court otherwise directs, be Disallowed in full and expunged without further order of the Bankruptcy Court.

GSDOCS\2043892.1
RLF1 3922042v. ~~13803871v~~

### 4. Post-Confirmation Jurisdiction of the Bankruptcy Court

Notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction as is legally permissible, as described in more particular detail in Article XIII of the Plan.

## VII.  CONFIRMATION OF THE PLAN

### A.  Introduction

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It requires further that a plan proponent's disclosures concerning such plan have been adequate and have included information concerning all payments made or promised by the debtor in connection with the plan.

To confirm the Plan, the Bankruptcy Court must find that all of these and certain other requirements have been met. Thus, even if the requisite vote is achieved for Class 4, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

### B.  Conditions Precedent to the Effective Date

The Effective Date may not occur, and thus the Plan will not become effective, unless: (a) the Confirmation Order, in a form and substance satisfactory to the Debtors (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld), is entered and becomes a Final Order; (b) the Substantive Consolidation Order is entered and becomes a Final Order; and (c) all actions and documents necessary to implement the provisions of the Plan shall have been effected or executed and delivered.

The Debtors (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld) may at any time, without leave or order of the Bankruptcy Court and without any other formal action, waive or modify conditions (b) and (c) above, or the requirement that the Confirmation Order be a Final Order (unless such Confirmation Order is subject to a stay).

If the Plan is confirmed, the Debtors expect the Effective Date to occur not later than thirty (30) days after the Confirmation Date.

### C.  Acceptance

The Plan is predicated on Class 4 voting to accept the Plan. Provided Class 4 accepts the Plan and the Plan otherwise complies with the statutory requirements of section 1129(a) of the Bankruptcy Code, the Debtors will have the right to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code as to those Classes deemed to reject the Plan. Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or impaired interests if a bankruptcy court finds that the plan does not

discriminate unfairly and is "fair and equitable" with respect to the rejecting class or classes. This procedure is commonly referred to in bankruptcy parlance as "cram down." Because certain Impaired Classes will be deemed to have rejected the Plan by virtue of receiving no Distributions thereunder, the Debtors will seek a cram down of such Classes at the Confirmation Hearing.

## D.    Plan Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponents of the plan have complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponents under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

- The proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponents must have disclosed the identity of any insider that the reorganized debtors will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims or interests has either accepted the plan or is not impaired under the plan.

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims regular installment cash payments, over a period ending not later than five years after the date the order for

43

relief was entered in the bankruptcy case, of a total value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan (unless, as here, such liquidation is proposed in the plan).

Subject to receiving the requisite acceptance of the Plan by Class 4, Bankruptcy Code and the "cram down" of Classes not receiving any Distribution under the Plan, the Debtors believe that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

## 1. Best Interests of Holders of Claims and Interests; Liquidation Analysis

The "best interests of creditors" test requires that a bankruptcy court find either that all members of each impaired class have accepted a plan or that each holder of an allowed claim or interest of each impaired class of claims or interests will receive or retain under a plan on account of such claim or interest property of a value, as of the effective date of such plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what Holders of Claims would receive if the Debtors were hypothetically liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Debtors' Chapter 11 cases were converted to a chapter 7 case and each of the respective Debtor's Assets were liquidated by a chapter 7 trustee. The proceeds available for satisfaction of Allowed Claims would consist of the Cash held by the Debtors, as well as any remaining Assets reducible to Cash, at the time of the conversion to chapter 7. Any such Cash amount would then be reduced by the amount of any Allowed Secured Claims, the costs and expenses of the chapter 7 case and additional Allowed Administrative Claims, and other priority Claims that may result from the use of chapter 7 for the purposes of liquidation. The costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed in the chapter 7 case, such as compensation for the Debtors' and Creditors' Committee's Professionals. These Claims would be paid in full out of the Debtors' Cash before the balance of the Cash would be made available to Holders of General Unsecured Claims. In addition, other Claims might arise upon conversion to a chapter 7 case that might dilute the Cash available to Holders of Allowed General Unsecured Claims. Moreover, additional Claims against the Debtors' Estates might arise as the result of the

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

establishment of a new bar date for the filing of Claims in the chapter 7 cases of the Debtors. To the extent that the chapter 7 trustee (or trustees) does not seek substantive consolidation, creditors of the Debtors would likely see further dilution as a result of the prohibitive expense in attempting to allocate the Assets and liabilities of each of the Debtors from the unitary enterprise that operated the Fuddruckers and Koo Koo Roo businesses prepetition. Nevertheless, the possibility that a chapter 7 trustee would not seek substantive consolidation, and that such prohibitive expense would be incurred, exists.

The liquidation analysis attached hereto as <u>Exhibit C</u> provides a summary of the proceeds from a liquidation of the Debtors' Assets available to Holders of Allowed Claims and Allowed Interests, assuming a chapter 7 liquidation in which one or more trustees appointed by the Bankruptcy Court would liquidate each of the Debtors' Estates. In summary, the Debtors believe that Holders of Allowed Claims and Allowed Interests would receive less in a chapter 7 liquidation than they would receive under the Plan. That belief is based upon, among other factors: (a) the additional administrative expenses involved in the appointment of a trustee and a new set of attorneys, accountants and other chapter 7 professionals not familiar with the Debtors or the Claims and Interests of the Debtors; (b) the substantial time which would elapse before creditors would receive any distribution in respect of their Claims due to a trustee's need to become familiar with the Chapter 11 Cases and the Debtors' books and records, and the trustee's duty to conduct independent investigations; (c) any additional General Unsecured Claims, or other Claims, that may be asserted against the Debtors after conversion to chapter 7; and (d) the substantial cost, including the prohibitive cost of not substantively consolidating the Assets and liabilities of the Debtors, and delay which can be avoided by a largely consensual plan.

### 2. Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor unless such liquidation or further reorganization is proposed in the plan. The Plan is a liquidating plan. Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

### 3. Acceptance by Impaired Classes

Under section 1124 of the Bankruptcy Code, a class is "impaired" under a plan unless, with respect to each claim or interest in such class, such plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law which entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based upon such claim or interest. A class that is not impaired under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Under the Plan, Classes 1 (Priority Non-Tax Claims), 2 (Secured Claims) and 3 (Convenience Claims) are Unimpaired and Classes 4 (General Unsecured Claims), 5 (Non-Compensatory Penalty Claims), 6 (Subordinated Claims) and 7 (Interests) are Impaired. Under the Plan, it is not

expected that Holders of Class 5 or 6 Claims (Non-Compensatory Penalty Claims and Subordinated Claims, respectively) or Holders of Class 7 Interests will receive any Distributions.

### 4.    Cram Down

**PROVIDED THAT CLASS 4 HAS VOTED TO ACCEPT THE PLAN, THE DEBTORS WILL SEEK TO CRAM DOWN THE PLAN AGAINST CLASSES OF HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO HAVE VOTED TO REJECT THE PLAN.**

If all the applicable requirements for confirmation of a plan are met as set forth in sections 1129(a)(1) through (16) of the Bankruptcy Code, except that one or more of classes of impaired claims or interests have failed to accept such plan pursuant to section 1129(a)(8) of the Bankruptcy Code, a debtor may nevertheless request that the bankruptcy court confirm the plan over the dissenting class or classes in accordance with section 1129(b) of the Bankruptcy Code, a process referred to as "cram down." Because certain Impaired Classes will be deemed to have voted to reject the Plan by virtue of receiving no Distributions thereunder, the Debtors will seek a "cram down" of such Classes at the Confirmation Hearing. Under the "cram down" provisions of the Bankruptcy Code set forth in section 1129(b) of the Bankruptcy Code, the Debtors must demonstrate to the Bankruptcy Court that (i) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class, (ii) the Plan is fair and equitable with respect to each non-accepting Impaired Class, and (iii) at least one Impaired Class has accepted the Plan.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the Holders of each type of Claim and by treating each Holder of a Claim in each Class identically, the Plan has been structured so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims or interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before any junior class may receive anything under the plan.

The Debtors believe that the Plan satisfies the "cram down" requirements of the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

GSDOCS\2043892.1
| RLF1 3922042v. 1~~3803871~~v

## VIII. EFFECT OF CONFIRMATION

### A. Discharge

Pursuant to section 1141(d)(3) of the Bankruptcy Code, because the Plan is a liquidating plan, occurrence of the Effective Date will not discharge the Claims against the Debtors; provided, however, that no Holder of an Allowed Claim or Interest may, on account of such Claim or Interest, seek or receive any payment from, or seek recourse against, the Debtors, the Liquidating Trust, the Liquidating Trustee, the Released Parties, their respective property, successors and assigns, except as expressly provided in the Plan.

### B. Binding Effect

On and after the Effective Date, the provisions of the Plan shall bind all present and former Holders of Claims against, or Interests in, the Debtors and such Holders' successors and assigns, whether the Claim or Interest of such Holder is Impaired under the Plan and whether such Holder has filed a Proof of Claim or Interest or accepted the Plan. The Confirmation Order shall provide that the terms and provisions of the Plan and the Confirmation Order shall survive and remain effective after entry of any order converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, and the terms and provisions of the Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

## IX. CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A. Allowance of Claims

Distributions to Beneficiaries will be affected by the pool of Allowed Claims and the amount of Liquidation Expenses, in particular, the costs associated with the investigation and prosecution of Rights of Action and reconciliation of Disputed Claims. However, the Debtors have not yet fully analyzed the Claims filed against their Estates. Upon the completion of further analyses of the Proofs of Claim, which will likely lead to Claims objection litigation and related matters, the total amount of Claims that ultimately become Allowed claims in these Chapter 11 Cases may differ from the Debtors' estimates, which are reflected in this Disclosure Statement, and such difference could be material. With respect to Class 4 Claims in particular, the actual ultimate aggregate amount of Allowed General Unsecured Claims in such Class may differ significantly from the estimate set forth herein. Accordingly, the amount of Pro Rata Distributions that may be received by a particular Holder of an Allowed General Unsecured

Claim may be either adversely or favorably affected by the aggregate amount of Claims ultimately allowed in Class 4.

**B.    Post-Confirmation Date Administrative Claims**

Because the Administrative Claims Bar Date will occur after the Confirmation Date, there is a risk that Administrative Claims that are, to date, unknown to the Debtors or the Creditors' Committee could be filed and, subsequently, Allowed, which could adversely affect Distributions to Beneficiaries.

**C.    Litigation Risks**

Other than as set forth herein, the Debtors do not believe that there are any risks respecting pending or threatened litigation against them that would significantly or materially negatively affect confirmation of the Plan.

**D.    IRS Audit**

The IRS is currently in the process of auditing tax returns filed by KCI, LLC for the years 2007 through 2009.  This audit may reveal liabilities owed by the Debtors that could give rise to Priority Tax Claim, which could have an adverse effect on Distributions to Beneficiaries.

**E.    Objection to Classifications**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Notwithstanding anything to the contrary herein, the Debtors and the Liquidating Trustee expressly reserve the right to object to the amount, priority or classification of any Claim.

**F.    Non-confirmation of the Plan**

Even if Class 4 (the only voting Class) accepts the Plan, there is a risk that the Bankruptcy Court may not confirm the Plan if the cram down requirements discussed above are not met.  The Debtors believe that the Plan satisfies all the requirements for confirmation of a liquidating plan under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

### G.  Delays of Confirmation and/or Effective Date

Any delay in confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Claims.  These or any other negative effects of delays in confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court and reduce recoveries to Beneficiaries.

### X.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS, we inform you that to the extent that this Article X and attachments are considered to be U.S. federal tax advice, such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.**

### A.  General

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE.  THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.  NO RULING HAS BEEN REQUESTED FROM THE IRS AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.

THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS AND INTERESTS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTORS.  THIS DESCRIPTION DOES NOT DISCUSS THE POSSIBLE STATE TAX OR NON-U.S. TAX CONSEQUENCES THAT MIGHT APPLY TO THE DEBTORS OR TO HOLDERS OF CLAIMS AND INTERESTS.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

OR INTEREST. HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

## B.     Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims and Interests will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder receives Distributions under the Plan in more than one taxable year, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim or Interest.

### 1.      Recognition of Gain or Loss

In general, a Holder of an Allowed Claim or Interest should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim or Interest less the Holder's tax basis in the Claim or Interest. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized. The Holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received by the Holder under the Plan on the Effective Date or a subsequent Distribution Date, less the amount (if any) treated as interest, as discussed below.

### 2.      Post-Effective Date Distributions

Because certain Holders of Allowed Claims, including Disputed Claims, that ultimately become Allowed Claims, may receive Distributions after the Effective Date, the imputed interest provisions of the Internal Revenue Code may apply and cause a portion of the subsequent Distributions to be treated as interest. Additionally, because Holders may receive Distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial Distribution, any loss and a portion of any gain realized by the Holder may be deferred. All Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

### 3.      Receipt of Interest

Holders of Allowed Claims will recognize ordinary income to the extent that they receive Cash or property, including interests in the Liquidating Trust, that is allocable to accrued but unpaid interest which the Holder has not yet included in its income. The Holder may take the position that, consistent with Section 8.16 of the Plan, the amounts received pursuant to the Plan are allocable first to principal, up to the full amount of principal, and only then to interest. However, the proper allocation of Plan consideration between principal and interest is unclear and Holders of Allowed Claims should consult their own tax advisors in this regard.

### 4. Bad Debt or Worthless Securities Deduction

A Holder who receives in respect of an Allowed Claim or Allowed Interest an amount less than the Holder's tax basis in the Claim or Interest may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Internal Revenue Code or a worthless securities deduction under section 165(g) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims and Allowed Interests, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### C. Treatment of the Liquidating Trust and its Beneficial Owners

As of the Effective Date, there will be a deemed transfer of the Debtors' Assets from the Debtors to Holders of Allowed Claims (and Allowed Interests) (the "Beneficiaries") and then from the Beneficiaries to the Liquidating Trust. The Liquidating Trustee will have the obligation to make Distributions to the Beneficiaries from the Liquidating Trust in accordance with the Plan. The Debtors believe that the Liquidating Trust will qualify as a liquidating trust, as defined in Treasury Regulation section 301.7701-4(d), and in accordance with Rev. Proc. 94-95 would therefore be taxed as a grantor trust, of which the Beneficiaries will be treated as the grantors. Thus, no tax should be imposed on the Liquidating Trust itself on the income earned or gain recognized by the Liquidating Trust. Instead, the Beneficiaries would be taxed on their allocable shares of such income and gain in each taxable year, whether or not they received any Distributions from the Liquidating Trust in such taxable year. The Liquidating Trust would pay federal, state and local tax on the taxable income and gain allocable to Holders of Disputed Claims on behalf of such Holders and, when such Disputed Claims were ultimately resolved, Holders whose Disputed Claims were determined to be Allowed Claims would receive Distributions from the Liquidating Trust net of taxes which the Liquidating Trust had previously paid on their behalf.

If the Internal Revenue Service succeeds in requiring a different characterization of the Liquidating Trust, the Liquidating Trust could be subject to tax on all of its net income and gains, with the result that the amounts distributable to the Beneficiaries could be reduced.

Each Beneficiary will be required to include in income the Beneficiary's allocable share, if any, of any income, gain, loss, deduction or credit recognized by the Liquidating Trust, including interest or dividend income earned on bank accounts and other investments. If the Liquidating Trust sells or otherwise disposes of a Liquidating Trust Asset in a transaction in which gain or loss is recognized, each Beneficiary will be required to include in income gain or loss equal to the difference between (i) the Beneficiary's pro rata share of the Cash or property received in exchange for the asset sold or otherwise disposed of, and (ii) the Beneficiary's adjusted basis in the Beneficiary's pro rata share of the asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Beneficiaries will be required to report any income or gain recognized on the sale or other disposition of a Liquidating Trust Asset whether or not the Liquidating Trust distributes the sales proceeds currently and may, as a result, incur a tax liability before the Holder receives a

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

Distribution from the Liquidating Trust. The Liquidating Trustee will distribute annually IRS Form 1041s (Schedule K-1s) with the Beneficiary's income or gain/loss allocation.

## D. Information Reporting and Withholding

Under the Internal Revenue Code's backup withholding rules, the Holder of an Allowed Claim may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan unless the Holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## XI. ALTERNATIVES TO LIQUIDATING PLAN

The Debtors have ceased all business operations and have sold substantially all of their Assets. There is no alternative to the Plan that would envision a continuation of the Debtors as an ongoing business. Since there is no alternative to liquidation, the Plan embodies what the Debtors consider to be the best and most cost-effective method of completing the orderly liquidation and distribution of the Debtors' Assets to Holders of Allowed Claims and, if all Allowed Claims are Paid in Full, to Holders of Allowed Interests. If the Plan is not confirmed, then the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In that event, the Debtors would cease their liquidation and distribution efforts and a trustee would be appointed to liquidate and distribute the remaining Assets of the Estates. The Debtors believe that a liquidation under chapter 7 would likely result in a lower return to Holders of Allowed Claims and Interests, and would significantly delay distributions.

## XII. CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan will provide each Holder of an Allowed Claim or Interest with a greater recovery than it would receive if the Debtors were to liquidate and distribute their Assets under chapter 7 of the Bankruptcy Code, in which case there would likely be a delay in making distributions and creditors would likely receive smaller distributions. As indicated in its letter to Holders of Claims attached hereto as Exhibit D, the Creditors' Committee supports the Plan. Thus, the Debtors and the Creditors' Committee recommend confirmation and implementation of the Plan as the best possible outcome for creditors.

The Debtors urge Holders of Class 4 Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Balloting Agent not later than _____, 2011 at 4:00 p.m. (Prevailing Pacific Time).

GSDOCS\2043892.1
RLF1 3922042v. 13803871v

Respectfully submitted,

**Deel, LLC**

By:_____
Name: Gregor Grant
Title:  Chief Financial Officer

**Brosna, Inc.**

By:_____
Name:  Gregor Grant
Title:  Chief Financial Officer

**KCI, LLC**
By:_____
Name:  Gregor Grant
Title:  Manager

**King Cannon, LLC**
By:_____
Name:  Gregor Grant
Title:  Director

**Atlantic Restaurant Ventures, Inc.**
By:_____
Name:  Gregor Grant
Title:  President

RLF1 3922042v. 1